```
 1                IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION
                   CASE NO. 1:17-cv-22437-KMM
 3


 4   CCA BAHAMAS, LTD., a foreign
     limited company,
 5
              Plaintiff,                July 19, 2017
 6                                      9:25 a.m.
          vs.
 7

     CONQUEST FINANCIAL MANAGEMENT
 8   CORPORATION,d/b/a Source Outdoor,
     a Florida corporation,
 9
              Defendants.               Pages 1 THROUGH 234
10   _____

11
                 TRANSCRIPT OF EVIDENTIARY HEARING
12           BEFORE THE HONORABLE ANDREA M. SIMONTON
                 UNITED STATES MAGISTRATE JUDGE
13

14   Appearances:

15   FOR THE PLAINTIFF:   SQUIRE PATTON BOGGS, US, LLP
                          ALVIN BRUCE DAVIS, ESQ.
16                        200 South Biscayne Boulevard, 41st Floor
                          Miami, Florida 33131-2398
17

18   FOR THE DEFENDANT:   FELDMAN LAW
                          ANDREW MARTIN FELDMAN, ESQ.
19                        7700 North Kendall Drive, Suite 809
                          Miami, Florida 33156
20

21   COURT REPORTER:      Yvette Hernandez
                          U.S. District Court
22                        400 North Miami Avenue, Room 10-2
                          Miami, Florida 33128
23                        yvette_hernandez@flsd.uscourts.gov

24

25
```

```
1                      I N D E X

2    Certificate.................................... 234
     Plaintiff opening ............................   18
3    Defendant opening ............................   29
     Plaintiff rests .............................. 169
4    Defendant rests .............................. 220
     Plaintiff closing ............................ 220
5    Defendant closing ............................ 222
     Plaintiff rebuttal ........................... 226

6

7                  W I T N E S S
     ON BEHALF OF THE PLAINTIFF:                    PAGE

8
     NATALIA DWORNIK
9    DIRECT EXAMINATION BY MR. DAVIS                  61
     CROSS-EXAMINATION BY MR. FELDMAN                 69
10   REDIRECT EXAMINATION BY MR. DAVIS               156
     RECROSS EXAMINATION BY MR. FELDMAN              167

11
     ON BEHALF OF THE DEFENDANT:
12
     GERALD SHVARTSMAN
13   CROSS-EXAMINATION BY MR. DAVIS                  176
     REDIRECT EXAMINATION BY MR. FELDMAN             213

14

15                E X H I B I T S
     PLAINTIFF'S EX. NO.:              OFFERED  ADMITTED
16       4      -Purchase order issued by CCA   62        62
                Bahamas to Source Outdoor
17       5      -Demand letter dated 5/3/17     63        63
         3      -Affidavit N. Dwornik           63        63
18       6      -Attachment A to Supp. Memo     63        64
                Confirmation of Payment from CCA
19              to Source
         7      -Attachment B to Supp. Memo     64        64
20              Receipt of Payment from Defendant
         8      -Attachment C to Supp. Memo     64        65
21              Notice of Order in Production
         9      -Attachment D to Supp. Memo     65        65
22              Copy of Dft. Advertisement of
                Chairs at Issue
23      15      -Supp. Affidavit, N. Dwornik    65        65
        11      -Ex. 1 to Supp. Affidavit       66        66
24              Email 12/7/16 req. details of
                previous transactions
25
```

Yvette Hernandez, Official Court Reporter

400 North Miami Avenue, 10-2

Miami, Florida 33128

(305) 523-5698

| 1 | 12 | -Ex. 2 to Supp. Affidavit | 67 | 67 |
| 2 | | Email 12/12/16 req. further information | | |
| 3 | 13 | -Ex. 3 to Supp. Affidavit | 68 | 68 |
| | | Photo of chair previously purchased | | |
| 4 | 14 | -Ex. 4 to Supp. Affidavit | 69 | 69 |
| | | Dft. Ad with photo of chair being offered for sale | | |

| | **DEFENDANT'S EX. NO.:** | | OFFERED | ADMITTED |
|---|---|---|---|---|
| 6 | 6 | -Article attached as Exhibit A to Response | 103 | 104 |
| | 20 | -Email of 3/8/17 with attachment | 122 | 122 |
| 7 | 14 | -December 7, 2016 Emails (Exhibit B to Shvartsman Affidavit) | 128 | 128 |
| 8 | 15 | -Emails of February 1, 7, 8, 2017 (Exhibit C t Shvartsman Affidavit) | 128 | 128 |
| 9 | 21 | -Deposit Detail Report w/Check Composites | 144 | 144 |
| 10 | 16 | -Emails of April 7, 12, 19, 2017 (Exhibit D to Shvartsman) | 146 | 146 |
| 11 | 5 | -Affidavit of Gerald Shvartsman | 170 | 170 |
| | 22 | -Email of 11/28/16 with Attachment | 173 | 174 |
| 12 | 17 | -Conquest sales history Spreadsheet (Exhibit E to Shvartsman Affidavit) | 173 | 174 |
| 13 | 18 | -Email of 7/17/17 of Images of Chair (Exhibit F to Shvartsman Affidavit) | 173 | 174 |
| 14 | 19 | -Email of 7/22/15 (Exhibit G to Shvartsman Affidavit) | 173 | 174 |

```
 1        (Call to order of the Court, 9:25 a.m.)

 2            THE COURT:  Good morning.  Please be seated.

 3            MR. DAVIS:  Good morning, Your Honor.

 4            MR. FELDMAN:  Good morning, Your Honor.

 5            COURTROOM DEPUTY:  Calling Case Number 17-22437,

 6    Civil, Chief Judge Moore, CCA Bahamas Ltd. v. Conquest

 7    Financial Management Corp.

 8            Counsel, would you please note your appearances for

 9    the record.

10            MR. DAVIS:  Alvin Davis for the Plaintiff, CCA Bahamas

11    Ltd.

12            MR. FELDMAN:  And Andrew Feldman on behalf of the

13    Defendant Conquest Financial Management Corp., Judge.

14            THE COURT:  Thank you.

15            And can you identify the persons who are seated with

16    you at counsel table.

17            Mr. Davis?

18            MR. DAVIS:  Yes, Your Honor.  With me is Natalia

19    Dwornik.  She is our affiant.

20            THE COURT:  Okay.  And Mr. Feldman?

21            MR. FELDMAN:  Thank you, Your Honor.

22            With me to my right here is Gerald Shvartsman, who is

23    the CEO of Defendant Conquest, and he's also submitted an

24    affidavit in this case.  And I also have in the courtroom --

25    just so the Court knows, Candice McCarthy sitting behind me.
```

```
1              THE COURT:  Okay.  As I said during our telephonic

2   status conference, the way that I want to proceed in this case

3   is have the parties present as defined exhibits, so that we

4   have a complete clear record of these proceedings, the

5   affidavits that you want me to consider, as well as any

6   exhibits which are referred to in the affidavits.  And I will

7   proceed on the basis of the affidavit setting forth the primary

8   position of the Plaintiff's and the Defendant's response.  And

9   then I'll permit cross-examination of any of the affiants upon

10  whom you rely.

11             I'll permit an opening statement that can highlight

12  various provisions of the affidavits and point -- you know, in

13  a sense an opening statement regarding the case.  And then

14  proceed with the -- with cross-examination, if there is a

15  desire for cross-examination.

16             You had something you want to say, Mr. Feldman?

17             MR. FELDMAN:  If you don't mind, Your Honor, I'd like

18  to take five, maximum 10 minutes of the Court's time to address

19  one issue, if I may.

20             Per the Court's scheduling order as I read it, Your

21  Honor directed that the Plaintiff file any additional

22  affidavits and supplemental materials that they wanted by last

23  Friday.  Your Honor then directed -- obviously, we're on a very

24  expedited basis.  My client is not even required to respond to

25  the complaint yet -- directed that we file a memorandum and any
```

1    affidavits or any documentation evidence that we may have to

2    support by Monday.  Your Honor then gave the Plaintiff an

3    opportunity to file a reply by 5:00 yesterday afternoon.

4          They filed their initial documentation -- granted,

5    just a few minutes -- but a few minutes late on Friday, not

6    necessarily in strict compliance with the Court's order.  But

7    then yesterday we don't get a reply as one would expect.  We

8    get an affidavit.  We get an affidavit with additional

9    information, additional documentation, as we're preparing to

10   come in here for an evidentiary hearing.  I just want to go on

11   record and say that I believe that's inappropriate.  I believe

12   it's not in keeping with what this Court's scheduling order

13   was.  It's not in keeping with what a reply is.  A reply is a

14   memorandum and response.  They obviously chose not to file

15   that, but file a new affidavit, new information -- assuming I

16   went to sleep at 11:00 at night, which anyone in their right

17   mind would do before they come in here for a 9:00 evidentiary

18   hearing -- effectively six hours prior to coming in here on an

19   evidentiary hearing.

20         I don't believe that's appropriate.  I think the Court

21   should consider either limiting what they offer in this hearing

22   to the issues that they have simply raised in that affidavit,

23   since they've clearly chosen to seek cross-examination by way

24   of an affidavit, or strike that affidavit completely.

25         THE COURT:  Mr. Davis?

```
 1            MR. DAVIS:  Yes, Your Honor.

 2            We had the right to file a supplemental memorandum, to

 3   which we would have attached the affidavit.  We elected not to

 4   bother with an additional memorandum and simply submitted the

 5   affidavit.  So we were thinking let's not do an additional

 6   memorandum because the only thing the memorandum would do would

 7   be to recite what's in the affidavit.  So we submitted the

 8   affidavit.  There are no surprises in the affidavit as to the

 9   materials that were referred to.

10            MR. FELDMAN:  Judge, may I say something briefly in

11   response?

12            THE COURT:  Yes.

13            MR. FELDMAN:  Your order did not give them the ability

14   to file a supplemental affidavit.

15            THE COURT:  Actually, it did because what I said was

16   that they could respond to any of the factual allegations and

17   if they needed to present additional facts they could do so in

18   their reply in response to whatever it was that you presented.

19   So I mean, technically they should have included a cover sheet

20   and the cover sheet should have been captioned a reply, and it

21   could have said:  "In reply to the allegations made by the

22   Defendant, we are submitting the affidavit of Natalia Dwornik."

23            Now, that wasn't done, and it should have been done.

24   Because merely filing an affidavit in a vacuum is not the

25   appropriate procedural way to bring something to the Court's
```

```
 1    attention.  But then, I'll look at the prejudice.  And what is
 2    it you want?  Do you want to continue this hearing so that you
 3    have additional time?  Are you suggesting that the contents of
 4    the affidavit do not constitute a reply, but constitute
 5    additional, you know, affirmative evidence on the part of the
 6    Plaintiff?
 7              I'm not going to strike it.  I will tell you that
 8    right now.
 9              MR. FELDMAN:  Understood, Your Honor.
10              THE COURT:  But I will consider other relief that you
11    may feel appropriate.
12              MR. FELDMAN:  May I have one second to chat with my
13    client, Judge?
14              THE COURT:  Sure.
15         (Pause in proceedings.)
16              MR. FELDMAN:  Judge, I mean, in speaking with my
17    client last night, yes, we would like a little bit of
18    additional time.  My client believes they can provide
19    additional information in response to this affidavit that may
20    be material to the issues here and maybe even from other
21    individuals.  Correct?  That may be material to some of the
22    issues that have been raised here in the affidavit, where they
23    claim, for example, they didn't receive a reconciliation from
24    us or they raise issues as to the circumstances related to the
25    chairs that are in question here.
```

```
 1          So yes, if the Court's inclined to do it, we request a
 2    short continuance of this hearing.
 3          THE COURT:  What do you mean when you say you request
 4    a short continuance of the hearing?  What is short in one
 5    person's mind is long in the other.
 6          MR. FELDMAN:  Understood, Judge.
 7          Give me one second, if I may pull up my calendar, Your
 8    Honor, to take a look.
 9          MR. DAVIS:  Your Honor, if I may --
10          THE COURT:  Well, I want to finish with him, and I'm
11    not going to rule.  I'm going to give you a chance to respond
12    to him.
13          MR. FELDMAN:  Thank you, Judge.  One second, if I may,
14    if the Court would indulge me.
15       (Pause in proceedings.)
16          MR. FELDMAN:  Even through next week, Judge.  I mean,
17    we're not looking for a significant amount of time here.
18          THE COURT:  Okay.  And I think I told you that my
19    calendar was such that if we didn't go this week -- because I'm
20    on criminal duty and then I have a conference out of state, and
21    I have other conflicts -- the earliest that I can continue it
22    to, if I continue it, is the week of August 14th.
23          I will also say that under Rule 6(C), the typical
24    response time for, you know, any motion, including a
25    preliminary injunction, is 14 days, even -- you know, unless
```

1    it's shortened by the Court, which I did, over your objection.

2          But Mr. Davis, let me hear from you.

3          MR. DAVIS:  Yes, Your Honor.

4          But for the lack of this cover sheet -- I apologize to

5    the Court.  I was trying to just conserve paper and time.  But

6    for the lack of that cover sheet, we would have been in

7    compliance with the Court's order and there's no provision in

8    the Court's order for them to respond further.  So to request

9    an extension for a response the Court did not permit in its

10   order is inconsistent with the Court's order.  There's no basis

11   for the continuance under the procedure that the Court set out.

12         So if we had said: "Reply Memorandum.  See attached

13   affidavit," they would have had no right to an extension of

14   time or a further reply.  So but for the absence of that cover

15   sheet, there's no basis for a continuance of the hearing.  We

16   brought our client in from the Bahamas.  She has a very

17   extensive schedule.  Not as extensive as the Court's, it would

18   appear, but she is here.  She's prepared to testify.  She's

19   prepared to testify on behalf of that supplemental affidavit.

20   I think we should proceed today.

21         THE COURT:  Okay.  I'm going to look at the

22   supplemental affidavit more closely.

23     (Pause in proceedings.)

24         THE COURT:  I will say that the attachments to the

25   affidavit are incredibly difficult to read.  They didn't scan

```
 1    very well into our system.  But that will be cured, I'm sure,

 2    because you have them as exhibits and I've found that

 3    frequently the original exhibits are clear.

 4         Well, in looking at the affidavit, it does seem to me

 5    that this is a fair reply to your response, which was

 6    permitted, even though it contains arguably some argument.  And

 7    so I'm going to go forward today, but I'm going to reserve on

 8    whether to give you additional time to rebut it.  The issues in

 9    this case seem to me to be, you know, fairly laid out in the

10    motion, the response, and the affidavits.

11         And so what I do want, though, is, I do want -- as I

12    said before, I want things numbered one, two, three, four, in

13    terms of exhibits.  If you have an affidavit that has

14    attachments to it, the affidavit can be Exhibit 1, and then it

15    would be along with its attached exhibits.  And then the

16    exhibits can be however they are numbered referred to in the

17    affidavit.  But I do want the affidavits to be documented as

18    exhibits.  If there are additional exhibits that are introduced

19    in the context of cross-examination, I assume those exhibits

20    have been exchanged or the parties can exchange them now, if

21    you didn't do it at the beginning of the hearing.  I don't know

22    if there are any additional exhibits that the parties are ready

23    to exchange.

24         I do recognize that this is an expedited procedure

25    that we're using here.  And so in that context, I know that the
```

1   parties are under a certain amount of pressure to have

2   everything -- you know, everything organized in terms of the

3   affidavits.  Obviously, you can cross-examine the witnesses in

4   terms of their affidavits.  And you know, I will say that in

5   looking at this, I look at whether there is irreparable harm or

6   not.  I'm not entirely convinced that there is.  There's an

7   allegation that doesn't -- that Source Outdoors might not be

8   able to satisfy any monetary damages.  I'm not sure what that's

9   based on.

10          I do recognize that if Source loses this lawsuit and

11  is down to be at fault, and if as a result CCA Bahamas incurs

12  that $125,000-a-day penalty, that it would require Source to

13  come up with possibly millions of dollars in order to

14  compensate CCA.  But I don't have any information, you know,

15  regarding the financial abilities of Source and I don't know if

16  it's a billion-dollar company, a multimillion-dollar company.

17  You know, I assume that -- you know, unless there's something

18  that says otherwise, that there's no danger of insolvency even

19  given the risk of hundreds of thousands of dollars.

20          I still don't have a clear understanding of how unique

21  these chairs are, why other chairs can't be procured.  The

22  context in which the purchase order was generated and paid is

23  not clear to me.  It appears there were other negotiations

24  going along at the same time.  I don't know what those were.

25          It also seems that there was some agreement on behalf

1    of, you know, the -- between the parties here, regarding other

2    payments that were to be made.  And it appeared, you know,

3    based on my reading of Ms. Dwornik's affidavit, that the

4    Plaintiff was willing to make those payments if they had the

5    proper documentation.  But I mean, that's -- but I don't know.

6    And I don't know whether this was a separate and independent

7    contract or whether it was part of a broader agreement and this

8    was one aspect of it.

9         So I have a lot of questions regarding these

10   proceedings, even after having looked at the affidavits.  You

11   know, I'm not sure if the parties have looked at trying to

12   resolve this case before it spins out of control and everybody

13   ends up -- everybody ends up losing.  And I guess, ultimately,

14   you want a mandatory injunction compelling delivery of the

15   chairs.

16        You incorporate by reference your complaint, the

17   affirmance in your complaint, some of which are not really

18   facts, but are legal conclusions.  And you know -- and I know

19   your complaint asks for -- you know, seems to imply, and the

20   affidavits seem to imply that the Defendant has these chairs

21   and they just need to be compelled to provide them, and that's

22   not clear.  That's not clear, either.

23        And if they don't have the chairs, and they haven't

24   been manufactured, I'm not sure that they can be compelled to

25   perform delivery of something that they don't currently have.

```
 1            So I guess maybe in that circumstance you would be

 2     asking them -- me to compel them -- or Judge Moore, because,

 3     obviously, I can't compel anybody to do anything.  I can only

 4     issue recommendations to Judge Moore -- but compel them to

 5     order the chairs and then produce the chairs.

 6            I mean, I don't know -- it also seemed odd that there

 7     would be a hundred percent payment in advance for the chairs.

 8     But that might be something that was required in light of the

 9     history of the parties.  I just don't -- you know, again, I

10     don't know.

11            But in any event, it is the Plaintiff's burden.  I'm

12     going to allow the Plaintiff to come forward.  Your exhibit

13     list will need to be renumbered.  Because the purpose of an

14     exhibit list is, of course, to make it easy for any reviewing

15     court, and for this Court, to refer to specific items.  And

16     when you've got three Exhibit As, three Exhibit Bs, three

17     Exhibit -- or two Exhibit Cs, and then a D and an E, and then a

18     1, 2, 3, 4, I'm not sure -- you know, I'm not sure how you can

19     refer to that or how a court can refer to it.

20            So as you -- I'm going to ask you to give your opening

21     statements first, where you explain the legal basis for the

22     relief.  You can incorporate into your argument the facts that

23     are contained in your affidavits and the opposing sides'

24     affidavits.  So it would be like a detailed opening statement

25     and then I will have the affiants available for
```

```
 1   cross-examination.

 2            Yes, Mr. Feldman?

 3            MR. FELDMAN:  Yeah.  Only because Your Honor said if

 4   there was anything else you wanted to exchange, we do have one

 5   email that was listed on the list that we provided to the Court

 6   that was not done previously, put together as quickly as we can

 7   in response to affidavit that was sent around at 5:00 -- almost

 8   5:00 yesterday.  I don't know if you wanted me to -- I have a

 9   copy of that for opposing counsel, obviously.  I don't know if

10   you wanted me to exchange that right now or what you wanted me

11   to do with --

12            THE COURT:  Yes.  And what exhibit number is that?

13            MR. FELDMAN:  Sure, Judge.  That would be the email

14   referred as Exhibit Number 20, the 3/8/17 email, as detailed

15   with the attachments.

16            THE COURT:  Okay.  Yes.  Give that to -- provide that

17   to Mr. Davis.

18            MR. FELDMAN:  Done, Judge.

19            THE COURT:  And since everything was supposed to be

20   provided to me as well, do you want to give me a copy of that?

21            MR. FELDMAN:  I have a copy for the Court, Your Honor.

22            THE COURT:  Okay.  Thank you.

23            MR. FELDMAN:  Yes, Your Honor.

24            May I approach, Judge?

25            THE COURT:  Yes.
```

```
 1              MR. FELDMAN:  Let me just get that copy.  One second,

 2       Your Honor.

 3          (Pause in proceedings.)

 4              THE COURT:  Do you have any -- do you have an

 5       additional copy of this or is this the only one?  I can make

 6       another one.

 7              MR. FELDMAN:  Yeah.  I think I may have made three,

 8       unfortunately, not four.  So the other one would be for my use.

 9       I can give it to the Court, if you want --

10              THE COURT:  That's okay.  That's fine.  I'll have my

11       courtroom deputy go out and make an extra copy.

12              MR. FELDMAN:  Thank you, Judge.

13              THE COURT:  Because if there's a reference to it.

14       That way, if the court reporter needs to refer to it.

15          (Pause in proceedings.)

16              THE COURT:  Okay.  And Mr. Davis -- and I'll ask both

17       sides.  Do either of you believe that any brief direct

18       examination is necessary in light of the additional information

19       that was provided after the affidavits were filed?

20              Mr. Feldman?

21              MR. FELDMAN:  As long as we're not going to have an

22       issue with the content, for example, of the exhibit that was

23       just provided, then probably not, Judge.  I mean, I think it's

24       laid out in the affidavits, in the exhibits, and all those

25       things, and --
```

```
1              THE COURT:  Well, you just need to tell me yes or no.
2              MR. FELDMAN:  No.
3              THE COURT:  I mean, I'm just asking you if you think
4     that there needs to be any brief direct examination in addition
5     to the affidavits --
6              MR. FELDMAN:  Not if we will not have any issues of
7     admissibility, Judge.
8              THE COURT:  Okay.  Mr. Davis?
9              MR. DAVIS:  You're referring only to direct, Your
10    Honor?
11             THE COURT:  Right.  Do you feel like you need to put
12    your witness on the stand for any brief direct examination to
13    either clarify, fill out, or explain the affidavit?
14             MR. DAVIS:  No, Your Honor.
15             THE COURT:  Okay.
16             MR. DAVIS:  I assume we'll have the right to redirect
17    after he does his cross-examination?
18             THE COURT:  Yes.  If he does a cross, you can
19    redirect, yes.
20             Okay.  So Mr. Davis, let me have you go first and you
21    can make your opening statement.
22             And just so the parties are aware, I took your word
23    with your three to three-and-a-half-hour estimate.  I have
24    another hearing, a brief hearing, at 1:00.  So we will be
25    recessing at around 12:30.  We can come back about 1:30 and
```

```
 1    then I'll also have to stop briefly for a guilty plea I have

 2    later this afternoon at 3:30.  And then we can come back and

 3    finish after I take that guilty plea.  I think I mentioned that

 4    that was something that might happen.  Although I had thought

 5    it was going to be a little bit later, but there were conflicts

 6    with attorneys needing to be in other courts.

 7             Okay.  So Mr. Davis?

 8             MR. DAVIS:  Thank you, Your Honor.

 9             And I still believe that we should be able to finish

10    by 12:30.

11             THE COURT:  Okay.

12             MR. DAVIS:  We've laid out our case in our papers and

13    I'm not going to repeat it in detail here.  I will just

14    highlight a couple of things.

15             But a little background, which is primarily the basis

16    for the affidavits.  The project in question when into

17    bankruptcy.  My client came into it after that time.  And in

18    addressing this specific issue before the Court, it took over

19    fulfilling contracts that had been entered into by the previous

20    entity that was handling what they call FF&E, which is the

21    furniture, fixtures, and -- what's E -- equipment.  And so --

22    and her testimony would be that she went to all of the vendors,

23    including Source, and said:  "Do you have any unfulfilled

24    contracts where money is owed?  Let me know what they are,"

25    because they needed all of the things that had been ordered to
```

1  put in the hotel, including these deck chairs that's at issue

2  here.

3          So she went to them and said, you know:  "What are you

4  owed?  We'll pay the balance and then we'll take the chairs,"

5  or the desks or the tables or whatever else was involved.  So

6  that was the basis for the conversation with Source.

7          There had been an order for 3,000 chairs.

8  Approximately 2814 had been delivered and paid for.  And so

9  they entered into a purchase order to purchase the other 1,400

10 chairs, paid full price in advance, which is in the record, for

11 those chairs.

12         There is an email -- there are several emails, in

13 which Ms. Dwornik clearly stated that:  "We want to make you

14 whole.  We want to pay what is owed, so that we can get the

15 equipment.  We need the documents to show that," because for

16 some there had been deposits.  So if there was a deposit, then

17 the balance would be what they would pay to acquire the

18 equipment.  So they asked several times:  "Give us the

19 records" -- to them:  "Give us the records of what you are

20 owed."  And the affidavit recites that they did not receive the

21 records in a timely manner.

22         They paid for the chairs in January.  In February, not

23 having received the documents that they required, they said:

24 "We can't process any more orders because we don't know what

25 has been paid or what hasn't been paid.  So we can't issue a

1  purchase order for an amount that we don't know about."

2  Because if there had been a deposit, the purchase order would

3  be for the balance.  If there had been no deposit, then the

4  purchase order would be for the entire amount, which was the

5  basis for the request of the documents in the first place.

6         As of February, when she sent an email saying:  "We

7  can't process any further at this time, and not receive it" --

8  you'll note that the document that was just handed up was in

9  March.  Even that was not complete because there was an issue

10  of a check that had been paid by mistake of almost $400,000.

11  And if you look at Exhibit -- the exhibit that was just handed

12  up, Exhibit 20, you'll see that it shows that they were owed

13  something in the neighborhood of 352,000, according to their

14  own number.  If that check had not been returned, they had been

15  paid in full.

16         So --

17         THE COURT:  I don't understand what happened with the

18  check.  I don't know --

19         MR. DAVIS:  We don't understand what happened to it.

20  We were told --

21         THE COURT:  This is a check that was issued by your

22  client?

23         MR. DAVIS:  No, not by our client.  Previously, a

24  check had been issued in this amount source said was issued by

25  mistake.  We heard it was issued by mistake, and we said:  "Did

1    you send it back?"  And they said:  "Yes."  And we asked for

2    proof that they had sent the check back, because if they had

3    not --

4              THE COURT:  Who issued the check?

5              MR. DAVIS:  A prior --

6              THE COURT:  Just give me -- you know, this is like a

7    complicated enough case.  And if what you tell me is:  "It was

8    a prior entity," that's not -- that's not that useful to me in

9    terms of keeping who did what straight.

10             MR. DAVIS:  I understand.  It was issued by a company

11   called PSI, which was the procurement manager for the company

12   that CCA took over for.  They're referenced in the pleadings;

13   PSI and BMI.  BMI was the prior contractor for FF&E and PSI was

14   its procurement agent.  PSI had issued the check.  And the

15   question was had the check been returned because it was agreed

16   that it was an overpayment.  And Ms. Dwornik was seeking proof

17   that the check had been returned, and that's an email.

18             We still don't know whether that was returned or not.

19   Because, if it had not been returned, then, according to

20   Exhibit 20, Source had been paid in full.  So the documentation

21   that we had requested originally was provided in March, but it

22   left that one hole of $400,000.  So we still did not know.

23             But --

24             THE COURT:  Do you know today?

25             MR. DAVIS:  Pardon?

```
 1              THE COURT:  But what's been done to follow up on

 2     whether the check was returned or not returned?  I mean, where

 3     is PSI?  I mean, are they still a functioning company?  Are

 4     they bankrupt?  Are they --

 5              MR. DAVIS:  They're still a functioning company.

 6              THE COURT:  And what do they say about the check?  Do

 7     they say the check was returned?

 8              MR. DAVIS:  We didn't inquire of them because we

 9     thought we had moved on.  We issued our purchase order and paid

10     for the chairs a hundred percent.  So there shouldn't have been

11     any issue with our purchase.

12              In any event, that's the point about the

13     documentation.  Now, as to the purchase --

14              THE COURT:  And just so everybody will know, this is

15     just openings.  I am not going to consider any of this to be

16     evidence, and I'll see what the evidence shows and if the

17     evidence supports what the opening statements say.  That's --

18              MR. DAVIS:  That's understood, Your Honor.

19              THE COURT:  And if you would quit making motions and

20     opening your mouth in astonishment, Mr. Feldman --

21              MR. FELDMAN:  Yes, Judge.

22              THE COURT:  -- and waiving around, that would be

23     useful because I find it distracting.

24              MR. FELDMAN:  I apologize, Judge.

25              THE COURT:  Thank you.
```

```
 1            MR. DAVIS:  Thank you, Your Honor.

 2            THE COURT:  Mr. Davis, you probably don't find it

 3    distracting because you can't see it.

 4            MR. DAVIS:  No.  I probably wouldn't find it

 5    distracting if I did see it, I've been doing this so long.

 6            There are really two issues that have emerged from the

 7    exchange of pleadings and affidavits.  The first is the

 8    assertion by Source that the agreement for them to provide

 9    these 1,400 chairs, for which we paid, was contingent upon CCA

10    making good on all of Source's shortfalls or debts -- that is,

11    money that had not been received -- and that if CCA had not

12    agreed to do that, they would not have sold the chairs.

13            It's not a sensible argument because we paid full

14    price for the chairs, and to say we wouldn't have accepted full

15    price for chairs because of this other issue makes no sense.

16    They could have sold the chairs.  But looking at it in terms of

17    contract law, their claim is that their agreement to provide

18    the chairs was based on both paying for them in full and the

19    agreement to make good on their other debts.  So that was the

20    consideration that they're reciting:  "We'll sell you the

21    chairs if you pay us in full and you make good on all of our

22    other indebtedness."

23            Now, we had not made good on all of their other

24    indebtedness for the reasons I've just described.  We didn't

25    have the information we required.  And based on what we had, we
```

1    felt that they had been paid in full.  But let's assume that we

2    did not make good on that indebtedness for purposes of the case

3    here, what that means is there was a failure of consideration

4    and therefore Source was not obligated to provide the chairs

5    because they said that was the basis of providing the chairs.

6    Failure of consideration:  "We don't have to provide the

7    chairs."  Fine.  You don't have to provide the chairs, but you

8    have to return our money.  You can't keep the money, keep the

9    chairs, and say now we're whole.

10           So if they want to say:  "You failed to do what you

11   agreed to do, we aren't obligated to provide the chairs,"

12   that's fine.  We agree with that as a matter of contract law,

13   but you don't get to keep our money.

14           Then we get into the chronology here because we made

15   the payment in January.  They acknowledged the payment the same

16   day.  We paid in full for the chairs.  So the second issue

17   here, which the Court has already framed, is:  Where are the

18   chairs?  Were the chairs ordered or were they not?  And if they

19   were ordered, where are they?  The documents submitted are --

20   by Source are in consistent.  Their counsel puts in his memo

21   that the chairs were never manufactured.  Mr. Shvartsman, in

22   his affidavit, recites that they are not available at this

23   time.

24           We then get issue of the advertisement, which we've

25   submitted, that purports to be selling our chairs on the open

1    market.  Now the response is:  "No.  Those aren't your chairs.

2    These chairs are readily available."  But we have noted in our

3    papers that the chairs that are being sold are identical to the

4    chairs identified in the purchase order.  Furthermore, adding

5    insult to injury, the advertisement pictures the chairs that

6    were previously purchased on our property.  So they're

7    advertising the sale of our chairs, which we paid for, on our

8    property.  So it's irony, if nothing else.

9         But the point is:  Are there chairs or not?  We agree

10   that if there are not chairs, they've never been manufactured,

11   then the Court can't require them to produce what hasn't been

12   manufactured.  And frankly, if the Court ordered them now to

13   order them and deliver them, they wouldn't be delivered in

14   time.  But we believe that the chairs exist, that they were

15   advertising the sale of those chairs.

16        Note also that although these chairs on their website

17   can come in eight different colors, these chairs in this ad can

18   only come in white, which was the color in the purchase order.

19   So they are saying:  "No changes.  You have to buy white

20   chairs."  You wouldn't do that if, as they claim, they take the

21   order and then have the chairs manufactured because they could

22   take the order in any color.

23        So it doesn't -- their position simply doesn't make

24   sense and is contrary to the evidence.  And that's one of the

25   reasons I will want to cross-examine Mr. Shvartsman to find out

1   the long lasting mystery:  Did they order the chairs or didn't

2   they?

3          Now, the chronology is that we paid in January.

4   Ms. Dwornik sent the email a month later, saying:  "We can't

5   process anything."  Did they order the chairs in that month or

6   did they not?  And what does "They are no longer available"

7   mean?  Because it would suggest that what it means is that they

8   were once, but they are no longer.  Mr. Shvartsman doesn't

9   verify in his affidavit that they were never manufactured.  He

10  says they are not available.  Clearly, they were manufactured

11  and delivered, because they are selling them.  So other issue

12  is that.

13         In terms of meeting our burden here for injunctive

14  relief, which is extraordinary relief, I agree with the Court's

15  analysis.  We don't have in the record yet, because of the

16  preliminary nature of the case, proof that they can't afford to

17  pay a million dollars a week, which is what the liquidated

18  damages would be.  So given the fact that they, according to

19  them, lost all of this money, that they were still missing

20  $352,000, it appeared to be a logical conclusion that they

21  would not be able to indemnify us for these millions.  But do I

22  have their financial statements?  I do not.

23         The other prong of our irreparable harm is really, in

24  our mind, the more serious aspect of it.  And it was the prong

25  that the Court expressed some skepticism about -- or at least

1   indicated you required more in terms of proof that there would

2   be irreparable harm.  Source was very helpful in that regard by

3   attaching to their papers a copy of an article from the

4   newspaper in the Bahamas which is following this matter -- I

5   would say more closely than I, but I don't want to say I

6   haven't been paying attention to my own case.  But they are

7   paying as much attention to it as anyone could outside the

8   courtroom.  And the article, if you look at it, castigates CCA,

9   makes references to the Chinese who are the bank, and the

10  Chinese who are the company, and to the prior developer who's

11  trying to get back in.

12          The combination of that, plus the finding of the Court

13  in Delaware, that this is the largest construction project in

14  the Bahamas, it will employ 5,000 people, that it will generate

15  $140 million in revenue, will constitute 14 percent of the GDP

16  of the Bahamas --

17          THE COURT:  I thought it was 12 percent.

18          MR. DAVIS:  Twelve.  I apologize.

19          THE COURT:  But I don't know.  I could be wrong.

20          MR. DAVIS:  I'll work with 12.  It's equally

21  significant.  But the point is that it is an immensely

22  important project and it is the sort of the flagship of CCA in

23  the Bahamas.  There's other work in the Bahamas that can be

24  done, and there's other work throughout Central America that

25  they are bidding on.

1          So the publicity, which would obviously follow based

2     on that article that you can see -- the publicity would follow

3     that CCA did not meet its contractual obligations would be

4     immensely damaging to its reputation, constitute a loss of

5     goodwill, could constitute a loss of customers.  The cases that

6     we submitted support the issue of an injunction under those

7     circumstances because it is irreparable in the sense that you

8     cannot get that back.  If CCA is thought of as a major

9     construction company that can't meet its commitments, that

10    can't meet its deadlines, it is not going to be sought out for

11    other similar projects.  And this will be, for good or for

12    worse, the largest casino in the southern hemisphere, for those

13    who are fanciers of casinos.

14          So that is the prong of the irreparable harm that we

15    really want to emphasize, that we've tried to emphasize.  And I

16    recognize we can't prognosticate and assure the Court that if

17    this isn't completed that will follow because we'll only now

18    when it follows.  But it is very logical, given the combination

19    of the importance, the scrutiny that it is getting in the local

20    press, the attention the government is paying to it, which

21    we've put in our papers, it would constitute irreparable harm.

22          In terms of the balance of the equities here, they've

23    been paid.  They probably still have the chairs.  But whether

24    they do or not, it doesn't matter.  They've been paid.  The

25    harm that they assert in their papers is that they are still

1   owed $352,000.  Well, that is not our responsibility.  We never

2   agreed to be their insurer of last resort.  We agreed that we

3   would make good on their unpaid amounts in order to get the

4   chairs.

5            So if we didn't do that, that doesn't mean they get to

6   keep our money and that we have to make them whole on the whole

7   project, regardless of who is owed that money.  It means we

8   don't get the chairs.  So the notion that they are going to be

9   harmed because they can't pay of all of their bills doesn't

10  enter into this case.  Once we didn't do what they claim we say

11  we did, if you feel it wasn't justified, then we don't get the

12  chairs, but we get our money back.  But there is no harm as a

13  consequence of this injunction to get chairs that we paid for.

14           Thank you.

15           THE COURT:  Okay.  Mr. Feldman?

16           MR. FELDMAN:  Thank you, Judge.

17           First of all, I apologize for moving around back

18  there.

19           THE COURT:  Okay.  I can't hear you.  I'm sorry.

20           MR. FELDMAN:  I apologize for moving around back

21  there.

22           THE COURT:  Okay.

23           MR. FELDMAN:  But the reason I was doing that is

24  because we just heard opposing counsel say they don't need any

25  direct testimony.  And yet, half of the opening that we just

1    heard was about a check that they say was paid and wasn't

2    returned.  PSI doesn't appear in their documentation, no

3    mention of a check appears in their documentation, none of

4    that.

5          When you look at the supplemental affidavit that they

6    filed in this case -- that Natalia Dwornik filed in this case,

7    it doesn't say what they said:  "We didn't receive in a

8    reasonable time."  Paragraph 3 says CCA never received the

9    necessary complete information requested:  "We were unable to

10   determine what amount remained to be paid, as to which orders,

11   from our predecessor."  The email in Exhibit 20 clearly refutes

12   that.

13         Then we hear in the opening about not getting money

14   back.  My client has -- and I don't have a copy of it here.

15         THE COURT:  Okay.  You need to make sure that you only

16   speak into the microphone.  As you might notice, the court

17   reporter is wearing headsets.

18         MR. FELDMAN:  Yes, Judge.

19         THE COURT:  And what that is designed to do is to

20   allow her to hear what is spoken into the microphone.  When you

21   turn your back, when you speak when you're walking, it makes it

22   difficult for all of us to hear.

23         MR. FELDMAN:  My mistake, Judge.  I apologize.

24         THE COURT:  Sure.

25         MR. FELDMAN:  But I have a copy of an email sitting

```
 1   here -- unfortunately, just on my phone, because this wasn't
 2   addressed in any of their opening papers -- that includes the
 3   attachments of a check from PSI to Source Outdoor, in the
 4   amount of $397,512.50, dated 8/7/2014.  We have a check from
 5   Source Outdoor back to Purchasing Solutions International,
 6   Inc. -- which I will tell the Court is PSI -- in the amount of
 7   $397,512.50, dated -- I believe it's 8/8/2014, with a back
 8   stamp on it "Cashed."  That money was returned --
 9           THE COURT:  I'm sorry.
10           Okay.  You have an email, including a check from PSI,
11   dated August 27th of 2014?
12           MR. FELDMAN:  I have an email from my client, Judge,
13   dated June 15, 2015, that Candice McCarthy, who is sitting here
14   in the courtroom, wrote to Dennis and Mike -- I believe they
15   are with PSI -- basically attaching to it or, I guess, you
16   know, saying:  "Can you send me the confirmation for this
17   payment sent to us wire/check," et cetera.  Then there's an
18   email response saying -- to Candice, saying:  "I had our
19   accountant research the funding, and this was a wire in the
20   amount of $397,512.50, which was issued from our bank on
21   8/20/14.  Please let me know if you have any further questions
22   or need further assistance."
23           THE COURT:  Okay.  Because I don't have those in front
24   of me, I don't know who is saying:  "Issued from our bank."
25   Whose bank is "our bank"?
```

```
1          MR. FELDMAN:  Judge, I guess this is the issue -- this
2     is -- and I'll get right to the root of it.  They talk about
3     this money being the reason that now they say they wouldn't
4     pay.  Initially, it was:  "We didn't get it."  Now they get
5     presented with an email, in direct response to what they filed
6     yesterday afternoon, showing they clearly got it, Mr. Davis
7     comes up here and tells the Court:  "Well, we didn't get all
8     the requested information.  There was money that was paid that
9     Source didn't return."
10          The gist of this is, Judge, attached to this -- I've
11     got a copy on my phone here -- because, again, none of this was
12     in their moving papers or responsive papers.  Attached to this
13     is a check from Purchasing Solutions for 397,512.50, and a
14     refund check, which says on it specifically:  "Refund from
15     Source Outdoor to Purchasing Solutions," for 397,512.50.  And
16     that was back in 2015.  Source does not have that money, Judge.
17     They gave it back.  None of this is in their moving -- frankly,
18     this is why we need additional time.  None of this that you
19     just heard is in their moving papers.  He said he doesn't need
20     any direct examination.  Source does not have that money.  They
21     gave it back.
22          So let's assume they gave it back and let's assume
23     there's a failure of consideration, as he acknowledged in his
24     opening.  How does the Court bear an injunction directing my
25     client to do something in the face of failure of consideration?
```

```
 1    I think it's important that the Court keep in mind where we are
 2    in this case.  We're not trying it.  We're determining whether
 3    there is a basis for entering a mandatory high-standard
 4    preliminary injunction directing my client to deliver to them
 5    chairs in a situation which we just had questions raised about
 6    failure of consideration from the party seeking the injunction.
 7             Under those set of circumstances, what do you have?
 8    Maybe Source has to give the money back.  Maybe they have to
 9    pay everything.  But that's a case for another day.  That's not
10    a case for a preliminary injunction before my client has even
11    had to plead in response to the complaint.
12             Now, let's look at what Mr. Shvartsman said regarding
13    the chairs in his affidavit.  It's not what Mr. Davis -- I
14    believe it is -- represented was the circumstances of what
15    Mr. Shvartsman said.  What Mr. Shvartsman said in Paragraph 25
16    of his affidavit is:  "Source is not currently in possession of
17    the 1,420 chaise lounge chairs CCA seeks in this case."  Source
18    is not in possession of it.  I don't remember exactly what the
19    statement was that Mr. Davis said, but that's what the
20    affidavit says.  That's what Mr. Shvartsman --
21             THE COURT:  He says they're not available right now,
22    which is basically the same thing as not currently in
23    possession.  I mean, it's opening statement.
24             MR. FELDMAN:  I understand.
25             THE COURT:  And so he's saying that, according to
```

1    Mr. Shvartsman's affidavit, that Mr. Shvartsman is saying that

2    Source does not presently have the chairs and therefore can't

3    be compelled to provide them.  And Mr. Davis said that on

4    cross-examination he's going to ask Mr. Shvartsman why.

5           MR. FELDMAN:  Understood.

6           THE COURT:  And that's a fair --

7           MR. FELDMAN:  Understood.  Understood.

8           THE COURT:  And that's a fair point.  My question is:

9    Based on everything that I'm hearing here today, I'm not sure

10   why the parties haven't met and tried to work this out in

11   person, instead of going through a bunch of emails back and

12   forth, in terms of in fact -- and I don't know this, but it

13   seems -- if, in fact, CCA said:  "We'll be happy to pay you, as

14   long as you didn't already get paid by PSI," and if, in fact,

15   you've got a refund check to PSI that shows you didn't pay,

16   well, does that mean that CCA is willing to now pay the amount

17   of money because they see that the PSI check was refunded or

18   not?

19           I'm just talking about kind of looking at the whole

20   broad picture, rather than spending tens of thousands of

21   dollars, you know, if not more -- hundreds of thousands of

22   dollars litigating this case and -- but then there's another

23   fundamental question.  If Source doesn't have the chairs, can't

24   get the chairs, never ordered the chairs, you know, it seems to

25   me that -- that it's difficult to resolve that, assuming that

1    the chairs can't be obtained within a certain period of time.

2            MR. FELDMAN:  I have not spoken with opposing counsel

3    about it.  If Your Honor wants to adjourn for 10 minutes, and

4    he and I can have a chat, I don't know if it'll go anywhere,

5    but, you know --

6            THE COURT:  We're going to go forward with what we've

7    got.  But I'm just saying that if everybody sort of agrees on

8    basic facts, and there was a lack of sufficient information,

9    and now you have the information, I'm not sure why -- you know,

10   why we're here.  But there may be a disagreement about that.  I

11   don't know.  I'm just saying looking at what I saw.

12           MR. FELDMAN:  I guess, Judge, like I said, I'm more

13   than happy to have a conversation with opposing counsel.

14           Going back to where we're at in this respective case,

15   again, I think it's important for the Court to remember why we

16   are here.  We're not here to try this case.  We are here to

17   determine whether the Court should enter a mandatory

18   preliminary injunction with a very high standard that the

19   Plaintiff bears the burden of carrying at every single step of

20   the way, directing my client to deliver 1,420 chairs that he

21   put in an affidavit under oath he does not have and that he

22   will testify to under oath he does not have, when he's sitting

23   on the stand --

24           THE COURT:  Well, I mean, he says he doesn't have

25   them.  Maybe his brother-in-law does.  I mean, I don't know.  I

```
 1    mean, that's a vague --

 2              MR. FELDMAN:  Judge, I believe --

 3              THE COURT:  Did he ever them?

 4              MR. FELDMAN:  -- he will indicate that they have not

 5    been manufactured; is that correct?

 6              MR. SHVARTSMAN:  Thank you.  Yes.

 7              MR. FELDMAN:  Okay.  So at the end of the day, I

 8    believe that's what the testimony will bring out, is that they

 9    have not, in fact, been manufactured.

10              So what do we have when we deal with this set of

11    circumstances?  Well, first of all, I think that we cited a

12    significant amount of case law in our response, and I'm not

13    going the regurgitate much of that here.  The Court obviously

14    can take a look at and rely what's set forth in the response.

15    But just to get to kind of the heart of the matter, we don't

16    believe they meet the substantial likelihood of success on the

17    merits under the circumstances.  This contract --

18              THE COURT:  So is it your client's position that they

19    are entitled to keep the money and not deliver the chairs?  You

20    couldn't answer that in our telephonic status conference, which

21    I understand.  But I'm just trying to get at what the heart of

22    it is.  Are they saying -- I mean, is there a disagreement that

23    this money was for these chairs?  There doesn't appear to be.

24              MR. FELDMAN:  I think that, Judge, in the telephonic

25    status conference I obviously had less information than I have
```

1    now.

2         THE COURT:  Of course you did.  And I told you I'm not

3    holding you to anything.  I'm just asking you today because

4    that wasn't clear to me --

5         MR. FELDMAN:  I think that my client's position would

6    be that this was part of a global arrangement that was entered,

7    and they are owed X, Y, Z amount of money, and they got paid

8    some portion of it and they applied it in a certain way.

9         Now, whether that was appropriate or not, that would

10   be something for the Court to ultimately decide.  But at the

11   end of the day, it may be something, frankly, for a jury to

12   decide because there's certainly no jury trial waiver in this

13   case, and that's probably a factual issue at the end of the

14   day.

15        So I think my client's position would certainly be if

16   they got the total amount of everything that they were owed,

17   they would have a responsibility to manufacture these chairs

18   and to get it going now.  They haven't received it, though.

19   And at the end of the day, when we come back to where we are in

20   this case, when you have the significant questions that

21   surround the contract, the significant questions that surround

22   an issue that hopefully the Court will stick to it and limit

23   their testimony, and not let them do any direct -- and there

24   won't even be evidence to deal with this issue that they didn't

25   see fit to put forth in their moving papers -- significant

1    issues, questions to the payment, a payment that was

2    refunded -- at least in the email that I've got there sitting

3    on my telephone right now -- significant questions as to the

4    circumstances, significant questions as to why Mr. Davis'

5    firm -- I believe it was his firm -- sent a demand letter

6    saying:  "If you don't do this, we're moving in 48 hours," and

7    then at $150,000 a day, they waited 55 plus days in order to do

8    something, and how that supports irreparable harm --

9    significant questions as to how Ms. Dwornik even testifies as

10   to some of the things that she has testified to related to

11   irreparable harm, for example, on the reputation of CCA, the

12   circumstances, the publicity, Moody's.  How does Ms. Dwornik

13   know what Moody's is going to do with the Bahamas sovereign

14   debt rating if these chairs are not delivered?  I have no idea.

15        But the Eleventh Circuit has made clear that

16   irreparable harm cannot be speculative.  A lot of what this

17   Court is dealing with here is speculative.  They are not

18   sitting there with an expert prepared to testify as to Moody's,

19   S&P, or Fitch and what the impact of delay or the impact of a

20   failure to deliver chairs will have on the sovereign debt

21   rating of the Bahamas from either Moody's, S&P, or Fitch.

22        Certainly, Ms. Dwornik, I don't believe -- I guess we

23   could get into it on cross-examination -- is competent to

24   testify about those things.  So we have significant questions

25   as to the irreparable harm, the speculative, as opposed to the

```
1   actual nature of it, and the eminent nature of it under the

2   circumstances.  We have significant delay.  We have significant

3   questions as to the contractural history here and the

4   contractual development here, and we have a preliminary

5   injunction hearing where they are asking this Court to have my

6   client do something, deliver property that they do not

7   currently have.  All of those, given where we are at

8   procedurally, clearly support rejecting and denying the motion

9   that's been filed.

10          We can even get into the questions of the tipping of

11  the scales of the interest in the public policy, and all of

12  those different things.  But frankly, that's three and four in

13  a four-part test.  One they can't meet the burden of at this

14  preliminary juncture.  Certainly two they can't meet the burden

15  of.  Not to mention that one has to ask how these chairs are

16  peculiar and unique as opposed to other chaise lounge chairs

17  that can be purchased elsewhere.  What makes them different

18  than what could be purchased from a competitor, when they

19  apparently are pretty much all made with the same thing --

20          THE COURT:  Who is Source's supply for the chairs?

21  There's a vague reference that they're -- I think a vague

22  reference that they're being manufactured in China.

23          MR. FELDMAN:  I don't know the answer to that.  I

24  don't know the answer.

25          THE COURT:  Well, that's okay.  I was just wondering,
```

```
 1    you know, that if this is a company that you're suggesting that
 2    the Plaintiff can order directly from.  I mean, I don't know if
 3    it's --
 4         MR. FELDMAN:  My client just whispered to me, Judge --
 5    and he'll tell me if I say something wrong here -- Gerald -- if
 6    I say something wrong because I don't want to misrepresent to
 7    the Court -- that they make them here and manufactured here.
 8         MR. SHVARTSMAN:  In Miami, in my warehouse.
 9         MR. FELDMAN:  In his warehouse in Miami.
10         MR. SHVARTSMAN:  Down the street.
11         THE COURT:  Okay.  So Source manufactures the chairs
12    here?
13         MR. FELDMAN:  Yes, Judge.
14         THE COURT:  Okay.
15         MR. FELDMAN:  The -- correct, Gerald?
16         MR. SHVARTSMAN:  Yes.
17         MR. FELDMAN:  So at the end of the day, Source
18    manufactures the chairs here.  They manufacture a lot of
19    furniture here.  The point being there's nothing peculiar or
20    unique about this.  You know, Florida law is pretty clear.
21         THE COURT:  Of course, if somebody copied -- I mean,
22    they have half the chairs.  Presumably, they want the second
23    half to match the first half.
24         MR. FELDMAN:  I don't know that that would make it
25    peculiar or unique, Judge.
```

```
 1          THE COURT:  And if somebody were to copy the chairs,
 2     then you get into this whole issue of design patent
 3     infringement, which, I mean, I don't know --
 4          MR. FELDMAN:  Maybe we do, but I'm not so sure that
 5     the fact we want the left to match the right make them peculiar
 6     or unique.  Like I put in our moving papers in our response,
 7     we're not talking about a basketball signed by Michael Jordan,
 8     a Hank Aaron card, or anything signed by Major League athlete.
 9     We're not talking about antique furniture that's unique.  We're
10     not talking about anything that has any particular uniqueness
11     to it.  He talks about a casino, the largest casino.  I would
12     be surprised, frankly, if the casino is sitting outside.  These
13     are chaise lounge chairs.  I would be surprised if they are
14     sitting inside.  My guess would be they're not going to be even
15     in the casino.
16          So at the end of the day --
17          THE COURT:  Generally speaking, lounge chairs are
18     around the pool area, which many casinos have.
19          MR. FELDMAN:  Yes.
20          THE COURT:  So I would -- and my guess is that most
21     places want their chairs to match when they are -- you know, I
22     don't know what the area is.  I don't really have enough
23     information at this point.  But --
24          MR. FELDMAN:  Right.  I think that's the big problem,
25     Judge, or that's part of the big problem.
```

1        THE COURT:  -- in terms of where the chairs would be,

2    I'm not sure it matters.

3        But it strikes me that there's a possibility that

4    there is a certain amount of uniqueness if you have -- you

5    know, it's like if you order -- you order a pair of shoes and

6    you get one shoe, and then you're trying to get the second

7    shoe, to say:  "Well, there are plenty of shoes around.  You

8    can go anywhere and buy that second shoe," and -- you know,

9    true.  Shoes are not unique.  There may be many shoes, but you

10   want them to match.  And I'm not sure that if you buy one shoe

11   at, you know -- I don't know shoe companies.  But it's at --

12   you know, at one place, and then you try to find its match in

13   another place, you could have a problem there.  I mean,

14   that's --

15       MR. FELDMAN:  Let's assume that that's the case,

16   Judge.  Let's assume that's -- first of all, I think it would

17   be Source's position that that does not rise to the level of

18   peculiar or unique that the Florida Supreme Court and the

19   Florida courts -- which is obviously what we're dealing with

20   here.  We're dealing with Florida law -- has said you need in

21   order to support a mandatory -- in order to support an

22   injunction related to the pretension or return of personal

23   property.  So I think it would be Source's position that

24   that -- that, respectfully, that doesn't get there.

25       But let's even assume that that is the case.  So how

```
 1   is it irreparable, unsolvable that you get a chair that may not
 2   be the exact same thing?  It's not irreparable.  It's not
 3   irreparable harm.  It doesn't rise to the level of what we're
 4   dealing with here.  It just doesn't get there.
 5          And the talk about Source's financial wherewithal, I
 6   think the cases that we cited in our moving papers make very
 7   clear that you're -- that that's not the test.  The test is
 8   whether it can be monetized.  And clearly, CCA believed the
 9   delay would be monetized because they included -- according to
10   them -- we still don't have a copy of it -- they included a
11   liquidated damages clause in their underlying contract that
12   monetized the delay.
13          THE COURT:  Actually, I was really just pointing that
14   out to make sure your client was aware that they could be on
15   the hook for millions of dollars if they lost the case.  That
16   was part of it.
17          MR. FELDMAN:  I appreciate that, Judge.  And -- and --
18   and -- and my client obviously now is clearly on the hook for
19   that because Your Honor has explained it to him.
20          But going back to where we're at right now, it doesn't
21   meet the threshold test, and I think that -- and -- and -- in
22   the Court's assessment of the circumstances here, what I would
23   ask, in wrapping it up, is that this Court cannot, during the
24   course of these proceedings, lose sight of where we are, lose
25   sight of how high the burden is, lose sight of what they really
```

```
 1    need to do to meet it at every element, including a substantial
 2    likelihood of success, where the contract terms are
 3    questionable and ambiguous and open at best --
 4         THE COURT:  How long does it take to manufacture these
 5    chairs from start to finish?  I mean, I don't know, 1,400
 6    chairs.
 7         MR. FELDMAN:  Judge, my client -- again, if I ask you
 8    a question and I say anything incorrect, please correct me.
 9         My client just said 90 days.
10         THE COURT:  Because that gets -- in a sense, they're
11    saying the irreparable harm is the October date.  So if they
12    hadn't been manufactured yet, and they started in two weeks,
13    let's say, early August, which is optimistic in terms of -- and
14    this is -- I'm just saying like the best case scenario for the
15    Plaintiff would be November, sometime in November.
16         MR. FELDMAN:  Judge, that's an interesting point that
17    you raise because I think the Court can take judicial notice of
18    what's the peak season in the Bahamas.  I think Your Honor kind
19    of even mentioned this.  I think that at the end of the day the
20    Court can certainly take notice -- judicial notice of when
21    winter starts and ends.
22         THE COURT:  Winter starts December 21st.
23         MR. FELDMAN:  Correct.
24         THE COURT:  But I don't know --
25         MR. FELDMAN:  I would encourage the Court to keep in
```

1   mind that that probably is the peak season.  I can't imagine

2   the peek season is in October.  The peak season is going to be

3   around the holidays.  It's going to be when all the snowbirds

4   are leaving from the north.  It's going to be when everybody's

5   heading down to South Florida and places south of here.  And at

6   the end of the day, we even have a question of whether or not

7   this is really going to impact the peak season and questions as

8   to Ms. Dwornik's ability based on firsthand personal knowledge

9   to testify as to what the peak tourist season is in the

10  Bahamas.

11       There are a lot of things that are suspect here.

12  There are a lot of things that are open and questionable.

13  There are a lot of things that don't meet the thresholds.

14  Again, I would merely request that this Court, throughout these

15  proceedings, throughout today, and all the way up through

16  issuing your report and recommendation to Judge Moore, that

17  this Court keep in mind the unique position that we are at and

18  the significant burden that Plaintiff bears each step of the

19  way in getting there.

20       Thank you, Judge.

21       THE COURT:  Okay.  Okay.  Thank you.

22       Mr. Davis, are you ready to proceed?

23       MR. DAVIS:  Yes.  Could I have one minute?  This

24  exhibit that we just got and that he just offered, we've had it

25  for some time.  But if you if you look at it, this is where

1   we're seeing that they're saying they sent us a reconciliation.

2   But if you look at the second page, it makes reference to the

3   check that we are talking about, and it says:  "I need to hunt

4   down a copy of the canceled check.  I can't find it.  And I'll

5   get it to you."  So the email that he's relying on to say that

6   they sent it back doesn't say that.  And whatever he has to

7   show that it did go back, we never got.  So based on what they

8   had provided us at that time, we didn't know that it had been

9   paid back.  And so it was an open issue.

10          But may I point out one further thing?  The purpose of

11  getting the information was so that CCA could make good on

12  these various contracts and get the goods for which they would

13  pay.  They never agreed to just say:  "Whatever your losses

14  are, we'll hold you harmless."  What they agreed to do was:

15  "If you give us the information of what you are owed, we will

16  pay that so that we can get the goods on which the money is

17  owed."

18          So I did talk to Mr. Feldman, right after we sent the

19  demand letter, to see if we could work it out.  But if their

20  view is that we agreed to make them whole, whether we got the

21  furniture or the equipment or not, there was never such an

22  agreement.  There never would have been such an agreement.  We

23  didn't come in and say:  "We're just going to make you whole

24  because we like you and you're good people."  We're going to

25  make you whole so that we can get what it is that we're paying

1    for.

2            We've moved on.  We've obtained that from other

3    vendors.  We have no reason to make them whole at this point

4    because we don't want what it is that they have to sell.  And

5    of course, they were free to sell it to anyone else from

6    February on.  And if they did or didn't, we don't know.

7            But the notion that we're -- since they still are owed

8    $352,000, according to them, we have to pay that in exchange

9    for nothing makes no sense.

10           THE COURT:  Okay.  So why don't you -- you can present

11   your affidavit.  And again, as I said to both sides -- I'm

12   not -- no, I'm not going to hear -- I'm never going to get to

13   the evidentiary part of this hearing if I keep going back and

14   forth.  And so what I'm going to do is -- as I said, your

15   opening statements put everything in context for me, but I'm

16   not relying on anything that you said with respect to anything.

17   I'm only relying on the evidence that's presented.  So just

18   like when you tell a jury:  "This is our opening," and the

19   judge says to the jury:  "It's not evidence," I just want to

20   put everybody on notice that I don't consider that evidence.

21           I mean, I've tried to mix up in -- and get a little

22   more context so that the parties could see each other's

23   positions, you know, and could understand the -- you know, what

24   the other side was saying in terms of what their position was.

25   And so I've asked some questions in that regard.  But I'm not

```
 1    going to be relying on anything that is not contained in the

 2    affidavits or in testimony that's presented to me today.

 3            So --

 4            MR. FELDMAN:  Can I ask him one question, Judge?

 5            THE COURT:  If counsel want to confer, fine.  Do I

 6    need to take a recess before we start with the witness?

 7            MR. FELDMAN:  Maybe for five minutes.  Because I'm

 8    trying to actually jump on the suggestion of the Court that why

 9    hasn't everybody had a brief talk here.  I'm trying to jump on

10    that suggestion a little bit.

11            THE COURT:  Okay.  And Mr. Davis has explained that

12    they've already moved on and gotten the goods that they were

13    going to pay for from somebody else.  So I don't know where

14    that leads you.

15            MR. FELDMAN:  Not the chairs, obviously, because --

16            THE COURT:  Not the chairs.  That is -- that's

17    correct, not the chairs, because that's what we're here on

18    today.  If they had the chairs, or the chaise lounges, my guess

19    is we wouldn't be here.

20            But I'll take a brief recess for about five minutes.

21            MR. FELDMAN:  Thank you, Judge.

22      (Recess from 10:35 a.m. to 10:44 a.m.)

23            THE COURT:  Please be seated.

24            Mr. Davis, are you ready to proceed?

25            MR. DAVIS:  I am, Your Honor.
```

```
1            THE COURT:  Okay.  If you want to identify and present
2    your exhibits.
3            MR. DAVIS:  Your Honor, based on the multiple letters
4    that are available to you, I went through and I just renumbered
5    them, starting at the top one, 1 through 14.
6            THE COURT:  Okay.
7            MR. DAVIS:  And I told Mr. Feldman that.  So that's
8    how I'll refer to them.  So I would just offer, at this time,
9    the affidavit of Ms. Dwornik, which is Exhibit 3, and is
10   attached to our motion for preliminary junction, and Exhibit
11   11, which is the supplemental affidavit of Ms. Dwornik, and
12   offer the attachments -- the exhibits to her two affidavits.
13           THE COURT:  Okay.  And the -- okay.  There were
14   duplicates of some.
15           MR. DAVIS:  Yes, there were.
16           THE COURT:  So you've got Exhibit A to the verified
17   complaint, but you haven't relied on the verified complaint in
18   this.  That is taken -- that is overtaken by her affidavits; is
19   that correct?
20           MR. DAVIS:  Yes.
21           THE COURT:  So the exhibits are the remaining numbers
22   in 1 through 14.  Exhibit 3 is her affidavit.  Exhibit 11 is
23   her affidavit.  And then I'm not sure --
24           MR. DAVIS:  Well -- and we're relying on the exhibits
25   to the supplemental memo as well.  So B and C, which became 4
```

```
 1   and 5 --

 2             THE COURT:  Okay.

 3             MR. DAVIS:  -- are the attachments to her first

 4   affidavit.

 5             THE COURT:  Okay.

 6             MR. DAVIS:  And then 6, 7, 8, 9, and 10 are exhibits

 7   to our supplemental memo.  And --

 8             THE COURT:  I'm not aware of case -- I mean, case law

 9   being an appropriate exhibit.  I mean, I'm not sure --

10             MR. DAVIS:  We just had attached those for the Court's

11   use.  We don't need those as an exhibit.

12             THE COURT:  Okay.  Six, 7, 8, and 9, and 10 are

13   attached to Exhibit 11, which is her supplemental affidavit?

14             MR. DAVIS:  Yes.

15             THE COURT:  Or the supplemental memo.

16             MR. DAVIS:  Supplemental memo is 6.

17             THE COURT:  Right.

18             MR. DAVIS:  And then the supplemental affidavit of

19   Ms. Dwornik and the three exhibits.  That's the --

20             THE COURT:  Okay.  Let me see if I can -- I'm just not

21   sure what these are.  And also, it's difficult when you've

22   written over and offered and marked an exhibit for me.  You've

23   got your motion for temporary injunction, which you re-filed, I

24   think, at Docket Entry 14, including the page.  So the -- her

25   affidavit attached to that, which is -- Docket Entry 14, as
```

```
 1    well as 4, is her affidavit.  So that affidavit now becomes

 2    Exhibit 3?

 3              MR. DAVIS:  Yes, Your Honor.

 4              THE COURT:  Okay.  So I'm just going to say that's

 5    Plaintiff's Exhibit 3.  And then the attachments -- and that

 6    affidavit has attachments to it, which are referred to as

 7    Exhibit B, which is almost too faint to read.  But that would

 8    be --

 9              MR. DAVIS:  That's Exhibit 4 now.

10              THE COURT:  Exhibit 4?

11              MR. DAVIS:  It's the same as Exhibit 1, purchase

12    order.

13              THE COURT:  Four, which is the same as Plaintiff's

14    Exhibit 1.  I mean, that was one of the reasons of having the

15    exhibits, is so that I didn't have duplicate items to refer to.

16              And then that's Plaintiff's Exhibit 4, which is a

17    group of pages.  And then your Exhibit C is Plaintiff's Exhibit

18    5?

19              MR. DAVIS:  Yes, Your Honor.

20              THE COURT:  Which is also a group of emails.

21              And then -- okay.  So you want to admit Exhibit 3, 4,

22    and 5; is that correct, for purposes of this hearing?

23              MR. DAVIS:  Yes, Your Honor.

24              THE COURT:  Okay.

25              MR. DAVIS:  And the others that I already referenced.
```

```
 1              THE COURT:  So those will be admitted.  I'm just going

 2     through them one at a time to the extent that I can.

 3              MR. DAVIS:  Yes, Your Honor.

 4              THE COURT:  So then you have -- so Exhibit 1 and 2 are

 5     duplicates of that, correct?  So you're not offering 1 and 2,

 6     the purchase order and the --

 7              MR. DAVIS:  That's correct, Your Honor.

 8              THE COURT:  Okay.  So 1 and 2 are not offered.

 9     They're withdrawn.

10              Then there's the supplemental memorandum in support,

11     which also has -- I'm not sure.  Let me look at Exhibit --

12              MR. DAVIS:  Six through 9 are not duplicates of

13     anything that was previously submitted.

14              THE COURT:  Okay.  So what are they?

15              And they are not attached to a -- and 10 is case law,

16     which is withdrawn as an exhibit.  But what is --

17              MR. DAVIS:  Six through 9 are attached to the

18     supplemental memorandum.

19              THE COURT:  Right.  But how are they authenticated?  I

20     don't know -- and they're not attached to an affidavit.

21              MR. DAVIS:  No -- well, they are discussed in the

22     affidavit.

23              THE COURT:  Okay.  They're discussed in the affidavit

24     of -- what affidavit?

25              MR. DAVIS:  In Ms. Dwornik's affidavit.
```

```
 1              THE COURT:  Which of Ms. Dwornik's affidavits?

 2              MR. DAVIS:  In the -- I believe they're discussed in

 3     the -- originally discussed in the supplemental.

 4              THE COURT:  So you're saying that they're discussed --

 5     they're part of the Exhibit 11?  Is that -- let me find her

 6     supplemental affidavit.

 7              MR. DAVIS:  They are in the supplemental memo.

 8              THE COURT:  I'm looking for the -- I have her original

 9     affidavit.  You don't have these exhibits separated out as like

10     independent exhibits that can just be offered at this hearing;

11     is that right?

12              MR. DAVIS:  I do not, Your Honor.

13              THE COURT:  Let me find her -- I'm trying to find her

14     supplemental affidavit that I know I was looking at before.

15              Okay.  So her supplemental affidavit is Exhibit 11.

16              MR. DAVIS:  Well, that's her supplemental affidavit,

17     but in our --

18              THE COURT:  Which is Docket Entry Number 17.

19              MR. DAVIS:  Right.  But in our motion for temporary

20     injunction --

21              THE COURT:  Okay.

22              MR. DAVIS:  -- there's -- Exhibit 8 of that is her

23     affidavit, in which she identifies the payment, the purchase

24     order, the payment documents --

25              THE COURT:  I'm just terribly confused in terms of how
```

1    to number these things, which is why -- which is why I

2    wanted -- and you know, I should have made my order more clear

3    that I wanted the parties to come here, have your exhibits

4    marked, have your exhibit list, and hand up to me each exhibit

5    that you intended to rely on as an independent exhibit, so that

6    I would have it, not having to fumble through and find exhibits

7    to motions, exhibits to supplements, independent affidavits,

8    exhibits to a complaint, and all of that.

9            I just assumed that I would have -- like a trial, you

10   just have exhibits.  You offer them up.  They're admitted.

11   They're not admitted.

12           So I've got Plaintiff's Exhibit 11.  And then -- I'm

13   just going to stick with Plaintiff's Exhibit 11 and then

14   Exhibit 1 to that affidavit is now Plaintiff's Exhibit 12?

15           MR. DAVIS:  Yes, Your Honor.

16           THE COURT:  Which is largely too faint to read, I'll

17   be honest with you.  I can't read lots of it because it's so

18   faint in terms of the printing.

19           Exhibit 2 is Plaintiff's Exhibit 12.  Exhibit 3 is

20   Plaintiff's Exhibit 13.  And Exhibit 4 is Plaintiff's Exhibit

21   14.

22           MR. DAVIS:  Fourteen.

23           THE COURT:  And so I'm still trying to -- so this

24   whole thing is Plaintiff's Exhibit 11 through 14, the

25   supplemental affidavit, and I'm still trying to go through.

```
 1              Okay.  Then the supplemental memo has payment
 2    documents, which are -- Exhibit A to the supplemental memo,
 3    you're saying is Plaintiff's Exhibit 6.  And Exhibit B is
 4    Plaintiff's Exhibit 7, which you're describing as receipt of
 5    payment from Defendant.
 6              MR. DAVIS:  Yes, Your Honor.
 7              THE COURT:  Exhibit C is Plaintiff's Exhibit 8.  And
 8    Exhibit D is Plaintiff's Exhibit 9.
 9              Okay.  And these are -- so Plaintiff's Exhibit 6
10    through 9.  And those were attached to the supplemental --
11    okay.  The supplemental memo.  And then -- okay.  But they
12    weren't -- and you say that they are -- that what they are is
13    described in another affidavit?  Is that --
14              MR. DAVIS:  Yes.  They're in her -- the affidavit
15    that's attached to the motion.
16              THE COURT:  Okay.
17              MR. DAVIS:  Your Honor, I note that we did not mark --
18    and I apologize -- did not mark her supplemental affidavit
19    itself as an exhibit, which we're offering as an exhibit.  I
20    had listed the exhibits to it, but would need to list the
21    supplemental affidavit itself as an exhibit.  So that would
22    be -- I guess we could call it Exhibit 15.
23              THE COURT:  Oh, okay.  So -- that would be?
24              MR. DAVIS:  I apologize.  I did not understand your
25    order to require what is obviously a very sensible way to
```

1    proceed about marking the exhibits.

2            THE COURT:  Okay.  So the exhibit -- okay.  So Exhibit

3    1 to the supplemental affidavit is -- okay -- is 11.  Then

4    Exhibit 2 to the supplemental affidavit is -- is 12, 13, and

5    14.  I think I've got -- I think I have them all marked.

6            And as I said, I'm fine with having a supplemental

7    affidavit.  I mean, there could be like two exhibits; her

8    original affidavit with its attachments; her supplemental

9    affidavit with its attachments could be Exhibit 2.  I didn't

10   require like exhibits to the affidavit to be separately marked.

11   I just wanted -- this is our Exhibit 1.  It has -- it's an

12   affidavit with four attachments.  This is Exhibit 2.  It's a

13   supplemental affidavit with four attachments.  This is

14   Exhibit -- you know, the independent exhibits that aren't

15   identified by anybody, I mean, I'm not sure.  You know, there

16   may need to be some kind of foundation.  I don't know -- you

17   know, I've not seen exhibits that don't have a foundation that

18   are just offered, unless there's no objection.  I don't know.

19   So ...

20           Okay.  So I'll hear objections to the exhibits as I've

21   just described.

22           MR. FELDMAN:  So that I understand correctly, Judge, I

23   didn't hear the Court admitting 6 through 10.  So I'm assuming

24   those are not coming in.

25           THE COURT:  No.  I haven't admitted anything yet.

1    I've just been trying to number them.

2            MR. FELDMAN:  Understood.

3            Judge, I think from a -- I'm not going to make

4    everybody jump through a standard basic business records.  I'm

5    assuming we're not going to have to do that here on every

6    single one of these things.  The affidavits contain no

7    foundational information at all, nothing to support the fact

8    that the documents are business records, nothing to support the

9    fact that the photograph that is attached apparently as

10   Plaintiff's 13 is a fair and accurate representation of

11   anything.

12           I mean -- and at the risk of making this Court waste

13   more time, which I don't want to do, I would simply object on

14   the basis that I think right now they have said they don't need

15   any more direct examination, and there is nothing

16   substantiating --

17           THE COURT:  Okay.  Here's what I'm going to do --

18           MR. FELDMAN:  -- the admissibility of these documents.

19           THE COURT:  I'm going to cut to the chase.

20           Mr. Davis, call your witness.  I want her to

21   authenticate any exhibits that you have on direct examination

22   or I'm not letting them in.  Now, do you have direct

23   examination that you would like to present to do that?

24           MR. DAVIS:  Now that you mention it, I do, Your Honor.

25           THE COURT:  Okay.  So I am sustaining your objection,

1   but I'm giving him an opportunity to go forward on direct

2   examination -- I mean, I've had hundreds of preliminary

3   injunctions and I don't think any of them have ever been this

4   confusing.  But it could be that I just assumed a certain

5   degree of organization that just, for whatever reason, didn't

6   happen.

7          So Mr. Davis, here's the way we're going to proceed:

8   You're going to call Ms. Dwornik to testify.  She can

9   authenticate whatever exhibits she needs to authenticate.  You

10  can offer them one at a time, but I will consider her

11  supplemental affidavit and you can make any objections or you

12  can make any argument you want regarding a lack of foundation

13  or you can cross-examine her regarding the affirmance in her

14  affidavit.

15         With respect to exhibits, Mr. Davis, let's just go one

16  at a time, and she can identify what they are, and you can lay

17  a foundation, and I'll just take objections.  And as I said,

18  I've set aside the day.  If we're here till midnight, we will

19  be here till midnight.  And we will just take it as it comes.

20  If we have to start again tomorrow, we can start again tomorrow

21  morning at 8:00 a.m.  So why don't you call Ms. Dwornik and

22  that's the way I'm going to handle -- that's the way I'm going

23  to handle the exhibits.

24         And I'm going to -- you know, the way they do it in

25  state court is the judge makes the exhibit list, instead of

```
 1    having them premarked.  So I assume you have exhibits that
 2    you'll be able to mark.  You have copies of the exhibits you
 3    want us to consider, right?
 4              MR. DAVIS:  I do.
 5              THE COURT:  Okay.  Okay.  So Ms. Dwornik --
 6              MR. DAVIS:  Your Honor, how do you want to proceed
 7    with exhibits that we've listed and they've listed as well?  If
 8    they've listed an exhibit --
 9              THE COURT:  It's your case.
10              MR. DAVIS:  Thank you, Your Honor.
11              THE COURT:  You need to get them admitted.  And if
12    they want to then use your exhibits, they can.  If they want to
13    mark a duplicate exhibit, they can do that.  I'm -- you know,
14    however it is you want to deal wit.  I mean, ideally, what
15    happens is there's some collaboration, there's like perhaps an
16    exhibit notebook, there's joint exhibits.  I've had parties do
17    that say:  "These are the relevant exhibits for you to
18    consider.  We don't object to any of them coming in."  And then
19    you have brief argument explaining them and cross-examination
20    regarding the issues.
21              I mean, I think there are serious issues in this case
22    on both sides.  So -- but I'm just trying to get a record.  I'm
23    just trying to get the evidence in that needs to be considered
24    in evaluating those positions.
25              MR. DAVIS:  All right.  We'll call Ms. Dwornik.
```

```
 1            THE COURT:  Ms. Dwornik, if you'll come forward,
 2    please, and take the witness stand, and remain standing while
 3    you're sworn.
 4        NATALIA DWORNIK, PLAINTIFF WITNESS, SWORN
 5            COURTROOM DEPUTY:  Please be seated.  Speak in the
 6    microphone.  State your name, spell your first and your last
 7    name, for the record.
 8            THE WITNESS:  Natalia Dwornik.  N-A-T-A-L-I-A.
 9    Dwornik.  D-W-O-R-N-I-K.
10            THE COURT:  Okay.  You can proceed, Mr. Davis.
11            MR. DAVIS:  Your Honor, may I approach the witness to
12    show her the exhibits because I don't have an extra set?
13            THE COURT:  Yes.  You want a handheld microphone, so
14    you can question her while you're both looking at exhibits?
15            MR. FELDMAN:  Judge -- thank you.
16            THE COURT:  And I'll extend the same courtesy to you,
17    Mr. Feldman, if you need to do so.
18            MR. FELDMAN:  Judge, just so we're -- if he does it in
19    the aggregate, I'm fine.  I mean, he doesn't need to do them,
20    from my perspective, one by one.  They are business records and
21    there's a photograph.  He can do the business records in the
22    aggregate, the photograph, and move on, you know.
23            THE COURT:  With respect to which exhibits are we
24    discussing?
25            MR. FELDMAN:  I think they have a photograph and
```

1    everything else would be a business record.

2         THE COURT:  Okay.  Mr. Davis, you can proceed.

3         When he offers it, you can say you don't object, but I

4    just want a record of what's being offered and what the number

5    is of what's being offered.  And then under the rules -- as you

6    all know, they were amended because the Eleventh Circuit wants

7    all exhibits electronically filed.  You need to keep the

8    original exhibits that are introduced and you need to scan

9    them, numbered appropriately, into the record after the

10   conclusion of the hearing, which is another reason why we need

11   discrete exhibits filed with respect to a hearing.

12                          DIRECT EXAMINATION

13   BY MR. DAVIS:

14   Q.  I'm going to show you what's been marked as the purchase

15   order.  Is this the purchase order in the transaction at issue

16   here?

17   A.  It is.

18        THE COURT:  Okay.  What exhibit are we referring to

19   here?

20        MR. DAVIS:  This is Exhibit Number 4, Your Honor.

21        THE COURT:  Okay.  Plaintiff's Exhibit Number 4.  And

22   can you describe for the record what Plaintiff's Exhibit Number

23   4 purports to be.

24        THE WITNESS:  This is the original purchase order that

25   was issued by CCA Bahamas to Source Contract.

```
 1    BY MR. DAVIS:

 2    Q.  And is this document from the business records of CCA?

 3    A.  It is.

 4    Q.  And does CCA normally keep records of this sort as a

 5    business record?

 6    A.  Yes, we do.

 7           MR. DAVIS:  I move this exhibit into evidence, Your

 8    Honor.

 9           THE COURT:  Okay.  It will be admitted.

10      (Plaintiff's Exhibit 4 received into evidence.)

11    BY MR. DAVIS:

12    Q.  I'll show you what has been marked as Exhibit 5.  Do you

13    recognize that document?

14    A.  Yes, I do.

15    Q.  And what is that document?

16    A.  This is the letter that was issued by our legal advisers to

17    the company Source regarding the non-delivery of the chairs

18    that we purchased under that purchase order.

19    Q.  This is a demand letter that was sent?

20           THE COURT:  Can you give me a date, please.

21           MR. DAVIS:  It's May 3rd, 2017, Your Honor.

22    BY MR. DAVIS:

23    Q.  And is this document also from the business records of CCA?

24    A.  It is.  Yes.

25    Q.  And it's normally maintained as a business record --
```

1    documents of this sort?

2    A.  Correct.

3            MR. DAVIS:  I'd move this document into evidence, Your

4    Honor.

5            THE COURT:  Okay.  It will be admitted.

6        (Plaintiff's Exhibit 5 received into evidence.)

7            THE COURT:  And are you also offering Exhibit 3, her

8    affidavit?

9            MR. DAVIS:  Yes, Your Honor.

10           THE COURT:  Okay.  And I'll admit her affidavit.

11       (Plaintiff's Exhibit 3 received into evidence.)

12           MR. DAVIS:  Moving to Exhibit 6, Your Honor, which is

13   attachment A to the supplemental memo.

14   BY MR. DAVIS:

15   Q.  Can you describe what these documents are, please.

16   A.  This is confirmation from our accounting department of

17   payment to -- from CCA Bahamas for the purchase order.

18   Q.  Payment to Source?

19   A.  To Source, yes.

20   Q.  And is this document from the business records?

21   A.  This is from the business records.

22   Q.  And this is routinely kept as a business record by CCA?

23   A.  It is.

24           MR. DAVIS:  Move Exhibit 6 into evidence, Your Honor.

25           THE COURT:  Okay.  Six is admitted.

```
 1        (Plaintiff's Exhibit 6 received into evidence.)

 2   BY MR. DAVIS:

 3   Q.  Now direct your attention to Exhibit 7, which is Exhibit B

 4   to the supplemental memorandum.  And can you tell -- describe

 5   that for the Court, please.

 6   A.  This is an email from Source Contract to myself, confirming

 7   that the payment has been received, dated 11th of January 2017.

 8        MR. DAVIS:  And I'd move that into evidence, Your

 9   Honor.  It's an admission.

10        THE COURT:  Okay.  Exhibit 7 is admitted.

11        (Plaintiff's Exhibit 7 received into evidence.)

12   BY MR. DAVIS:

13   Q.  Now, look at Exhibit C to this memo, which is now Exhibit

14   8.  Can you tell the Court what that is.

15   A.  This was an automated message received from Source Outdoor.

16   It came from a sort of no-reply sales-type email address,

17   confirming that the order for the chairs is in production and

18   the estimated completion date would be the 19th of May, 2017.

19   Q.  And is this from the business records of CCA?

20   A.  It is.

21   Q.  And this is routinely maintained as a business record in

22   CCA?

23   A.  Correct.

24        MR. DAVIS:  Move this into admission, Your Honor as

25   Exhibit 8.
```

```
 1              THE COURT:  Okay.  It will be admitted.

 2         (Plaintiff's Exhibit 8 received into evidence.)

 3    BY MR. DAVIS:

 4    Q.  Okay.  Look at Exhibit 9, which is Exhibit 10 to the --

 5    Exhibit D to the supplemental memorandum.  Can you describe

 6    that, please.

 7    A.  This is an email that I received from Source Outdoors, with

 8    a picture of the Bahama project site, which is our project,

 9    with a picture of the -- some of the chairs that were purchased

10    by BML previously and were delivered.

11    Q.  Can you identify where that picture was taken.

12    A.  That is at the poolside of the project.

13              MR. DAVIS:  Offer this, Your Honor, as Exhibit D --

14    I'm sorry -- Exhibit 9.

15              THE COURT:  Okay.  It will be admitted.

16         (Plaintiff's Exhibit 9 received into evidence.)

17    BY MR. DAVIS:

18    Q.  Can you identify this document, please.

19    A.  This is my supplemental affidavit.

20              MR. DAVIS:  I'll offer that as Exhibit 15, Your Honor.

21              THE COURT:  Okay.  Exhibit 15 will be admitted.

22         (Plaintiff's Exhibit 15 received into evidence.)

23    BY MR. DAVIS:

24    Q.  Okay.  Now, looking at Exhibit 11, which is 1 to the -- to

25    your supplement, can you describe for the Court what that
```

1    document is.

2    A.   This is an email requesting the details of all the previous

3    transactions between Source and BML/PSI, so that I could

4    understand what the situation was regarding payments and

5    deliveries and orders.

6            THE COURT:  And what's the date of that?

7            THE WITNESS:  That email is December the 7th, 2016.

8    BY MR. DAVIS:

9    Q.   And is this normally kept as a business regard of CCA?

10   A.   It is, yes.

11   Q.   And is it the type of record that is normally retained as a

12   business record?

13   A.   Correct.

14           MR. DAVIS:  Offer this as Exhibit 11, Your Honor.

15           THE COURT:  Okay.  It will be admitted.

16       (Plaintiff's Exhibit 11 received into evidence.)

17   BY MR. DAVIS:

18   Q.   Exhibit 2, please.

19       Ask you to identify this -- this is Exhibit 12 or Exhibit 2

20   to your supplemental affidavit.  Can you describe what that is,

21   please.

22   A.   This is a response, dated December the 12th, regarding my

23   request for further information.  Source have -- state that

24   they need time to work on this information because all the old

25   purchase orders have been closed out and written off, and it's

1   asking for a meeting on site.

2   Q.  And is this from the business records of CCA?

3   A.  It is.  Correct.

4          MR. DAVIS:  Offer this as Exhibit 12, Your Honor.

5          THE COURT:  Okay.  Exhibit 12 is admitted.

6      (Plaintiff's Exhibit 12 received into evidence.)

7   BY MR. DAVIS:

8   Q.  Look at Exhibit 3, which is Exhibit 13.  Can you tell the

9   Court what that is.

10  A.  This is a photograph of one of the chairs that has already

11  been delivered to the project.

12  Q.  This was pursuant to the first order?

13  A.  Correct.  Yes.

14         MR. DAVIS:  Okay.  Offer that as Exhibit 13, Your

15  Honor.

16         MR. FELDMAN:  Objection.  Foundation.

17         THE COURT:  Okay.  What's wrong with the foundation?

18         MR. FELDMAN:  They haven't established it's a fair and

19  accurate representation, Judge, the chair they actually have on

20  site or who took the picture.

21         THE COURT:  Okay.  Mr. Davis.

22  BY MR. DAVIS:

23  Q.  Is this a fair and accurate representation of the chairs

24  that are on site that were delivered to you from Source

25  pursuant to the first order?

```
 1    A.  It is.  It is a picture of the chair, together with the

 2    second picture.  Actually has "Source Outdoor," the logo, on

 3    the chair.

 4    Q.  Do you know who took the picture?

 5    A.  Alex Hailey, who is our external works manager.

 6    Q.  And it is an accurate representation of the chair on the

 7    site?

 8    A.  It is.  Yes.

 9         MR. DAVIS:  I move this into evidence, Your Honor.

10         THE COURT:  It will be admitted.

11    (Plaintiff's Exhibit 13 received into evidence.)

12    BY MR. DAVIS:

13    Q.  And look at the next exhibit.  Can you describe for the

14    Court what that is.

15         THE COURT:  This, for the record, is Exhibit 14, which

16    is Exhibit 4 to her supplemental affidavit?

17         MR. DAVIS:  It is, Your Honor.

18         THE COURT:  Okay.

19         THE WITNESS:  This is, again, the advertisement from

20    Source Furniture advertising with a picture of the Bahama

21    project with the chairs that are on this photograph that I just

22    showed, advertising a special on these chairs.

23    BY MR. DAVIS:

24    Q.  And what is attached to that?

25    A.  And that is from the Source website, a picture of -- a
```

1    close-up picture of the Atlantic chairs.

2    Q.  Of the chairs being offered in the advertisement?

3    A.  Correct, yes.

4            MR. DAVIS:  Offer this as Exhibit 14, Your Honor.

5            THE COURT:  Okay.  Exhibit 14 will be admitted.

6        (Plaintiff's Exhibit 14 received into evidence.)

7            MR. DAVIS:  I can tender Ms. Dwornik for

8    cross-examination at this time.

9            THE COURT:  Okay.  Mr. Feldman.

10           MR. FELDMAN:  Thank you, Judge.

11                       CROSS-EXAMINATION

12   BY MR. FELDMAN:

13   Q.  Ms. Dwornik, how long have you worked with CCA?

14   A.  With or for?  Just to be correct.

15   Q.  How long have you worked for CCA?

16   A.  About three years.

17   Q.  Three years.

18       Okay.  And do I understand correctly that you're a contract

19   manager?

20   A.  I am, yes.

21   Q.  And what does that position entail?

22   A.  Well, I do all sorts of things, from bidding estimates,

23   drawing contractual -- drawing up contractual agreements,

24   contractual administration, procurement, change order

25   management.

```
 1   Q.  Do you deal with on-site delivery issues?

 2   A.  I do, yes.

 3   Q.  What's your role with regard to on-site delivery issues?

 4   A.  Well, my role is to -- what is procured through my FF&E

 5   department is to make sure we get it on site and installed.

 6   Q.  Do you run -- I'm sorry.  Go ahead, please.

 7   A.  And installed.

 8   Q.  Do you run the FF&E department?

 9   A.  No, I don't.

10   Q.  And "FF&E" stands for what again, please?

11   A.  Furniture, fittings, and equipment.

12   Q.  Who runs the FF&E department for CCA?

13   A.  Luming Gao.

14   Q.  Who?

15   A.  Luming Gao.

16            THE COURT:  Can you spell that, please.

17            THE WITNESS:  L-U-M-I-N-G.  Gao.  G-A-O.  That's who I

18   report to.

19   BY MR. FELDMAN:

20   Q.  So you report directly to Mr. or Mrs.?

21   A.  Mister.

22   Q.  You report directly to Mr. Gao?

23   A.  I do.

24   Q.  Is Mr. Gao located in the Bahamas or elsewhere?

25   A.  He is in the Bahamas.
```

```
1    Q.   Permanently or just in connection with this project?

2    A.   Well, in connection with this project, but permanently.  I

3    mean, it's a very long project.

4    Q.   Do you know who Mr. Gao reports to?

5    A.   Yes, I do.

6    Q.   Who does Mr. Gao report to?

7    A.   He reports to the president of CCA Bahamas.

8    Q.   President of CCA Bahamas?

9    A.   Correct.

10   Q.   Is CCA Bahamas a subsidiary entity?

11   A.   Of?

12   Q.   Let me rephrase the question.  Is there a parent company of

13   CCA Bahamas?

14   A.   There is, yes.

15   Q.   I'm sorry?

16   A.   There is, yes.

17   Q.   What would that company be?

18   A.   It's a very complicated structure.  I can't be a hundred

19   percent sure.  But I believe it's CC -- Construction -- CCA --

20   just Construction -- China Construction America.

21   Q.   So you believe -- and I understand you said you can't be

22   certain, but you believe that China Construction America would

23   be the parent company for CCA Bahamas?

24   A.   Well, the parent company is actually CSEC, which is -- is

25   the parent company in Beijing -- is the ultimate parent
```

```
 1    company.
 2    Q.   Okay.  So then do you know how many layers there would be
 3    between the ultimate parent company, as you described it, and
 4    CCA Bahamas?
 5    A.   I would suspect three or four.  I can't be sure of the
 6    company structure.
 7    Q.   But you don't know for certain, correct?
 8    A.   Correct.
 9    Q.   As part of your job, do you have access to CCA Bahamas'
10    financial information?
11    A.   No, I do not.
12    Q.   So is it fair for me to say that if I were to ask you right
13    now -- and I'm not asking for a number.  I'm just asking if you
14    would or you wouldn't know -- whether you know how much money
15    CCA Bahamas currently has in the bank account right now or in
16    all of its bank accounts, you would not know?  Is that a fair
17    statement?
18    A.   That's correct.  I wouldn't know.
19    Q.   Have you ever had access to that information?
20    A.   No.
21    Q.   Do you have any idea how much money CCA Bahamas makes?
22    A.   No.
23    Q.   Do you have any idea how much money CCA Bahamas spends on a
24    weekly basis?
25    A.   No.
```

```
 1   Q.  On a monthly basis?

 2   A.  No.

 3   Q.  On an annual basis?

 4   A.  No.

 5   Q.  On a daily basis?

 6   A.  No.

 7           MR. FELDMAN:  For ease of my examination here, Judge,

 8   unless I introduce something differently, I'll just refer to

 9   the exhibits -- to the extent that Plaintiff has offered them,

10   I'll go by their exhibit numbers.  Okay, Judge?

11           THE COURT:  That's fine.

12   BY MR. FELDMAN:

13   Q.  You signed an affidavit, correct?

14   A.  Correct.

15   Q.  In connection with the motion for temporary injunction in

16   this case?

17   A.  That's correct.

18   Q.  That affidavit was sworn to as true and correct?

19   A.  Correct.

20   Q.  Have you ever discussed how much money CCA Bahamas has in

21   the bank?

22   A.  With who?

23   Q.  With anybody at CCA Bahamas.

24   A.  No.

25   Q.  So you didn't discuss it with anyone prior to signing this
```

1    affidavit?

2    A.  No.

3    Q.  In Paragraph 9 of the affidavit -- and I'll read it here --

4    you said:  "The consequences of not meeting this date would be

5    catastrophic."  Do you recall that?

6    A.  Yes, I do.

7    Q.  Okay.  And were you referring to the $150,000 a day in

8    liquidated damages for the first 31 days and $250,000 a day

9    thereafter?

10   A.  I was referring to the overall situation of the project.

11   Q.  Okay.  So let's take it piece by piece.  Let's talk about

12   the liquidated damages first.  Okay?

13   A.  Uh-huh.

14   Q.  As we sit here right now, do you know if CCA Bahamas

15   financially could pay $150,000 a day in liquidated damages?

16   A.  No, I don't.

17   Q.  As we sit here right now, do you know if CCA Bahamas could

18   pay $250,000 a day in liquidated damages?

19   A.  No, I don't.

20   Q.  As we sit here right now, do you have any idea how long CCA

21   Bahamas could go on sustaining those type of payments?

22   A.  No, I don't.

23   Q.  Have you actually seen the contract between CCA Bahamas and

24   whoever it's in contract with that provides for those

25   liquidated damages?

```
 1    A.  Yes, I have.

 2    Q.  Have you read the liquidated damages clause?

 3    A.  Yes, I have.

 4    Q.  Do you know if it has any conditions or limitations to it?

 5    A.  I can't answer that because I don't remember.

 6    Q.  But you didn't offer it in connection with these

 7    proceedings, did you?

 8    A.  It's a sealed document.

 9    Q.  I'm sorry?

10    A.  It's a sealed court document.

11    Q.  Did you ask to have it unsealed or did CCA Bahamas ask to

12    have it unsealed?

13    A.  It's sealed by the Court.

14    Q.  That's not what I'm asking.  I'm asking if CCA Bahamas

15    requested that it be unsealed for purposes of these

16    proceedings?

17    A.  I don't know that answer.

18              THE COURT:  Which court sealed it?

19              THE WITNESS:  Bahamas.

20              THE COURT:  You need to speak into the microphone.

21              THE WITNESS:  Sorry.  The court in the Bahamas.

22              THE COURT:  Okay.

23    BY MR. FELDMAN:

24    Q.  So you don't know whether CCA Bahamas sought to have it

25    unsealed or not; is that correct?
```

1   A.  Correct.

2   Q.  Do you have any involvement at CCA Bahamas -- let me stress

3   something.  If the -- I just want an answer to this yes or no

4   because I don't want to ask about conversations you may have

5   had if the answer is yes.  Okay?

6   A.  (No verbal response.)

7   Q.  Do you have any involvement with the legal proceedings that

8   CCA Bahamas may have had in connection with whatever case

9   ultimately resulted in the sealing of that document?

10  A.  I'm sorry.  I'm not sure I understand the question.

11  Q.  Okay.  Let me break it out a little bit.  Do you know what

12  case -- what court case that document was sealed in?

13  A.  Well, only in that -- well, what's known in the papers.

14  But that was part of the government negotiations for CCA and

15  the receivers to complete the project.

16  Q.  So you know that based on newspaper proceedings or you

17  actually have personal knowledge of that?

18  A.  Well, a bit of both, I guess.

19  Q.  Okay.  So explain to me what your aspect of personal

20  knowledge would be related to that.

21  A.  Well, I just know that there was a deal between that --

22  that brought us back to the project during the -- after the

23  suspension period and that a deal had been done between the

24  parties for the project to restart.

25  Q.  Do you know what that deal entailed?

```
1    A.  As in the actual content of everything?

2    Q.  Yeah.

3    A.  No, I don't.

4    Q.  Were you part of the negotiations for that deal?

5    A.  Only parts of the negotiation.

6    Q.  What parts were you involved in?

7    A.  Just certain documents.

8    Q.  I'm sorry?

9    A.  Just certain documents.  I don't have the whole story.

10   Q.  Were you involved in the negotiation of the contract that

11   was signed that includes the liquidated damages provision that

12   you've mentioned here?

13   A.  I was, yes.

14   Q.  Okay.  What role did you play in that regard?

15   A.  I was just -- well, I was part of the CCA team that was

16   reviewing the agreements with the -- that were being drafted by

17   the opposing counsel.

18   Q.  So were you part of the negotiations?

19   A.  As in was I actually talking with people or was I talking

20   with my own people?

21   Q.  Were you talking with other people outside of CCA Bahamas?

22   A.  No.  Just with my legal team, as far as I recall.

23   Q.  Do you have any ownership interest in CCA Bahamas?

24   A.  No, I do not.

25   Q.  Prior to working with CCA Bahamas, where did you work?
```

```
 1    A.  I worked for a company in the Bahamas called AMS.

 2              THE COURT:  Can you spell that, please.

 3              THE WITNESS:  A-M-S.

 4    BY MR. FELDMAN:

 5    Q.  AMS you said?

 6    A.  Uh-huh.

 7    Q.  Are they a construction company?

 8    A.  They are a plumbing contractor.

 9    Q.  A plumbing contractor.  Okay.

10        Is CCA Bahamas a general contractor?

11    A.  Yes.

12    Q.  Prior to working for CCA Bahamas, had you ever worked for a

13    general contractor?

14    A.  Yes.

15    Q.  Which one?

16    A.  Well, I've been working for 30 years.  I've been working

17    for a lot of contractors.

18    Q.  Okay.  So have you worked for more than one?

19    A.  Yes.

20    Q.  Okay.  Have you ever held the same position that you hold

21    at CCA Bahamas, of contract manager, with any other

22    construction companies?

23    A.  Well, my background is working as a consultant.  So I don't

24    tend to have those kind of titles.

25    Q.  So would the answer then technically be no?
```

1    A.  Well, have I done the type of work before?  Yes.

2    Q.  Okay.

3    A.  Do I have that title?  I don't know.  I work for -- for

4    example, I work for CCA Bahamas, but I also work for the South

5    America division, where I have a slightly different title.  So

6    the titles are a little bit irrelevant to what I actually do.

7    Q.  Okay.  Do you know if CCA Bahamas has a public relations

8    department?

9    A.  I don't know.

10   Q.  Is it fair to assume, then, that you've never dealt with

11   anybody that you would have been under the understanding was

12   part of CCA Bahamas' public relations department?

13   A.  Correct.  Most of -- most of the -- most of the support for

14   CCA Bahamas is through their head office in CCA America.

15   Q.  I'm sorry.  Can you say that again, please.

16   A.  Most of the support for CCA Bahamas is from their head

17   office in New Jersey, which is CCA America.

18   Q.  CCA America would be the head office, in New Jersey?

19   A.  Uh-huh.

20   Q.  Do you deal with people at CCA America?

21   A.  Seldom.

22   Q.  Seldom.  Have you ever dealt with people at CCA America

23   regarding the Baha Mar project?

24   A.  Possibly.

25   Q.  Have you ever dealt with people at CCA America regarding

```
1    Source -- Conquest Financial?  I'll refer to them as Source

2    Outdoor here.  Okay?

3    A.  Okay.

4    Q.  Because that's the name they do business under.

5    A.  Okay.

6    Q.  Have you ever dealt with somebody at CCA America regarding

7    Source Outdoor?

8    A.  No.

9    Q.  Have you ever dealt with somebody at CCA America regarding

10   public relations for CCA America or CCA Bahamas?

11   A.  No.

12   Q.  Have you ever been involved in the issuance of any press

13   releases related to CCA Bahamas?

14   A.  I may have had one dealing at one point.

15   Q.  Do you recall exactly what that was?

16   A.  I don't.  It was around the time when the new deal was

17   agreed for resumption of the project.  This is a $3 billion

18   project.  There's so much going on, I honestly can't remember.

19   Q.  Okay.  So obviously -- you said -- just let me follow-up on

20   that.  You just said there was a lot going on and you can't

21   remember, correct?

22   A.  Uh-huh.

23   Q.  So you don't have any specific recollection of ever dealing

24   with anybody related to CCA Bahamas public relations, correct?

25   A.  Correct.
```

1    Q.   Nothing related to their press relations, correct?

2    A.   Not with CCA America, no.  I had one dealing that I can

3    remember, and it was to our legal team.  They were getting

4    ready to make a press announcement, and I think I was asked to

5    review it.

6    Q.   Prior to testifying here today, did you specifically

7    discuss with anybody at -- I'm sorry.  Let me strike that.

8         Prior to the affidavit that you have signed in connection

9    with the motion for temporary injunction, did you specifically

10   discuss with anybody at CCA Bahamas the impact it would have on

11   CCA Bahamas' reputation if delivery of the project was late?

12   A.   I possibly would have had that discussion with Mr. Gao,

13   yes.

14   Q.   You said "possibly."

15   A.   Yeah.

16   Q.   Are you sure or you don't recall?

17   A.   No.  I can't be --

18   Q.   You don't recall?

19   A.   I mean, we -- we had a lot of discussions as to how we're

20   going to resolve this case with him and how we could move

21   forward.

22   Q.   That's not what I asked.  I asked if you recall a specific

23   conversation that you may have had regarding the impact of late

24   delivery on CCA Bahamas' reputation.

25   A.   I can't recall.

1   Q.  Has CCA Bahamas missed any deadlines in connection with the

2   Baha Mar project?

3   A.  I don't know.  I don't know the answer to that.

4   Q.  Would it be something you would know if they were on time

5   or late?

6   A.  For -- for this -- historically, no.

7   Q.  Okay.

8   A.  When they were originally in contract with BML.

9       At this point, now that they are in contract with the

10  receiver, yes, I would know.

11  Q.  When did they sign a contract with the receiver?

12  A.  I can't give you the date, but I -- it's around about

13  September of last year.

14  Q.  So how could you tell me for certain that you would know

15  based on the timeline they signed the contract with receiver,

16  if you don't know when they signed the contract with the

17  receiver?

18  A.  I don't know when they signed it.  You asked me a question

19  when it was signed.  I can't remember the date it was signed.

20  I know that our contract period runs from -- and I don't have

21  it front of me, but something like the 5th or the 10th of

22  October 2016, and it was for one year.

23  Q.  So from, let's say, the 5th of September -- is that what

24  you said, the 5th or 10th?

25  A.  No.  No.  It was -- I think it was signed some time in

```
 1   September.  I don't know.
 2   Q.  Let's say from September 2016 till your testimony here
 3   right now --
 4   A.  Uh-huh.
 5   Q.  -- has CCA Bahamas missed any deadlines?
 6   A.  No.
 7   Q.  They have not?
 8   A.  No.
 9   Q.  Is CCA Bahamas currently on schedule to complete the
10   project on time, except for these chairs?
11   A.  As far as I'm aware, yes.
12   Q.  Do you know or you're not certain?
13   A.  As far as I know, yes.
14   Q.  So --
15   A.  Much of the project's already been handed over.  We're
16   actually very early in the delivery and the project is actually
17   open.
18   Q.  So am I -- I want to make sure I understand correctly.
19   You're saying CCA Bahamas is on time or you're saying you don't
20   have any knowledge that CCA Bahamas is late?  Which one would
21   it be?
22   A.  Well, I don't understand the difference.
23   Q.  Okay.  If you tell me that CCA Bahamas is on time, I'm
24   going to assume that you know for certain that they're on
25   target.  If you tell me that you don't have any knowledge that
```

```
 1    CCA Bahamas is late, I'm going to assume that to the best of

 2    your knowledge they're on target, but you don't know for sure.

 3    Which one is it?

 4    A.  Well, no one could be sure until the date --

 5    Q.  I'm asking as of now.

 6    A.  Well, as of now, as far as I'm aware, we are ahead of

 7    schedule.

 8    Q.  Is that with regard to all aspects of the project?

 9    A.  I would say yes.

10         THE COURT:  Let me clarify.  You said the project is

11    actually open now?

12         THE WITNESS:  Correct.

13         THE COURT:  And what do you mean by "open now," like

14    there are guests or there's an operating casino or --

15         THE WITNESS:  Correct.  The project is made up of four

16    hotels, a casino, golf course, a convention center, and another

17    auxiliary facilities.  The convention center is open, the golf

18    course/clubhouse is open, the casino floor and a lot of the

19    podium retail is open.

20         THE COURT:  A lot of the what?

21         THE WITNESS:  Retail around the podium.

22         THE COURT:  Around the what?

23         THE WITNESS:  Podium, where the casino is.

24         THE COURT:  Okay.

25         THE WITNESS:  There's a lot of retail shops around the
```

```
 1    casino and restaurants.  So quite a number of those are open

 2    already.  There are paying guests in two of the hotels.

 3    BY MR. FELDMAN:

 4    Q.  Following up --

 5         MR. FELDMAN:  I'm sorry, Judge.  Do you have

 6    another -- can I --

 7         THE COURT:  Go ahead.

 8    BY MR. FELDMAN:

 9    Q.  Following up on the question Judge Simonton just asked you,

10    what part of the project remains to be open?

11    A.  The SLS Hotel and the Rosewood Hotel.

12    Q.  The chairs what we're talking about here, which hotel would

13    those be for?

14    A.  Rosewood and --

15    Q.  Rosewood?

16    A.  Well, I'd have to look at exactly the number.  I think --

17    out of the 3,000 chairs, I think they were allocated quite

18    evenly across the four properties.

19    Q.  So you can't say for certain whether they are for one or

20    the other right now?

21    A.  Correct.

22    Q.  Are they for any of the hotels that are already open?

23    A.  Like I said, I would have to look at the numbers, but

24    effectively, two hotels are open and two are not, and we have

25    half the chairs, roughly.  But as I say, I have to look at the
```

```
 1   numbers of how many were allocated to each hotel.

 2   Q.  Have you ever worked for any member of the media in the

 3   Bahamas?

 4   A.  No.

 5   Q.  Have you ever worked for any member of the media in the US?

 6   A.  No.

 7   Q.  Have you ever worked for any member of the media in China?

 8   A.  No.

 9   Q.  Prior to signing your affidavit in support of the motion

10   for temporary injunction, did you discuss the impact it would

11   have on CCA in terms of publicity with any member of the media

12   in the Bahamas?

13   A.  No.

14   Q.  Did you discuss it with any member of the media in the US?

15   A.  No.

16   Q.  Did you discuss it with a the member of the media China?

17   A.  No.

18   Q.  Did you discuss it with any member of the media anywhere in

19   the world?

20   A.  No.

21   Q.  Did you discuss it with any media relations department or

22   public relations department for any of the CCA entities?

23   A.  Only with counsel and with other people.

24   Q.  I don't know what you talked about with counsel.  So --

25   when you say "counsel," you mean legal counsel?
```

```
 1          THE COURT:  You cut her off when she was saying:  "And
 2     other people."
 3          MR. FELDMAN:  Okay.  I'm sorry, Judge.  I'm sorry.
 4     BY MR. FELDMAN:
 5     Q.  I'm not talking about what you talked about with legal
 6     counsel.  What other people?
 7     A.  Well, like Mr. Gao, as I mentioned, and other people in my
 8     FF&E department.
 9     Q.  So you have no actual personal knowledge as to the impact
10     or as to what -- strike that.
11          You have no actual personal knowledge as to what type of
12     press or media coverage CCA will or will not receive if you're
13     late.  Isn't that correct?
14     A.  I think I've got a very good indication of what it would
15     be.  I've been involved with the project for 12 years.  I've
16     seen how the media is following the project.  I've seen -- I
17     read the papers every day about what's going on at the project.
18     A lot of people write about the project every single day.  From
19     my experience of 12 years of being on the project, I can see
20     how every single thing is picked up by the media.  And I think
21     it's a very good guess that this will be picked up from the
22     media.  And in fact, it has been already.
23          THE COURT:  Can you tell me when the SLS and Rosewood
24     hotels are anticipated to open as of now.
25          THE WITNESS:  The SLS, yesterday, we had some
```

```
 1   completion for some sections of it.  I think in the next month,
 2   six weeks.  I can't be certain right now.
 3          THE COURT:  And what about the Rosewood?
 4          THE WITNESS:  Again, certain sections of the Rosewood
 5   have received completion just this week, I believe.
 6          THE COURT:  And what do you mean certain -- I don't
 7   understand what "certain sections" means.
 8          THE WITNESS:  Well, again, the hotel is so big, and
 9   we're completing it in sections because the new operator is
10   very keen to have it operational as quickly as possible and not
11   wait till our October date.  So we're trying to facilitate them
12   to open as much as they can, every week to open a little bit
13   more.
14          THE COURT:  So the Rosewood Hotel is currently having
15   guests?
16          THE WITNESS:  No.  There's no guests in the Rosewood
17   or the SLS right now.
18          THE COURT:  Okay.  So when you say certain parts are
19   complete, you're just saying that along the lines of like
20   certain floors are complete, other floors aren't --
21          THE WITNESS:  Yeah.  I believe the library in the
22   Rosewood has received completion.  And I don't know, maybe the
23   ballroom.  I would have to check.  But not guest rooms, no.
24          MR. FELDMAN:  May I, Judge?
25          THE COURT:  Yes.
```

```
1    BY MR. FELDMAN:

2    Q.  You just said, I believe, you think you have a pretty good

3    idea, but I just want to clarify something.  Any of the things

4    that you've just talked about you have a good idea about, you

5    have not actually discussed any of that with any member of the

6    media, correct?

7    A.  Correct.

8    Q.  You have not discussed it with any member of any kind of

9    public relations team or department that CCA Bahamas or any CCA

10   entity may have, correct?

11   A.  Correct.

12   Q.  In your affidavit -- and I just want to get clarity of

13   something -- you alluded to the fact that this would be the

14   peak of tourist season.  You're talking about the tourist

15   season in the Bahamas?

16   A.  Correct.

17   Q.  When do you believe the peak of the tourist season in the

18   Bahamas is?

19   A.  It begins in early November, prior to Thanksgiving.

20   Thanksgiving being a very big tourism weekend.

21   Q.  Hold on.  So if CCA Bahamas were to deliver on

22   October 30th, it would be prior to even your estimate of the

23   peak of the tourist season?

24   A.  Correct.

25            MR. DAVIS:  You said CCA.
```

```
 1          MR. FELDMAN:  I'm sorry?

 2          MR. DAVIS:  You said:  "CCA delivered."

 3          MR. FELDMAN:  Yeah, CCA would have delivered -- I

 4    mean, substantially complete is what I meant to --

 5          THE WITNESS:  Yeah, and that's why I think the date is

 6    the 10th of October in our contract.

 7    BY MR. FELDMAN:

 8    Q.  How do you conclude that the beginning of November is the

 9    peak of the tourist season?

10    A.  Data.  Hotel data in the Bahamas.

11    Q.  What hotel data are you talking about?

12    A.  It's the Bahamas Hotel Association, I believe, or something

13    like that.  They issue figures.

14    Q.  Have you ever actually seen that data yourself?

15    A.  I have, yes.

16    Q.  When was the last time you looked at it?

17    A.  I can't tell you.

18    Q.  Did you look at it prior to signing the affidavit in

19    support of your motion for temporary injunction?

20    A.  No.  No, I did not.

21    Q.  Let me shift over for a second --

22          MR. FELDMAN:  I'm just going to walk over and get

23    something from my desk, Judge.

24          (Pause in proceedings.)

25
```

```
 1   BY MR. FELDMAN:

 2   Q.  I'm going to refer you to -- where is it?

 3         MR. FELDMAN:  Never mind.  I was going to discuss the

 4   documentation from Moody's.  But just for the record, that has

 5   not been admitted into the record here.  So we'll move on from

 6   that.

 7   BY MR. FELDMAN:

 8   Q.  As we sit here right now, could you recite for the Court

 9   what the liquidated damages clause in your contract -- or in

10   CCA Bahamas' contract actually says?

11   A.  Not from memory, no.

12   Q.  Could you recite if there's any exception?  Could you tell

13   the Court definitively whether there's any exceptions?

14   A.  No.

15   Q.  Could you tell the Court definitively whether there's any

16   conditions to it?

17   A.  No.  As far as I recall, there's a time period after which

18   those kick in under the contract.

19   Q.  I asked if you could tell the Court specifically or

20   definitively whether there were any conditions to it.

21   A.  No, I cannot.

22   Q.  Could you tell the Court definitively whether there's any

23   limitations on it?

24   A.  No, I cannot.

25   Q.  Do you know if it mentions the delivery of FF&E?
```

1   A.  I'm sorry?  Do I?

2   Q.  Do you know if the liquidated damages provision discusses

3   the delivery of FF&E?

4   A.  No, it does not.  It's just the L&D damages are related to

5   completing the project in October.

6   Q.  Do you know where in the contract FF&E is discussed?

7   A.  What do you mean by "where"?

8   Q.  Do you know if the contract explicitly mentions FF&E?

9   A.  It mentions that CCA have to complete the project,

10  including FF&E.

11  Q.  That's not my question.  Do you know if the contract

12  specifically mentions FF&E?

13  A.  Yes, it does.

14  Q.  Do you know if the contract specifically makes a condition

15  of substantial completion the completion of FF&E?

16  A.  No.

17  Q.  No, you don't know, or no, it doesn't?

18  A.  I don't know.  I'm not a lawyer.  The contract, in my

19  opinion, says you got to finish all your contract work.  And

20  that includes FF&E, by definition, as all contract work.

21  Q.  So are you changing your prior testimony to say you now

22  know?

23  A.  No.  I'm not really understanding your question, where

24  you're going --

25  Q.  Let me ask again, so we're clear.

```
1    A.   Uh-huh.

2    Q.   Do you know if the contract specifically mentions FF&E?

3    A.   The FF&E is listed as one of the items that has to be

4    completed under the contract.

5    Q.   Do you know if every single item that has to be completed

6    under the contract has to be substantially completed in order

7    to not have liquidated damages?

8    A.   That's a legal question.

9    Q.   So is the answer you don't know?

10   A.   No.   The answer is:   There is a scope of work that has to

11   be complete under the contract.   FF&E is part of that scope.

12   Q.   Okay.   Let me ask it this way:   Do you know if every single

13   thing listed in that scope has to be substantially completed by

14   October 15th?

15   A.   Contractually, yes.

16   Q.   So it's your testimony that every single thing that is

17   listed in the scope has to be substantially completed by

18   October 15th?

19   A.   Contractually, yes.

20   Q.   And it would be your testimony, then, that if every single

21   thing that's listed in that scope is not completed that CCA

22   Bahamas will incur liquidated damages?

23   A.   No.   I'm just stating that the contract has a provision for

24   liquidated damages.

25   Q.   So you don't know if the liquidated damages applies to
```

```
1    every single item detailed in the scope?

2    A.  No.  It applies to all items.  But I can't say -- CCA

3    cannot say whether the owner will invoke that clause.

4    Q.  I'm not talking about invoking.  I'm not trying to -- I'm

5    trying get to the heart of the liquidated damages clause,

6    frankly.  And what I'm asking is this -- let me try to do it

7    this way.  You've testified that FF&E is explicitly included in

8    the scope, correct?

9    A.  Correct.

10   Q.  And let me ask:  Is FF&E a responsibility of CCA Bahamas?

11   A.  It is.

12   Q.  And so you've testified that that responsibility of CCA

13   Bahamas is explicitly included in the scope, correct?

14   A.  Correct.

15   Q.  And you've also testified there's a liquidated damages

16   provision, correct?

17   A.  Correct.

18   Q.  And you've testified that the liquidated damages provision

19   applies to the scope, correct?

20   A.  Correct.

21   Q.  And so I'm asking you this question, and I'm asking you if

22   you know for sure:  Do you know if every single item listed in

23   the scope -- I'll rephrase it this way:  Do you know if CCA

24   Bahamas misses any item whatsoever detailed in the scope

25   liquidated damages applies?
```

1   A.   That's up to the owner.

2   Q.   Well, might be up to the owner whether to enforce it.  But

3   is it your testimony here that CCA Bahamas is contractually

4   obligated to liquidated damages based on every single item

5   listed in the scope?

6   A.   Again, I'm not a lawyer, but that's what my understanding

7   is of the contract.

8   Q.   Have you seen the scope?

9   A.   Of the FF&E or the whole project?

10  Q.   No.  The whole contract.

11  A.   No.

12  Q.   So there's no way for you to determine whether something

13  relative to that scope may necessarily be applicable to

14  liquidated damages, if you've never even see the scope,

15  correct?

16  A.   No, because liquidated damages are based on non-completion

17  of the entire scope, and FF&E is part of that scope.

18  Q.   You know what a critical path item is?

19  A.   Yes, I do.

20  Q.   Would FF&E be a critical path item?

21  A.   Yes.

22  Q.   What other scheduling issues could result in the incurrence

23  of liquidated damages?

24          THE COURT:  I'm sorry.  Are you speaking from a

25  hypothetical point of view or --

```
 1            MR. FELDMAN:  No.  I'm asking in this instance, Judge.

 2            THE COURT:  I didn't understand the question.

 3            MR. FELDMAN:  I apologize.  I apologize.

 4   BY MR. FELDMAN:

 5   Q.  In this instance, what other scheduling misses could result

 6   in the incurrence of liquidated damages in this contract?

 7            MR. DAVIS:  Objection, Your Honor.  It's an entirely

 8   speculative question.

 9            MR. FELDMAN:  That's the whole point, Judge.

10            THE COURT:  Okay.  I'm sorry.  I don't understand

11   whether you're asking her if the -- I don't understand what

12   you're asking her, to be honest.

13            MR. FELDMAN:  Okay.

14            THE COURT:  Are you saying that -- are there ongoing

15   items that could subject them to liquidated damages or are

16   you -- that are not being completed that she's aware of, or are

17   you saying that -- does the contract have the scope of other

18   items contained within it, that if those other items listed in

19   the scope aren't substantially completed, it would lead to

20   liquidated damages?

21            MR. FELDMAN:  I think, Judge --

22            THE COURT:  I'm just confused about whether you're

23   talking about what's happening in fact, whether you're talking

24   about the terms of the contract as a whole, or --

25            MR. FELDMAN:  I'm trying to talk about the terms of
```

1    the contract as a whole right now and this witnesses'

2    understanding of the contract that they've indicated obligates

3    them for liquidated damages under the circumstances here.

4            So I guess in follow-up to the Court's question I'm

5    talking about the terms of the contract in whole.  And so, in

6    addressing that, my question would be:  Does Ms. Dwornik know

7    what other delivery obligations -- or scope, as she used the

8    term -- that CCA could miss may result in liquidated damages?

9            THE WITNESS:  Anything that me miss could -- I still

10   don't understand the question.

11   BY MR. FELDMAN:

12   Q.  So your testimony here is that any miss, no matter what it

13   is, would result in the incurrence of liquidated damages?

14   A.  No.  I'm not saying anything will.  I'm not using the word

15   "will."  All I'm just saying is there's a provision under the

16   contract for liquidated damages if CCA do not complete their

17   scope by the contractual date.

18           THE COURT:  That is substantially complete.  We keep

19   talking about completed.  So for example, if they were two

20   chairs short of a 3000-chair order --

21           THE WITNESS:  That would be substantially complete

22   probably by the architect, yes.

23           THE COURT:  And who would determine that?

24           THE WITNESS:  The architect.

25

```
 1    BY MR. FELDMAN:

 2    Q.  Who is the architect?

 3    A.  AE Kong.

 4    Q.  I'm sorry?

 5    A.  AE Kong.

 6    Q.  Did you discuss with the architect the issue of substantial

 7    completion prior to testifying here today?

 8    A.  No.

 9    Q.  Have you ever discussed with the architect the issue of

10    substantial completion relative to FF&E at the project?

11    A.  No.

12    Q.  But the architect is the one who would determine it,

13    correct?  Isn't that what you just said?

14    A.  Contractually, I believe so.

15    Q.  But you're not even certain of that, are you?

16    A.  No.

17         MR. FELDMAN:  I just don't want to confuse things,

18    Judge, with extra exhibits.

19      (Pause in proceedings.)

20    BY MR. FELDMAN:

21    Q.  You signed a supplemental affidavit in this, correct --

22    A.  Correct.

23    Q.  -- in this case.

24         And that was offered as Plaintiff's Number 11, for the

25    record.  And attached to that was an Exhibit 4, which is a
```

1    advertisement and a photograph?

2            THE COURT:  Excuse me.  I have the supplemental

3    affidavit as Exhibit 15.

4            MR. DAVIS:  That's correct.

5            MR. FELDMAN:  I'm sorry, Judge, 15.  My apologies.

6            THE COURT:  I just want to make sure we're talking

7    about the same exhibit.

8            MR. FELDMAN:  I'm sorry about that, Judge.  My

9    apologies.

10           THE COURT:  Okay.  And then the exhibits to that

11   supplemental affidavit, which were numbered 1 through 4 to the

12   supplemental affidavit, have been admitted as 11 through 14

13   here.

14           MR. DAVIS:  Right.

15           MR. FELDMAN:  Thank you, Judge.

16           May I approach, Your Honor?

17           THE COURT:  Yes, but you can't speak without a

18   microphone.  If you need a handheld microphone, we'll provide

19   it.

20           MR. FELDMAN:  Please.

21           Thank you, Your Honor.

22   BY MR. FELDMAN:

23   Q.  Ms. Dwornik, I'm going to show you what's Exhibit 4 to this

24   supplemental affidavit.  Okay?

25   A.  Uh-huh.

```
 1            THE COURT:  Which has been marked and admitted as
 2    Exhibit 14 in this case.
 3            MR. FELDMAN:  Yes, Judge.  Thank you very much for
 4    that clarification.
 5            THE COURT:  So you're showing her Plaintiff's Exhibit
 6    14.
 7            MR. FELDMAN:  Plaintiff's Exhibit 14.  Yes, Judge.
 8            Thank you.
 9    BY MR. FELDMAN:
10    Q.  Ms. Dwornik, this was an advertisement from Source Outdoor,
11    correct?
12    A.  Correct.
13    Q.  And a picture of a chair, correct?
14    A.  Correct.
15    Q.  And in Paragraph 12 of your affidavit, I'm going to quote.
16    A.  Uh-huh.
17    Q.  It says:  "The website even notes they are in white, in the
18    color we ordered, and not available pursuant to this offer in
19    any other color."  Could you show me where in this offer it
20    says that they're only in white?  Because I looked and didn't
21    see it.
22    A.  You'd have to press on viewing this email in your
23    browser --
24            THE COURT:  I'm sorry.  I can't understand anything
25    that you're saying.  You need to speak into microphone.
```

```
1              THE WITNESS:  Sorry.  Yeah.  It's not coming out on

2    this printout.  You have to follow the website.

3    BY MR. FELDMAN:

4    Q.  Right.  So basically, to get to where you're saying it has

5    to be in white, you have to go to the another document that's

6    not attached to this, correct?

7    A.  Correct.  Sorry.

8    Q.  So the advertisement that you attached doesn't say that,

9    does it?

10   A.  It appears not, no.  We should have attached another page.

11   Q.  So the advertisement attached doesn't say it, does it?

12   A.  Not attached, no.  But it does show a picture of the

13   chairs.

14             THE COURT:  I'm sorry.  You said what now?

15             THE WITNESS:  But it does show a picture of the

16   chairs.  Because that's a picture from Baha Mar, from the

17   project.

18             MR. FELDMAN:  I don't recall asking a question about

19   that, but ...

20   BY MR. FELDMAN:

21   Q.  Are you personally familiar with CCA Bahamas' reputation

22   around the world?

23   A.  I'm certainly aware of the reputation in the region.

24   Q.  Has CCA Bahamas ever done any other projects in the region?

25   A.  Well, CCA Bahamas is a company set up specifically for the
```

1    Baha Mar project.

2    Q.  So the -- so the Plaintiff here, CCA Bahamas, has never

3    done any other projects, correct?

4    A.  Well, the same company has.  I don't know what they call

5    themselves on other projects.  There's another project right

6    now underway in Nassau.

7         THE COURT:  By CCA Bahamas, or by other people, or by

8    people who are associated with CCA Bahamas operating under a

9    different name?

10        THE WITNESS:  Yeah.  They are just operating under a

11   different name.  Each project has got a specific name.

12        THE COURT:  A specific company set up to run that

13   project?  Is that what you're saying?

14        THE WITNESS:  Correct, yeah.

15   BY MR. FELDMAN:

16   Q.  Part of the CCA family?

17   A.  Correct.  Yeah.

18   Q.  Has CCA Bahamas ever had any bad publicity relating to the

19   to the project?

20   A.  Yes.

21   Q.  Tell me about it.

22   A.  Well, there's been a lot of bad publicity regarding quality

23   of product, completion of product, everything.

24   Q.  And so would quality of product be something you believe

25   would impact the reputation of a company?

1    A.   Yes.

2    Q.   Would completion of product be something that you believe

3    would impact the reputation of the company?

4    A.   Yes.

5    Q.   To the best of your knowledge, is that publicity that

6    you've seen yourself true?

7    A.   No.

8    Q.   It's not?

9    A.   No.

10        MR. FELDMAN:   If I may, Judge, I would actually offer

11   this --

12        THE COURT:   You need to speak into microphone.

13        MR. FELDMAN:   Yes.   I'm sorry, Your Honor.

14        THE COURT:   Okay.   Thank you.

15        MR. FELDMAN:   This would be item number 6 on the

16   Defense exhibit list.

17        THE COURT:   Okay.   I have your exhibit list and all it

18   says is:   "Article attached."

19        MR. FELDMAN:   As Exhibit A to the response, Judge.

20        THE COURT:   As Exhibit --

21        MR. FELDMAN:   That was filed as an attachment to

22   Exhibit A to the response that we filed with the Court.

23        THE COURT:   Okay.   And let me -- okay.   So this --

24   again, I don't have -- you didn't number.   So Exhibit A is an

25   article from the Tribune?

```
1              MR. FELDMAN:  Correct, Judge.

2              THE COURT:  Is that correct?

3              Any objection to Defendant's Exhibit 6?

4              MR. DAVIS:  No objection, Your Honor.

5              THE COURT:  Okay.  It will be admitted.

6              MR. FELDMAN:  Thank you, Judge.

7         (Defendant's Exhibit 6 received into evidence.)

8              MR. DAVIS:  Well, let me amend that.  I have no

9    objection to the article.  I have objections to all of the

10   comments that follow the article as pure hearsay.

11             MR. FELDMAN:  Judge, I'm not offering them.  In fact,

12   one of the things I'm going to inquire about is their truth.

13             THE COURT:  So you're not offering them for the

14   truth -- or the article for the truth.  You're offering them

15   for the purpose of showing what the publicity and opinions are

16   regarding CCA because one of the claims has been -- that's been

17   made of irreparable harm is damage to reputation?

18             MR. FELDMAN:  Correct, Judge.

19             THE COURT:  So you're offering this as proof of what

20   the reputation is, not with respect to whether or not the

21   contents are true?

22             MR. FELDMAN:  Correct, Judge.  I'm not offering them

23   for the truth.  So it's not hearsay.  And questions that I ask

24   about them will be directed, frankly, to whether it's true or

25   not.
```

```
 1              THE COURT:  Okay.  On that basis, the hearsay

 2     objection is overruled, since it's not being offered for the

 3     truth of anything contained in it.

 4              MR. FELDMAN:  May I approach, Judge?

 5              THE COURT:  Yes.

 6              Obviously, some of this is not --

 7              MR. FELDMAN:  Judge, there's a lot of commentary on

 8     the back of the article.  I can represent to the Court I'm not

 9     going to talk about the commentary.  It's just the way it

10     printed and that's how it was filed.  I'm going to stick to the

11     sum and substance of the article itself, Your Honor.

12              THE COURT:  Okay.

13     BY MR. FELDMAN:

14     Q.  Okay.  Let me flip you over to Page 4 of the article, if

15     you would.  Starts at the top with:  "This, in turn."  Do you

16     see that?

17     A.  Yes, I do.

18     Q.  Okay.  Who is Mr. Izmirlian?

19     A.  He's the owner of Baha Mar.

20              THE COURT:  I'm sorry.  Can you spell that.  I guess

21     it's I-Z-M-I-R-L-I-A-N?

22              MR. FELDMAN:  That's how it's represented here, Judge.

23     So I'm going to assume that's accurate.

24              THE COURT:  Well, I just want to help the court

25     reporter out a little bit, when you're using these names that
```

1   are not typical.

2   BY MR. FELDMAN:

3   Q.  Do you know Mr. Izmirlian?

4   A.  I do.

5   Q.  When you say "the owner of Baha Mar," is that the owner of

6   the project?  Or clarify for me, is Baha Mar the owner of the

7   project?

8   A.  Well, Baha Mar, now in liquidation, is not -- has been

9   liquidated.  I don't the exact situation of that company right

10  now.

11  Q.  So Mr. Izmirlian would have been the owner of the company

12  that got liquidated?

13  A.  Correct.

14  Q.  This mentions three misses under -- Paragraph 3 mentions

15  three, it looks like construction misses under Mr. Izmirlian.

16  Do you see that?

17  A.  I do.

18  Q.  Was CCA involved with any of those?

19  A.  I don't -- I don't know what those misses are.

20  Q.  Are you familiar with any construction misses under

21  Mr. Izmirlian?

22  A.  No.

23  Q.  Paragraph 4 says:  "Mr. Izmirlian now has further evidence

24  he can use to support these demands," apparently, referring

25  back to his demands -- "in his previous allegations against CCA

1    where he blamed shoddy workmanship."  Do you see that?

2    A.  I do.

3    Q.  Are you familiar with allegations made against CCA for

4    shoddy workmanship?

5    A.  I do not.

6    Q.  I'm sorry?

7    A.  I do not.

8    Q.  So you don't have any knowledge about that?

9    A.  I do not.

10   Q.  You don't know if it's true or not true, do you?

11   A.  That this is what Mr. Izmirlian said?  Are you asking me

12   whether I know whether he said this or not?

13   Q.  Do you know whether he said it?  Let's start there.

14   A.  No.  I don't know whether he said it or not.

15   Q.  Do you know if there have been any claims of shoddy

16   workmanship against CCA?

17   A.  As in legal claims, no.  I'm not aware of --

18   Q.  Any claims.  Do you know if anybody has claimed that CCA's

19   workmanship has been shoddy?

20   A.  Claimed, as claiming in a newspaper article or claimed as

21   in --

22   Q.  Let's start with a newspaper article.

23   A.  What do you mean by "claimed"?

24   Q.  Let's start with a newspaper article.  Alleged in a

25   newspaper article that CCA's work has been shoddy.

1    A.  Well, it's right here.

2    Q.  Other than this one, do you know of any others?

3    A.  Possibly, yes.

4    Q.  Do you know if there's any been lawsuits filed against CCA

5    related to the project?

6    A.  I don't think so.  I don't know.

7    Q.  I'm sorry?

8    A.  I don't know.

9    Q.  Jump to the next page.

10    A.  (Witness complies.)

11    Q.  The third paragraph down -- and I'll read it, and I'm going

12    to ask you what you know about this.  Okay?  Says:  CCA's

13    lawsuit" -- and they're referring to this lawsuit, just so you

14    know -- "is less than forthcoming on its relationship to

15    the" -- quote/unquote -- secured creditor, and the --

16    quote/unquote -- owner who are the China Export-Import Bank and

17    Perfect Luck.  "The latter is a vehicle of the bank, and all

18    three entities are ultimately owned and directed by the Beijing

19    Government."

20        Let's talk about the first sentence of that.  Do you know

21    if the first sentence of that statement is true?

22    A.  What?  That the lawsuit is less than forthcoming on its

23    relationship?

24    Q.  Well, let me ask this:  Does CCA have a relationship with a

25    secured creditor?

1   A.  I don't know.  Who is the secured creditor?

2   Q.  Do you know who the secured creditor is?

3   A.  I don't know.  I'm presuming the secured creditor is the

4   company that holds the mortgage.  I don't know.

5   Q.  Do you know if CCA has a relationship with a company that

6   may hold the mortgage?

7   A.  What do you mean by a "relationship"?  They obviously have

8   a contract with them, right, for completing the work.

9   Q.  Do you know -- do you know if there's a mortgage?

10   A.  Well, there was some kind of loan between the bank and BML.

11   Q.  Okay.  Who is China Export-Import Bank?

12   A.  That's the people that loaned the money to Mr. Izmirlian, I

13   believe.

14   Q.  Do you know if CCA -- do you know if China Export-Import

15   Bank has any ownership interest in CCA?

16   A.  I do not know.

17   Q.  Do you know if CCA has any ownership interest in China

18   Export-Import Bank?

19   A.  No, I do not.

20   Q.  Do you know who Perfect Luck is?

21   A.  I believe Perfect Luck are the -- the receivers, I think.

22   I'm not sure.

23   Q.  Do you know if CCA has any relationship with the receivers?

24   A.  I don't know.  No.

25   Q.  This alleges that Perfect Luck is a vehicle of the bank and

1    all three entities are ultimately owned and directed by the

2    Beijing Government.  Do you see that?

3    A.  I do, yeah.

4    Q.  Do you know if Perfect Luck is a vehicle for the China

5    Export-Import Bank?

6    A.  I don't know anything about these relationships.

7    Q.  Okay.  So you have no idea if they are owned or not by the

8    Beijing Government?

9    A.  No, I do not.

10   Q.  Then it goes on to say:  "Nor is there any mention of CCA's

11   role in the $101.5 million creditor payout process, which

12   discriminated against foreigners in favor of the Bahamians,

13   despite one of the contractor's executives sitting on the

14   five-person committee determining who received something and

15   how much."  Do you see that?

16   A.  Yes, I do.

17   Q.  Let me ask something about that.  Do you know if CCA played

18   a role in the $101.5 million creditor payout process?

19   A.  Yeah.  I believe they played -- they played some role.

20   Q.  What role?

21   A.  Well, like it says, one of the executives sat on the

22   committee.

23   Q.  Okay.  So one of the executives of CCA sat on the committee

24   that determined who got paid out money in connection with the

25   receivership.  Am I understanding correctly?

1   A.  I don't know if it's in connection with the receivership.

2   Q.  What committee do you understand this to be referring to?

3   A.  This was all about the government requirement for all debts

4   to be paid to the Bahamian company -- to Bahamian companies.

5   Q.  Okay.  So I asked what committee you understood that to be

6   referring to.

7   A.  That's probably that committee.

8   Q.  Do you know if the government required foreign debts to be

9   paid?

10  A.  I do not know.

11  Q.  So CCA sat on the committee that determined who got paid

12  Bahamian debt.  Am I understanding correctly?

13  A.  This is what this article says, yes.

14  Q.  Do you know that, though?

15  A.  No, I do not know that.  I didn't sit on the committee.  I

16  wasn't part of the committee.  I don't know what happened in

17  the committee.

18  Q.  I thought you mentioned that somebody sat on the committee

19  from CCA.  Did I misunderstand?

20  A.  That's what this article says.

21  Q.  So I want to get clarity because I think it's important.

22  Do you know if anybody from CCA sat on the committee?

23  A.  I believe so, yes.  But I don't -- I don't really know

24  because I wasn't part there.  I don't know whether they were or

25  not.

1    Q.   Then it goes on to say:  "The document, though, makes

2    numerous references to CCA's advantageous business relationship

3    with the China Export Bank and Perfect Luck."  I'm not sure

4    what document that's referring to.  Are you aware of a document

5    that makes reference to any advantageous business relationship

6    with the China Export-Import Bank?

7    A.   No, I do not.

8    Q.   Are you aware of any document that makes reference to an

9    advantageous relationship with Perfect Luck?

10   A.   No, I am not.

11   Q.   Are you aware of any document that discusses how China

12   Export-Import Bank has profited and is profiting both

13   financially and commercially from any relationship?

14   A.   I do not know.  No.

15   Q.   Are you aware of any document that discusses how Perfect

16   Luck has profited and is profiting both financially and

17   commercially from an advantageous business relationship?

18   A.   I do not know, no.

19   Q.   Goes on to say:  "CCA's warnings and pleas also recall the

20   confidential January 20, 2015 memo to its Beijing parent, in

21   which it warned that the critical March 27, 2015 opening date

22   was likely to be missed despite assurances to the contrary that

23   were given to then prime minister, Perry Christie, and

24   Mr. Izmirlian just two weeks earlier."  Do you see that?

25   A.   I do.

1    Q.   Okay.  My question for you is this:  If CCA -- when did CCA

2    sign its contract?

3    A.   Which contract?

4    Q.   The contract that it's currently operating under that it

5    says it's going to incur liquidated damages if they don't get

6    the chairs.

7    A.   Sometime in September last year.

8    Q.   So September 2016?

9    A.   Correct.

10   Q.   This talks about CCA's involvement or prior to that, in

11   January 2015.  Do you know if CCA was involved in the project

12   in January of 2015?

13   A.   Yes, they were.

14   Q.   What was the role of CCA prior to the contract here?

15   A.   I wasn't on the project then.

16   Q.   I'm sorry?

17   A.   I wasn't working for CCA then.

18   Q.   You weren't?

19   A.   No.

20   Q.   So you don't know what their role was?

21   A.   Oh, their role?  They are the general contractors on the

22   project.

23   Q.   So they were the general contractors for how long?

24   A.   I don't know.  A number of years.  I can't remember when

25   the project started.

1    Q.  A number of years?

2    A.  Yeah.

3    Q.  And I believe you testified earlier that CCA has not missed

4    any deadlines, correct?

5         THE COURT:  From September 2016 to the present was her

6    testimony.

7         MR. FELDMAN:  Okay.  Well, then -- thank you, Judge.

8    I'd like to get clarity on this now, since we know they go back

9    a number of years.

10   BY MR. FELDMAN:

11   Q.  In the number of years that CCA Bahamas has been involved

12   with this project, have they missed any deadlines?

13   A.  I don't know.

14   Q.  You weren't working with CCA Bahamas in January 2015?

15   A.  No.

16   Q.  I thought you said three years.  No?  Did I misunderstand

17   that you were with them for three years?

18   A.  Yeah.  It's coming up to three years.

19   Q.  Okay.  So if it's coming up on three years --

20   A.  Uh-huh.

21   Q.  -- and we're in the middle of 2017, how were you not with

22   them in January of 2015?

23   A.  I was in Panama.

24   Q.  Working for CCA Bahamas?

25   A.  Correct.

1   Q.  So you weren't working in the Bahamas?

2   A.  I was not working in the Bahamas.

3   Q.  But you were working in the company?

4   A.  Yes.

5   Q.  So when did you transfer to the Bahamas?

6   A.  I think it was -- I started getting involved in -- I think

7   it was February-- February 2016.

8   Q.  February 2016?

9   A.  I think so.  It was when -- it was after the suspension

10  period when the receivers started negotiation with CCA to come

11  back to the project.

12  Q.  So prior to those negotiations, do you know if CCA Bahamas

13  missed any deadlines?

14  A.  I don't know.

15  Q.  Prior to when you came to the Bahamas, were you at all

16  involved with the Baha Mar project?

17  A.  Yes, I was.

18  Q.  What was your role?

19  A.  Procurement manager.

20  Q.  But you weren't in the Bahamas to do that?

21  A.  No.  I was -- I was at one point.

22  Q.  When were you in the Bahamas?

23  A.  I arrived in the Bahamas in 2006.

24  Q.  So was this going on in 2006, this project?

25  A.  Yeah.

1    Q.  This project has been going on since 2006?

2    A.  Well, in fact, it's been going on since, I think, probably

3    2004 or 2005.

4    Q.  So the Baha Mar project is a 12-year-old project right now,

5    give or take?

6    A.  Correct.

7    Q.  And CCA has been the contractor for how long?

8    A.  I don't know.  I can't remember when they started.  I don't

9    know.  I think they started in 2010 or 2011.  I'm not sure.  I

10   can't remember.

11   Q.  Okay.  So let's assume for purposes here 2011.  Okay?  Am I

12   comfortable -- are you comfortable with the fact that they had

13   at least started in 2011?

14   A.  I can't remember when the contract started --

15   Q.  How about 2012?

16   A.  I don't know.  I honestly, would have to work it out.  I

17   just don't know.

18   Q.  So am I fair to say that, prior to 2016, you have no idea

19   whether CCA missed schedules or not?  Is that fair?

20   A.  Yeah.  It's fair.  I don't know.

21   Q.  You have no idea, prior to 2016, whether CCA Bahamas was

22   accused of any shoddy work or not?  Is that fair?

23   A.  They were accused in the papers, yes.

24   Q.  Okay.  They've been accused in the papers since 2016?

25   A.  I don't know.

1    Q.  The article here also mentions warnings and pleas from --

2    also, recall the confidential January 20, 2015 memo to its

3    Beijing parent.  Do you know anything about a confidential

4    January 20, 2015 memo to a Beijing parent?

5    A.  No, I don't.

6    Q.  It says -- it goes on to say, three paragraphs up from the

7    bottom, with quote:  Currently, the project is at a crucial

8    dash to meet the final deadline, end quote.  "CCA warned CSEC,

9    its Beijing parent, in 2015."  Do you see that?

10   A.  I do.

11   Q.  Do you know anything about that?

12   A.  I do not.

13   Q.  What's the final deadline?

14        THE COURT:  I'm sorry.  What are you referring to?

15   Are you referring to this line in the newspaper article that

16   she did she didn't know anything about or are you --

17        MR. FELDMAN:  I'm referring to her understanding right

18   now, Judge --

19        THE COURT:  It's useful if you don't interrupt me.

20        MR. FELDMAN:  Yes.  I'm sorry.

21        THE WITNESS:  The final deadline right now --

22        THE COURT:  There's no question pending.  Okay?

23        What I want from you is clarity.  Are you referring to

24   the quote that you just referred to or are you referring to the

25   current final deadline?

```
 1              MR. FELDMAN:  My apologies, Judge.  I would be
 2     asking -- since she said she didn't know anything about the
 3     quote, I would be asking about her understanding of the current
 4     final deadline.
 5              THE COURT:  Okay.  You can answer that.
 6              THE WITNESS:  Okay.  The current final deadline, as
 7     far as I'm aware, is the completion date in October.  And I
 8     think it's the 10th, but I would have to check exactly what
 9     date it is.
10     BY MR. FELDMAN:
11     Q.  Of this year?
12     A.  Of this year.
13     Q.  And so as far as you understand, that would be the final
14     deadline for completion of this 12-year construction project?
15     A.  Correct.
16     Q.  So am I understanding correctly that the final deadline for
17     completion of this 12-year construction project is potentially
18     being held up because you guys don't have 1,420 chaise lounge
19     chairs?  After I understanding that correctly?
20     A.  I'm -- the 1,420 chairs are a contractual obligation that
21     CCA have to complete in October.
22     Q.  I don't believe that was what I asked.  I believe what I
23     asked is, if I'm understanding correctly, that you were saying
24     that the final deadline of this 12-year project is being held
25     up because CCA does not have 1,420 outdoor chaise lounges?
```

```
 1   A.  And I'm saying that there is an obligation for CCA to

 2   complete in October.

 3          THE COURT:  Are you finished with this witness,

 4   Mr. Feldman?

 5          MR. FELDMAN:  I'm not, Judge.

 6          THE COURT:  Okay.  Well, it's 12:30.  We're going to

 7   take a recess until 1:30 and we'll resume at that time.

 8          How much longer do you have with this witness?

 9          MR. FELDMAN:  Probably about 30, 45 minutes, Judge.

10          THE COURT:  Okay.

11          MR. FELDMAN:  Thank you.

12          THE COURT:  We'll be in recess.

13       (Recess from 12:28 p.m. to 1:40 p.m.)

14          COURTROOM DEPUTY:  Recalling Case Number 17-22437,

15   Civil, Chief Judge Moore, CCA Bahamas v. Conquest Financial

16   Management Corp.

17          Appearances are as previously noted.

18          THE COURT:  Are the parties ready to proceed?

19          MR. FELDMAN:  Yes, Judge.

20          THE COURT:  Mr. Feldman?  Mr. Davis?

21          MR. DAVIS:  Yes, Your Honor.

22          THE COURT:  Okay.  And I believe we are still in the

23   cross-examination of Ms. -- I want to say Dwornik, and I know

24   it isn't.

25          THE WITNESS:  That's okay.
```

```
 1          THE COURT:  Anyway, you want to come forward and take

 2   the witness stand.  Let me pull out my exhibit list again.

 3          Ms. Dwornik, I'll remind you, you're still under oath.

 4          And Mr. Feldman, you can proceed.

 5          MR. FELDMAN:  Thank you very much, Your Honor.

 6   BY MR. FELDMAN:

 7   Q.  Ms. Dwornik, I'm trying to not to reduplicate anything we

 8   spoke about earlier.  If I do, I apologize ahead of time.  You

 9   filed a supplemental affidavit in this case.  Do you recall?

10   A.  I do.

11   Q.  And that has been marked -- and I'll refer to it

12   accordingly -- by the Plaintiff as, I believe, Exhibit Number

13   11.

14          THE COURT:  No, 15.

15          MR. FELDMAN:  The affidavit was 15, Judge?  Okay.

16          THE COURT:  Yes.  The affidavit is 15.

17          MR. FELDMAN:  I'm sorry.

18   BY MR. FELDMAN:

19   Q.  Exhibit Number 15.

20      Okay.  I'd like to ask you a few questions about that

21   affidavit.  Prior to reviewing that affidavit, had you reviewed

22   Mr. Shvartsman's affidavit that he filed in this case?

23   A.  Yes, I have.

24   Q.  You say, in Paragraph 3 of this affidavit:  CCA never

25   received the necessary complete information requested."  Do you
```

```
 1   recall that?

 2   A.  I do.

 3   Q.  And was that from Source?

 4   A.  Yes.

 5   Q.  So is it your position that if CCA would have received the

 6   necessary information requested, they would have made good the

 7   monies owed to Source?

 8   A.  Probably, yes.

 9   Q.  Did you put a time limitation of receipt of that

10   information?

11   A.  No.

12   Q.  I'm going to refer you to what was marked on the Defense

13   exhibit as, I believe, Number 20, which is an email, dated

14   March 8th, 2017, the one that was exchanged previously.  Okay?

15   A.  Okay.

16          MR. FELDMAN:  May I approach, Your Honor?

17          THE COURT:  Yes.  And I need to pull that out as well.

18          And you can approach her and give her that.  I just

19   don't want you to -- excuse me?

20          MR. FELDMAN:  A microphone, please.

21          THE COURT:  Is it down there?

22          Oh, it's over here, next to -- come around next to the

23   computer.  You'll see a microphone.

24          Yes.  Make sure it's turned on.

25          MR. FELDMAN:  Thank you.
```

```
 1              THE COURT:  Okay.  Now let me turn to your -- where is
 2      your Exhibit 20 located in the record?
 3              MR. FELDMAN:  It was the additional document, Judge,
 4      that we had handed up to Your Honor at the beginning of the
 5      case and exchanged with opposing counsel.
 6              THE COURT:  Okay.  Let me -- okay.  And that is the
 7      one -- because it isn't marked on mine.  Is this the email that
 8      is dated at the top July 18th, 2017?
 9              MR. FELDMAN:  Yeah, Judge.  That's just my client
10      sending it on to me.
11              THE COURT:  I just want to make sure I'm looking at
12      the right document.
13              MR. FELDMAN:  You are looking at the right one, Judge.
14              THE COURT:  Okay.  So this is Defendant's Exhibit 20?
15              MR. FELDMAN:  Correct, Judge.
16              May I proceed?
17              THE COURT:  Yes.  Are you offering it?
18              MR. FELDMAN:  I would like to offer it, yes.
19              THE COURT:  Is there an objection?
20              MR. DAVIS:  No objection.
21              THE COURT:  Defendant's Exhibit 20 will be admitted.
22          (Defendant's Exhibit 20 received into evidence.)
23              MR. FELDMAN:  Thank you, Judge.
24      BY MR. FELDMAN:
25      Q.  Ms. Dwornik, I'm going to show you what's been marked as
```

1    Defendant's Exhibit 20.  Okay?

2    A.  Uh-huh.

3    Q.  There's an email chain here with an attachment.  Can you

4    take a look at that real quick.

5    A.  Yeah.  I'm familiar with this document.

6    Q.  Was this document not Candice from Source Outdoor sending

7    you a reconciliation?

8    A.  It is, yes.

9    Q.  And you received this document on March 8th, 2017, correct?

10   A.  Correct.

11   Q.  Anything missing?

12   A.  Yes.

13   Q.  What's missing?

14   A.  Missing is -- the big part of the puzzle is the check

15   return of 300 and whatever it was -- 89,000.  And I asked for

16   verification that that had been returned.

17   Q.  When did you ask for that?

18   A.  When I first met -- when we first met in December.

19   Q.  So in response to this email, did you say:  "Wait a minute.

20   What about the check?"

21   A.  I would have to see the rest of the emails to see -- to see

22   what happened after that.

23   Q.  Okay.  You asked for it in December, correct?

24   A.  Correct.  Yes.  And this email here from Source says:  "I

25   need to hunt down the copy of the canceled check at our bank."

1    Q.  Okay.

2    A.  And that was never received.

3    Q.  Did you follow up and ask for it again?

4    A.  I don't know.  I would have to check.

5    Q.  Okay.

6    A.  And if I may comment on this --

7    Q.  I asked you what was different.  So I want to hear what's

8    different.  What was missing is what I asked you.

9    A.  So the other -- so at this point, I had already been

10   waiting two plus months for the full information, which I

11   wasn't getting.  I just kept -- you know, it's coming.  It's

12   coming.  It's coming.  And even this email says:  "I can't find

13   it.  I'm still looking for it."  So two and a half months

14   later, and we've got deadlines, we are still waiting for this

15   information.

16       I then had a very quick review of this, and I was extremely

17   alarmed to see that when we were talking about the lounge

18   chairs, which the original order from PSI was in the value of

19   about $800,000, I was advised in December that only half of the

20   chairs were delivered because only half the payment was made.

21   So therefore, CCA made another payment for the other half of

22   the chairs.  This reconciliation shows that actually the

23   payment received was 620,000 against 795,000 and that the

24   balance owing was only a-hundred-and-something thousand.  Yet,

25   in December, I took it on -- you know, on goodwill that I was

1    being given the correct information, and we paid almost

2    $400,000.

3    Q.  Where are you referring to exactly?  So I can look at the

4    same thing as you.

5    A.  I can't -- this one here.  This is the order for the lounge

6    chairs, the 700-something thousand.  And it says --

7              THE COURT:  Could you identify the page and item

8    number that we're talking about, so we can all be in the same

9    place.

10             THE WITNESS:  So it's the third page of the

11   reconciliation and it's the eighth line.  And it shows the

12   order value of 700 -- I think it's 85 or 95,000.  I can't

13   see --

14             THE COURT:  I see it says:  "Baha Mar, Limited, care

15   of Purchasing Solutions, Atlantic chaise, white."  And then it

16   says -- there's a line that says 200 -- well, it says $443, I

17   guess, 275, or --

18             THE WITNESS:  No.  That was the number of the -- the

19   first column is the number of the chairs.

20             THE COURT:  Okay.  443, $275, 121,825.  And then it

21   says 795,025, 639,000, then 156,025.  And then it says:

22   "Partial shipment, frames in white."

23             THE WITNESS:  I think that's:  "Frames in warehouse."

24             THE COURT:  Oh, frames in warehouse.  Sorry.

25             THE WITNESS:  So this is -- the 785,000 is actually

```
 1    the total of those one, two, three, four, five line items of
 2    chairs.  That was all on the one order.  And this is saying
 3    that out of that 795,000, they received over $600,000 and that
 4    the balance to pay was only 156.  Yet, in December, I was
 5    advised that only 50 percent were paid, and that's why only
 6    50 percent will deliver, and that I would have to pay for the
 7    balance.  And as I say, I did that in good faith, thinking I
 8    would get, you know, all the information.
 9           So I wasn't getting information.  I kept asking for
10    the information.  And then when I got this partial information,
11    I was quite shocked to see that actually I was paying for
12    something that had already been paid for.
13    BY MR. FELDMAN:
14    Q.  And do you know if this included the 300-plus
15    thousand dollars that Source indicated before we started was
16    sent back?
17    A.  No.  It does not.
18    Q.  How do you know that?
19    A.  Because the email says that it can't be found.
20    Q.  Yeah.  But that doesn't necessarily mean it doesn't include
21    it on the spreadsheet, does it?
22    A.  No.  But if it was on the spreadsheet, it should be --
23           THE COURT:  Wait a minute.  Excuse me, Mr. Feldman.
24           MR. FELDMAN:  Yes?
25           THE COURT:  You're interrupting and talking over her
```

1    and you're arguing with her.  So if you could just back off,

2    perhaps, and maybe stand behind the podium.  I think that

3    because you're standing right next to her, you're viewing it as

4    a conversation between the two of you, where you're talking

5    over each other and trying to, you know, have a discussion,

6    instead of like a question and answer.  So --

7            MR. FELDMAN:  My apologies, Judge.

8            THE COURT:  I think, you know, that would be -- that

9    would be useful.

10            MR. FELDMAN:  Sure.

11   BY MR. FELDMAN:

12   Q.  So it doesn't say in that spreadsheet whether there's a

13   reduction for the money that Source indicated was returned or

14   not, does it?

15   A.  No, it does not.

16   Q.  What's the Chinese New Year?

17   A.  What do you mean what is it?

18   Q.  What is it?  Is it a holiday?

19   A.  It's a date in the calendar.

20   Q.  Okay.  Did you guys have delays because of the Chinese New

21   Year on your end?

22   A.  No.  Why would we?

23   Q.  They weren't held up -- hold-ups on your end, related to

24   communication with Source regarding the reconciliation?

25   A.  No.

```
 1              MR. FELDMAN:  May I approach, Judge?

 2              THE COURT:  Yes.  Just identify what you're

 3    approaching with and show it to opposing counsel.

 4              MR. FELDMAN:  Sure.

 5         (Pause in proceedings.)

 6              MR. FELDMAN:  Judge, I'm going to approach with a copy

 7    of what is marked as Number 14 and Number 15 on our witness and

 8    exhibit list, which are Exhibits B and Exhibit C to

 9    Mr. Shvartsman's affidavit.

10              THE COURT:  Okay.

11              MR. FELDMAN:  And I'd like to offer them in.

12              THE COURT:  Okay.  Let me turn to Mr. Shvartsman's

13    affidavit.

14              Okay.  So Exhibit B is Defendant's Exhibit 14?

15              MR. FELDMAN:  That would be correct, Judge.

16              THE COURT:  Okay.  Any objection to Defendant's

17    Exhibit 14?

18              MR. DAVIS:  No objection.

19              THE COURT:  It will be admitted.

20         (Defendant's Exhibit 14 received into evidence.)

21              THE COURT:  And Exhibit 15 is Exhibit C.  Any

22    objection to Defendant's Exhibit 15?

23              MR. DAVIS:  No objection.

24              THE COURT:  It will be admitted.

25         (Defendant's Exhibit 15 received into evidence.)
```

```
 1                    MR. FELDMAN:  Thank you very much, Your Honor.

 2                    THE COURT:  And you can approach.

 3                    MR. FELDMAN:  Thank you, Judge.

 4                    THE COURT:  Just don't hover over her.

 5                    MR. FELDMAN:  I'm sorry?

 6                    THE COURT:  Don't hover over her.

 7                    MR. FELDMAN:  I promise, Judge.

 8                    I'm actually going to give her a copy and go back, if

 9      I may.  Make it easier.

10                    THE COURT:  I think that would be a good thing.

11      BY MR. FELDMAN:

12      Q.  I've handed you now what was attached to Mr. Shvartsman's

13      affidavit and was identified as Exhibit B there, but for our

14      purposes here, Defendant's 14.  And Exhibit C there.  For our

15      purposes here, Defendant's 15.

16           As part of Exhibit B, I just want to be clear, on the first

17      page, you'll see an email -- going back, you'll see an email of

18      December 7, 2016 that it looks like was sent from you to

19      Candice at Source Outdoor.  Do you see that?

20      A.  The second document you gave me?

21      Q.  Yes.

22      A.  Yes.

23      Q.  And you -- therein, you identify a series of purchase

24      orders that you ask for reconciliation on, correct?

25      A.  Correct.
```

1    Q.  And --

2    A.  Well, no.  The list there is the open purchase orders.

3    This is not the list of all purchase orders.  So this is only

4    part of the reconciliation.

5    Q.  Okay.  So those are the open purchase orders only?

6    A.  Correct.

7    Q.  And in response, Candice writes to you and says:  "Well,

8    unfortunately, we're owed a lot of money from Baha Mar.  If

9    you're willing to pay what's owed, we'll be willing to help you

10   with anything we can," correct?

11   A.  Correct.

12   Q.  You respond:  "We appreciate the debt situation and we are

13   making good monies owed," correct?

14   A.  Correct.

15   Q.  Jump to the other one that I handed you, if you would,

16   please.

17   A.  (Witness complies.)

18       Yes.

19   Q.  Candice writes to you, on February 1st, 2017 --

20   A.  Yeah.

21   Q.  -- asking if you have time to review that day.

22   A.  Correct.

23   Q.  Right?  What was she talking about?

24   A.  She was talking all the new quotations she had sent me for

25   all new -- to purchase all new items.

1   Q.  So is it your testimony she wasn't talking at all about any

2   money that was owed?

3   A.  Correct.

4   Q.  How do you know that?

5   A.  Because I remember this trail.  And what happened was

6   during the course of January/February, I was receiving

7   countless quotations from the office for the purchase of all

8   new product.

9   Q.  Okay.

10  A.  And Candice was asking me what the status was of all those

11  orders.

12  Q.  And you respond to her:  "Hi, Candice.  Apologize for radio

13  silence.  With CNY and other issues I have to deal with, I

14  haven't been focused on procurement for the last few days."

15  A.  Correct.

16  Q.  How long were you radio silent?

17  A.  Probably two days.

18  Q.  CNY, is that Chinese New Year?

19  A.  Correct.

20  Q.  Were you in the Bahamas at the time?

21  A.  No.

22  Q.  Where were you?

23  A.  I think I was in Florida.

24  Q.  Did you ever go to Source's office and meet with them when

25  you were in Florida?

```
1    A.  No, I did not.

2    Q.  Did you tell them you were coming to Florida and maybe we

3    could meet and sort this out?

4    A.  We had just met at the end of December on site.  And this

5    is -- was about four or five week weeks later.

6    Q.  So the answer to that question would be no, you did not?

7    A.  I didn't know what there was to sort out.  To sort out

8    what?

9    Q.  I don't know.  The reconciliation.  Did you ever say --

10   A.  But I needed to have a copy of it first to review it before

11   I can try and discuss it, but I never got anything.

12   Q.  In the February 1st, email, did you say:  "Where is the

13   reconciliation?"

14   A.  Not on this particular email.  But you'll find other emails

15   where I have requested the information several times.  This is

16   just one snippet of all the emails.

17   Q.  So you go on and you say -- after the first paragraph, you

18   say:  "Secondly, I've been collecting and reviewing all the

19   documents you've been sending."  Do you see that?

20   A.  Yes.

21   Q.  So Source was sending you documents, correct?

22   A.  Correct.  That's all the quotations we were talking about.

23   Q.  So you didn't get any documentation related to any of the

24   past due amounts by then?

25   A.  No, I did not.
```

1   Q.  "However, the receivers have a fundamental issue with the

2   450,000 or deposit monies previously paid, none of which is

3   being honored by Source Outdoor."  See that?

4   A.  I do.

5   Q.  Did you ask about the reconciliation with that being there?

6   A.  I'm sorry.  What's the question?

7   Q.  So despite "the receivers have an issue," you didn't say:

8   "Send me a copy of this check," right?

9   A.  I did several times, yes, in many emails.  It's just not on

10  this email that you have printed.

11  Q.  When was the deadline for you receiving the reconciliation?

12  A.  Well, theoretically, everything is typically, it seems, on

13  a three-month lead-in time.  So --

14  Q.  So -- I'm sorry.

15  A.  So I was counting back from April and -- which brought me

16  to about February.  And I had many discussions with my team

17  internally, and the decision within the team was we need to

18  move on and purchase these items.

19  Q.  Did you ever send an email to Source that says:  "If you

20  don't send us the reconciliation by this certain drop-dead

21  date," whatever that may have been, "We're going to move on and

22  purchase these items elsewhere"?

23  A.  No.  I did not.  But I didn't need to.  Because I didn't

24  have to answer to them as to where I was going to buy product

25  from for the hotel.  I had an order with them for the chairs

1    and that was the only order I placed with them.  I didn't have

2    to discuss any other procurement with them.

3    Q.  So because you didn't have to discuss it with them, you

4    didn't discuss it with them, correct?

5    A.  No.  I discussed it with them for months from December --

6    Q.  But you didn't send --

7    A.  Yes.  I sent them emails from December all the way through

8    January and February asking for reconciliations and asking for

9    copies of the returned check, which, in our meeting in

10   December, I was assured I would get.  And again, when we met in

11   the new year on site, again, I was told I would get a copy of

12   that check.  And I never received any of that.  So at that

13   point, the company decided it was time to move on.

14   Q.  And you didn't communicate that to Source?

15   A.  Yes, I did.

16   Q.  You did?

17   A.  Yes, I did.

18   Q.  With a drop-dead date:  "If we don't get the

19   reconciliation" --

20   A.  No.  I told them:  "I've waited long enough and I'm moving

21   on."  I don't have to wait for them.  I don't have any contract

22   with them for anything other than the chairs.  And Source was

23   very aware of our drop-down dates, and that's why in December

24   we placed the chairs order ahead of anything that I'd received

25   from them because I was led to believe that they were coming

1  from China and they were on a very long lead time and therefore

2  I had to place the order immediately to be able to meet my

3  date.

4  Q.  Did you have personal knowledge as to whether Source has

5  ever made the 1,420 chairs that you are seeking here?

6  A.  No.  Other than the email from Source confirming that they

7  were in production.  So by, you know, default, I came to the

8  conclusion that they were in the process of being made because

9  I was advised that from them.

10  Q.  Mr. Shvartsman communicated to you on April 7th, didn't he,

11  by email?

12  A.  I don't have them all in front of me.  I don't know what

13  date.

14  Q.  That's fine.

15      Before we get to that, you say in Paragraph 8 of the

16  affidavit you supplied in support of the motion for summary

17  judgment --

18          THE COURT:  Excuse me.  There is no motion --

19          MR. FELDMAN:  I'm sorry.  Motion for temporary

20  injunction, Judge.

21          THE COURT:  Okay.  Why don't you refer it to by

22  exhibit number.  So that I know which affidavit you're talking

23  about.

24          MR. FELDMAN:  Absolutely, Judge.

25          THE COURT:  Okay.

```
1              MR. FELDMAN:  It's on the Plaintiff's exhibit list.

2              THE COURT:  Is this Exhibit 3, her initial affidavit?

3              MR. FELDMAN:  I believe so.  Yes, Judge.

4         Thank you.

5    BY MR. FELDMAN:

6    Q.   Paragraph 8 of Exhibit 3, you state:  "Given the time

7    required to find an alternate supplier to negotiate a new

8    purchase order to have the chairs manufactured and delivered to

9    CCA's freight forward in Miami for onward shipping to CCA's

10   project site in the Bahamas, CCA would not be able to complete

11   this aspect of the project by the substantial completion date."

12   Do you see that?

13   A.   Yes, I do.

14   Q.   After you said:  "We're" -- strike that.

15        As you sit here today, have you tried to find an alternate

16   supplier for the chairs?

17   A.   No, I have not.

18   Q.   As you sit here today, have you tried to negotiate a new

19   purchase order for the chairs?

20   A.   With who?

21   Q.   Anybody.

22   A.   Well, if I've not looked for a supplier, then no, clearly,

23   I haven't.

24   Q.   Exhibit A to the motion for temporary injunction, which I

25   believe is Plaintiff's 3 -- so Exhibit A would be --
```

1    unfortunately, I don't have my list here.

2            THE COURT:  That's -- the affidavit you were just

3    referring is Exhibit A.

4            MR. FELDMAN:  I'm sorry.  Exhibit B, which is the

5    contract they attached.

6            THE COURT:  Okay.  Exhibit B is Plaintiff's Exhibit 4.

7            MR. FELDMAN:  Yes.  Thank you, Judge.

8    BY MR. FELDMAN:

9    Q.  Plaintiff's Exhibit 4 has various documents attached to it

10   that you referred to as a contract.  Are you familiar with

11   those?

12   A.  To be honest, I don't know what exhibit you're talking

13   about.  I'm completely lost here.  I don't have them in front

14   of me.

15           MR. FELDMAN:  May I approach, Judge?

16           THE COURT:  Yes.

17           THE WITNESS:  Yes.  That's the CCA purchase order.

18   BY MR. FELDMAN:

19   Q.  Tell me where on there it identifies a delivery date.

20   A.  It does not, other than to be shipped immediately.

21   Q.  Tell me where on there it identifies a drop-dead date for

22   production completion.

23   A.  It does not.

24       (Pause in proceedings.)

25           MR. SHVARTSMAN:  Sorry, Judge.

```
 1    BY MR. FELDMAN:

 2    Q.  This exhibit that we have just discussed shows a deposit of

 3    $401,525.  Do you see that?

 4    A.  No, I don't.

 5    Q.  Unit costs, down where it says:  "Cost Code Description,"

 6    there's a number 2:  "Furnishings, deposit."  Do you see that?

 7    A.  That's correct.  Yeah.

 8    Q.  401,525?

 9         THE COURT:  It says 404,000, not --

10         MR. FELDMAN:  My copy's blurry.  I'm sorry.

11    BY MR. FELDMAN:

12    Q.  And then a grand total balance of 309,500 --

13    A.  Correct.

14    Q.  Are you saying Source didn't get that deposit?

15    A.  They did, plus more.  In the reconciliation of March 8th,

16    they showed that they got paid actually 600,000, and not the

17    404,000, for these lounge chairs.

18    Q.  And so if Source returned $390,000, potentially, to PSI,

19    how much would you be left with?

20    A.  I don't know what that's got to do with anything.

21    Q.  Do you know if Source ever sent the money back to

22    Purchasing Solutions?

23    A.  No, I don't.  Because I requested that information many

24    times and never received it.

25         THE COURT:  I'm a little bit confused.  What's the
```

1    relationship between Purchasing Solutions and these chairs?

2            THE WITNESS:  The owner of Baha Mar, they engaged a

3    procurement company to do all the procurement of all the FF&E

4    on the project.  So they were the company that went out to

5    source the vendors, and they are the ones that actually wrote

6    purchase orders on behalf of BML, and they are the ones that

7    actually paid the money.  So Baha Mar paid money to PSI and

8    then PSI paid the vendors.

9            THE COURT:  So when the initial order for the chairs

10   was placed, it was placed by PSI and PSI was the entity that

11   made the payment?

12           THE WITNESS:  Correct.  Yes.

13           THE COURT:  Okay.  I just -- I'm sure that was clear

14   to everybody but me.  But since it wasn't clear to me, I

15   thought it was wise to clear it up while I had a witness.

16   BY MR. FELDMAN:

17   Q.  Did CCA have access to Baha Mar's records?

18   A.  Some records.

19   Q.  Financial records?

20   A.  No.

21   Q.  Did CCA have any access to Purchasing Solutions' records?

22   A.  Yes.

23   Q.  Financial records?

24   A.  Yes.

25   Q.  Did you ever ask Purchasing Solutions if they got back the

```
1    money?

2    A.  Yes.

3    Q.  What did they say?

4    A.  They did not.

5    Q.  When did you ask them that question?

6    A.  It was -- I didn't speak to them personally.  It was part

7    of the claims process for Baha Mar for all the outstanding

8    debt.  And anyone who had outstanding debt, and wanted to file

9    a claim, could do so via the receivership.  So PSI were one of

10   the companies that was claiming money from BML for monies that

11   had not been paid.  And as part of their claim submission, they

12   had to submit a check register showing all the payments that

13   they had made to vendors.

14   Q.  Have you reviewed that check register?

15   A.  Yes, I have.

16   Q.  When did you review it?

17   A.  I don't know what the date is, but --

18   Q.  When was it generated?

19   A.  Probably last September, October.

20   Q.  So would it surprise you to know or would it surprise you

21   if I told you that in 2015 Purchasing Solutions deposited a

22   check from Source Outdoor for a refund of 390-plus thousand

23   dollars, approximately?

24   A.  Yes.  And that is why I asked every vendor that I called --

25   and we had over 900 vendors on this project.  Although I had
```

```
1    records from PSI, I asked every vendor to provide me with their

2    record so that I could make sure that we were on the same page,

3    and those records were never received from Source.

4            MR. FELDMAN:  Judge, this is getting -- I mean, I

5    don't want to talk over.  But I ask a question that could be

6    answered yes or no and then there's a explanation that follows

7    it, not --

8            THE COURT:  She's allowed to explain her answer,

9    but -- so why don't you repeat your question and then she can

10   answer it.  And if she needs to explain it, she can.

11           MR. FELDMAN:  I think he answered it and then ran on

12   beyond that.  So I think we have an answer on it, though.

13           THE COURT:  So the bottom line is when you reviewed

14   the check register, there was no reflection of a refund of

15   $390,500 from Source Outdoor?  Is that what you said?

16           THE WITNESS:  Correct.  That was a question mark over

17   that.

18           THE COURT:  When you say there was a question mark,

19   what do you mean?

20           THE WITNESS:  That the records didn't show that as

21   being repaid.  The records just showed that there was this

22   payment and then a question mark and saying something like in

23   error.

24           THE COURT:  What was that last word?  A question mark

25   that said something like what?
```

```
1            THE WITNESS:  I think it said "in error."  "Payment in

2       error" or something like that.

3            MR. FELDMAN:  Judge, at this point in time, I

4       mentioned before I've got an email -- and this kind of all

5       popped up in response to what was filed very late here.  I've

6       got an email with attachments to it that I'd like to share with

7       opposing counsel and then just show the attachments, which are

8       check copies, to the witness and have the witness talk about

9       them.  And then I will file them with the Court after we are

10      done here today.  But I think it's certainly material because

11      it includes a refund check for 390-plus thousand dollars.

12            THE COURT:  Forward the email to my e-file box and my

13      law clerk will print it out.  I'm not having you show phones to

14      people -- which would have been nice for you to have arranged

15      to do during our lunch break.

16            MR. FELDMAN:  I apologize, Judge.  You are correct.  I

17      apologize.

18            THE COURT:  Mr. Davis -- and then we'll talk about

19      what it is, you'll see it, and whatever objection you have to

20      it you can talk about.

21            MR. FELDMAN:  May I have the email address, Judge?

22            THE COURT:  Simonton@flsd.uscourts.gov.

23            MR. DAVIS:  Your Honor, I only rise to note that we

24      wouldn't be here at all if they had refunded the money and told

25      us that they had refunded the money when I sent the letter to
```

```
1    them.  This is ...

2              MR. FELDMAN:  Simonton@flsd.uscourts.gov?

3              THE COURT:  And hopefully that will happen quickly.

4              MR. FELDMAN:  It's happening right now, Judge.  The

5    whole --

6              THE COURT:  Well, I mean, it's easy for you to say.

7    What I'm talking about is, you know, our email servers go

8    through various locations.

9              MR. FELDMAN:  There's two of them, Judge, that are

10   coming.  There is the check that was written to Source and the

11   check that was written in response by Source.

12             THE COURT:  Okay.  My law clerk says she's printing it

13   now.

14       (Pause in proceedings.)

15             THE COURT:  So while we're waiting for that, when we

16   look at Plaintiff's Exhibit 4, and it's got a signature on

17   behalf of CCA Bahamas, whose signature is that?

18             THE WITNESS:  That's the president, Tiger Wu.

19             THE COURT:  Okay.  And I assume she needs to make

20   copies of those documents.  Alicia, you want to try to get them

21   from Pam, the documents she's printing and the copy she's

22   making.

23             Oh, she's here.

24             MR. FELDMAN:  I can come back to that, if you want.

25             Oh, there you go.
```

```
1              THE COURT:  Yeah.  She's here.
2              MR. FELDMAN:  I'd like to offer those both into
3      evidence right now, Judge.
4              THE COURT:  Well, we need to first give them exhibit
5      numbers and then --
6              MR. FELDMAN:  Plaintiff's -- Defendant's 21, a
7      composite exhibit of two checks.
8              THE COURT:  And which is the top page, the deposit
9      detail report or the BB&T check?
10             MR. FELDMAN:  The top page would be the Purchasing
11     Solutions check to Source Outdoor and the second page would be
12     the Source Outdoor check to Purchasing Solutions.
13             THE COURT:  Defendant's Exhibit 21, composite.
14             Okay.  Any objection to -- to Defendant's 21?
15             MR. DAVIS:  No objection.
16             THE COURT:  Okay.  Defendant's 21 will be admitted,
17     and it will be a August 18, 2014 check from Source to
18     Purchasing Solutions, and that's in the amount of $397,512.50,
19     as well as the deposit detail report.
20         (Defendant's Exhibit 21 received into evidence.)
21         (Pause in proceedings.)
22             MR. FELDMAN:  I'm waiting for Your Honor.
23             THE COURT:  Oh, okay.  You can continue.
24             MR. FELDMAN:  You mentioned one check there.
25     Obviously, part of Exhibit 21 is the check from Source to
```

1    Purchasing Solutions as well.

2           THE COURT:  Right.  Actually, I meant from Source -- I

3    said from Source to Purchasing Solutions.  And then the second

4    page, which is a deposit detail report is from Purchasing

5    Solutions to Source.  That's the second check.

6           MR. FELDMAN:  Thank you, Judge.

7    BY MR. FELDMAN:

8    Q.  Ms. Dwornik, I'm going to show you part of Exhibit 21,

9    which is the deposit detail statement that the Judge just

10   mentioned.  I'm going to try not to hover over, but I only have

11   one copy.  I'm going to look at it with you, if I may.  And I

12   want to make sure you're done before I say anything.  But this

13   says it's for $397,512.50, from Purchasing Solutions to Source

14   Outdoor.  Do you see that?

15   A.  Yes, I do.

16   Q.  And I'm going to show you the second page, which is a check

17   from Source Outdoor to Purchasing Solutions for $397,512.50.

18   Do you see that?

19   A.  I do.

20   Q.  On the memo it says what?

21   A.  "Check Number 2128, Refund."

22   Q.  And it looks like it's been deposited from a stamp in the

23   back on the bottom, correct?

24   A.  No.  I have no idea what that stamp is.  Sorry.

25   Q.  Okay.  Is this the deposit that you're referring to when

1   you talk about 300-plus thousand dollars?

2   A.  Yes.

3   Q.  And so assuming this check, for $397,512 from Source

4   Outdoor to Purchasing Solutions, was cashed and references

5   refund in the memo, Source would have given that money back,

6   correct?

7   A.  If it's been cashed, yes.  I don't know if it's been cashed

8   or cleared or anything.  But I can see that it's a check

9   written, yes.

10  Q.  I will tell you that that check from Source Outdoor to

11  Purchasing Solutions is dated August 18, 2014.  Okay?  The

12  report that you mentioned, was it after August 18, 2014 or

13  before?

14  A.  Probably after.

15  Q.  I'm going to hand you what's been marked as Defendant's

16  Exhibit 16, which was Exhibit D to Mr. Shvartsman's affidavit.

17          MR. FELDMAN:  I'd like to have that moved into

18  evidence, Judge.

19          THE COURT:  Okay.  Defendant's Exhibit 16 will be

20  admitted.

21      (Defendant's Exhibit 16 received into evidence.)

22          MR. FELDMAN:  Thank you.

23          May I approach, Your Honor?

24          THE COURT:  Yes.

25

```
1    BY MR. FELDMAN:

2    Q.  I've handed you what's been marked as Defendant's

3    Exhibit 16.  Take a look at that and tell me if you're familiar

4    with it.

5    A.  Yes, I am.

6    Q.  Those are some emails between you and Mr. Shvartsman,

7    correct?

8    A.  Correct.  Yes.

9             THE COURT:  Wait.  Exhibit -- okay.  Sixteen is

10   Exhibit B and -- no.  I'm sorry.

11            MR. FELDMAN:  Sixteen was D to the affidavit, Judge.

12            THE COURT:  D to the affidavit.  Okay.  That's --

13            MR. FELDMAN:  May I continue?

14            THE COURT:  I misheard.  Well, only if you want to

15   continue without me getting to the exhibit so that I can follow

16   along.

17            MR. FELDMAN:  I would much prefer you have the

18   exhibit.

19            THE COURT:  But please follow along, if you need to.

20   But this is Defendant's Exhibit 16.

21            Okay.  It begins with like an April 19, 2017, the

22   date?

23            MR. FELDMAN:  That's the date on the top one.  Yes,

24   Judge.  There's three emails actually in there.

25            THE COURT:  I was just referring to the date on the
```

```
 1    top one --

 2              MR. FELDMAN:  That is the top one.  Yes, Your Honor.

 3              THE COURT:  -- to make sure I was on the right

 4    exhibit.

 5              Okay.

 6    BY MR. FELDMAN:

 7    Q.  Ms. Dwornik, let me direct you to Mr. Shvartsman's email to

 8    you, dated April 7th, 2017.  Do you see that?

 9    A.  I do.

10    Q.  In that email, Mr. Shvartsman goes through the amount or

11    the application of the money and the balance and the

12    application of the money, and he also says that:  "You have

13    advised us that is unlikely in the future payments can be

14    made."  Do you see that?

15    A.  I do.

16    Q.  Did you advise Source that it is unlikely any future

17    payments can be made?

18    A.  Possibly.  I'd have to find an email that says that.  I

19    don't know.

20    Q.  Did I -- I'm sorry.  I don't want to interrupt you.  I

21    apologize.

22    A.  Did I?  Do you have an email that uses those words?

23    Q.  I can go back and probably track one down.  Sure.

24         Do you want me to do that right now?

25    A.  No.  No.  Carry on.
```

```
1            THE COURT:  I guess the question is:  Do you recall

2    telling Mr. Shvartsman or sending him an email to the effect

3    that it was unlikely any further payments could be made on or

4    about that time?

5            THE WITNESS:  I don't think so.  Because I think this

6    is the only email exchange I had with him during the whole

7    course of the contract.

8    BY MR. FELDMAN:

9    Q.  Do you remember saying that to anybody at Source?

10   A.  Well, I'd have to understand what context.

11   Q.  As of April 7, 2017, was it CCA's intention to issue any

12   more payments to Source Outdoor?

13   A.  No.

14   Q.  Mr. Shvartsman goes on to say:  "That is certainly

15   problematic, as we will need a resolution of any and all

16   financial matters prior to manufacture and/or delivery of any

17   further materials."  Do you see that?

18   A.  I do.

19   Q.  You respond to him on April 12th, 2017.  Do you see that?

20   A.  I do.

21   Q.  In there, do you talk about the manufacture or delivery of

22   any materials?

23   A.  Sorry.  One more time.  What was the question?

24   Q.  In that email that you respond to Mr. Shvartsman, do you

25   talk about the manufacture or delivery of materials?
```

1    A.  Yes, I do.

2    Q.  Where?

3    A.  Says:  "Please confirm delivery date of lounge chairs paid

4    for by CCA."

5    Q.  Okay.  And Mr. Shvartsman writes back to you on April 19th,

6    correct?

7    A.  Correct.

8    Q.  And does he say:  "I'm delivering the chairs to you"?

9    A.  What on delivery of the chairs -- what -- what are you

10   asking?

11   Q.  He doesn't say:  "I'm delivering the chairs to you," does

12   he?

13   A.  In this email?

14   Q.  Yes.

15   A.  Well, he certainly says that he's processed the order.

16   Q.  Where are you referring to exactly?

17   A.  "In reliance of your indication, for example, that" -- and

18   I quote, we are making good monies owed, unquote -- "certain

19   orders -- certain purchase orders were processed," and there

20   was only the one purchase order.  So in this email is

21   confirmation that that purchase order for the chairs was, in

22   fact, processed.

23   Q.  And does it say that they're delivering anything on any

24   specific time certain or no?

25   A.  No.

```
 1    Q.  In fact, he says:  "We look forward to getting paid what is
 2    owed, which was the premise of our continuing to move forward
 3    with you and to the making good of monies owed," correct?
 4    A.  Correct.
 5    Q.  And in that reference, he refers back to your statement
 6    that CCA was going to make good on monies owed, correct?
 7    A.  Correct.
 8    Q.  Did you respond yourself to Mr. Shvartsman's email?
 9    A.  The one of April 19th?
10    Q.  Uh-huh.
11    A.  No, I did not.
12    Q.  The next communication that was sent to Source was from
13    your attorneys, correct?
14    A.  Correct.
15    Q.  And that was the May 3, 2017 letter, I believe; is that
16    correct?
17    A.  I don't have it in front of me, but it's probably the
18    letter you're referring to, yes.
19    Q.  I'm looking at --
20         MR. FELDMAN:  And it's on the Defendant's list.  It's
21    Exhibit C to the motion for temporary injunction, which would
22    be what number on your list?
23         On the Plaintiff's list, Judge, I'm sorry.  On the
24    Plaintiff's list.
25         THE COURT:  What number?
```

```
 1              MR. FELDMAN:  Five, Your Honor.

 2              THE COURT:  Okay.  Exhibit 5.  Okay.

 3              MR. FELDMAN:  May I approach?

 4              THE COURT:  Yes.

 5   BY MR. FELDMAN:

 6   Q.  I'm handing you what's the Plaintiff's marked Exhibit

 7   Number 5.  You said the next communication to Source was the

 8   letter from your lawyers.  Is that the letter you're referring

 9   to?

10   A.  Yeah.  I believe so.

11   Q.  Does that letter indicate that CCA is going to make good

12   monies owed to Source?  Let me rephrase that.  That letter

13   doesn't say that, does it?

14   A.  No, it does not.

15   Q.  In fact, what the letter says is quote:  Source Outdoor

16   apparently is refusing to meet its contractual obligations

17   based on its allegations it's owed money by Baha Mar, Ltd."  Do

18   you see that?

19   A.  I do.

20   Q.  Doesn't say that we agree to make good, does it?

21   A.  No.

22   Q.  Then goes on to demand that:  "If Source Outdoor does not

23   confirm in writing within 48 hours that it will meet these

24   demands, CCA will seek a temporary restraining order."  Do you

25   see that?
```

1   A.  Yes, I do.

2   Q.  That was May 3, 2017.

3   A.  Yes.

4   Q.  Do you know how that was delivered?

5   A.  No.  I don't know.

6   Q.  Prior to filing this lawsuit, CCA didn't seek a temporary

7   restraining order or injunction, did it?

8   A.  No.

9   Q.  So we went from May 3 to June 29, I believe, if the date is

10  correct, without doing anything, correct?

11  A.  We did a lot internally.

12  Q.  Without doing anything --

13  A.  What do you mean without doing anything?

14  Q.  Without pursuing a temporary injunction?

15  A.  No, we did.

16  Q.  Huh?

17  A.  Yes, we did.

18  Q.  You did?

19  A.  Yes, we did.

20  Q.  Pursue a temporary injunction before this lawsuit?

21  A.  Correct.  In that period between May the 3rd --

22  Q.  And June 29th, you pursued a temporary injunction?

23  A.  We started to follow the process that we had to take.

24  Q.  You started to follow the process?

25  A.  Correct.

1   Q.  To seek a --

2   A.  To get --

3   Q.  -- expedited temporary injunction?

4   A.  Correct.

5         MR. DAVIS:  Your Honor, may the witness answer the

6   question, please?

7         THE COURT:  Let her answer what process that they

8   started on May 3rd.

9         THE WITNESS:  There is basically -- as I explained at

10  beginning, there's CCA Bahamas.  They're held by CCA America.

11  I don't know if there's an another intermediary company.

12  Everything was reported back to Beijing.  Nothing can happen

13  within seconds within the company.  There's an enormously long

14  process that has to be followed.  So I have to take it up the

15  chain.  And then I have to wait for it to come down the chain

16  for sign-offs and permissions, et cetera, et cetera.

17  Q.  So how many people are up the chain?

18  A.  I have no idea.

19  Q.  How many people did you deal with up the chain?

20  A.  One.

21  Q.  Who would that be?

22  A.  Mr. Gao.

23  Q.  Does Mr. Gao have the authority?

24  A.  No.

25  Q.  So he has to go up the chain, correct?

```
1    A.  Yes.

2    Q.  Do you know who he dealt with?

3    A.  Probably Mr. Wu.

4    Q.  Probably, or you're certain?

5    A.  Well, I don't know.  I don't know if there's anybody else

6    in between him and Mr. Wu.  But I think Mr. Wu --

7    Q.  Okay.  So it possible there could have been others?

8    A.  Possible.

9    Q.  Do you know who ultimately signed off on it?

10   A.  No.

11        (Pause in proceedings.)

12             MR. FELDMAN:  Judge, I'm just going through my list of

13   certain things here, so -- just to Your Honor knows.

14        (Pause in proceedings.)

15   BY MR. FELDMAN:

16   Q.  You've alleged based, I believe, on information and belief

17   that Source is selling your chairs; is that correct?

18   A.  Correct.

19   Q.  Other than the advertisement that you have attached to the

20   temporary injunction motion or the supplemental temporary

21   injunction motion, do you have any other specific firsthand

22   information that Source is selling your specific 1,420 chairs?

23   A.  No, I do not.

24        (Pause in proceedings.)

25             MR. FELDMAN:  Your Honor, I don't think I have
```

1    anything else right now.

2              THE COURT:  Okay.  Do you have redirect Mr. Davis?

3    Any questions?

4              MR. DAVIS:  I do, Your Honor.

5              THE COURT:  Okay.

6                         REDIRECT EXAMINATION

7    BY MR. DAVIS:

8    Q.  The check for $375,000 that you were just shown, had you

9    ever seen that before?

10   A.  No, I have not.

11   Q.  Was that a document you were requesting since December of

12   2016.

13   A.  It is.

14   Q.  You never received it?

15   A.  Never received it.

16   Q.  And the documents you did receive, you got them in March

17   and they indicated that you had overpaid for the remaining

18   chairs by several hundred thousand dollars?

19   A.  Correct.

20   Q.  Let's talk about the -- the language "make good on monies

21   owed."  First of all, how many vendors were you dealing with

22   when CCA came back onto the project?

23   A.  Well, hundreds.

24   Q.  And did you make this same proposal to those hundreds of

25   vendors?

1    A.  We did.

2    Q.  What was the proposal?  What did it mean:  "Make good on

3    monies owed"?

4    A.  Well, we understood that deposits had been paid to many

5    vendors for furniture for the project.  A lot of the furniture

6    for the project is bespoke furniture.  In the essence of time,

7    we figured that if vendors already had made a lot of the

8    furniture, then we would approach the same vendors to see if we

9    could complete the sale that they had started with PSI and

10   receive the goods for the project.

11   Q.  So you would go in and pay what was owed and get the

12   product that you paid for?

13   A.  Correct.  Yeah.

14   Q.  And was that your proposal to Source?

15   A.  Yes, it was.

16   Q.  And was that your intention at the time you made the

17   proposal?

18   A.  Yes, it was.

19   Q.  Was to purchase whatever they had manufactured for --

20   pursuant to PSI, pay them what was owed on that, and take

21   delivery of the product?

22   A.  Yes, it was.

23   Q.  Were you able to do that with the other vendors?

24   A.  In the most part, yes.

25   Q.  Were you able to do it with Source?

```
1    A.  No.

2    Q.  Why?

3    A.  Because Source advised me in the meeting in December that

4    they would not honor any of the deposit monies that had been

5    paid, which totaled 400-something thousand, plus we had this

6    check of 369.  So we were at about $800,000, and Source said:

7    "Well, we're not going to honor any of the deposits and if you

8    want the product you'll have to pay full price again."  And in

9    fact, they issued me quotations for all the product in that

10   full hundred percent value, and they wouldn't take any of the

11   deposits at all.  They wouldn't honor them.  They said we had

12   to do a completely new sale because that was an old purchase

13   order with a different company and if we wanted that product we

14   would just have to buy it from scratch, like, you know, anybody

15   else.

16   Q.  Was that a factor in your deciding not to go forward with

17   Source on any of these items?

18   A.  Yes, it was.

19   Q.  But did you did go forward on the remaining 1,400 chairs?

20   A.  Correct.  Because that was at the same meeting, and I was

21   very -- we were very aware of the time constraint.  And Source

22   advised us that these lounge chairs were being manufactured in

23   China and it was imperative to get the purchase order out

24   immediately so that we could -- there would be a chance that we

25   could make the April delivery date that we were looking for.
```

1    And so even during the meeting Source's office here in Florida

2    actually emailed me a quotation and an invoice, so that we

3    could turn that purchase order around immediately.  So --

4    Q.  And you did that?

5    A.  I did that in good faith, thinking that we could resolve

6    the rest in the same manner.

7         THE COURT:  Hadn't they already told you that they

8    wouldn't do that?  I mean, I'm not sure of the timing of all of

9    this.

10         THE WITNESS:  Yeah.  It was the same meeting when they

11   said:  "Oh, you know, all your deposits are gone.  But if you

12   want these lounge chairs, you better order them and you better

13   order them quick because otherwise you won't get them because

14   they are coming from China."  So I did that, and I was still

15   chasing -- after that meeting, still chasing the reconciliation

16   still hoping that we could maybe do a deal, but --

17   BY MR. DAVIS:

18   Q.  For the balance of the items that --

19   A.  For the balance of the items.  But it just became apparent,

20   when I just wasn't getting the information, that, you know,

21   there wasn't going to be a deal.

22   Q.  Now, you were shown the advertisement and you were asked

23   about the advertisement that you received from Candice

24   McCarthy.

25   A.  Uh-huh.

1    Q.   Candice McCarthy is who?

2    A.   She's a lady in Source's office.

3    Q.   That you dealt with?

4    A.   Yes.

5    Q.   She's here in the courtroom.

6    A.   I've never met her.  So I don't know what she looks like.

7    Q.   She's waving hello to you.  Did you read the whole ad --

8    you looked at one page?

9    A.   Yes.

10   Q.   Did you read it and did it make any reference to the color

11   of the chairs that was being offered?

12   A.   Yes, it did.  It said that the offer was only for chairs

13   with the white frame and the white fabric.

14   Q.   And are those the same colors of the chairs you ordered?

15   A.   They are.

16   Q.   Now, are you familiar with the offerings of Source that

17   that chair comes in multiple colors?

18   A.   I've seen that on the website, yes, that you can choose

19   multiple colors for the frame and the fabric on the chair.

20   Q.   But this ad said no changes, white only?

21   A.   Correct.

22   Q.   Is that an unusual way, in your experience, for vendors to

23   offer products that come in multiple colors?

24   A.   No.  Typically, that's the kind of marketing email I get

25   when it's like an end-of-product sale or leftover inventory

```
 1   sale, where you can't specifically choose what you want.

 2   Q.  Have you been involved in a number of construction products

 3   over your many years?

 4   A.  I have, yes.

 5   Q.  And you have been involved in the bidding process?

 6   A.  Yes, I have.

 7   Q.  And are you aware, in that kind of process, that the

 8   timeliness of the vendor is a factor in selecting a vendor?

 9   A.  Yes.

10   Q.  Now, was CCA in consideration for other projects in the

11   Bahamas at around the time we're talking about?

12   A.  In -- other projects in the Bahamas, I'm not sure other

13   than the other projects that the potential buyer of Baha Mar

14   wanted to undertake once they had purchased the property.

15   Q.  But that would be in the Bahamas?

16   A.  In the -- yeah.

17   Q.  And was CCA also under consideration for projects in

18   Jamaica?  In fact, are you at the very moment missing your

19   plane to Jamaica?

20   A.  Yes, I am.

21   Q.  And based on your experience, if CCA was unable to complete

22   the Baha Mar project, make it -- you know, in accordance with

23   the contract, what impact, based on your experience, would that

24   have on the ability of CCA to obtain other construction

25   contracts of this nature?
```

```
 1    A.  Well, personally, I think, you know, delivery and
 2    workmanship is the number one thing that project owners are
 3    looking for.  So it's two things that they very much value
 4    highly.
 5    Q.  So if CCA failed to timely complete this project in
 6    accordance to the contract, based on your experience based on
 7    these other projects, what impact might it have on those other
 8    projects?
 9    A.  Oh, absolutely.  I mean, I've taken the Jamaican Government
10    around the project recently to look at what we're doing, and we
11    are under huge scrutiny on the Baha Mar project for the work
12    that's coming out that we're trying to negotiate now in Jamaica
13    with the government.
14         THE COURT:  And excuse me for interrupting.  I'm
15    just -- I'm a little confused.  I may have misunderstood
16    something about your earlier testimony.  I thought that CCA
17    Bahamas, Limited was a company formed for the purpose of the
18    Baha Mar project only.
19         So is there a different CCA company that's been formed
20    for the purpose of obtaining like the Jamaica project or how
21    does that work?
22         THE WITNESS:  Basically, most of these companies come
23    under another element of just CCA South America.  But
24    typically, from what I can see when CCA goes into a new region,
25    and they have to register a new company to do business in that
```

1    region, they register it under a different name per region.

2    Whether it's CCA South America, CCA Panama, CCA Bahamas, CCA

3    America, it's all the same holding company.  But it's just

4    separate limited companies per project because these projects

5    typically are billions of dollars.  And so for, I guess, many

6    reasons, including accounting purposes, it's run -- each

7    project is run as its own little company.

8              THE COURT:  So when you say CCA is going to Jamaica

9    and negotiating, what you're talking about are the principals

10   of the holding company are going to Jamaica and they are the

11   same people who are the principals of CCA Bahamas.

12             THE WITNESS:  Correct.

13             THE COURT:  But it's not that CCA Bahamas would be

14   doing that business.

15             THE WITNESS:  Correct.

16             THE COURT:  It's just part of the CCA umbrella.

17             THE WITNESS:  Correct.  Yes.  Because to do business

18   in different localities you have to have a business license as

19   a registered company.

20   BY MR. DAVIS:

21   Q.  But the additional projects that you're talking about, the

22   new owner considering those would be to be done by CCA Bahamas;

23   is that correct?

24   A.  Correct.  Yes.

25             THE COURT:  I'm sorry.  What did you say?  You said

```
 1    that CCA Bahamas would be doing the new projects?

 2              THE WITNESS:  No.  The current development that is in

 3    receivership, the Baha Mar project, that is currently under

 4    sale agreement to a new owner post-bankruptcy.  And this new

 5    owner, from what I understand, has, you know, a budget of up to

 6    a billion dollars for more work on the Baha Mar development.

 7    And we are one of the contractors that is looking for these

 8    contracts.

 9              THE COURT:  So it would be to -- the new owner, you're

10    saying, wants to expand the Baha Mar project.

11              THE WITNESS:  Correct.  Yes.

12              THE COURT:  And CCA Bahamas is trying to get new

13    contracts to serve as the general contractor for the expansion?

14              THE WITNESS:  To service the new owner.

15              THE COURT:  To serve as the new owner?

16              THE WITNESS:  To service the.

17              THE COURT:  The new owner.

18              THE WITNESS:  To work for the new owner.

19              THE COURT:  Okay.  Because right now CCA works for the

20    receivers.  Okay.

21              THE WITNESS:  But once the sale is complete, the new

22    owner has other work that they would like to do.

23              THE COURT:  Okay.

24    BY MR. DAVIS:

25    Q.  Were you ever advised by Source at any time that the chairs
```

1  had never been -- that you paid for had never been ordered?

2  A.  No.

3  Q.  Were you ever advised that they were not being

4  manufactured?

5  A.  No.

6  Q.  In fact, were you ever advised that they were being

7  manufactured?

8  A.  Yes.

9  Q.  How were you so advised?

10  A.  Initially, I was advised via an email from Source saying

11  that the chairs were in manufacture and that they would be

12  available in May.

13  Q.  So it provided a specific date when they would be received?

14  A.  Correct.  And I wrote back because I was a little bit

15  worried about that date because we needed them in April.  And

16  so I wrote to Candice about that.

17  Q.  And what response did you get from Candice about the

18  delivery of your chairs?

19  A.  I don't remember the exact words, but I think she said that

20  that term -- there they were in manufacture and she would check

21  up on the date.

22  Q.  Did she indicate they had been in manufacturing for a long

23  period of time?

24  A.  Yes, she did.

25  Q.  Did she tell you that they weren't being manufactured at

```
1    all?

2    A.  No.

3    Q.  You were dealing mostly with Candice, were you not, on

4    this?

5    A.  Correct.  Yes.

6    Q.  And you had what you regarded as a good relationship with

7    her?

8    A.  Absolutely, yes.

9    Q.  And you believed she was being truthful with you?

10   A.  Yes.

11   Q.  When is the first time you learned that the chairs had not

12   even been manufactured?

13   A.  I think it was in the affidavit.  I'm not sure.

14   Q.  Well, in the documents in this case is when you first

15   learned it; is that correct?

16   A.  Yes.

17   Q.  When you paid the money to Source, what was the purpose of

18   the payment of the money?

19   A.  It was to pay for the 1,400 chairs, as per the purchase

20   order.

21   Q.  Did CCA ever agree to pay storage fees for Source?

22   A.  No.

23   Q.  Did it ever agree to pay mitigation for Source?

24   A.  No.

25   Q.  Do you even know what Source was storing, for which they
```

1    wanted to charge you?

2    A.  No.

3    Q.  So the -- to be clear, the offer of payment that you

4    were -- the offer of making the other contracts whole was with

5    the expectation you would pay the money and you would get those

6    goods?

7    A.  Correct.  Yes.

8    Q.  Did you offer to pay the money whether you got the goods or

9    not?

10   A.  No, we did not.

11            MR. DAVIS:  Thank you, Your Honor.

12            Can she be excused to go catch a plane?

13            THE COURT:  Yes.

14            Mr. Feldman.

15            MR. FELDMAN:  I was going to ask if I could have five

16   minutes of redirect.

17            THE WITNESS:  That's okay.  I'll stay.  I'll catch

18   another plane.

19            THE COURT:  Okay.  Five minutes.

20                          RECROSS-EXAMINATION

21   BY MR. FELDMAN:

22   Q.  You spoke about a project going on in Jamaica.  Are you

23   involved in the negotiations of that?

24   A.  There's no negotiations yet.

25   Q.  Who's handling that prospecting of that project?

```
1    A.  What do you mean by who?  You want a name?

2    Q.  Are you -- you.  Are you handing it?

3    A.  Well, one of the CCA --

4    Q.  I'm sorry?

5    A.  One of the CCA presidents is.

6    Q.  So it's not you?

7    A.  I'm involved in it, yes.  But I'm not leading the charge,

8    no.

9    Q.  Do you have any personal knowledge of what state

10   negotiations might be with the owner, who is apparently taking

11   over out of receivership?  I understood you saying that you

12   want to -- CCA wants to contract with the new owner in Bahamas,

13   correct?

14   A.  Correct.  That's what I understand.

15   Q.  Do you know where that's at right now, what stage it's at?

16   A.  No.

17   Q.  Are you handling those negotiations?

18   A.  No.  I'm not.

19       (Pause in proceedings.)

20   BY MR. FELDMAN:

21   Q.  In Paragraph 8 of your supplemental affidavit, you state:

22   "Following my notice to Source that CCA could not process

23   further Source orders, Source continued to keep us advised of

24   the progress of our purchase order.  Did not advise CCA the

25   chairs would not be delivered until Mr. Shvartsman's
```

1     self-serving email of April 11, 2017;" is that correct?

2     A.   Correct.

3     Q.   So you knew in April of 2017 Source was not delivering the

4     chairs, didn't you?

5     A.   Yes.  Yes.

6     Q.   That was before this lawsuit was filed, wasn't it?

7     A.   Yes.

8           MR. FELDMAN:  No other questions, Judge.

9           THE COURT:  Okay.  Anything else, Mr. Davis?

10          MR. DAVIS:  No, Your Honor.  Thank you.

11          THE COURT:  Can this witness be excused from further

12    proceedings in this court?

13          MR. FELDMAN:  Yes, Judge.

14          THE COURT:  Okay.  Thank you for attending.  You're

15    free to go.

16          THE WITNESS:  Thank you.  Thank you, Your Honor.

17       (Witness excused.)

18          THE COURT:  Okay.  Mr. Davis, do you have any other

19    evidence or witnesses?

20          MR. DAVIS:  Your Honor, we rest.

21          THE COURT:  Okay.  I'll -- because I allowed brief

22    examination by Mr. Davis, I'll allow you if you need brief

23    examination of your witnesses, Mr. Feldman.  And I'll give you

24    the opportunity to call whoever you want first for purposes of

25    cross-examination by Mr. Davis, if he elects to do so.

```
 1              MR. FELDMAN:  Right now, I call Gerald Shvartsman to

 2    the stand, Your Honor.

 3              THE COURT:  Okay.

 4        GERALD SHVARTSMAN, DEFENDANT WITNESS, SWORN

 5              COURTROOM DEPUTY:  Thank you.  Please be seated.

 6              THE WITNESS:  Watching a lot of TV shows doing this.

 7              COURTROOM DEPUTY:  Speak into the microphone.  State

 8    your name, spell your first and your last name, for the record.

 9              THE WITNESS:  Gerald Shvartsman.  G-E-R-A-L-D.  Last

10    name S-H-V-A-R-T-S-M-A-N.

11              MR. FELDMAN:  Judge, right now, I'd just like to

12    initially offer Mr. Shvartsman's affidavit into evidence.

13              THE COURT:  Okay.  Okay.  That's -- the affidavit is

14    Defendant's Exhibit Number 5?

15              MR. FELDMAN:  That would be correct, Your Honor.

16              THE COURT:  Okay.

17              MR. FELDMAN:  And it had various different exhibits.

18              THE COURT:  That would be admitted.

19         (Defendant's Exhibit 5 received into evidence.)

20              THE COURT:  And the exhibits that are attached,

21    which -- are they listed separately, I believe, on your -- they

22    are listed separately on your exhibit list, correct?

23              MR. FELDMAN:  That is correct Judge.  Some of them

24    have already come in, I believe.

25              THE COURT:  Right.
```

1          MR. FELDMAN:  I would ask that the rest of them come

2    in.

3          THE WITNESS:  Okay.  Let me just -- for the record,

4    Defendant's Exhibit Number 6 is Exhibit -- okay.  That was

5    Exhibit A to the response.  I'm not sure.  That was the

6    article.  I got that separate.

7          I don't know which of these -- I don't know which of

8    these exhibits attached to his affidavit you separately

9    numbered.  So you're going to have to go through them with me,

10   so that I can mark on the exhibit what the exhibit number is.

11   And then hopefully when you're showing it we can have some

12   clarity.

13         MR. FELDMAN:  Sure, Judge.

14         THE COURT:  Composite Exhibit A appears to be -- begin

15   with an email that's -- well, the emails you have are from

16   Candice McCarthy to you.

17         MR. FELDMAN:  Yeah.  That's just them forwarding that,

18   Judge.

19         THE COURT:  Okay.  Forwarding a November 28, 2016

20   email.  And I don't know -- it's a part of Composite Exhibit A.

21   But I don't see that -- I don't see it marked.  I don't see it

22   on your exist list.  So is it not on your exhibit list?

23         MR. FELDMAN:  I may have overlooked that one, Judge.

24   I'd like to mark it down as 22, please.

25         THE COURT:  Unless -- okay.  The article attached to

1    the response, demand letter.  I got Exhibit -- okay.  So

2    Exhibit 22 will be Composite Exhibit A to the affidavit of

3    Mr. Shvartsman.  And it's an email chain, beginning or ending

4    with November 28th, 2016.  And it may be it's only --

5              MR. FELDMAN:  There's also a November 17th letter

6    attached to it Judge, which makes it a composite.

7              THE COURT:  Okay.  So it's an email of November 28th,

8    2016 and a letter dated November 17th, 2016.  The letter is a

9    Dear Vendor letter from Raymond Winder, the Joint and Several

10   Receiver Manager, acting without personal liability, according

11   to the signature line.  And the email --

12             MR. FELDMAN:  One would expect nothing less, Your

13   Honor.

14             THE COURT:  And the email is from Ms. Dwornik to -- it

15   looks like Ms. McCarthy.

16             Okay.  That's Exhibit 22.

17             MR. FELDMAN:  Yes, Judge.

18             THE COURT:  And then Exhibit -- I believe we've

19   already admitted perhaps Exhibit B.  I'm not sure.

20             MR. FELDMAN:  I show that as Number 14.

21             THE COURT:  Fourteen.  Exhibit B is Number 14.

22             Exhibit C to the affidavit.

23             THE COURT:  Defendant's 14, right.

24             And then Exhibit C is Defendant 15, which was already

25   admitted.

```
1                MR. FELDMAN:  Correct, Judge.

2                THE COURT:  And then Defendant's Exhibit D is -- I

3    mean, the Exhibit D to the affidavit is Defendant's Exhibit 16,

4    which has also been admitted.

5                I can't read your handwriting with respect to Exhibit

6    17.  I don't know --

7                MR. FELDMAN:  I warned your clerk about my writing.

8                THE COURT:  Is that Exhibit E?

9                MR. FELDMAN:  Exhibit E.  Yes, Judge, would be --

10   Exhibit Number 17 would be Exhibit E to Mr. Shvartsman's

11   affidavit.

12               THE COURT:  Okay.  Defendant's Exhibit 17.  And that's

13   the Conquest sales history spreadsheet?

14               MR. FELDMAN:  Yes, Judge.

15               THE COURT:  And is that -- okay.  Any objection to

16   Exhibit E, Mr. Davis?

17               MR. DAVIS:  No, Your Honor.  I don't have any

18   objection to any of his exhibits.

19               THE COURT:  Exhibit F is Defendant's Exhibit 18?

20               MR. FELDMAN:  Yes, Judge.

21               THE COURT:  Okay.  That will be admitted.

22               And Exhibit 19 is Exhibit G to the affidavit.

23               MR. FELDMAN:  Yes, Judge.

24               THE COURT:  And then Exhibit 22 is separate.  And I

25   think that covers all of your exhibits.
```

1        (Defendant's Exhibits 17 - 19 and 22 received into

2   evidence.)

3        MR. FELDMAN:  Thank you, Your Honor.

4        THE COURT:  Okay.

5        MR. FELDMAN:  Obviously, I'd offer Mr. Shvartsman's

6   affidavit, which has obviously now been received into evidence

7   and the Court -- and if opposing counsel has questions he'd

8   like to ask of Mr. Shvartsman, then he could ask those and then

9   if I could obviously redirect.

10        THE COURT:  Okay.  Now the other -- I have -- there

11   are a number of other exhibits that we didn't admit, and I

12   assume that you didn't admit them because those are already

13   admitted --

14        MR. FELDMAN:  That's --

15        THE COURT:  -- in connection with the Plaintiff's and

16   it's not necessary to have double exhibits.

17        MR. FELDMAN:  Yeah.  I tried not to do that Judge, I

18   tried to go off their exhibit list whenever I could.

19        THE COURT:  Okay.  So that's -- I think that takes

20   care of all the exhibits that Defendant wants to admit.  I just

21   want to make sure.

22        There's a Moody's report, which is Exhibit F to

23   Plaintiff's supplement, which I guess was already admitted.

24        MR. FELDMAN:  No.  Judge, I believe he didn't offer

25   that into evidence.  I had a conversation with him about that.

1    That was not offered into evidence.

2            THE COURT:  Okay.

3            MR. FELDMAN:  Correct?

4            MR. DAVIS:  Correct.

5            THE COURT:  So that would not be in evidence.  Okay.

6    So it's not in evidence.

7            MR. FELDMAN:  It's not in evidence.

8            THE COURT:  That's fine.  Okay.

9            MR. FELDMAN:  I don't think there's anything else on

10   my end, Judge.  Obviously, Mr. Shvartsman can testify relative

11   to the issues he submitted his affidavit.

12           THE COURT:  Okay.  Okay.  Mr. Davis.  And I'll just

13   say that in 20 minutes I have a guilty plea proceeding, and I'm

14   not sure when the marshals will have the Defendant here or if

15   he's here in the holding cell or -- he's here in the holding

16   cell.  So we just need to wait for the attorneys to arrive,

17   since we can't --

18           MR. DAVIS:  And do you have time after the sentence?

19           THE COURT:  Yes.  It's not a sentencing.  It's a plea.

20           MR. DAVIS:  Oh, it's a plea.

21           THE COURT:  Right.  I can't do sentencings.

22           MR. DAVIS:  Oh.

23           THE COURT:  I can only do guilty pleas and not guilty

24   pleas.

25           MR. SHVARTSMAN:  Not guilty.

```
 1          MR. DAVIS:  I've been in court numerous times when
 2    they do the sentencing, and it always makes me feel like why am
 3    I here.  My case doesn't mean anything.  This guy's going to
 4    jail for 20 years.  So ...
 5          Well, I think we've addressed my first line of
 6    questions, the chairs that -- are you okay?
 7          THE WITNESS:  Sorry.  Yes.  I apologize.
 8                        CROSS-EXAMINATION
 9    BY MR. DAVIS:
10    Q.  I seldom get yawns in the middle of my first question.
11    But were the chairs that were ordered and paid for by Source --
12    I'm sorry -- by CCA, ever manufactured?
13    A.  No.
14    Q.  Why not?
15    A.  Because at the time when we were going go to start
16    manufacturing, I went back to my accounting department, saw
17    monies due, saw the lack of cooperation that CCA originally
18    told us that they were going to have with us by paying us the
19    monies due, and decided that it's not something we wanted to do
20    at the time.
21    Q.  When was that?
22    A.  I don't have the date in front of me.  I apologize.
23    Q.  Was it two weeks, three weeks after you were paid, a month
24    after you were paid?
25    A.  I don't have that date in front of me.  I'd have to look it
```

```
1    up in my records.

2    Q.  When's the first time you told CCA that you weren't going

3    to manufacture the chairs?

4    A.  The day that I sent them the letter.

5    Q.  The letter?  What date?

6    A.  The email.  I don't have that date.  I sent an email.

7    Q.  April?

8    A.  I don't have a date.  I sent an email.  Whatever date is on

9    that email is the day that I told them that we would not be

10   manufacturing the chairs.

11   Q.  And why did you wait till April to tell them that?

12   A.  Because we were trying -- we were going back and forth with

13   them trying to get them to commit to the purchase of the rest

14   of the furniture, like they promised.

15   Q.  Were you doing that?

16   A.  Myself and Candice, mostly Candice.

17   Q.  What did you do to inform them that the chairs weren't

18   being manufactured prior to April 17th?

19   A.  I didn't do anything.

20   Q.  So you waited four months after being paid to tell them you

21   weren't going to manufacture the chairs?

22   A.  That is correct.

23   Q.  Did you offer to return the money they had paid?

24   A.  No.

25   Q.  Why?
```

1    A.   Because we applied the monies to monies owed to us by Baha

2    Mar and CCA.

3    Q.   What right did you have to apply money given to you by CCA

4    to a debt owned by -- owed by another company?

5    A.   I didn't know I had a right -- I didn't know I had to have

6    a right to apply monies.

7    Q.   You think you can take someone's money and apply it to

8    someone else's debt just any way you please?

9    A.   Do I think that?  This is not an opinion.

10   Q.   Well, I --

11   A.   You want me to give you my opinion or --

12             THE COURT:  Wait.  Let him give his explanation about

13   why he thought that he could apply money that was paid by CCA

14   Bahamas to a debt that was owed to a different company.

15             THE WITNESS:  May I go?

16             THE COURT:  Yes.

17             THE WITNESS:  So there were several emails going back

18   and forth from Natalia saying that they would make good on

19   monies due.

20             THE COURT:  Several emails going back and forth what?

21             THE WITNESS:  From Natalia from CCA, saying that they

22   were going to make good on monies due.  So that gave me the

23   impression that they were going to make good on monies due.

24   And when they stopped making good on monies due, we applied the

25   monies to where they belonged in our company, where we were

1    owed at that time.

2    BY MR. DAVIS:

3    Q.  Not owed by CCA?

4    A.  Well, you can't speak out of two sides of your mouth,

5    right?  It's either you're going to make good on monies due or

6    you're not.  I didn't ask them if they are going to make good

7    on monies due.  They told me they're going to make good on

8    monies due.

9    Q.  My question was not on monies owed by CCA, correct?

10   A.  And my answer is that they told us that they were going to

11   make monies that were owed in the past good, and then that's

12   what we did.

13   Q.  So --

14   A.  So they sold us very simply that they were going to pay

15   whatever debt is outstanding -- by that email, she told us that

16   they're going to make good on monies due.  So we figured out

17   what the monies were due.  We got their deposit.  They stopped

18   talking to us.  They went radio silent, as per Natalia's email,

19   told us that they are no longer going to do business with us.

20   And at that point it was a business decision to say:  "Okay.

21   Are we ever going to recover monies due?"  The answer is

22   probably no because she's told us already.  So it was a

23   business decision to make the monies that we were paid and

24   apply them to old debt.

25   Q.  So it was a business decision to take somebody else's money

```
 1   and apply it to somebody else's debt?
 2          MR. FELDMAN:  Asked and answered.
 3          THE COURT:  He can explain his answer.
 4          THE WITNESS:  Again, once they took responsibility for
 5   previous debt, it became their debt.
 6   BY MR. DAVIS:
 7   Q.  Are you saying that CCA took responsibility for the debt of
 8   the other companies?
 9   A.  CCA sent an email saying that they were going to take care
10   of all monies due.
11   Q.  Meaning what to you?
12   A.  Meaning that they were going to take care of all
13   outstanding orders so we can fulfill them and ship them.
14   Q.  Oh, so you understood they would pay money to fulfill
15   orders and then you would ship the goods to CCA; is that
16   correct?
17   A.  Yes.
18   Q.  Did you ship any goods to CCA based on the money you
19   applied to other people's debt?
20   A.  We just applied that recently.  So there's still
21   outstanding monies due.  If we were paid that money in full,
22   we'll be happy to ship whatever items are on order.
23   Q.  When did you apply that money --
24   A.  I have to -- I'm sorry.  Continue.
25   Q.  -- that was paid in January?
```

```
 1    A.  I have to look at my accounting records.  I don't have that

 2    on me.

 3    Q.  Any recollection ballpark?

 4    A.  I don't know exactly.  I believe it was sometime in April.

 5    Q.  Did the application of that money, as you put it, complete

 6    any of the orders to which you applied it?

 7    A.  I don't know.

 8    Q.  Well, wouldn't you be obligated to fulfill orders if you

 9    applied that money to an order and it completed the payment?

10    A.  If there's still money due on the account, no.

11            THE COURT:  Okay.  So let me just make sure I

12    understand.  So you're saying that until they pay in full

13    everything that was completely due, you were not going to ship

14    anything?

15            THE WITNESS:  Correct.

16            THE COURT:  And were you giving them credit for

17    deposits that had been made or not?

18            THE WITNESS:  That's a good question.

19            So we did give some credit for deposits that were

20    made, but we incurred -- I don't know exactly the amount, but

21    well over a hundred-and-something-thousand dollars in storage

22    fees -- 300,000 -- thank you -- $300,000 dollars in storage

23    fees, which was applied to the account.

24            And what we did was, we said:  "Okay.  Natalia, we're

25    not going to apply any of your deposits on this order because
```

```
 1    we've closed out all orders in the system, and we have losses

 2    from your company.  So what we're going to do is we're going to

 3    create new orders for all these items.  And then we're going to

 4    give you an additional 20 percent discount, essentially, that

 5    will be part of your -- part of the deposits we received

 6    towards new orders."

 7    BY MR. DAVIS:

 8    Q.  You just said losses from CCA?

 9    A.  Previous orders.

10    Q.  I'm sorry?

11    A.  Previous orders.

12    Q.  Well, you said losses from your company.  You didn't have

13    any losses from CCA.

14    A.  Excuse my misspeak.  Previous orders.

15    Q.  Not from CCA?

16    A.  Correct.

17    Q.  Did CCA ever agree to allow you to apply its money that it

18    paid for the chairs for that purpose?

19    A.  I don't believe we asked.

20    Q.  Well, if you didn't ask, they couldn't have agreed, could

21    they?

22    A.  Correct.

23    Q.  And did they ever agree to pay for storage costs?

24    A.  I don't believe so.

25    Q.  Source advised CCA on two separate occasions that its order
```

1  was in production and on one occasion even said when it would

2  be shipped.  Are you aware of that?

3  A.  Can you show me that, please.

4  Q.  I'm just asking you:  Are you aware of that?

5  A.  I would like to see that.  In order for me to be aware of

6  it, I'd like to look at it and see it.

7  Q.  Without seeing it, you have no knowledge of it?

8  A.  I can't be aware of something I don't see.  So if you can

9  show it to me, I'd be happy to acknowledge it or not.

10  Q.  Okay.

11      (Pause in proceedings.)

12          MR. DAVIS:  May I approach, Your Honor?

13          THE COURT:  Yes.  But you need to identify what you're

14  approaching with.

15          MR. DAVIS:  Yes, Your Honor.

16          THE COURT:  Is this an exhibit that's been marked or

17  is it just something you're using to refresh his recollection?

18          MR. DAVIS:  I believe it's been marked.  But rather

19  than sort through it, I'll just ask him.  He said if he sees

20  it --

21          THE COURT:  Okay.

22          THE WITNESS:  Okay.

23          MR. FELDMAN:  Judge, can I just take a quick look to

24  see what was just handed to the witness?

25          THE COURT:  Certainly.

1          MR. DAVIS:  It's an email --

2          THE COURT:  Don't speak unless you're in front of a

3    microphone, Mr. Davis.

4          MR. FELDMAN:  I just want to take a look.

5    BY MR. DAVIS:

6    Q.  It's an email of February 28th, 2017, from Ms. McCarthy to

7    Natalia, that says:  "These have been" -- it's in response to

8    an inquiry from Ms. Dwornik.  "Any idea what's going on?  How

9    come it's taking so long to start production?"  And she

10   responds:  "Dear Natalia.  Hi, Natalia.  These have been in

11   production for a very long time.  Your internal stage was only

12   now changed.  I'll check on the shipping date and get back to

13   you shortly."

14        Having seen this email, are you aware that Source was

15   advising CCA that these chairs were, in fact, in production?

16   A.  So the email you're referring to is from Candice McCarthy,

17   who is a salesperson responding to an inquiry from Natalia.

18   I'm not sure of the date.  And Candice may have researched it

19   or asked someone the stage in the factory, but I'm not aware of

20   that because I'm not on that email.  Candice also doesn't have

21   anything to do with the manufacturing or shipping of any

22   product.  All she does is front-end sales and actually is not

23   even allowed in the factory.

24   Q.  Well, having seen the email, you agree that an email went

25   from Candice to CCA indicating that the chairs were in

```
 1    production?

 2    A.  That is correct.  I do see that email.

 3    Q.  And they were not in production?

 4    A.  That is correct.

 5    Q.  Why would Candice give false information to CCA?

 6    A.  Why?

 7    Q.  Yes.

 8    A.  That's an interesting question.  If you want the truth,

 9    salespeople are liars, generally speaking, and they want to

10    appease their customers.

11    Q.  Is Candice a liar?

12    A.  When it comes to that, appeasing customers on that email,

13    it may be.  I wasn't there.  I don't know what information she

14    got.  But salespeople in general are not allowed in the factory

15    and they are not allowed to speak to anybody in the factory.

16    So -- for them to receive dates.  So this type of thing doesn't

17    happen.  So it's impossible that she got information from the

18    actual manufacturing floor because she's not allowed on the

19    manufacturing floor.

20         THE COURT:  So are you saying that salespeople who

21    have made hundreds of thousands of dollars of sales to a

22    customer and get an inquiry on the status are not allowed to

23    respond?

24         THE WITNESS:  That is correct.  We have customer

25    service.  Just like when you go buy a car at Ford, and your
```

1   transmission breaks, you don't call your salesman.  You call

2   the service department.  It's the same thing.

3           THE COURT:  Well, but if you buy a car from a

4   salesperson, and the car is on order, isn't the salesperson the

5   one that you call to find out if it's come in yet?

6           THE WITNESS:  Depending on what factory --

7           THE COURT:  It's not like a broken chair.

8           THE WITNESS:  No.  I understand.  But I'm giving you

9   an example of our process.  Our process, how it works, is when

10  a salesperson completes the sale and the money is in, it goes

11  to the next stage.

12          So once the next stage is started, salespeople are not

13  allowed to give dates because generally speaking, they may give

14  the wrong information, just like we have today.  And then the

15  customers get upset because they were given the wrong

16  information.  So what we do is we funnel all inquiries from

17  salespeople to our customer service department, which actually

18  gets the real information, and speak to the client on those

19  types of questions.

20          THE COURT:  And who is in your customer service

21  department?

22          THE WITNESS:  Today, it's a girl by the name of Nica.

23  I'm not sure of her last name.  Antonica -- I don't know her

24  last name.  I apologize, but she's in the department.  She's --

25          THE COURT:  Who was in that department in early 2017,

1    between February and April --

2         THE WITNESS:  It was Jaime.

3         THE COURT:  Excuse me?

4         THE WITNESS:  Sorry.  The girl's name is Jamie.  I

5    don't have her last name in front of me, but she's no longer

6    with the company.

7         THE COURT:  So Jaime would have been the person that

8    Candice should have told Ms. Dwornik to speak to?

9         THE WITNESS:  Correct.

10        THE COURT:  So the appropriate -- from your

11   perspective, the appropriate chain would have been Candice

12   should have said to Ms. Dwornik:  "I can't give you any

13   information.  I am forwarding your email to Jaime, who is the

14   person responsible for determining when the chairs will be

15   manufactured and shipped"?

16        THE WITNESS:  Precisely.  Very well-said.

17   BY MR. DAVIS:

18   Q.  So when Ms. McCarthy said they have been in production for

19   a long period of time, was she just making that up?

20   A.  It's very possible, yes.

21   Q.  I see.

22        MR. DAVIS:  May I approach, Your Honor?

23        THE COURT:  Yes.

24        MR. DAVIS:  I'm going to show him an email of

25   February 28th, which led to the email I just showed him from

```
1    salesforce.com to rodrick@sourceoutdoor.net and

2    dworniknatalia@chinaconstructionus.

3         THE COURT:  Okay.  That's too much for me to write

4    down.  Is that an exhibit?

5         MR. DAVIS:  Yes, it is.

6         THE COURT:  You need to use the handheld mic if you're

7    going to talk away from the microphone.  Okay?

8         THE WITNESS:  Okay.  Are you referring to this on the

9    bottom here?

10        MR. DAVIS:  I am.

11        THE WITNESS:  Okay.

12   BY MR. DAVIS:

13   Q.  Did you read over the page?

14   A.  Yeah.

15        THE COURT:  And you don't know the exhibit number, I

16   assume, of this?

17        MR. DAVIS:  I have to dig it out.  I'm just going to

18   read it to the Court and move on.

19   BY MR. DAVIS:

20   Q.  The email I just shown you reads, on 28, February 2017, at

21   11:25 to rodrick@sourceoutdoor.net and

22   dworniknatalia@chinaconstructionus.  "Subject:  Your Source

23   Outdoor is now in production."

24   A.  Who is it from?

25   Q.  It's from salesforce.com.
```

```
 1        "Dear.  Your Source Outdoor order is now in production.

 2   Your estimated completion date is 5/19/2017.  Your goods will

 3   leave our premises on or before 5/26/2017.  We will make every

 4   attempt to ship the items sooner than that estimated date."

 5   Recites the purchase number, which is the purchase number on

 6   the purchase order that we've looked for.  And then it offers:

 7   "Any questions or concerns, please contact us at," gives a

 8   number.  "Or email us at sourceoutdoor.net."

 9        Is sourceoutdoor.net the Internet address that your company

10   utilizes?

11   A.  Correct.

12   Q.  So this email also appears to be telling CCA that its order

13   was in production.  Not only that, when it would be delivered.

14   So is this email false?

15   A.  What you're looking at as an auto email.  So when something

16   is put into production, it generates that email automatically

17   and sends that and creates the dates, depending on the size of

18   the order, and it automatically sends to the customer.

19   Q.  Is this email false?

20   A.  No.  It was definitely put into production, but I took it

21   out of production.

22   Q.  Oh, so now you're saying you took it out of production?

23   A.  Correct.

24   Q.  When did you put it into production?

25   A.  I believe that date says it was put into production --
```

1    right there.  You're looking at it.  What day was that email?

2    Q.  February 28th.

3    A.  It may have been February 28th when it was put into

4    production or shortly before that.

5    Q.  And when did you take it out of production?

6    A.  Right after that email went out.

7    Q.  Why did the email go out indicating it was in production?

8    A.  It's an automatic email.  When something is put into

9    production, the system generates an email and it automatically

10   emails the client --

11   Q.  Do you have an automatic email that tells people when

12   something is taken out of production?

13   A.  As of right now?

14   Q.  No.  Then.

15   A.  Then, no.  I believe now if a date changes today, the

16   customer will be notified.  We've updated our system since

17   then, but at that time we did not have that.

18   Q.  How did you notify CCA -- after it received this email

19   indicating its order was in production, how did you notify them

20   that it was now out of production?

21   A.  By email.

22   Q.  When?

23   A.  I believe the date of the letter that I sent Natalia.

24   Q.  April 17th?

25   A.  Correct.

1    Q.  So you took it out of email -- took it out of production in

2    February.  You notified them about it two months later?

3    A.  It may have been out of production in March.  I don't know

4    exactly.  I don't have that information directly in front of

5    me.  It may have been the first couple days in March.  I

6    believe it's February 28th, the date of that email.

7    Q.  Is a notice like this automatically produced when you take

8    it out of production?

9    A.  No.

10       Is the date of the email February 28th?

11   Q.  Yes.

12   A.  Does anybody know what day of the week February 28th was?

13   It was 2017.  February 28th.

14   Q.  So on two occasions that we've seen, you've notified CCA

15   that its order was in production.  And it wasn't until April

16   that you told them not that it wasn't in production, but that

17   you were not going to deliver the chairs.  You never said it's

18   not in production, did you?

19   A.  Correct.

20            THE COURT:  Is this a good place to stop, Mr. Davis?

21            MR. DAVIS:  Yes, Your Honor.

22            THE COURT:  Okay.  We'll be in recess while I handle

23   the criminal matter.  Well, recess on this case and I'll be in

24   recess while I allow -- you're going to need to clear your

25   tables, to some extent neaten it up, because I'm going to need

1    the Government attorney, the Defendant, and Defense counsel to

2    be able to sit at your tables.  So we'll be in recess.

3        (Recess from 3:32 p.m. to 4:23 p.m.)

4            THE COURT:  Please be seated.

5            COURTROOM DEPUTY:  Recalling Case Number 17-22437,

6    Civil, Chief Judge Moore, CCA Bahamas v. Conquest Financial

7    Management Corp.

8            Appearances are as previously noted.

9            THE COURT:  Okay.  I need Mr. Shvartsman back on the

10   witness stand.

11           Mr. Davis, are you ready to proceed?

12           MR. DAVIS:  I am, Your Honor.  Thank you.

13           THE COURT:  Okay.

14           MR. DAVIS:  May I proceed?

15           THE COURT:  Yes.

16   BY MR. DAVIS:

17   Q.  Okay.  Mr. Shvartsman, Exhibit D to your affidavit, which

18   is now Defendant's 16, advises Ms. Dwornik that, of the

19   $390,000 that CCA paid, 352,677 was being applied towards

20   mitigation losses.  What is mitigation loss as you use that

21   term?

22   A.  Mitigating losses means covering for orders that were

23   either canceled or not completed, shipped because the funds not

24   transferred.

25   Q.  Okay.  So when you applied this money for mitigation, what

1    did you do and what effect did it have?

2    A.  I don't understand the question.  What did I do?

3    Q.  You took the money, but you applied it how?

4    A.  We went through orders.

5    Q.  Yes?

6    A.  Each order to see how much money each order was outstanding

7    for each order, and we applied that sum of money to each one of

8    those orders.  We went down the list until money had ran out.

9    Q.  Okay.  How many orders were you able to complete in that

10    fashion?

11    A.  I don't have that information.

12    Q.  Can you estimate how many you were able to complete?

13    A.  I cannot estimate.

14    Q.  Were you able to complete any orders in that fashion?

15    A.  I do not have that information.

16    Q.  Who has it?

17    A.  I would have to go to my accounting department and have it

18    printed.

19         THE COURT:  Does the reconciliation that your attorney

20    provided, that lists amounts of money, assist you in making

21    that determination or are you unfamiliar with the

22    reconciliation that your attorney filed?

23         THE WITNESS:  I'm unfamiliar with the reconciliation.

24    It was supplied by Candice, who, I believe, dealt with

25    accounting on that, and I did not see it until recently.  So it

1    would not help.

2    BY MR. DAVIS:

3    Q.   Did you sell -- did Source sell any of the products to

4    which you had applied this mitigation money?

5    A.   Can you be more specific, please.

6    Q.   No.

7    A.   So I cannot answer the question, if you can't be more

8    specific.   I need specific -- which product?

9    Q.   Did you sell any of the product to which you applied this

10   money to mitigate your damages?

11   A.   There may have been some sale of some product that was for

12   that, to mitigate our damages.   I don't have that information

13   in front of me.   But it's very possible that we did sell some

14   of the items over the last two years of -- while Baha Mar was

15   in bankruptcy.

16   Q.   Is it not a fact that some of that product was sold to a

17   third party, who then turned around and sold it back to CCA?

18   A.   Absolutely.

19   Q.   That's correct?

20   A.   Yes, sir.

21   Q.   Okay.   Where is the product -- is there any product you

22   have not sold?

23   A.   I don't believe any product remains in our warehouse.   It's

24   all been liquidated.

25   Q.   It's all been sold?

1   A.  Liquidated, correct.

2   Q.  What's --

3   A.  Sold, disposed of, recycled, thrown away, liquidated.

4   Q.  How much of it was resold, as opposed to thrown away?

5   A.  $64,000 -- $64,500.

6   Q.  Was sold?

7   A.  Correct.

8   Q.  So that, you do remember?

9   A.  Yes.  It was to Frank from -- well, yeah.

10         THE COURT:  I'm sorry.  I didn't hear the last part of

11  it.  Frank from where?

12         THE WITNESS:  He didn't ask the question.  So I just

13  didn't make it up.  I didn't answer it.

14  BY MR. DAVIS:

15  Q.  Who did you sell it to?

16  A.  Frank from Source Awnings and Metalworks.

17  Q.  Now, you were aware that Source was to provide

18  documentation to CCA in order for CCA to understand how much

19  money was left to be paid to fulfill the orders?

20  A.  I was left out of part of that conversation.  I'm not

21  intimately involved in each order that comes through the

22  company.

23  Q.  Do you know whether Source provided the information that

24  was requested?

25  A.  I believe it did.

1    Q.   How do you know that?

2    A.   Because I saw in the affidavit, an email trail provided.

3    Q.   You saw it in what affidavit, yours?

4    A.   Excuse me.  Not affidavit.  In the email trail provided, I

5    saw that there was a correspondence from Candice, I believe

6    sometime in March, with the reconciliation.

7    Q.   Did you see any correspondence indicating that the

8    information about the returned check had been furnished to CCA?

9    A.   I'm not involved in every single email that goes through

10   the company, and I was not intimately involved back and forth

11   between Candice and Natalia.

12   Q.   Well, my question was:  Did you see any emails to that

13   effect?

14   A.   Repeat the question, please.

15   Q.   Sure.  Did you see any emails from Source to CCA regarding

16   the check that was allegedly returned?

17   A.   I did not see any emails to that effect.  But I do know why

18   that check took a long time to come up with.  We had switched

19   bank accounts to -- from BB&T to Chase, and we -- all accounts

20   were closed.  So we had to request that check, and it was quite

21   old.  It was already over a year and a half, I believe, maybe

22   close to two years old at that point.  It took months and

23   months and months for BB&T to respond with a copy of the

24   canceled check.  Otherwise, we would have provided it the

25   minute we had it.

1    Q.  In Paragraph 14 of your affidavit, you recite that:

2    "Source submitted documentation to CCA.  Operating on the

3    premise that CCA was making good on monies owed, source

4    proceeded to deal with CCA."  What does that mean:  "Source

5    proceeded to deal with CCA"?

6    A.  Well, the whole experience between the Baha Mar project --

7    and when I say "Baha Mar," it's the hotel in general, not just

8    the Baha Mar, Ltd. Corp. -- the whole experience was a less

9    than favorable -- why don't you put it that way.  So we didn't

10   want to go into the same experience again with CCA.  So we made

11   it clear to them that unless they buy the rest of the orders

12   that are outstanding, then we didn't want to do business with

13   them.

14   Q.  My question was:  You recited that Source proceeded to deal

15   with CCA.  What did that mean?

16   A.  Source --

17          MR. FELDMAN:  He answered that, Judge.

18          THE COURT:  Okay.  Where was -- where is -- what's the

19   exhibit you're referring to?

20          MR. DAVIS:  I'm referring to Paragraph 14 of his

21   affidavit.

22          THE COURT:  Okay.

23          MR. DAVIS:  And his affidavit is Exhibit what?

24          MR. FELDMAN:  His affidavit was listed as --

25          THE COURT:  His affidavit is Exhibit 5.

```
 1              MR. FELDMAN:  Correct, Judge.

 2              THE COURT:  Okay.

 3   BY MR. DAVIS:

 4   Q.  I'm just trying to understand what you meant.

 5   A.  I believe I answered that.

 6   Q.  Well, try it again.  What did it mean that you proceeded to

 7   deal with CCA?  How do you deal with CCA?

 8   A.  The whole experience with the Baha Mar Hotel, not Baha Mar

 9   Ltd., was less than favorable.  We didn't want to get into the

10   same type of arrangements with CCA.  So we made arrangements

11   where we voiced our concerns with Natalia, and we were assured

12   that CCA would purchase the remainder of the furniture and make

13   good on all monies due in order for us to do business with

14   them.

15   Q.  And therefore, you did what?

16              THE COURT:  You're not answering the question, sir.

17              THE WITNESS:  Maybe you can explain it differently, so

18   I understand it.

19              THE COURT:  The question is, you said:  "We proceeded

20   to deal with CCA" --

21              THE WITNESS:  Can you read the paragraph, please.

22              THE COURT:  You want to give your client a copy of his

23   affidavit?

24              MR. FELDMAN:  Sure, Judge.

25              THE COURT:  You have answered the first part.  You
```

```
 1    have explained the first part of the paragraph.  You have not

 2    explained the last phrase what you meant by "proceeded to deal

 3    with CCA."  What were you dealing with CCA?  What does it mean

 4    to deal with CCA?  It's very kind of casual language.

 5           THE WITNESS:  I understand.  I'd like to read it, so I

 6    can better --

 7           THE COURT:  Absolutely.  Your counsel should have had

 8    you have a copy of it, since you're on cross-examination of

 9    your affidavit.

10           THE WITNESS:  Okay.  Where is it?

11           THE COURT:  Paragraph 14.

12           THE WITNESS:  Thank you.

13       (Pause in proceedings.)

14           THE WITNESS:  So what I believe is what making -- when

15    Source proceeded to deal with CCA, was proceeded to -- they

16    continued to do business with CCA.

17    BY MR. DAVIS:

18    Q.  By doing what?

19    A.  By completing all open orders.

20    Q.  Does it mean to place the order for the chairs?

21    A.  I'm not sure what you mean by that.  But I explained it's

22    to -- from our perspective, it was to complete all open orders.

23    Q.  Well, wasn't one of the open orders at this time the order

24    for the balance of the chairs?

25    A.  I believe at the beginning, when this was done, we didn't
```

1    have an order for the chairs until the first week of January.

2    So I'm not sure my mind set at the time of me thinking this or

3    discussing it.  So I can't really answer that question.

4    Q.  Uh-huh.

5    A.  We submitted documentation to CCA, operating on the premise

6    that CCA was making good on monies owed because we received an

7    email from Natalia stating that.  Therefore, Source proceeded

8    to deal with CCA.  Meaning, we proceeded to deal with them and

9    sell them goods, as long as all monies due were paid because we

10   did not want to continue to do business with them in any other

11   way.

12   Q.  Paragraph 27.  Do you still have the affidavit in front of

13   you?

14   A.  I sure do.

15   Q.  "Source had to store multiple products in this instance"?

16   A.  Yes.

17   Q.  "And it was known that they were accruing storage fees

18   related thereto"?

19   A.  Yes.

20   Q.  How did you advise CCA that you were accruing storage fees?

21   A.  We made Purchasing Solutions aware of all storage fees, I

22   believe, within 30 days of the bankruptcy announcement of Baha

23   Mar.  CCA was not our client at the time, until January of this

24   year when we received the first purchase order.  So we did not

25   have to make them aware of storage fees.  We made our customer

```
 1    aware of storage fees, who is PSI.

 2    Q.  Did you ever make CCA aware that you were accruing storage

 3    fees relating to the furniture that you were holding?

 4    A.  Yes.

 5    Q.  When did you do that?

 6    A.  When I met with Natalia in person face to face.

 7    Q.  What did you tell her?

 8    A.  I said:  "There is storage fees" -- excuse me -- "that are

 9    accruing or all open orders."

10    Q.  Okay.  You recite in your affidavit or you refer us to

11    Exhibit G, which is attached.  But Exhibit G, that makes

12    reference to -- you were referring to accruing storage fees.

13    That never went to CCA.

14    A.  Please give me a minute to look it up.

15    Q.  Okay.

16        (Pause in proceedings.)

17            THE WITNESS:  Okay.  So I have the email.

18            THE COURT:  Okay.  And this is Defendant's Exhibit 19,

19    for the record, which is Exhibit G to the affidavit.

20    BY MR. DAVIS:

21    Q.  That never went to CCA, did it?

22    A.  I cannot testify to Mike Williams forwarding it to anybody

23    or not.

24    Q.  Well, look at it.  Does it show that it went to CCA?

25    A.  No, it doesn't.
```

1   Q.  Okay.

2   A.  Well, why would we send an email to CCA in 2015, when they

3   weren't our customer until January 2017?

4   Q.  Well, you never sent a similar email to CCA, did you?

5   A.  Why -- I don't know if Mike sent an email to anybody.  How

6   could I know that?

7   Q.  You never sent an email to CCA advising that you were

8   accruing storage fees?

9   A.  I did it in person, in January of 2017, face to face.  I

10  didn't feel the need to send an email at that point as well.

11  Q.  Do you know why Candice McCarthy sent CCA a copy of the ad

12  for the chairs?

13  A.  I believe CCA's email is in our system as a customer at

14  that point, and an advertisement went out to all existing

15  customers.

16  Q.  Uh-huh.

17  A.  Automatic email.

18  Q.  And did that advertisement refer to the same chairs that

19  CCA thought it had purchased?

20  A.  Can you please elaborate because "the same" is interpreted

21  many different ways.

22  Q.  What does "the same" mean to you?

23  A.  "The same" means to me -- there's many different the sames,

24  the same style, the same exact -- their chairs, the same color.

25  So if you could be more specific.

1    Q.  Certainly.  Didn't the ad make reference to the same exact

2    chairs that had been purchased for the first round of chairs?

3    A.  Can you repeat that, please.

4         THE COURT:  Let me see if I can clarify and then you

5    can follow-up.

6         THE WITNESS:  No.  I understand --

7         THE COURT:  Did the ad refer to not the specific chair

8    that -- they may have been purchased.  Did the ad refer to the

9    exact same style, color, and design of the chair that was the

10   subject of the purchase order?

11        THE WITNESS:  Thank you very much.

12        Yes.

13   BY MR. DAVIS:

14   Q.  And did you have chairs on hand to sell?

15   A.  We make everything to order.  We do not stock any aluminum

16   frames in any powder coat finish colors.

17   Q.  Were there any such chairs in storage?

18   A.  We only have one storage facility, and it's our warehouse

19   located in Miami that's a hundred thousand square feet.

20        THE COURT:  Why don't you answer yes or no, and then

21   you can explain your answer.  It will be easier for everybody

22   to understand.

23        THE WITNESS:  No.

24        THE COURT:  Did you have any -- any of that type of

25   chair in storage, one, two, a hundred, a thousand?

```
 1              THE WITNESS:  No.

 2              THE COURT:  Okay.

 3              THE WITNESS:  We only -- should I explain now?

 4              THE COURT:  If he wants you to explain, he will.  And

 5     if you want to explain it, you can.

 6     BY MR. DAVIS:

 7     Q.  You recite in your affidavit, at Paragraph 28, that Source

 8     remains owed the sum of $332,308.70.  Who owes that to Source?

 9     A.  Well, that's a complicated question.  That's two-part.

10     Part of that money is owed by Baha Mar.  When Natalia from CCA

11     sent us the email stating that they would make good all monies

12     due, I believe it became -- she indicated in that email that

13     they were going to be taking care of all monies due from those

14     orders.

15     Q.  Well, you said some of it was owed by Baha Mar.  Who owed

16     the rest of it?

17     A.  All of it is owed by Baha Mar.

18     Q.  By Baha Mar?

19     A.  Correct.

20     Q.  Not by CCA?

21     A.  It depends on how you interpret that email, when Natalia

22     says all monies will be -- all monies due will be taken care

23     of.

24     Q.  Who placed the orders?

25     A.  Which orders?
```

1    Q.   The orders that have resulted in the 332,000 deficit.

2    A.   Baha Mar and Purchasing Solutions.

3    Q.   But not CCA?

4    A.   Correct.

5    Q.   So the 332,000 is owed pursuant to orders that were placed

6    by Baha Mar, not by CCA?

7    A.   Correct.

8    Q.   So why does CCA owe money for orders that were placed by

9    Baha Mar?

10   A.   Because Natalia -- sorry.  Natalia sent an email stating

11   that all monies would be paid in full going forward.  They were

12   going to make good on all monies due.

13   Q.   And they would make good on all monies due if they got the

14   goods.  Isn't that true?

15   A.   I didn't see that in the email.  All I read was the

16   paragraph where it said all monies due would be paid.

17   Q.   So you understood that they would make good all the money

18   that Source was owed, whether they got any additional product

19   or not?

20   A.   Well, we would be happy to ship all the product on open

21   orders once all monies are paid.

22   Q.   Can you answer my question.

23   A.   Can you repeat it, please.

24   Q.   I can.

25        It was your understanding that they were going to make good

1  on all orders in Source's hands, whether they got the product

2  or not?

3  A.   That is not my understanding.

4  Q.   Okay.   Your understanding is that if they made good, they

5  would get the product?

6  A.   Correct.

7  Q.   So by applying the money they paid for the chairs, the

8  orders from Baha Mar were made good, were they not?

9  A.   Partial.   Partially, yes.

10  Q.   Okay.

11  A.   There is still $332,000 outstanding.

12  Q.   Well, are those spread over all of the orders?   Do they

13  pertain to one order, two orders, how many orders?

14  A.   We have maybe 60 or 70 orders.   I don't know exactly.   I

15  don't have the spreadsheet in front of me.   But our company

16  policy is if anybody owes us money, and they have multiple

17  orders, until their balance is zero, we can't ship them.

18      So if you own five hotels, one in Las Vegas, and, you know,

19  four throughout the world, and you have open orders and owe us

20  money on four of them, but your Las Vegas property has paid in

21  full, we're not going to ship the Las Vegas order until all the

22  rest of the orders are paid in full.

23  Q.   So it may be the case that by applying CCA's money to Baha

24  Mar's orders, some of those orders may have been completed.

25  That is, if they owed 30,000, you applied 30,000 of CCA's

1    390,000, that order would have been completed, would it not?

2    A.  They definitely do have some orders that are complete at

3    this point.

4    Q.  Have you shipped those to CCA?

5    A.  There's still outstanding $332,000.  We will not stip until

6    we're paid in full, as stated before.

7    Q.  And did CCA ever agree to that arrangement?

8    A.  CCA sent an email, Natalia, stating that all monies -- all

9    orders would be paid and all monies would be paid.

10   Q.  And that you would not have to ship a single order until

11   all of them were paid?

12   A.  We'll be happy to ship once outstanding monies are paid.

13   Q.  Did CCA ever agree that, even though an order was

14   fulfilled, you did not have to ship it until all other orders

15   were fulfilled?

16   A.  CCA doesn't have to agree.  That's our company policy and

17   that's how we work internally.

18   Q.  I didn't ask you about your company policy.  I asked you if

19   CCA ever agreed to that arrangement.

20   A.  Did CCA -- I don't know if CCA ever did not agree to that

21   arrangement.

22         THE COURT:  Was CCA made aware of that arrangement

23   that you would not ship anything until everything was paid in

24   full?  Was that ever conveyed to them in any way that you are

25   aware of?

```
 1            THE WITNESS:  So there's two parts to that answer.

 2   Yes, when we spoke to Natalia, I told her in person --

 3            THE COURT:  Okay.  When was this conversation?

 4            THE WITNESS:  It was, I believe, in December when I

 5   flew out there to see her.  I told Natalia that there's storage

 6   fees due and we have multiple orders that have open balances on

 7   them and we need to get them cleared up.  And that's when she

 8   sent the email stating that all monies due were going to be

 9   made good, and here's your first order, and we're going to work

10   through the rest of the orders.

11            When -- and then stopped.  Nothing happened after

12   that, radio silence.

13   BY MR. DAVIS:

14   Q.  Was it Source's position in this arrangement that if CCA

15   did not satisfy all of the open orders, make good on all of the

16   open orders, that Source was not obligated to ship the chairs?

17   A.  Can you repeat that question, please.

18   Q.  Yes.  The arrangement that we've been discussing, was it

19   your understanding that if, in fact, CCA did not make good on

20   all of the open orders that Source was not obligated to ship

21   the chairs to CCA?

22   A.  So our intention was to finish the relationship with CCA by

23   closing out all open orders for Baha Mar.  There was twofold.

24   They needed the product.  We had the product sitting around for

25   the most part, and we wanted to finish it and move on.
```

1    So when their relationship started out again, and we made

2    it clear our perspective was:  Unless this happens we're really

3    not interested in doing business with you at all, we were under

4    the impression that that's what was going to happen.  We were

5    going to be made whole and we were going to ship whatever

6    orders were partially complete and partially paid for, so we

7    could ship the orders and move on.

8    So once we received the first order, and then everything

9    stopped after that, shortly after that, we decided that we're

10   going to, you know, change the way this is happening because

11   nobody's getting back to us, nobody's responding.  I sent a

12   couple emails.  Candice sent a couple emails.  We tried calling

13   and nobody else was getting back to us at all.  So they, at

14   that point, went radio silent and we received an email back

15   from Natalia stating that:  It's very likely that nothing's

16   going to happen going forward.  So we're not going to do

17   anymore orders," and that's why we decided to go ahead and do

18   what we did.

19   Q.  So with this understanding, if CCA didn't make good on the

20   orders, you were not obligated to ship the chairs to CCA; is

21   that correct?

22   A.  That's a very difficult question to answer.  I don't -- I

23   don't understand.  I don't know the law behind that exactly.

24   So obligated --

25   Q.  I'm not asking you the law.  I'm asking to understand a

1   commercial arrangement that you made --

2   A.  So the commercial arrangement that I made is simple.  They

3   were going to pay all outstanding debts and -- so we can ship

4   all the old furniture that we had, as well as put in a new

5   order, and that didn't happen.  So the arrangement changed.

6   Q.  And if they didn't pay all of the outstanding debts, you

7   would not be obligated to ship the chairs that they thought

8   they had purchased?

9   A.  I still -- I don't understand your question.  Because it's

10  kind of more a statement than it is a question.

11  Q.  The question is:  If CCA did not make good on all of your

12  open orders, isn't it the case that you were then not obligated

13  to ship the chairs to CCA because you had made that arrangement

14  to ship the chairs contingent upon them completing the orders?

15  A.  That's not a hypothetical -- that's not a question.  That's

16  kind of what happened.

17  Q.  Did you understand the question?

18  A.  I do understand the question.  But it's what happened.

19  You're basically saying back to me what I said to you.  That's

20  exactly what happened.  We had an arrangement.  They changed

21  the arrangement.  We didn't ship their product.

22  Q.  Good.  You've answered my question.

23      Then what entitled you to keep the money, even though you

24  didn't ship the chairs?

25  A.  That's also a question that I don't understand.  Entitled?

```
 1    I don't really understand the definition of the word "entitled"

 2    that you're using because we had an arrangement.  We had an

 3    email from Natalia saying they were going to make good on all

 4    monies due.  They didn't do that.  So we had to mitigate our

 5    damages.  So we did that by applying all monies received to old

 6    outstanding orders.

 7    Q.  And CCA never agreed to that arrangment, did it?

 8    A.  CCA didn't not agree to that arrangement.  They sent an

 9    email stating that they were going to make all monies due and

10    all orders good.  That didn't happen.  When they stopped

11    communicating with us, we took their money and applied it to

12    old orders.

13    Q.  Did CCA ever agree that you could do that with their money?

14    A.  I didn't ask.

15    Q.  So the answer is no, they never agreed?

16    A.  No.  The answer is:  I didn't ask them for permission to do

17    it.

18    Q.  Okay.

19              MR. DAVIS:  Thank you.

20              THE COURT:  So there's no question that when they paid

21    you the money they paid you, they were paying for the chairs.

22    That was the reason they gave you that money at the time they

23    gave you the money.

24              THE WITNESS:  At the time they gave us the money, we

25    were specifically -- we were made specific promises.
```

```
 1            THE COURT:  That's not my question.

 2            THE WITNESS:  I know, but --

 3            THE COURT:  My question is -- and you can answer yes

 4   or no.  You have a bad habit of not answering yes or no, which

 5   is not uncommon because people aren't used to testifying

 6   frequently.

 7            So when they gave you the money, I believe what your

 8   testimony was -- I just want to make sure that I understand it,

 9   in your affidavit -- is that when they gave you this money, the

10   purpose for which they give you that specific money was to pay

11   the balance that was owed to complete the chair purchase.

12            THE WITNESS:  Yes.

13            THE COURT:  Okay.  And then, thereafter, you believed

14   the agreement was that they were going to pay you additional

15   money to clear up all of the debts.

16            THE WITNESS:  Correct.

17            THE COURT:  And --

18            THE WITNESS:  Actually, it was beforehand, where they

19   made that promise or they sent the email to us stating that.

20            THE COURT:  And once they made that promise, which

21   they wanted a reconciliation or the documentation before they

22   made the payments -- but once they promised that, you agreed

23   that you would furnish them chairs if they paid you in full for

24   the chairs prior to them -- the chairs going into production.

25            THE WITNESS:  Correct.
```

```
1          THE COURT:  And your understanding was that they would

2     pay you in full for money due on previous orders.

3          THE WITNESS:  Correct.

4          THE COURT:  Does that sum it up?

5          THE WITNESS:  Yes.

6          THE COURT:  And when they did not pay you money due on

7     previous orders, and said that they did not intend to, you

8     elected to apply that money to the previous orders.

9          THE WITNESS:  Yes.

10          THE COURT:  Okay.  I think I understand.

11          MR. FELDMAN:  May I ask a few questions?

12          THE COURT:  Yes.  You're finished, Mr. Davis?

13          MR. DAVIS:  I am, Your Honor.

14          THE COURT:  Okay.  Redirect.

15          MR. FELDMAN:  Thank you, Judge.

16                     REDIRECT EXAMINATION

17     BY MR. FELDMAN:

18     Q.  Just for clarification, you said --

19          THE COURT:  You need to wait till you get to the

20     microphone.

21          MR. FELDMAN:  Sure, Judge.

22     BY MR. FELDMAN:

23     Q.  Just for clarification, I believe, Judge Simonton said

24     "thereafter" and you said "before."  The statement about make

25     good on monies due was made before that payment, correct?
```

1    A.   Yes.

2    Q.   And when you accepted that payment, and decided to move

3    forward with CCA, were you under the understanding that CCA was

4    going to make good on all monies due?

5    A.   Yes.

6    Q.   And when we talk about all monies due, does that refer

7    to -- in your mind, to all the money that would be owed

8    associated with the dealings that Source may have had with Baha

9    Mar or their purchasing agent?

10   A.   Yes.

11   Q.   As we sit here right now, has CCA made good on all monies

12   due to Source?

13   A.   No.

14   Q.   Is Source Outdoor owed money?

15   A.   Yes.

16   Q.   I believe in your affidavit you stated how much that was.

17   Do you recall?

18   A.   $332,000.

19   Q.   And some change, right?

20   A.   Correct.

21   Q.   Okay.  And so, as we sit here right now, is it your

22   position that Source Outdoor is owed $332,000 and change from

23   CCA?

24   A.   Yes.

25   Q.   And is it your position that CCA agreed to make good on

```
 1    that money?

 2    A.  Yes.

 3    Q.  And if CCA wouldn't have done that, would you have entered

 4    into a business relationship with CCA?

 5    A.  No.

 6    Q.  And was that communicated during your meeting with Natalia?

 7    A.  Yes.

 8    Q.  And that was a meeting you had in person, correct?

 9    A.  Correct.

10    Q.  Mr. Shvartsman, you mentioned I believe you have one

11    warehouse facility, correct?

12    A.  Yes.

13    Q.  Is that the only storage or warehouse facility you have?

14    A.  Yes.

15    Q.  As we sit here right now, and you are testifying, are 1,420

16    chaise lounge chairs that CCA claims they are entitled to

17    sitting in that facility?

18    A.  No.

19    Q.  Have they been manufactured?

20    A.  No.

21    Q.  Are you currently in possession of any 1,420 chaise lounge

22    chairs?

23    A.  No.

24         THE COURT:  Have you manufactured any of those chaise

25    lounge chairs; in other words, the all-white chairs in that
```

 1    style, for any purpose since January?

 2              THE WITNESS:  I believe we have fulfilled some orders

 3    in our system that are the same, but it can't be more than a

 4    few hundred pieces to several different customers.

 5    BY MR. FELDMAN:

 6    Q.   The advertisement that was attached to CCA's affidavit, or

 7    Ms. Dwornik's affidavit, is that a picture of the -- any one of

 8    the specific 1,420 chairs that CCA claims they are entitled to?

 9    A.   That's the picture of the Atlantic chaise lounge, which was

10    sold to Baha Mar in 2014 and delivered sometime in 2015, I

11    believe, or between '14 and '15, and it was -- just happened to

12    be a nice picture that we used.

13    Q.   Okay.  So I'm going to ask you a hypothetical now.  Okay?

14    A.   Yes.

15    Q.   If somebody would have called you up in response to that

16    advertisement, said:  "I want to come over and I want to buy

17    1,400 of those and I want to pick them up tomorrow," could you

18    have delivered them?

19    A.   No.

20    Q.   Is that because you don't have them?

21    A.   Correct.

22    Q.   So when that was sent out, you were not looking to sell

23    Baha Mar's actual chairs, were you?

24    A.   No.  We used that advertisement simply because it's a nice

25    picture that we had and it's a very popular chaise lounge.  We

1    reduced the price from our usual selling price of like 350 or

2    $370 to 299 because at the time we were running a promotion

3    trying to get sales leads and white-on-white costs us less to

4    make than the other colors in the family.

5    Q.  So it's cheaper to make white-on-white?

6    A.  Correct.

7    Q.  You mentioned the December meeting with Ms. Dwornik.  And

8    you mentioned, I believe -- and I want to make sure I

9    understood correctly -- at that meeting, you told her that

10   Source was incurring storage fees, correct?

11   A.  Yes.

12   Q.  Were you under the impression at the end of that meeting

13   that that was part of what CCA was going to make good?

14   A.  Yes.

15   Q.  Did she ever tell you that was not part of what CCA was

16   going to make good?

17   A.  No.

18   Q.  Did she call you up after that meeting and say, you know:

19   "Gerald, you may have misunderstood.  Let me clarify.  We're

20   not going to make good on this"?

21   A.  No.  And in fact, we received a PO shortly thereafter for

22   the first -- for the chaise lounges in question.

23   Q.  So the PO that you received for the chaise lounges in

24   question was after you had the meeting with Ms. Dwornik?

25   A.  Correct.

```
1    Q.   And after you communicated to her that this money was owed?

2    A.   Yes.

3    Q.   And after it was expressed to you they were going to make

4    good on monies owed?

5    A.   Correct.

6    Q.   And that included storage?

7    A.   Correct.

8              THE COURT:  Can you explain to me why your number, in

9    terms of the amount of money owed in your affidavit, is

10   different than the number that's on the reconciliation sheet

11   that was provided?

12             THE WITNESS:  The reconciliation does not include

13   storage.

14             THE COURT:  The reconciliation sheet is more -- is

15   higher than what's on your affidavit.

16             THE WITNESS:  Because --

17             THE COURT:  So don't make up answers.

18             THE WITNESS:  No, I'm not, if you'd let me finish.

19             So what happens is, if you take that number on the

20   reconciliation sheet and you add the storage, and you subtract

21   the 390,000, you're going to come up with the number of

22   335,000, approximately.

23             THE COURT:  So you add the reconciliation and the

24   storage.  And how much was the storage?

25             THE WITNESS:  I believe it was $300,000.
```

```
 1              THE COURT:  So you had the reconciliation, you added

 2      the storage, and then you subtracted the payment made for the

 3      chairs?

 4              THE WITNESS:  Correct.

 5              I believe it comes to like $332,000 and change.

 6              THE COURT:  You can proceed, Mr. Feldman.

 7              MR. FELDMAN:  I don't think I have anything else,

 8      Judge.  I'm just checking my notes real quick.

 9              THE COURT:  Okay.

10         (Pause in proceedings.)

11              MR. FELDMAN:  I don't have anything else, Judge.

12              THE COURT:  Do you have any recross, Mr. Davis?

13              MR. DAVIS:  No.  Thank you, Your Honor.

14              THE COURT:  Thank you.  You can step down,

15      Mr. Shvartsman.

16              You want to call your next witness?

17              MR. FELDMAN:  I mean, Judge, on --

18              THE COURT:  I can't hear what you are saying because

19      you're not speaking into the mic.

20              MR. FELDMAN:  I don't believe I need her.

21              THE COURT:  So you're not calling and you're striking

22      her affidavit from consideration?

23              MR. FELDMAN:  No.  Candice did not file an affidavit.

24      The reason Candice is here, Your Honor, is because we got the

25      information from them in the affidavit very late yesterday and
```

```
1    one of the emails that we addressed today she had written, and

2    I noticed Mr. Shvartsman wasn't on.  So I had her down here in

3    case there were any issues.  She did not submit an affidavit.

4              THE COURT:  Okay.  So the Defense rests?

5              MR. FELDMAN:  The Defense would rest, Judge.

6              Okay.  Mr. Davis, do you have anything further?

7              MR. DAVIS:  I do not, Your Honor.

8              THE COURT:  Okay.  I'll hear brief argument.

9              Mr. Davis, it's your burden, so you get to go first.

10             MR. DAVIS:  Well, we continue to believe, going

11   through the factors, that we will prevail on the merits.  And I

12   think, if anything, Mr. Shvartsman's testimony has confirmed

13   that view.  There is no possible rationale for keeping the

14   money and not delivering the chairs.  We paid for the chairs.

15   They didn't deliver the chairs.

16             If we did not make good on the balance because we

17   didn't have sufficient information to do so, that would have

18   entitled them not to sell us the chairs.  It does not entitle

19   them to not sell us the chairs and keep the money.  There's no

20   theory of contract law, of which I am aware, that would entitle

21   them to say:  "You failed to perform your part of the contract,

22   but we're going to keep your money anyway."  So I think the

23   likelihood of prevailing on the merits is clear.

24             Whether it's in the public interest to require people

25   to comply with their agreements, not to keep other people's
```

1  money, I think the public interest factor certainly weighs in

2  our favor.

3        In terms of the balancing of the harms, there is no

4  harm to Source as a consequence of what occurred here.  In

5  fact, they have been paid for the chairs that we did not

6  receive.  So if they're required to produce the chairs, then

7  they would simply have fulfilled the contract that they agreed

8  to fulfill and they would have paid -- they would have provided

9  chairs which they have been paid in full.

10        In terms of the need for injunctive relief, the

11  irreparable harm, we have addressed it as fully as we can

12  address it.  It is clear that if -- in a project of this kind,

13  if CCA is prevented from fulfilling its contract, and as a

14  consequence of that it is clearly made public -- which it will

15  be from the exhibit that they already attached -- it will cause

16  grave damage to the reputation of CCA, to its ability to gain

17  additional contracts.  But to recover from the notion that they

18  do not perform in a timely fashion is toxic for any company in

19  its position providing the kinds of services that it provides.

20        And so there would be no way that money damages could

21  compensate them for that.  There would be no way to calculate

22  the damages that follow from that.  And it is obvious from the

23  article in the Tribune that it is going to be followed closely,

24  that anything that can be said about CCA will be said.

25        So under these circumstances, since we now learn that

1      these chairs can be manufactured here, I think that the Court

2      should require Source to fulfill its contract and to provide

3      the 1,400 chairs that were provided on an expedited basis.

4              Thank you, Your Honor.

5              THE COURT:  Okay.

6              Mr. Feldman?

7              MR. FELDMAN:  Thank you, Judge.

8              Judge, I'm going to start where I ended in my opening.

9      I think it's important for this Court to remember why we are

10     here.  We are here because they are seeking a mandatory

11     temporary injunction to, quote, have Source immediately deliver

12     1,420 chaise lounge chairs to CCA's freight forwarder in Miami

13     for onward shipping to CCA's project site in the Bahamas, in

14     accordance with the terms of a binding contract between the

15     parties.

16             THE COURT:  Don't step away from the microphone.

17             MR. FELDMAN:  Sorry, Judge.

18             So what did we hear?  Well, we heard differences in

19     interpretation of what the contract meant.  We heard about an

20     email that basically said that CCA was going to make good on

21     monies owed.  We heard evidence that they didn't do that.  We

22     heard testimony about a conversation that happened in December,

23     before the money was otherwise paid, that discussed storage

24     between Mr. Shvartsman and Ms. Dwornik.  We heard one take on

25     the contract on the left and another take on the contract on

1    the right.

2           We have a purchase order prepared by CCA that doesn't

3    talk about a delivery date.  We've got back and forth.  We've

4    got statements and an affidavit that says that we didn't get

5    this and we couldn't get the check.  But yet, there was an

6    email that circulated around in, I believe it was March, with

7    regard to the reconciliation.

8           So what do we have?  We've got a set of circumstances

9    on the contract, Judge, on the substantial likelihood of

10   success on the merits, which the Plaintiff bears a very high

11   burden for a mandatory temporary injunction, a difference in

12   interpretation.  Frankly, that's a jury question.  What the

13   contract meant under the circumstances where it's not clear and

14   it's basing on conflicting testimony is a jury question.  They

15   can't meet the substantial likelihood of success on the merits

16   requirement for a mandatory temporary injunction on a jury

17   question.

18          Let's move on to irreparable harm.  Ms. Dwornik put a

19   lot of things in her affidavit.  But at the end of the day, we

20   have one person here who's testified.  She didn't have

21   information relative to the media and the impact this will have

22   on CCA's reputation.  We find out that CCA has different

23   companies.  So who even knows if CCA Bahamas is going to do

24   business any beyond this.

25          THE COURT:  Well, she said that they were trying to do

1     additional business with the purchaser of the resort and the

2     receiver who was planning an expansion.  So there is evidence

3     of CCA Bahamas having additional work.

4          MR. FELDMAN:  There is.  But I also believe, Judge,

5     that she testified that she wasn't involved in those and she

6     didn't know where they were at -- at what stage.  She doesn't

7     know if that's going to materialize.  That's speculative.

8          At the end of the day, the Eleventh Circuit, Your

9     Honor, has basically indicated that in order to establish

10    irreparable injury, you can't have harm that's speculative.

11    The courts have also indicated that the issue of monetary

12    damages defeats irreparable injury.  At the end of the day, if

13    it can be monetized, it's not irreparable injury.  That's what

14    you have here.

15         You have a situation that can be monetized.  Not only

16    that, Ms. Dwornik testified that since April, when she was told

17    that she wasn't getting her chairs, they had not spoken to one

18    other person regarding replacement of those chairs.  They have

19    not attempted to cover.  They have not attempted to avoid the

20    consequences.  They have not attempted to do any of those

21    things.  They've just sat tight, sat tight until June when they

22    sent -- when they filed this lawsuit.  They sat tight from May,

23    50-plus days.  At 150 or $250,000, what is that, like

24    $9 million in damages?  Who sits tight for $9 million

25    potentially in damages if they waited 50 days?  And the answer

1   that we got was:  "Well, it had to run up the flagpole and then

2   back down."  I would think $9 million, if that's what they

3   claim, would get somebody's attention further up the flagpole.

4   But we didn't hear any of that.  And frankly, we didn't hear

5   from anybody else on the flagpole here, Judge.

6         You don't have irreparable injury.  You don't have --

7   you have got an issue of monetary damages, which in and of

8   itself defeats irreparable injury.  You've got a situation that

9   is speculative at best as to everything except the number.  And

10   even on the number Ms. Dwornik didn't provide a copy of the

11   contract.  She doesn't know what the terms of the liquidated

12   damages clause necessarily are.  We don't have the answers.

13   And apparently, she says it's sealed in a court in the Bahamas,

14   but they never asked to have it unsealed for purposes of

15   presenting it to this Court here.  They never asked to have it

16   unsealed and then asked this Court to reseal it.  I mean, there

17   are remedies that they could have pursued if this was really

18   irreparable.  They didn't need to wait.

19         Delay goes against irreparable harm here, Judge.

20   You've got delay.  You've got lack of clarity.  You've got

21   someone who I believe what her testimony revealed is a lot of

22   things that are in her affidavit she doesn't have firsthand

23   personal knowledge of.  We don't have the contract for which

24   they rely on for these numbers or the ability to necessarily

25   tack it to these chairs.  You're missing a whole bunch of

1    things.

2         And I think, Judge, when you look at those two -- we

3    can talk about the balancing of the interest, or even public

4    policy, or things of that nature.  But I think when you look at

5    those two, they don't get past it.  And they have to meet all

6    four, a high burden for meeting all four.

7         We are at the early stages of this litigation, and the

8    only relief they have requested is that Source deliver chairs

9    Source has testified to they don't have, and Ms. Dwornik says

10   she has no firsthand knowledge of the fact that they have them,

11   other than an advertisement which Mr. Shvartsman explained.

12        At the end of the day, the Court needs to -- this

13   Court, Your Honor, should recommend to Judge Moore that the

14   motion for temporary injunction be denied.  And then obviously

15   everybody can figure out what they do in response to that

16   Report and Recommendation.

17        But suffice to say, Judge, based on the evidence that

18   they've put forward, they have not met their burden.  The Court

19   should deny the motion.

20        THE COURT:  Mr. Davis, do you have any reply -- or

21   rebuttal, I guess you would call it.

22        MR. DAVIS:  I only want to point out that there is no

23   dispute as to the contract.  The contract is a written

24   document.  It is attached to our complaint.  It is an exhibit.

25   It provides that if we pay $390,500 we will receive the 1,420

1  chairs.  There's no ambiguity.  It has not been modified by

2  anything.  That is the contract.  We paid the money.  They

3  didn't provide the chairs.  So it is clear that there's a

4  breach of contract, and it is clear that we'll prevail on the

5  merits.

6          I have been candid with the Court in terms of the

7  irreparable harm.  It is difficult to predict irreparable harm.

8  What we've done is we have demonstrated the importance of this

9  project to the Government of the Bahamas, to the population of

10 the Bahamas, to the economy of the Bahamas.  We have

11 demonstrated that.  And with the help of the Defendant

12 demonstrated that this is a matter that receives intense local

13 attention, and will continue to do so.  If they do not provide

14 the chairs, if CCA cannot complete the contract, and if that is

15 publicized, which it will be, that constitutes irreparable

16 harm.

17         The monetary point we have raised, I have no reason to

18 believe, after hearing the testimony today, that Source would

19 be able to compensate CCA if it is hit with at least a million

20 dollars a week in penalties.  But we're not going to rely

21 heavily on that point because we have not taken the financial

22 testimony under these circumstances of the Defendant.

23         But we think the irreparable harm is obvious that if a

24 company does not complete a project, such as this project

25 that's been going on for 12 years, that the publicity that

1    would be attendant to that would be devastating, would

2    constitute irreparable harm.  And since they are obligated to

3    provide the chairs, they should simply be required to provide

4    the chairs.

5         Thank you, Your Honor.

6         THE COURT:  Okay.  I mean, I don't -- I mean, I have a

7    couple of issues.  I mean, first is the delay in coming to

8    court, but also the delay in ordering other chairs once it

9    became obvious there was a contract dispute and the chairs

10   weren't going to be delivered.  I mean, it just seemed to me

11   that both sides kind of did what they wanted, rather than

12   sitting down to actually talk and try to work things out.  I

13   mean, I just find it troubling.

14        And I also find it odd that you can't buy -- you can't

15   buy chaise lounges somewhere else.  I mean, in terms of

16   irreparable harm, it's the inability to get chaise lounges.  I

17   haven't heard anything to indicate there's anything unique

18   about these particular chaise lounges or any reason why other

19   chaise lounges can't be procured.  So I'm just letting you know

20   that I find that troubling.

21        And in addition, you know, I'm not -- you know, I

22   don't -- I'm not sure what would be considered substantial

23   compliance with the project or not, in terms of the failure to

24   deliver a certain number of lounge chairs, when you're talking

25   about a huge, you know, billion-dollar project.  So I have that

 1    concern.

 2           On the other hand, I will say I think that there's a

 3    very strong case, you know, for relief in terms of, you know, a

 4    return of the money.  You know, I'm not aware of any law that

 5    permits a defendant to keep the money, not perform on a

 6    contract.  I mean, it's -- you know, but I suppose that would

 7    be a civil theft action for treble damages for conversion of

 8    money.  I know there's a conversion count.  I don't think it's

 9    been -- I don't recall, but I don't think there's actually a

10    civil theft count there.

11           But a return of money is not irreparable.  You elected

12    not to ask any questions about finances in terms of whether

13    they would be able to repay or not repay.  You know, I don't

14    know that you're going to get discovery on that -- you know, on

15    that or not.  I can't predict.  But there was no evidence

16    adduced at this hearing regarding their inability to pay.  I

17    don't know whether the Defendant is a multibillion dollar

18    company or a -- you know, a hundred-thousand-dollar company.  I

19    don't have any idea what their bank balance was.

20           So -- and also, since the Defendant doesn't have the

21    chairs, which was the premise of your motion -- you know, and I

22    think there's no dispute that these chairs are going to take

23    awhile to manufacture, I'm not sure that I can order them to do

24    something that they cannot perform.  I just don't know how that

25    works.  I mean, maybe you can -- you know, maybe you can

1    address that.  Because your whole motion was premised on the

2    fact that they did have chairs.  They had chairs that had been

3    manufactured.  They were selling them to somebody else.  They

4    were dissipating them.  And I didn't see any evidence of that.

5         So I don't know if you want to address that.  I know

6    you've said I should order them to manufacture the chairs they

7    were supposed to manufacture -- or Judge Moore should.  I

8    should recommend it.  But part of your motion has been undercut

9    by the evidence.

10        MR. DAVIS:  It has by information that they provided

11   today.  But at the time the motion was filed, they had told us

12   on two occasions that the chairs are being produced and that

13   they would be delivered on May 26th.  That was the basis for

14   the motion.  If the chairs had been produced, give them to us.

15   Now they say they haven't -- now they say they lied, which is

16   hardly the most sterling defense.

17        THE COURT:  No.  I understand.  If there were ever

18   press covering this, you have the corporate representative of

19   the Defendant stating that they sent emails that weren't

20   truthful and their salespeople were generally liars and would

21   say whatever it took to satisfy their customers.  Hardly a

22   ringing endorsement of the business practices, but that's what

23   the testimony was.

24        MR. DAVIS:  Based on their testimony and accepting --

25        THE COURT:  And understandably, the Defendant decided

1    not to call the person who the Defendant had labeled a liar.

2              MR. DAVIS:  Yes.

3              THE COURT:  But that's another story.

4              MR. DAVIS:  Well, that's an endorsement of sorts.

5         But accepting the testimony today, which is very

6    difficult to do under these circumstances, the only alternative

7    we have is to request that the chairs -- if they have not, in

8    fact, been produced, be produced.

9         And we also had the fact that the chair that they are

10   advertising on the same basis as the chairs that we purchased,

11   and only available on that basis, also led us to believe the

12   chairs were available and they were trying to sell them off 200

13   at a time, according to the ad.  So all of those things led to

14   a legitimate, credible belief that the chairs existed.

15             If the Court accepts that they don't, and we don't

16   have any -- we haven't got anyone inside their warehouse, then

17   the alternative is to require them to create the chairs.

18             THE COURT:  Okay.  And you know -- and just -- I mean,

19   I'm left with the evidence that I have regarding the existence

20   of the chairs.  And I understand your reliance on evidence that

21   you had.  I'm not saying it was unfounded by any means.  But I

22   have certainly seen instances where there were private

23   investigators, where there were calls made to find out what's

24   the availability from people who were pretending to be

25   interested in buying them.  You know, where there's -- you

1  know, there are other methods of finding out information.  But

2  as it stands right now, there's nothing -- there's nothing

3  that, you know -- that establishes that those particular chairs

4  exist.

5          And you know -- now, obviously, you know -- and I just

6  had a criminal guilty plea.  Obviously, if somebody commits

7  perjury, and it turns out that there was a warehouse and that

8  there were chairs in this warehouse, then we have, you know, a

9  defendant committing perjury on a material matter before this

10 Court, that the Court is considering in terms of determining

11 whether relief should be granted.  But I can only assume

12 that -- you know, that he was not committing perjury.  Because

13 obviously, whether chairs exist or don't is something that's --

14 you know, should be pretty easy to determine.  And so -- you

15 know, by looking at records and support to find out, you know,

16 what happened.  So you know, I think there we have it.

17         So the bottom line is:  I'm going to take this under

18 advisement.  I'm going to review the exhibits and the emails in

19 more detail, now that I have a fuller understanding of both

20 parties' positions and have had the benefit of hearing the

21 witnesses and seeing the witnesses, and I'll enter a Report and

22 Recommendation.  And then Judge Moore will consider it after,

23 you know, considering objections.

24         So is there anything else, Mr. Davis?

25         MR. DAVIS:  No.  Thank you, Your Honor.

```
 1              THE COURT:  Thank you.

 2              Is there anything else, Mr. Feldman?

 3              MR. FELDMAN:  No.  Thank you for your time, Your

 4    Honor.

 5              THE COURT:  Thank you.  We'll be in recess.

 6              And both sides need to file their exhibits with an

 7    exhibit list, in accordance with the new policy -- relatively

 8    new policies of this Court that were enacted pursuant to the

 9    direction of the Eleventh Circuit, not because our judges voted

10    on it, which requires that any time there's a trial or exhibits

11    are admitted, they need to be -- copies need to be

12    electronically filed with an exhibit list.  And then in the

13    meantime we make sure that we keep copies of the exhibits,

14    which I have in various forms.  So you'll just need to make

15    sure that you do that.

16              Thank you.

17        (Proceedings concluded at 5:34 p.m.)

18

19

20

21

22

23

24

25
```

```
 1    UNITED STATES OF AMERICA       )

 2    ss:

 3    SOUTHERN DISTRICT OF FLORIDA   )

 4                    C E R T I F I C A T E

 5          I, Yvette Hernandez, Certified Shorthand Reporter in

 6    and for the United States District Court for the Southern

 7    District of Florida, do hereby certify that I was present at

 8    and reported in machine shorthand the proceedings had the 19th

 9    day of July, 2017, in the above-mentioned court; and that the

10    foregoing transcript is a true, correct, and complete

11    transcript of my stenographic notes.

12          I further certify that this transcript contains pages

13    1 - 234.

14          IN WITNESS WHEREOF, I have hereunto set my hand at

15    Miami, Florida this 8th day of November, 2017.

16

17                      /s/Yvette Hernandez
                        Yvette Hernandez, CSR, RPR, CLR
18                      Certified Shorthand Reporter
                        400 North Miami Avenue, 10-2
19                      Miami, Florida 33128
                        (305) 523-5698
20                      yvette_hernandez@flsd.uscourts.gov

21

22

23

24

25
```

**$**

**$101.5 [2]** 110/11 110/18
**$101.5 million [2]** 110/11
 110/18
**$125,000 [1]** 12/12
**$125,000-a-day [1]** 12/12
**$140 [1]** 27/15
**$140 million in [1]** 27/15
**$150,000 [3]** 38/7 74/7 74/15
**$150,000 a [2]** 74/7 74/15
**$250,000 [3]** 74/8 74/18
 224/23
**$250,000 a [1]** 74/8
**$275 [1]** 125/20
**$3 [1]** 80/17
**$300,000 [2]** 181/22 218/25
**$332,000 [5]** 206/11 207/5
 214/18 214/22 219/5
**$332,000 outstanding [1]**
 206/11
**$332,308.70 [1]** 204/8
**$352,000 [3]** 26/20 29/1 47/8
**$370 [1]** 217/2
**$370 to [1]** 217/2
**$375,000 [1]** 156/8
**$375,000 that [1]** 156/8
**$390,000 [2]** 138/18 192/19
**$390,000 that [1]** 192/19
**$390,500 [2]** 141/15 226/25
**$390,500 from [1]** 141/15
**$397,512 [1]** 146/3
**$397,512 from [1]** 146/3
**$397,512.50 [6]** 31/4 31/7
 31/20 144/18 145/13 145/17
**$400,000 [3]** 20/10 21/22
 125/2
**$401,525 [1]** 138/3
**$443 [1]** 125/16
**$600,000 [1]** 126/3
**$600,000 and [1]** 126/3
**$64,000 [1]** 195/5
**$64,500 [1]** 195/5
**$800,000 [2]** 124/19 158/6
**$9 [3]** 224/24 224/24 225/2
**$9 million [3]** 224/24 224/24
 225/2

**'**

**'14 [1]** 216/11
**'15 [1]** 216/11

**—**

**-Affidavit [2]** 2/17 3/11
**-Article [1]** 3/5
**-Attachment [4]** 2/18 2/19 2/20
 2/21
**-Conquest [1]** 3/12
**-December [1]** 3/7
**-Demand [1]** 2/17
**-Deposit [1]** 3/9
**-Email [4]** 3/6 3/11 3/13 3/14
**-Emails [2]** 3/8 3/10
**-Ex [4]** 2/23 3/1 3/2 3/3
**-Purchase [1]** 2/16
**-Supp [1]** 2/23

**/**

**/s/Yvette [1]** 234/17

**1**

**1,400 [7]** 19/9 23/9 44/5
 158/19 166/19 216/17 222/3
**1,420 [12]** 33/17 35/20 118/18

 118/20 118/25 135/5 155/22
 169/6 226/20 226/21 226/24
 226/25
**10 [7]** 5/18 35/3 50/6 50/12
 52/15 56/23 65/4
**10-2 [2]** 1/22 234/18
**103 [1]** 3/5
**104 [1]** 3/5
**10:35 [1]** 48/22
**10:44 [1]** 48/22
**10th [4]** 82/21 82/24 90/6
 118/8
**11 [17]** 2/23 49/11 49/22
 50/13 53/5 53/15 54/12 54/13
 54/24 56/3 66/14 66/16
 98/24 99/12 120/13 169/1
**11/28/16 [1]** 3/11
**11:00 [1]** 6/16
**11:25 to [1]** 188/21
**11th [1]** 64/7
**12 [14]** 3/1 3/10 27/20 54/14
 54/19 56/4 66/19 67/4 67/5
 67/6 87/15 87/19 100/15
 227/25
**12 percent [1]** 27/17
**12-year [2]** 118/14 118/17
 118/24
**12-year-old [1]** 116/4
**12/12/16 [1]** 3/1
**12/7/16 [1]** 2/24
**121,825 [1]** 125/20
**122 [2]** 3/6 3/6
**128 [4]** 3/7 3/7 3/8 3/8
**12:28 [1]** 119/13
**12:30 [3]** 17/25 18/10 119/6
**12th [2]** 66/22 149/19
**13 [7]** 3/2 54/20 56/4 57/10
 67/8 67/14 68/11
**14 [30]** 3/3 3/7 9/25 31/21
 49/5 49/22 50/24 50/25 54/21
 54/24 56/5 68/15 69/4 69/5
 69/6 99/12 100/2 100/6 100/7
 128/7 128/14 128/17 128/20
 129/14 172/20 172/21 172/23
 197/1 197/20 199/11
**14 percent [1]** 27/15
**144 [2]** 3/9 3/9
**146 [2]** 3/10 3/10
**14th [1]** 9/22
**15 [20]** 2/23 3/8 3/14 31/13
 55/22 65/20 65/21 65/22 99/3
 99/5 120/14 120/15 120/16
 120/19 128/7 128/21 128/22
 128/25 129/15 172/24
**150 [1]** 224/23
**156 [2]** 2/10 126/4
**156,025 [1]** 125/21
**15th [2]** 93/14 93/18
**16 [11]** 2/24 3/1 3/10 3/11
 146/16 146/19 146/21 147/3
 147/20 173/3 192/18
**167 [1]** 2/10
**169 [1]** 2/3
**17 [10]** 2/17 3/6 3/12 3/13
 15/14 53/18 173/6 173/10
 173/12 174/1
**17-22437 [3]** 4/5 119/14 192/5
**170 [2]** 3/11 3/11
**173 [4]** 3/11 3/12 3/13 3/14
**174 [4]** 3/11 3/12 3/13 3/14
**176 [1]** 2/13
**17th [4]** 172/5 172/8 177/18
 190/24

**18 [6]** 2/2 3/13 144/17 146/11
**18th [1]** 122/8
**19 [7]** 1/5 3/10 3/14 147/21
 173/22 174/1 201/18
**19th [4]** 64/18 150/5 151/9
 234/8
**1:00 [1]** 17/24
**1:17-cv-22437-KMM [1]** 1/2
**1:30 and [2]** 17/25 119/7
**1:40 [1]** 119/13
**1st [2]** 130/19 132/12

**2**

**20 [16]** 3/6 15/14 20/12 21/20
 30/11 112/20 117/2 117/4
 121/13 122/2 122/14 122/21
 122/22 123/1 175/13 176/4
**20 percent [1]** 182/4
**200 [3]** 1/16 125/16 231/12
**2004 [1]** 116/3
**2005 [1]** 116/3
**2006 [3]** 115/23 115/24 116/1
**2010 [1]** 116/9
**2011 [3]** 116/9 116/11 116/13
**2012 [1]** 116/15
**2014 [7]** 31/4 31/7 31/11
 144/17 146/11 146/12 216/10
**2015 [14]** 31/13 32/16 112/20
 112/21 113/11 113/12 114/14
 114/22 117/2 117/4 117/9
 140/21 202/2 216/10
**2016 [17]** 3/7 66/7 82/22 83/2
 113/8 114/5 115/7 115/8
 116/18 116/21 116/24 129/18
 156/12 171/19 172/4 172/8
 172/8
**2017 [29]** 1/5 3/8 3/10 62/21
 64/7 64/18 114/21 121/14
 122/8 123/9 130/19 147/21
 148/8 149/11 149/19 151/15
 153/2 169/1 169/3 184/6
 186/25 188/20 189/2 189/3
 191/13 202/3 202/9 234/9
 234/15
**21 [8]** 3/9 144/6 144/13
 144/14 144/16 144/20 144/25
 145/8
**2128 [1]** 145/21
**213 [1]** 2/13
**21st [1]** 44/22
**22 [6]** 3/11 171/24 172/2
 172/16 173/24 174/1
**220 [2]** 2/4 2/4
**222 [1]** 2/5
**22437 [3]** 4/5 119/14 192/5
**226 [1]** 2/5
**234 [3]** 1/9 2/2 234/13
**2398 [1]** 1/16
**25 [1]** 33/15
**26th [1]** 230/13
**27 [2]** 112/21 200/12
**275 [1]** 125/17
**27th [1]** 31/11
**28 [3]** 171/19 188/20 204/7
**2814 [1]** 19/8
**28th [10]** 172/4 172/7 184/6
 187/25 190/2 190/3 191/6
 191/10 191/12 191/13
**29 [2]** 2/3 153/9
**299 [1]** 217/2
**29th [1]** 153/22

## 3

**3/8/17 [2]** 3/6 15/14
**30 [3]** 78/16 119/9 200/22
**30,000 [2]** 206/25 206/25
**300 [1]** 123/15
**300,000 [1]** 181/22
**300-plus [2]** 126/14 146/1
**3000-chair [1]** 97/20
**305 [1]** 234/19
**309,500 [1]** 138/12
**30th [1]** 89/22
**31 [1]** 74/8
**33128 [2]** 1/22 234/19
**33131-2398 [1]** 1/16
**33156 [1]** 1/19
**332,000 [2]** 205/1 205/5
**335,000 [1]** 218/22
**350 [1]** 217/1
**352,000 [1]** 20/13
**352,677 [1]** 192/19
**369 [1]** 158/6
**390,000 [2]** 207/1 218/21
**390-plus [2]** 140/22 142/11
**397,512.50 [2]** 32/13 32/15
**3:30 [1]** 18/2
**3:32 [1]** 192/3
**3rd [3]** 62/21 153/21 154/8

## 4

**400 [2]** 1/22 234/18
**400-something [1]** 158/5
**401,525 [1]** 138/8
**404,000 [2]** 138/9 138/17
**41st [1]** 1/16
**443 [1]** 125/20
**45 [1]** 119/9
**450,000 [1]** 133/2
**48 [2]** 38/6 152/23
**4:23 [1]** 192/3

## 5

**5,000 [1]** 27/14
**5/19/2017 [1]** 189/2
**5/26/2017 [1]** 189/3
**5/3/17 [1]** 2/17
**50 [1]** 224/25
**50 percent [2]** 126/5 126/6
**50-plus [1]** 224/23
**523-5698 [1]** 234/19
**55 [1]** 38/7
**5698 [1]** 234/19
**5:00 [3]** 6/3 15/7 15/8
**5:34 [1]** 233/17
**5th [3]** 82/21 82/23 82/24

## 6

**60 [1]** 206/14
**600,000 [1]** 138/16
**61 [1]** 2/9
**62 [2]** 2/16 2/16
**620,000 [1]** 124/23
**63 [5]** 2/17 2/17 2/17 2/17 2/18
**639,000 [1]** 125/21
**64 [4]** 2/18 2/19 2/19 2/20
**65 [5]** 2/20 2/21 2/21 2/23 2/23
**66 [2]** 2/23 2/23
**67 [2]** 3/1 3/1
**68 [2]** 3/2 3/2
**69 [3]** 2/9 3/3 3/3

## 7

**7/17/17 [1]** 3/13
**7/22/15 [1]** 3/14
**70 [1]** 206/14
**700 [1]** 125/12
**700-something [1]** 125/6
**7700 [1]** 1/19
**785,000 [1]** 125/25
**795,000 [2]** 124/23 126/3
**795,025 [1]** 125/21
**7th [3]** 66/7 135/10 148/8

## 8

**8/20/14 [1]** 31/21
**8/7/2014 [1]** 31/4
**8/8/2014 [1]** 31/7
**809 [1]** 1/19
**85 [1]** 125/12
**89,000 [1]** 123/15
**8:00 a.m [1]** 58/21
**8th [4]** 121/14 123/9 138/15 234/15

## 9

**90 [1]** 44/9
**900 [1]** 140/25
**95,000 [1]** 125/12
**9:00 evidentiary [1]** 6/17
**9:25 [2]** 1/6 4/1

## A

**a-hundred-and-something [1]** 124/24
**A-M-S [1]** 78/3
**a.m [5]** 1/6 4/1 48/22 48/22 58/21
**Aaron [1]** 41/8
**abilities [1]** 12/15
**ability [5]** 7/13 45/8 161/24 221/16 225/24
**able [14]** 12/8 18/9 26/21 59/2 135/2 136/10 157/23 157/25 192/2 193/9 193/12 193/14 227/19 229/13
**about [114]** 17/25 20/1 22/6 22/12 26/25 30/1 30/13 32/2 33/5 34/19 35/3 35/10 38/24 40/20 41/7 41/9 41/10 41/11 43/5 46/3 48/20 56/1 69/16 74/11 76/4 82/12 85/12 86/24 87/5 87/5 87/17 87/18 88/3 89/4 89/4 89/14 90/11 94/4 96/22 96/23 96/24 96/25 97/5 97/19 99/7 99/8 101/18 102/21 104/12 104/24 105/9 107/8 108/12 108/20 110/6 110/17 111/3 113/10 116/15 117/3 117/11 117/16 118/2 118/3 119/9 120/8 120/20 123/20 124/17 124/19 125/8 130/23 131/1 132/5 132/22 133/5 133/16 135/23 137/13 142/8 142/18 142/20 143/7 146/1 149/4 149/21 149/25 156/20 158/6 159/23 161/11 162/16 163/9 163/21 165/15 165/16 165/17 167/22 173/7 174/25 178/12 191/2 196/8 207/18 213/24 214/6 221/24 222/19 222/22 223/3 226/3 228/18 228/25 229/12
**above [1]** 234/9
**above-mentioned [1]** 234/9

**absence [1]** 10/14
**accepted [2]** 23/14 214/2
**accepting [2]** 230/24 231/5
**accepts [1]** 231/15
**access [4]** 72/9 72/19 139/17 139/21
**accordance [4]** 161/22 162/6 222/14 233/7
**according [8]** 20/13 21/19 26/18 33/25 43/9 47/8 172/10 231/13
**accordingly [1]** 120/12
**account [3]** 72/15 181/10 181/23
**accountant [1]** 31/19
**accounting [6]** 63/16 163/6 176/16 181/1 193/17 193/25
**accounts [3]** 72/16 196/19 196/19
**accruing [6]** 200/17 200/20 201/2 201/9 201/12 202/8
**accurate [5]** 57/10 67/19 67/23 68/6 105/23
**accused [3]** 116/22 116/23 116/24
**acknowledge [1]** 183/9
**acknowledged [2]** 24/15 32/23
**acquire [1]** 19/17
**across [1]** 85/18
**acting [1]** 172/10
**action [1]** 229/7
**actual [6]** 39/1 77/1 87/9 87/11 185/18 216/23
**actually [32]** 7/15 43/13 48/8 67/19 68/2 71/24 74/23 76/17 77/19 79/6 83/16 83/16 84/11 89/5 90/14 91/10 103/10 124/22 125/25 126/11 129/8 138/16 139/5 139/7 145/2 147/24 159/2 184/22 186/17 212/18 228/12 229/9
**ad [9]** 3/4 25/17 160/7 160/20 202/11 203/1 203/7 203/8 231/13
**add [2]** 218/20 218/23
**added [1]** 219/1
**adding [1]** 25/4
**addition [2]** 17/4 228/21
**additional [24]** 5/21 6/8 6/9 7/4 7/5 7/17 8/3 8/5 8/18 8/19 11/8 11/18 11/22 16/5 16/18 32/18 122/3 163/21 182/4 205/18 212/14 221/17 224/1 224/3
**address [7]** 5/18 64/16 142/21 189/9 221/12 230/1 230/5
**addressed [4]** 31/2 176/5 220/1 221/11
**addressing [2]** 18/18 97/6
**adduced [1]** 229/16
**adjourn [1]** 35/3
**administration [1]** 69/24
**admissibility [2]** 17/7 57/18
**admission [2]** 64/9 64/24
**admit [5]** 51/21 63/10 174/11 174/12 174/20
**admitted [35]** 2/15 3/5 52/1 54/10 54/11 56/25 59/11 62/9 63/5 63/25 64/10 65/15 65/21 66/15 67/5 68/10 69/5 91/5 99/12 100/1 104/5 122/21

**A**

**admitted... [12]** 128/19 128/24 144/16 146/20 170/18 172/19 172/25 173/4 173/21 174/13 174/23 233/11

**admitting [1]** 56/23

**advance [2]** 14/7 19/10

**advantageous [4]** 112/2 112/5 112/9 112/17

**advertisement [18]** 2/22 24/24 25/5 68/19 69/2 99/1 100/10 101/8 101/11 155/19 159/22 159/23 202/14 202/18 216/6 216/16 216/24 226/11

**advertising [5]** 25/7 25/15 68/20 68/22 231/10

**advise [3]** 148/16 168/24 200/20

**advised [13]** 124/19 126/5 135/9 148/13 158/3 158/22 164/25 165/3 165/6 165/9 165/10 168/23 182/25

**advisement [1]** 232/18

**advisers [1]** 62/16

**advises [1]** 192/18

**advising [2]** 184/15 202/7

**AE [2]** 98/3 98/5

**affiant [1]** 4/19

**affiants [2]** 5/9 14/25

**affidavit [166]** 2/17 2/23 2/23 3/1 3/2 3/3 3/7 3/8 3/11 3/12 3/13 3/14 4/24 5/7 6/8 6/8 6/15 6/22 6/24 6/24 7/3 7/5 7/7 7/8 7/8 7/14 7/22 7/24 8/4 8/19 8/22 10/13 10/19 10/22 10/25 11/4 11/13 11/14 11/17 13/3 15/7 17/13 19/20 24/22 26/9 30/5 33/13 33/16 33/20 34/1 35/21 47/11 49/9 49/11 49/22 49/23 50/4 50/13 50/18 50/25 51/1 51/1 51/6 52/20 52/22 52/23 52/24 52/25 53/6 53/9 53/14 53/15 53/16 53/23 54/14 54/25 55/13 55/14 55/18 55/21 56/3 56/4 56/7 56/8 56/9 56/10 56/12 56/13 58/11 58/14 63/8 63/10 65/19 66/20 68/16 73/13 73/18 74/1 74/3 81/8 86/9 89/12 90/18 98/21 99/3 99/11 99/12 99/24 100/15 120/9 120/15 120/16 120/21 120/21 120/22 120/24 128/9 128/13 129/13 135/16 135/22 136/2 137/2 146/16 147/11 147/12 166/13 168/21 170/12 170/13 171/8 172/2 172/22 173/3 173/11 173/22 174/6 175/11 192/17 196/2 196/3 196/4 197/1 197/21 197/23 197/24 197/25 198/23 199/9 200/12 201/10 201/19 204/7 212/9 214/16 216/6 216/7 218/9 218/15 219/22 219/23 219/25 220/3 223/4 223/19 225/22

**affidavits [24]** 5/5 5/6 5/12 5/22 6/1 11/10 11/17 12/3 12/4 13/10 13/20 14/23 14/24 16/19 16/24 17/5 18/16 23/7 48/2 49/12 49/18 53/1 54/7 57/6

**affirmance [2]** 13/17 58/13

**affirmative [1]** 8/5

**affirmed [39]** 13/10 16/19 17/17 18/3 18/17 46/18 61/9 76/22 91/17 115/9 118/19 123/22 132/17 136/14 142/9 146/12 146/14 159/15 175/18 176/23 176/24 177/20 190/6 190/18 208/11 209/9 209/9 217/18 217/24 218/1 218/3 227/18 232/22

**afternoon [7]** 6/3 18/2 32/6

**again [25]** 14/9 32/11 35/15 44/7 45/14 47/11 58/20 58/20 68/19 70/10 79/15 88/4 88/8 92/25 95/6 103/24 120/2 124/3 134/10 134/11 158/8 180/4 197/10 198/6 209/1

**against [7]** 106/25 107/3 107/16 108/4 110/12 124/23 225/19

**agent [2]** 21/14 214/9

**aggregate [2]** 60/19 60/22

**agree [15]** 24/12 25/9 26/14 152/20 166/21 166/23 182/17 182/23 184/24 207/7 207/13 207/16 207/20 211/8 211/13

**agreed [16]** 21/15 23/12 24/11 29/2 29/2 46/13 46/14 46/20 80/17 182/20 207/19 211/7 211/15 212/22 214/25 221/7

**agreement [9]** 12/25 13/7 23/8 23/17 23/19 46/22 46/22 164/4 212/14

**agreements [3]** 69/23 77/16 220/25

**agrees [1]** 35/7

**ahead [6]** 70/6 84/6 85/7 120/8 134/24 209/17

**alarmed [1]** 124/17

**Alex [1]** 68/5

**Alicia [1]** 143/20

**all [132]** 16/24 18/22 18/25 23/10 23/21 23/23 26/19 29/9 29/17 30/22 32/7 36/11 39/7 39/11 39/19 42/16 45/3 45/15 54/8 56/5 57/7 59/25 61/6 61/7 66/2 66/24 69/22 72/16 84/8 92/19 92/20 94/2 97/15 103/17 104/9 108/17 110/1 111/3 111/3 115/15 125/8 126/2 126/8 130/3 130/24 130/25 130/25 131/1 131/7 131/10 132/16 132/18 132/22 134/7 135/12 139/3 139/3 140/7 140/12 142/4 142/24 149/15 156/21 158/9 158/11 159/8 159/11 163/3 166/1 173/25 174/20 180/10 180/12 182/1 182/3 184/22 186/16 194/24 194/25 196/19 198/13 199/19 199/22 200/9 200/21 201/9 202/14 204/11 204/13 204/17 204/22 204/22 205/11 205/12 205/13 205/15 205/16 205/17 205/20 205/21 206/1 206/12 206/21 207/8 207/8 207/9 207/11 207/14 208/8 208/15 208/15 208/20 208/23 209/3 209/13 210/3 210/4 210/6 210/11 211/3 211/5 211/9 211/10 212/15 214/4 214/6 214/7 214/11 215/25

**affirmative [1]** 8/5

**allegation [1]** 12/7

**allegations [5]** 7/16 7/21 106/25 107/3 152/17

**alleged [2]** 107/24 155/16

**allegedly [1]** 196/16

**alleges [1]** 109/25

**allocated [2]** 85/17 86/1

**allow [5]** 14/12 30/20 169/22 182/17 191/24

**allowed [8]** 141/8 169/21 184/23 185/14 185/15 185/18 185/22 186/13

**alluded [1]** 89/13

**almost [4]** 15/7 20/10 51/7 125/1

**along [5]** 11/15 12/24 88/19 147/16 147/19

**already [21]** 24/17 34/14 48/12 51/25 67/10 83/15 85/2 85/22 87/22 124/9 126/12 157/7 159/7 170/24 172/19 172/24 174/12 174/23 179/22 196/21 221/15

**also [31]** 4/23 4/24 9/23 12/25 14/6 18/1 25/16 50/21 51/20 52/11 62/23 63/7 79/4 94/15 112/19 117/1 117/2 148/12 161/17 172/5 173/4 184/20 189/12 210/25 224/4 224/11 228/8 228/14 229/20 231/9 231/11

**alternate [2]** 136/7 136/15

**alternative [2]** 231/6 231/17

**although [3]** 18/4 25/16 140/25

**aluminum [1]** 203/15

**ALVIN [2]** 1/15 4/10

**always [1]** 176/2

**am [19]** 22/15 48/25 57/25 69/20 83/18 110/25 111/12 112/10 116/11 116/18 118/16 147/5 161/20 176/2 187/13 188/10 192/12 213/13 220/20

**ambiguity [1]** 227/1

**ambiguous [1]** 44/3

**amend [1]** 104/8

**amended [1]** 61/6

**America [19]** 27/24 71/20 71/22 79/5 79/14 79/17 79/18 79/20 79/22 79/25 80/6 80/9 80/10 81/2 154/10 162/23 163/2 163/3 234/1

**amount [18]** 9/17 12/1 20/1 20/4 20/24 30/10 31/4 31/6 31/20 34/16 36/12 37/7 37/16 42/4 144/18 148/10 181/20 218/9

**amounts [3]** 29/3 132/24 193/20

**AMS [2]** 78/1 78/5

**analysis [1]** 26/15

**and/or [1]** 149/16

**ANDREA [1]** 1/12

**ANDREW [2]** 1/18 4/12

**announcement [2]** 81/4 200/22

**annual [1]** 73/3

**another [19]** 16/6 17/24 33/9 34/22 42/13 55/13 61/10 84/16 85/6 101/5 101/10 102/5 124/21 154/11 162/23 167/18 178/4 222/25 231/3

**226/5 226/6 231/13**

**A**

**answer [35]** 36/20 39/23 39/24
75/5 75/17 76/3 76/5 78/25
82/3 93/9 93/10 118/5 127/6
132/6 133/24 141/8 141/10
141/12 154/5 154/7 179/10
179/21 180/3 194/7 195/13
200/3 203/20 203/21 205/22
208/1 209/22 211/15 211/16
212/3 224/25
**answered [7]** 141/6 141/11
180/2 197/17 198/5 198/25
210/22
**answering [2]** 198/16 212/4
**answers [2]** 218/17 225/12
**anticipated [1]** 87/24
**antique [1]** 41/9
**Antonica [1]** 186/23
**any [173]** 5/5 5/9 5/21 5/25
6/1 7/16 9/24 11/22 12/8
12/14 14/11 14/14 16/4 16/17
17/4 17/6 17/12 18/23 19/24
20/7 22/11 22/12 22/15 25/22
29/24 31/2 31/21 32/20 37/23
41/10 57/15 57/21 58/3 58/11
58/12 59/18 72/21 72/23 74/20
75/4 76/2 76/7 77/23 78/21
80/12 80/23 82/1 83/5 83/20
83/25 85/22 86/2 86/5 86/7
86/11 86/14 86/18 86/21 86/22
89/3 89/5 89/5 89/8 89/8 89/9
91/12 91/13 91/15 91/20 91/22
94/24 97/12 100/19 101/24
102/3 102/18 104/3 106/18
106/20 107/8 107/15 107/18
108/2 108/4 109/15 109/17
109/23 110/10 112/5 112/8
112/11 112/13 112/15 114/4
114/12 115/13 116/22 128/16
128/21 131/1 132/23 132/23
134/2 134/12 134/21 139/21
144/14 148/16 149/3 149/11
149/15 149/16 149/22 150/23
155/21 156/3 158/4 158/7
158/10 158/17 160/10 164/25
168/9 169/18 173/15 173/17
173/18 178/8 180/18 181/3
181/6 181/25 182/13 184/8
184/21 187/12 189/7 193/14
194/3 194/9 194/21 194/23
196/7 196/12 196/15 196/17
200/10 203/15 203/16 203/17
203/24 203/24 205/18 207/24
215/21 215/24 216/1 216/7
219/12 220/3 221/18 223/24
224/20 225/4 226/20 228/18
229/4 229/12 229/19 230/4
231/16 231/21 233/10
**anybody [19]** 14/3 56/15 73/23
79/11 80/24 81/7 81/10 107/18
111/22 136/21 149/9 155/5
158/14 185/15 191/12 201/22
202/5 206/16 225/5
**anymore [1]** 209/17
**anyone [6]** 6/16 27/7 47/5
73/25 140/8 231/16
**anything [53]** 14/3 15/4 26/5
37/3 41/8 41/10 44/8 47/16
47/16 48/1 52/13 56/25 57/11
97/9 97/14 100/24 105/3 110/6
117/3 117/11 117/16 118/2
120/7 123/11 130/10 132/11

134/22 134/24 138/20 145/12
153/13 156/1 169/9 175/9
176/3 177/19 181/14 184/21
207/23 219/7 219/11 220/6
220/12 221/24 227/2 228/17
228/17 232/24 233/2
**anyway [2]** 120/1 220/22
**anywhere [3]** 35/4 42/8 86/18
**apologies [4]** 99/5 99/9 118/1
127/7
**apologize [18]** 10/4 22/24
27/18 29/17 29/20 30/23 55/18
55/24 96/3 96/3 120/8 131/12
142/16 142/17 148/21 176/7
176/22 186/24
**apparent [1]** 159/19
**apparently [6]** 39/19 57/9
106/24 152/16 168/10 225/13
**appear [3]** 10/18 30/2 36/23
**appearances [4]** 1/14 4/8
119/17 192/8
**appeared [2]** 13/2 26/20
**appears [5]** 12/23 30/3 101/10
171/14 189/12
**appease [1]** 185/10
**appeasing [1]** 185/12
**applicable [1]** 95/13
**application [3]** 148/11 148/12
181/5
**applied [16]** 37/8 178/1
178/24 180/19 180/20 181/6
181/9 181/23 192/19 192/25
193/3 193/7 194/4 194/9
206/25 211/11
**applies [4]** 93/25 94/2 94/19
94/25
**apply [10]** 178/3 178/6 178/7
178/13 179/24 180/1 180/23
181/25 182/17 213/8
**applying [3]** 206/7 206/23
211/5
**appreciate [2]** 43/17 130/12
**approach [15]** 15/24 60/11
99/16 105/4 121/16 121/18
128/1 128/6 129/2 137/15
146/23 152/3 157/8 183/12
187/22
**approaching [2]** 128/3 183/14
**appropriate [7]** 6/20 7/25 8/11
37/9 50/9 187/10 187/11
**appropriately [1]** 61/9
**approximately [3]** 19/8 140/23
218/22
**April [21]** 3/10 133/15 135/10
147/21 148/8 149/11 149/19
150/5 151/9 158/25 165/15
169/1 169/3 177/7 177/11
177/18 181/4 187/1 190/24
191/15 224/16
**April 11 [1]** 169/1
**April 12th [1]** 149/19
**April 17th [2]** 177/18 190/24
**April 19 [1]** 147/21
**April 19th [2]** 150/5 151/9
**April 7 [1]** 149/11
**April 7th [2]** 135/10 148/8
**architect [6]** 97/22 97/24
98/2 98/6 98/9 98/12
**are [271]**
**area [2]** 41/18 41/22
**aren't [6]** 24/11 25/1 56/14
88/20 96/19 212/5

**arguably [1]** 11/6
**argument [6]** 11/6 14/22 23/13
58/12 59/19 220/8
**around [21]** 15/7 17/25 22/22
29/17 29/20 41/18 42/7 45/3
80/16 82/12 84/21 84/22 84/25
101/22 121/22 159/3 161/11
162/10 194/17 208/24 223/6
**arranged [1]** 142/14
**arrangement [16]** 37/6 207/7
207/19 207/21 207/22 208/14
208/18 210/1 210/2 210/5
210/13 210/20 210/21 211/2
211/7 211/8
**arrangements [2]** 198/10 198/10
**arrive [1]** 175/16
**arrived [1]** 115/23
**article [23]** 3/5 27/3 27/8
28/2 103/18 103/25 104/9
104/10 104/14 105/8 105/11
105/14 107/20 107/22 107/24
107/25 111/13 111/20 117/1
117/15 171/6 171/25 221/23
**as [204]** 3/5 5/1 5/3 5/5 5/5
5/20 6/7 6/9 7/8 8/24 10/17
10/17 11/2 11/11 11/17 12/11
14/16 14/20 15/6 15/6 15/14
15/14 15/20 16/21 16/21 20/6
22/13 24/12 25/20 27/7 27/7
28/8 29/12 30/10 30/16 32/23
33/22 34/13 34/14 38/3 38/4
38/9 38/9 38/18 38/25 38/25
39/3 39/16 45/7 45/9 47/11
47/14 49/25 50/11 50/25 51/1
51/6 51/11 51/13 52/16 53/9
54/5 55/4 55/19 55/19 55/21
56/6 56/20 57/9 58/17 58/19
59/7 61/5 61/14 62/4 62/12
62/25 63/22 64/21 64/24 65/13
65/20 66/9 66/11 66/14 67/4
67/14 69/4 72/3 72/9 73/18
74/14 74/17 74/20 77/1 77/19
77/22 77/22 78/23 80/1 81/19
83/11 83/11 83/13 83/13 84/5
84/6 84/6 84/6 85/25 87/7
87/9 87/10 87/11 87/24 88/10
88/10 88/12 88/12 91/8 91/17
91/17 92/20 93/3 96/24 97/1
97/7 98/24 99/3 99/12 100/1
103/19 103/20 103/21 104/10
104/19 107/17 107/20 107/20
118/6 118/7 118/13 118/13
119/17 120/12 121/13 121/17
122/25 125/4 126/7 127/3
128/7 129/13 129/16 133/24
135/4 136/15 136/18 137/10
140/11 141/20 144/19 144/19
145/1 146/15 147/2 149/11
149/15 154/9 163/7 163/18
164/13 164/15 166/6 166/19
171/24 172/20 179/18 181/5
189/15 190/13 192/8 192/20
195/4 197/24 200/9 200/9
202/10 202/13 207/6 210/4
210/4 214/11 214/21 215/15
221/4 221/11 221/11 221/13
225/9 226/23 227/24 231/10
232/2
**aside [1]** 58/18
**ask [41]** 14/20 16/16 34/4
39/15 43/23 44/7 48/4 66/19
72/12 75/11 75/11 76/4 92/25

**A**

**ask... [28]** 93/12 94/10
104/23 108/12 108/24 110/17
120/20 123/17 124/3 129/24
133/5 139/25 140/5 141/5
167/15 171/1 174/8 174/8
179/6 182/20 183/19 195/12
207/18 211/14 211/16 213/11
216/13 229/12
**asked [26]** 19/18 21/1 47/25
81/4 81/22 81/22 82/18 85/9
91/19 111/5 118/22 118/23
123/15 123/23 124/7 124/8
140/24 141/1 159/22 180/2
182/19 184/19 207/18 225/14
225/15 225/16
**asking [29]** 14/2 17/3 37/3
39/5 67/1 72/13 72/13 75/14
75/14 84/5 94/6 94/2 94/21
96/1 96/11 96/12 101/18
107/11 118/2 118/3 126/9
130/21 131/10 134/8 134/8
150/10 183/4 209/25 209/25
**asks [1]** 13/19
**aspect [4]** 13/8 26/24 76/19
136/11
**aspects [1]** 84/8
**assert [1]** 28/25
**assertion [1]** 23/8
**assessment [1]** 43/22
**assist [1]** 193/20
**assistance [1]** 31/22
**associated [2]** 102/8 214/8
**Association [1]** 90/12
**assume [19]** 11/19 12/17 17/16
24/1 32/22 32/22 42/15 42/16
42/25 59/1 79/10 83/24 84/1
105/23 116/11 143/19 174/12
188/16 232/11
**assume that's [1]** 42/16
**assumed [2]** 54/9 58/4
**assuming [5]** 6/15 34/25 56/23
57/5 146/3
**assurances [1]** 112/22
**assure [1]** 28/16
**assured [2]** 134/10 198/11
**astonishment [1]** 22/20
**athlete [1]** 41/8
**Atlantic [3]** 69/1 125/15
216/9
**attached [36]** 3/5 7/3 10/12
11/15 32/10 32/12 49/10 50/10
50/13 50/25 52/15 52/17 52/20
55/10 55/15 57/9 68/24 98/25
101/6 101/8 101/10 101/11
101/12 103/18 129/12 137/5
137/9 155/19 170/20 171/8
171/25 172/6 201/11 216/6
221/15 226/24
**attaching [2]** 27/3 31/15
**attachment [9]** 2/18 2/19 2/20
2/21 3/6 3/11 63/13 103/21
123/3
**attachments [14]** 10/24 11/14
15/15 31/3 49/12 50/3 51/5
51/6 56/8 56/9 56/12 56/13
142/6 142/7
**attempt [1]** 189/4
**attempted [3]** 224/19 224/19
224/20
**attendant [1]** 228/1
**attending [1]** 169/14

**attention [7]** 8/1 27/6 27/7
27/16 27/23 27/23 38/13 38/21
44/18 45/10 61/25 63/17 70/24
70/25 71/7 71/8 71/10 71/13
71/23 72/4 72/15 72/21 72/23
73/20 73/23 74/14 74/17 74/21
74/23 75/11 75/14 75/19 75/21
75/24 76/2 76/8 77/21 77/23
77/25 78/1 78/10 78/12 78/21
79/4 79/7 79/14 79/16 80/10
80/13 80/24 81/10 82/1 83/5
83/9 83/19 83/20 83/23 84/1
86/3 86/12 89/9 89/15 89/18
89/21 90/10 90/12 93/22 94/10
94/13 94/24 95/3 101/24
101/25 102/2 102/7 102/8
102/18 114/11 114/14 114/24
115/1 115/2 115/5 115/12
115/15 115/20 115/22 115/23
116/21 119/15 131/20 136/10
143/17 154/10 161/11 161/12
161/15 162/17 163/2 163/11
163/13 163/22 164/1 164/12
168/12 178/14 192/6 222/13
223/23 224/3 225/13 227/9
227/10 227/10
**attorney [7]** 8/1 27/6 27/7
27/16 27/23 27/23 38/13 38/21
193/22
**attorney [3]** 192/1 193/19
193/22
**attorneys [3]** 18/6 151/13
175/16
**August [6]** 9/22 31/11 44/13
144/17 146/11 146/12
**August 14th [1]** 9/22
**August 18 [3]** 144/17 146/11
146/12
**August 27th [1]** 31/11
**authenticate [3]** 57/21 58/9
58/9
**authenticated [1]** 52/19
**authority [1]** 154/23
**auto [1]** 189/15
**automated [1]** 64/15
**automatic [3]** 190/8 190/11
202/17
**automatically [4]** 189/16
189/18 190/9 191/7
**auxiliary [1]** 84/17
**availability [1]** 231/24
**available [11]** 14/25 24/22
25/2 26/6 26/10 33/21 49/4
100/18 165/12 231/11 231/12
**Avenue [1]** 1/22 234/18
**avoid [1]** 224/19
**aware [31]** 17/22 43/14 50/8
83/11 84/6 96/16 101/23
107/17 112/4 112/8 112/11
112/15 118/7 134/23 158/21
161/7 183/2 183/4 183/5 183/8
184/14 184/19 195/17 200/21
200/25 201/1 201/2 207/22
207/25 220/20 229/4
**away [4]** 188/7 195/3 195/4
222/16
**awhile [1]** 229/23
**Awnings [1]** 195/16

**B**

**back [61]** 17/25 18/2 21/1
21/2 27/11 28/8 29/12 29/17
29/20 30/14 30/21 31/5 31/7
32/16 32/17 32/21 32/22 33/8
34/11 35/14 37/19 43/20 46/6
46/7 46/9 47/13 76/22 105/8
106/25 114/8 115/11 126/16
127/1 129/8 129/17 133/15
138/21 139/25 143/24 145/23
146/5 148/23 150/5 151/5
154/12 156/22 165/14 176/16
177/12 178/17 178/20 184/12
192/9 194/17 196/10 209/11
209/13 209/14 210/19 223/3
225/2
**background [2]** 18/15 78/23
**bad [3]** 102/18 102/22 212/4
**Baha [45]** 79/23 82/2 101/16
102/1 105/19 106/5 106/6
106/8 115/16 116/4 125/14
130/8 139/2 139/7 139/17
140/7 152/17 161/13 161/22
162/11 162/18 164/3 164/6
164/10 178/1 194/14 197/6
197/7 197/8 198/8 198/8
200/22 204/10 204/15 204/17
204/18 205/2 205/6 205/9
206/8 206/23 208/23 214/8
216/10 216/23
**Bahama [2]** 65/8 68/20

**BAHAMAS [119]** 1/4 2/16 4/6
27/16 27/23 27/23 38/13 38/21
44/18 45/10 61/25 63/17 70/24
70/25 71/7 71/8 71/10 71/13
71/23 72/4 72/15 72/21 72/23
73/20 73/23 74/14 74/17 74/21
74/23 75/11 75/14 75/19 75/21
75/24 76/2 76/8 77/21 77/23
77/25 78/1 78/10 78/12 78/21
79/4 79/7 79/14 79/16 80/10
80/13 80/24 81/10 82/1 83/5
83/9 83/19 83/20 83/23 84/1
86/3 86/12 89/9 89/15 89/18
89/21 90/10 90/12 93/22 94/10
94/13 94/24 95/3 101/24
101/25 102/2 102/7 102/8
102/18 114/11 114/14 114/24
115/1 115/2 115/5 115/12
115/15 115/20 115/22 115/23
116/21 119/15 131/20 136/10
143/17 154/10 161/11 161/12
161/15 162/17 163/2 163/11
163/13 163/22 164/1 164/12
168/12 178/14 192/6 222/13
223/23 224/3 225/13 227/9
227/10 227/10
**Bahamas' [6]** 72/9 79/12 81/11
81/24 91/10 101/21
**Bahamian [3]** 111/4 111/4
111/12
**Bahamians [1]** 110/12
**balance [16]** 19/4 19/17 20/3
28/22 124/24 126/4 126/7
138/12 148/11 159/18 159/19
199/24 206/17 212/11 220/16
229/19
**balances [1]** 208/6
**balancing [2]** 221/3 226/3
**ballpark [1]** 181/3
**ballroom [1]** 88/23
**bank [22]** 27/9 31/20 31/24
31/25 31/25 72/15 72/16 73/21
108/16 108/17 109/10 109/11
109/15 109/18 109/25 110/5
112/3 112/6 112/12 123/25
196/19 229/19
**bankrupt [1]** 22/4
**bankruptcy [4]** 18/17 164/4
194/15 200/22
**based [22]** 12/9 13/3 23/18
23/25 28/1 34/9 45/8 46/7
49/3 76/16 82/15 95/4 95/16
152/17 155/16 161/21 161/23
162/6 162/6 180/18 226/17
230/24
**basic [2]** 35/8 57/4
**basically [8]** 31/15 33/22
101/4 154/9 162/22 210/19
222/20 224/9
**basing [1]** 223/14
**basis [20]** 5/7 5/24 10/10
10/15 14/21 18/15 19/6 20/5
24/5 33/3 57/14 72/24 73/1
73/3 73/5 105/1 222/3 230/13
231/10 231/11
**basketball [1]** 41/7
**BB [3]** 144/9 196/19 196/23
**be [282]**
**bear [1]** 32/24
**bears [3]** 35/19 45/18 223/10
**became [5]** 49/25 159/19 180/5
204/12 228/9

**B**

**because [122]** 7/6 7/15 7/24
9/19 11/2 14/2 14/13 15/3
16/13 18/25 19/15 19/24 20/2
20/9 21/2 21/15 21/19 22/8
22/23 23/3 23/13 23/15 24/5
24/14 25/21 26/7 26/11 26/15
28/7 28/17 29/9 29/24 31/1
31/23 32/11 34/17 37/3 37/12
40/6 43/9 43/19 44/10 44/17
46/24 47/4 48/7 48/15 48/17
54/17 60/12 61/6 66/24 75/5
76/4 80/4 88/9 95/16 100/20
101/16 104/16 111/21 111/24
118/18 118/25 122/7 124/20
126/19 127/3 127/20 131/5
133/23 134/3 134/25 135/8
138/23 142/10 149/5 158/3
158/12 158/20 159/13 159/13
163/4 163/17 164/19 165/14
165/15 169/21 174/12 176/15
177/12 178/1 179/22 181/25
184/20 185/18 186/13 186/15
191/25 192/23 196/2 200/6
200/9 202/20 205/10 209/10
210/9 210/13 211/2 212/5
216/20 216/24 217/2 218/16
219/18 219/24 220/16 222/10
227/21 230/1 232/12 233/9
**becomes [1]** 51/1
**been [131]** 7/20 7/23 8/22
10/6 11/20 13/24 18/19 18/25
19/7 19/8 19/16 19/25 19/25
20/2 20/3 20/10 20/14 20/14
20/24 21/15 21/17 21/19 21/20
22/1 22/10 23/5 23/11 24/1
25/10 25/11 27/6 28/23 28/24
36/5 36/9 39/9 44/12 46/8
46/22 57/1 58/3 61/14 62/12
64/7 66/25 67/11 76/23 78/16
78/16 79/11 80/12 83/15 87/15
87/22 91/5 99/12 100/1 102/22
104/16 104/16 106/8 106/11
107/15 107/19 107/25 108/4
114/11 116/1 116/2 116/7
116/24 120/11 122/25 123/16
124/9 126/12 131/14 132/18
132/19 133/21 140/11 142/14
145/22 146/7 146/7 146/15
147/2 155/7 157/4 158/4 161/2
161/5 162/19 165/1 165/1
165/22 166/12 173/4 174/6
176/1 181/17 183/16 183/18
184/7 184/10 187/7 187/11
187/18 190/3 191/3 191/5
194/11 194/24 194/25 196/8
203/2 203/8 206/24 207/1
208/18 215/19 221/5 221/9
227/1 227/6 227/25 229/9
230/2 230/8 230/14 231/8
**before [26]** 1/12 6/17 11/12
13/12 18/18 33/10 48/6 53/14
79/1 126/15 132/10 135/15
142/4 145/12 146/13 153/20
156/9 169/6 189/3 190/4 207/6
212/21 213/24 213/25 222/23
232/9
**beforehand [1]** 212/18
**begin [1]** 171/14
**beginning [6]** 11/21 90/8
122/4 154/10 172/3 199/25
**begins [2]** 89/19 147/21

**behalf [7]** 2/7 2/11 4/12
**behind [3]** 4/25 127/2 209/23
**Beijing [9]** 71/25 108/18
110/2 110/8 112/20 117/3
117/4 117/9 154/12
**being [31]** 3/4 25/3 32/3
39/22 40/19 50/9 61/4 61/5
69/2 77/16 87/19 89/20 96/16
105/2 118/18 118/24 125/1
133/3 133/5 135/8 141/21
158/22 160/11 165/3 165/6
165/25 166/9 177/18 177/20
192/19 230/12
**belief [2]** 155/16 231/14
**believe [83]** 6/11 6/11 6/20
16/17 18/9 25/14 31/7 31/14
33/14 36/2 36/8 36/16 38/5
38/22 53/2 71/19 71/21 71/22
88/5 88/21 89/2 89/17 90/12
98/14 102/24 103/2 109/13
109/21 110/19 111/23 114/3
118/22 118/22 119/22 120/12
121/13 134/25 136/3 136/25
151/15 152/10 153/9 155/16
170/21 170/24 172/18 174/24
181/4 182/19 182/24 183/18
189/25 190/15 190/23 191/6
193/24 194/23 195/25 196/5
196/21 198/5 199/14 199/25
200/22 202/13 204/12 208/4
212/7 213/23 214/16 215/10
216/2 216/11 217/8 218/25
219/5 219/20 220/10 223/6
224/4 225/21 227/18 231/11
**believed [3]** 43/8 166/9
212/13
**believes [1]** 8/18
**belonged [1]** 178/25
**benefit [1]** 232/20
**bespoke [1]** 157/6
**best [5]** 44/3 44/14 84/1
103/5 225/9
**better [3]** 159/12 159/12
199/6
**between [18]** 13/1 66/3 72/3
74/23 76/21 76/23 109/10
127/4 139/1 147/6 153/21
155/6 187/1 196/11 197/6
216/11 222/14 222/24
**beyond [2]** 141/12 223/24
**bidding [3]** 27/25 69/22 161/5
**big [5]** 41/24 41/25 88/8
89/20 123/14
**billion [4]** 12/16 80/17 164/6
228/25
**billion-dollar [2]** 12/16
228/25
**billions [1]** 163/5
**bills [1]** 29/9
**binding [1]** 222/14
**Biscayne [1]** 1/16
**bit [10]** 8/17 18/5 48/10
76/11 76/18 79/6 88/12 105/25
138/25 165/14
**blamed [1]** 107/1
**blurry [1]** 138/10
**BMI [2]** 21/13 21/13
**BML [6]** 65/10 66/3 82/7
109/10 139/6 140/10
**BML/PSI [1]** 66/3
**BOGGS [1]** 1/15
**both [12]** 16/16 23/18 47/11

59/22 60/14 76/18 112/12
233/6
**bother [1]** 7/4
**bottom [5]** 117/7 141/13
145/23 188/9 232/17
**Boulevard [1]** 1/16
**box [1]** 142/12
**breach [1]** 227/4
**break [2]** 76/11 142/15
**breaks [1]** 186/1
**brief [10]** 16/17 17/4 17/12
17/24 48/9 48/20 59/19 169/21
169/22 220/8
**briefly [2]** 7/10 18/1
**bring [2]** 7/25 36/8
**broad [1]** 34/20
**broader [1]** 13/7
**broken [1]** 186/7
**brother [1]** 35/25
**brother-in-law [1]** 35/25
**brought [3]** 10/16 76/22
133/15
**browser [1]** 100/23
**BRUCE [1]** 1/15
**Bs [1]** 14/16
**budget [1]** 164/5
**bunch [2]** 34/11 225/25
**burden [11]** 14/11 26/13 35/19
39/13 39/14 43/25 45/18 220/9
223/11 226/6 226/18
**business [38]** 57/4 57/8 60/20
60/21 61/1 62/2 62/5 62/23
62/25 63/20 63/21 63/22 64/19
64/21 66/9 66/12 67/2 80/4
112/2 112/5 112/17 162/25
163/14 163/17 163/18 179/19
179/20 179/23 179/25 197/12
198/13 199/16 200/10 209/3
215/4 223/24 224/1 230/22
**But were [1]** 176/11
**buy [11]** 25/19 42/8 42/10
133/24 158/14 185/25 186/3
197/11 216/16 228/14 228/15
**buyer [1]** 161/13
**buying [1]** 231/25

**C**

**calculate [1]** 221/21
**calendar [3]** 9/7 9/19 127/19
**call [17]** 4/1 18/20 55/22
57/20 58/8 58/21 59/25 102/4
169/24 170/1 186/1 186/1
186/5 217/18 219/16 226/21
231/1
**called [4]** 21/11 78/1 140/24
216/15
**calling [3]** 4/5 209/12 219/21
**calls [1]** 231/23
**came [5]** 18/17 64/16 115/15
135/7 156/22
**can [146]** 4/15 5/11 8/18 9/21
11/14 11/16 11/20 12/3 13/24
14/3 14/18 14/19 14/22 15/6
16/5 16/9 17/18 17/21 17/25
18/2 19/14 25/17 25/17 27/23
28/2 31/16 35/4 36/14 39/10
39/17 40/2 42/8 43/8 44/17
44/20 46/16 46/25 47/10 48/4
50/20 52/2 53/10 58/8 58/10
58/11 58/12 58/13 58/16 58/16
58/20 59/12 59/13 60/10 60/14
60/21 61/2 61/3 61/22 62/20

**C**

**can... [87]**   63/15 64/4 64/14
65/5 65/11 65/18 65/25 66/20
67/8 68/13 69/7 70/16 78/2
79/15 81/2 85/6 87/19 87/23
88/12 105/8 105/20 106/24
118/5 120/4 121/18 123/3
125/3 125/8 129/2 130/10
132/11 141/9 141/10 142/20
143/24 144/23 146/8 147/15
148/13 148/17 148/23 154/12
160/18 162/24 167/12 169/11
171/10 171/11 175/10 175/23
178/7 180/3 180/13 183/3
183/8 183/23 193/12 194/5
198/17 198/21 199/6 202/20
203/3 203/4 203/5 203/21
204/5 205/22 205/23 205/24
208/17 210/3 212/3 218/8
219/6 219/14 221/11 221/24
222/1 224/13 224/15 226/3
226/15 229/23 229/25 229/25
232/11

**can better [1]**   199/6
**can't [65]**   12/21 14/3 19/24
19/25 20/7 23/3 24/8 25/11
26/4 26/16 28/9 28/10 28/16
29/9 29/19 34/2 34/23 35/1
39/13 39/14 45/1 46/4 54/17
71/18 71/21 72/5 75/5 80/18
80/20 81/17 81/25 82/12 82/19
85/19 88/2 90/17 94/2 99/17
100/24 113/24 116/8 116/10
116/14 124/12 125/5 125/12
126/19 161/1 173/5 175/17
175/21 179/4 183/8 187/12
194/7 200/3 206/17 216/3
219/18 223/15 224/10 228/14
228/14 228/19 229/15
**canceled [4]**   46/4 123/25
192/23 196/24
**Candice [32]**   4/25 31/13 31/18
123/6 129/19 130/7 130/19
131/10 131/12 159/23 160/1
165/16 165/17 166/3 171/16
177/16 177/16 184/16 184/18
184/20 184/25 185/5 185/11
187/8 187/11 193/24 196/5
196/11 202/11 209/12 219/23
219/24
**candid [1]**   227/6
**cannot [11]**   28/8 38/16 43/23
91/21 91/24 94/3 193/13 194/7
201/22 227/14 229/24
**captioned [1]**   7/20
**car [3]**   185/25 186/3 186/4
**card [1]**   41/8
**care [6]**   125/14 174/20 180/9
180/12 204/13 204/22
**Carry [1]**   148/25
**carrying [1]**   35/19
**case [53]**   1/2 4/5 4/24 5/2
5/13 11/9 13/12 18/12 21/7
24/2 26/16 27/6 29/10 30/6
30/6 33/2 33/9 33/10 33/17
34/22 35/14 35/16 36/12 37/13
37/20 42/15 42/25 43/15 44/14
50/8 50/8 52/15 59/9 59/21
73/16 76/8 76/12 76/12 81/20
98/23 100/2 119/14 120/9
120/22 122/5 166/14 176/3
191/23 192/5 206/23 210/12

220/3 229/3
**cents [2]**   46/6 46/7
**cashed [4]**   31/8 146/4 146/7
146/7
**casino [10]**   28/12 41/11 41/11
41/12 41/15 84/14 84/16 84/18
84/23 85/1
**casinos [2]**   28/13 41/18
**castigates [1]**   27/8
**casual [1]**   199/4
**catastrophic [1]**   74/5
**catch [2]**   167/12 167/17
**cause [1]**   221/15
**CC [1]**   71/19
**CCA [305]**
**CCA's [17]**   107/18 107/25
108/12 110/10 112/2 112/19
113/10 136/9 136/9 149/11
202/13 206/23 206/25 216/6
222/12 222/13 223/22
**cell [2]**   175/15 175/16
**center [2]**   84/16 84/17
**Central [1]**   27/24
**CEO [1]**   4/23
**certain [27]**   12/1 35/1 37/8
42/4 58/4 71/22 72/7 77/7
77/9 82/14 83/12 83/24 85/19
88/2 88/4 88/6 88/7 88/18
88/20 98/15 133/20 150/18
150/19 150/24 155/4 155/13
228/24
**certainly [13]**   37/12 37/15
38/22 39/14 44/20 101/23
142/10 149/14 150/15 183/25
203/1 221/1 231/22
**Certificate [1]**   2/2
**Certified [2]**   234/5 234/18
**certify [2]**   234/7 234/12
**cetera [3]**   31/17 154/16
154/16
**chain [8]**   123/3 154/15 154/15
154/17 154/19 154/25 172/3
187/11
**chair [18]**   3/3 3/4 3/13 43/1
67/19 68/1 68/3 68/6 97/20
100/13 160/17 160/19 186/7
203/7 203/9 203/25 212/11
231/9
**chairs [222]**   2/22 8/25 12/21
12/21 13/15 13/20 13/23 14/5
14/5 14/7 19/1 19/4 19/7
19/10 19/11 19/22 22/10 23/9
23/12 23/14 23/15 23/16 23/18
23/21 24/4 24/5 24/7 24/7
24/9 24/11 24/16 24/18 24/18
24/21 24/25 25/1 25/2 25/3
25/4 25/5 25/7 25/9 25/10
25/14 25/15 25/16 25/17 25/20
25/21 26/1 26/5 28/23 29/4
29/8 29/12 29/13 33/5 33/13
33/17 34/2 34/23 34/24 34/24
35/1 35/20 36/19 36/23 37/17
38/14 38/20 39/15 39/16 39/20
40/11 40/18 40/22 41/1 41/13
41/17 41/21 42/1 44/5 44/6
48/15 48/16 48/17 48/18 62/17
64/17 65/9 67/10 67/23 68/21
68/22 69/1 69/2 83/10 85/12
85/17 85/25 97/20 101/13
101/16 113/6 118/19 118/20
124/18 124/20 124/22 125/6
125/19 126/2 133/25 134/22
134/24 135/5 136/8 136/16

136/19 138/17 139/1 139/9
150/21 155/17 155/22 156/18
158/19 158/22 159/12 160/11
160/12 160/14 164/25 165/11
165/18 166/11 166/19 168/25
169/4 176/6 176/11 177/3
177/10 177/17 177/21 182/18
184/15 184/25 187/14 191/17
199/20 199/24 200/1 202/12
202/18 202/24 203/2 203/2
203/14 203/17 206/7 208/16
208/21 209/20 210/7 210/13
210/14 210/24 211/21 212/23
212/24 212/24 215/16 215/22
215/25 215/25 216/8 216/23
219/3 220/14 220/14 220/15
220/18 220/19 221/5 221/6
221/9 222/1 222/3 222/12
224/17 224/18 225/25 226/8
227/1 227/3 227/14 228/3
228/4 228/8 228/9 228/24
229/21 229/22 230/2 230/2
230/6 230/12 230/14 231/7
231/10 231/12 231/14 231/17
231/20 232/3 232/8 232/13
**chaise [19]**   33/17 39/16 41/13
48/18 118/18 118/25 125/15
215/16 215/21 215/24 216/9
216/25 217/22 217/23 222/12
228/15 228/16 228/18 228/19
**chance [2]**   9/11 158/24
**change [5]**   69/24 209/10
214/19 214/22 219/5
**changed [3]**   184/12 210/5
210/20
**changes [3]**   25/19 160/20
190/15
**changing [1]**   92/21
**charge [2]**   167/1 168/7
**chase [2]**   57/19 196/19
**chasing [2]**   159/15 159/15
**chat [2]**   8/12 35/4
**cheaper [1]**   217/5
**check [65]**   3/9 20/10 20/14
20/18 20/21 20/24 21/2 21/4
21/14 21/15 21/17 22/2 22/6
22/7 30/1 30/3 31/3 31/4
31/10 31/17 32/13 32/14 34/15
34/17 46/3 46/4 88/23 118/8
123/14 123/20 123/25 124/4
133/8 134/9 134/12 140/12
140/14 140/22 141/14 142/8
142/11 143/10 143/11 144/9
144/11 144/12 144/17 144/24
144/25 145/5 145/16 145/21
146/3 146/8 146/10 156/8
158/6 165/20 184/12 196/8
196/16 196/18 196/20 196/24
223/5
**checking [1]**   219/8
**checks [1]**   144/7
**Chief [3]**   4/6 119/15 192/6
**China [16]**   39/22 71/20 71/22
86/7 86/16 108/16 109/11
109/14 109/17 110/4 112/3
112/6 112/11 135/1 158/23
159/14
**chinaconstructionus [2]**   188/2
188/22
**Chinese [5]**   27/9 27/10 127/16
127/20 131/18
**choose [2]**   160/18 161/1

**C**

**chose [1]** 6/14
**chosen [1]** 6/23
**Christie [1]** 112/23
**chronology [2]** 24/14 26/3
**Circuit [4]** 38/15 61/6 224/8
233/9
**circulated [1]** 223/6
**circumstance [1]** 14/1
**circumstances [16]** 8/24 28/7
33/7 33/14 36/11 36/17 38/4
38/12 39/2 43/22 97/3 221/25
223/8 223/13 227/22 231/6
**cited [2]** 36/11 43/6
**civil [5]** 4/6 119/15 192/6
229/7 229/10
**claim [7]** 8/23 23/17 25/20
29/10 140/9 140/11 225/3
**claimed [4]** 107/18 107/20
107/20 107/23
**claiming [2]** 107/20 140/10
**claims [7]** 104/16 107/15
107/17 107/18 140/7 215/16
216/8
**clarification [3]** 100/4 213/18
213/23
**clarify [6]** 17/13 84/10 89/3
106/6 203/4 217/19
**clarity [6]** 89/12 111/21
114/8 117/23 171/12 225/20
**clause [6]** 43/11 75/2 91/9
94/3 94/5 225/12
**clear [26]** 5/4 11/3 12/20
12/23 13/22 13/22 37/4 38/15
40/20 43/7 54/2 92/25 129/16
139/13 139/14 139/15 167/3
191/24 197/11 209/2 212/15
220/23 221/12 223/13 227/3
227/4
**cleared [2]** 146/8 208/7
**clearly [10]** 6/23 19/13 26/10
30/11 32/6 39/8 43/8 43/18
136/22 221/14
**clerk [3]** 142/13 143/12 173/7
**client [25]** 5/24 8/13 8/17
8/18 10/16 18/17 20/22 20/23
30/14 31/12 32/25 33/4 33/10
35/20 39/6 40/4 43/14 43/18
44/7 44/9 122/9 186/18 190/10
198/22 200/23
**client's [3]** 36/18 37/5 37/15
**close [2]** 69/1 196/22
**close-up [1]** 69/1
**closed [3]** 66/25 182/1 196/20
**closely [3]** 10/22 27/5 221/23
**closing [3]** 2/4 2/5 208/23
**CLR [1]** 234/17
**clubhouse [1]** 84/18
**CNY [2]** 131/13 131/18
**coat [1]** 203/16
**Code [1]** 138/5
**collaboration [1]** 59/15
**collecting [1]** 132/18
**color [7]** 25/18 25/22 100/18
100/19 160/10 202/24 203/9
**colors [7]** 25/17 160/14
160/17 160/19 160/23 203/16
217/4
**column [1]** 125/19
**combination [2]** 27/12 28/18
**come [26]** 6/10 6/17 12/13
14/12 17/25 18/2 25/17 25/18
37/19 46/23 54/3 60/1 115/10
160/23 162/22 170/24 171/1
184/9 186/5 196/18 216/16
218/21
**comes [6]** 32/7 58/19 160/17
185/12 195/21 219/5
**comfortable [2]** 116/12 116/12
**coming [15]** 6/18 56/24 59/18
101/1 114/18 114/19 124/11
124/12 124/12 132/2 134/25
143/10 159/14 162/12 228/7
**comment [1]** 124/6
**commentary [2]** 105/7 105/9
**comments [1]** 104/10
**commercial [2]** 210/1 210/2
**commercially [2]** 112/13 112/17
**commit [1]** 177/13
**commitments [1]** 28/9
**commits [1]** 232/6
**committee [12]** 110/14 110/22
110/23 111/2 111/5 111/7
111/11 111/15 111/16 111/17
111/18 111/22
**committing [2]** 232/9 232/12
**communicate [1]** 134/14
**communicated [3]** 135/10 215/6
218/1
**communicating [1]** 211/11
**communication [3]** 127/24
151/12 152/7
**companies [8]** 42/11 78/22
111/4 140/10 162/22 163/4
180/8 223/23
**company [61]** 1/4 12/16 12/16
21/10 21/11 22/3 22/5 27/10
28/9 40/1 62/17 71/12 71/17
71/23 71/24 71/25 72/1 72/3
72/6 78/1 78/7 101/25 102/4
102/12 102/25 103/3 106/9
106/11 109/4 109/5 111/4
115/3 134/13 139/3 139/4
154/11 154/13 158/13 162/17
162/19 162/25 163/3 163/7
163/10 163/19 178/4 178/14
178/25 182/2 182/12 187/6
189/9 195/22 196/10 206/15
207/16 207/18 221/18 227/24
229/18 229/18
**compel [3]** 14/2 14/3 14/4
**compelled [3]** 13/21 13/24
34/3
**compelling [1]** 13/14
**compensate [3]** 12/14 221/21
227/19
**competent [1]** 38/23
**competitor [1]** 39/18
**complaint [9]** 5/25 13/16
13/17 13/19 33/11 49/17 49/17
54/8 226/24
**complete [32]** 5/4 20/9 30/9
76/15 83/9 88/19 88/20 90/4
92/9 93/11 97/16 97/18 97/21
118/21 119/2 120/25 136/10
157/9 161/21 162/5 164/21
181/5 193/9 193/12 193/14
199/22 207/2 209/6 212/11
227/14 227/24 234/10
**completed [14]** 28/17 93/4 93/5
93/6 93/13 93/17 93/21 96/16
96/19 97/19 181/9 192/23
206/24 207/1
**completely [4]** 6/24 137/13
158/12 181/13
**completing [5]** 88/9 92/5 109/8
199/19 210/14
**completion [17]** 64/18 88/1
88/5 88/22 92/15 92/15 95/16
98/7 98/10 102/23 103/2 118/7
118/14 118/17 136/11 137/22
189/2
**compliance [3]** 6/6 10/7 228/23
**complicated [3]** 21/7 71/18
204/9
**complies [2]** 108/10 130/17
**comply [1]** 220/25
**composite [6]** 144/7 144/13
171/14 171/20 172/2 172/6
**Composites [1]** 3/9
**computer [1]** 121/23
**concern [1]** 229/1
**concerns [2]** 189/7 198/11
**conclude [1]** 90/8
**concluded [1]** 233/17
**conclusion [3]** 26/20 61/10
135/8
**conclusions [1]** 13/18
**condition [1]** 92/14
**conditions [3]** 75/4 91/16
91/20
**confer [1]** 48/5
**conference [4]** 5/2 9/20 36/20
36/25
**confidential [3]** 112/20 117/2
117/3
**confirm [2]** 150/3 152/23
**confirmation [4]** 2/18 31/16
63/16 150/21
**confirmed [1]** 220/12
**confirming [3]** 64/6 64/17
135/6
**conflicting [1]** 223/14
**conflicts [2]** 9/21 18/5
**confuse [1]** 98/17
**confused [4]** 53/25 96/22
138/25 162/15
**confusing [1]** 58/4
**connection [10]** 71/1 71/2
73/15 75/6 76/8 81/8 82/1
110/24 111/7 114/7 174/15
**CONQUEST [9]** 1/7 3/12 4/6
4/13 4/23 80/1 119/15 173/13
192/6
**consequence [3]** 29/13 221/4
221/14
**consequences [2]** 74/4 224/20
**conserve [1]** 10/5
**consider [9]** 5/5 6/21 8/10
22/15 47/20 58/10 59/3 59/18
232/22
**consideration [9]** 23/20 24/3
24/6 32/23 32/25 33/6 161/10
161/17 219/22
**considered [2]** 59/23 228/22
**considering [3]** 163/22 232/10
232/23
**consistent [1]** 24/20
**constitute [7]** 8/4 8/4 27/15
28/4 28/5 28/21 228/2
**constitutes [1]** 227/15
**constraint [1]** 158/21
**construction [14]** 27/13 28/9
71/19 71/20 71/20 71/22 78/7
78/22 106/15 106/20 118/14
118/17 161/2 161/24

**C**

consultant [1]   78/23
contact [1]   189/7
contain [1]   57/6
contained [4]   14/23 48/1
 96/18 105/3
contains [1]   11/6 234/12
content [2]   16/22 77/1
contents [2]   8/3 104/21
context [6]   11/19 11/25 12/22
 47/15 47/22 149/10
contingent [2]   23/9 210/14
continuance [4]   9/2 9/4 10/11
 10/15
continue [10]   8/2 9/21 9/22
 144/23 147/13 147/15 180/24
 200/10 220/10 227/13
continued [2]   168/23 199/16
continuing [1]   151/2
contract [78]   13/7 23/17
 24/12 36/17 37/21 43/11 44/2
 61/25 64/6 69/18 74/23 74/24
 77/10 78/21 82/8 82/9 82/11
 82/15 82/16 82/20 90/6 91/9
 91/10 91/18 92/6 92/8 92/11
 92/14 92/18 92/19 92/20 93/2
 93/4 93/6 93/11 93/23 95/7
 95/10 96/6 96/17 96/24 97/1
 97/2 97/5 97/16 109/8 113/2
 113/3 113/4 113/14 116/14
 134/21 137/5 137/10 149/7
 161/23 162/6 168/12 220/20
 220/21 221/7 221/13 222/2
 222/14 222/19 222/25 222/25
 223/9 223/13 225/11 225/23
 226/23 226/23 227/2 227/4
 227/14 228/9 229/6
contractor [7]   21/13 78/8 78/9
 78/10 78/13 116/7 164/13
contractor's [1]   110/13
contractors [4]   78/17 113/21
 113/23 164/7
contracts [8]   18/19 18/24
 46/12 161/25 164/8 164/13
 167/4 221/17
contractual [8]   28/3 39/4
 69/23 69/23 69/24 97/17
 118/20 152/16
contractually [4]   93/15 93/19
 95/3 98/14
contractural [1]   39/3
contrary [2]   25/24 112/22
control [1]   13/12
convention [2]   84/16 84/17
conversation [8]   19/6 35/13
 81/23 127/4 174/25 195/20
 208/3 222/22
conversations [1]   76/4
conversion [2]   229/7 229/8
conveyed [1]   207/24
convinced [1]   12/6
cooperation [1]   176/17
copied [1]   40/21
copies [6]   59/2 134/9 142/8
 143/20 233/11 233/13
copy [27]   2/22 15/9 15/20
 15/21 16/1 16/5 16/11 27/3
 30/14 30/25 32/11 41/1 43/10
 46/4 123/25 128/6 129/8
 132/10 133/8 134/11 143/21
 145/11 196/23 198/22 199/8
 202/11 225/10

copy's [1]   138/10
Copy[5] [1]   138/9
 192/7 197/8
corporate [1]   230/18
corporation [1]   1/8
CORPORATION,d [1]   1/8
CORPORATION,d/b/a [1]   1/8
correct [185]   8/21 36/5 40/15
 44/8 44/23 48/17 49/19 51/22
 52/5 52/7 63/2 64/23 66/13
 67/3 67/13 69/3 69/14 71/9
 72/7 72/8 72/18 73/13 73/14
 73/17 73/18 73/19 75/25 76/1
 84/12 84/15 85/21 87/13 89/6
 89/7 89/10 89/11 89/16 89/24
 94/8 94/9 94/13 94/14 94/16
 94/17 94/19 94/20 95/15 98/13
 98/21 98/22 99/4 100/11
 100/12 100/13 100/14 101/6
 101/7 102/3 102/14 102/17
 104/1 104/2 104/18 104/22
 106/13 113/9 114/4 114/25
 116/6 118/15 122/15 123/9
 123/10 123/23 123/24 125/1
 128/15 129/24 129/25 130/6
 130/10 130/11 130/13 130/14
 130/22 131/3 131/15 131/19
 132/21 132/22 134/4 138/7
 138/13 139/12 141/16 142/16
 145/23 146/6 147/7 147/8
 150/6 150/7 151/3 151/4 151/6
 151/7 151/13 151/14 151/16
 153/10 153/10 153/21 153/25
 154/4 154/25 155/17 155/18
 156/19 157/13 158/20 160/21
 163/12 163/15 163/17 163/23
 163/24 164/11 165/14 166/5
 166/15 167/7 168/13 168/14
 169/1 169/2 170/15 170/22
 170/23 173/1 175/3 175/4
 177/22 179/9 180/16 181/15
 182/16 182/22 185/2 185/4
 185/24 187/9 189/11 189/23
 190/25 191/19 194/19 195/1
 195/7 198/1 204/19 205/4
 205/7 206/6 209/21 212/16
 212/25 213/3 213/25 214/20
 215/8 215/9 215/11 216/21
 217/6 217/10 217/25 218/5
 218/7 219/4 234/10
correctly [9]   56/22 69/18
 83/18 110/25 111/12 118/16
 118/19 118/23 217/9
correspondence [2]   196/5 196/7
Cost [1]   138/5
costs [3]   138/5 182/23 217/3
could [68]   7/16 7/17 7/21
 23/16 25/21 27/7 27/19 28/5
 38/23 39/18 42/13 43/14 45/23
 46/11 46/19 47/22 47/23 55/22
 56/7 56/9 58/4 66/3 74/15
 74/17 74/21 81/20 82/14 84/4
 91/8 91/12 91/12 91/15 91/19
 91/22 95/22 96/5 96/15 97/8
 97/9 100/19 125/7 127/1 132/3
 140/9 141/2 141/5 149/3 155/7
 157/9 158/24 158/25 159/3
 159/5 159/16 167/15 168/22
 174/8 174/9 174/18 178/13
 182/20 202/6 202/25 209/7
 211/13 216/17 221/20 225/17
couldn't [3]   36/20 182/20

223/5
223/20
24/20 29/24 35/2 35/13 48/5
77/17 86/23 86/24 86/25 86/25
87/6 122/5 128/3 142/7 174/7
192/1 199/7
count [2]   229/8 229/10
counting [1]   133/15
countless [1]   131/7
couple [5]   18/14 191/5 209/12
 209/12 228/7
course [9]   14/14 37/2 40/21
 43/24 47/5 84/16 84/18 131/6
 149/7
course/clubhouse [1]   84/18
court [88]   1/1 1/21 1/21 4/1
 4/25 6/20 9/14 10/1 10/5 10/9
 10/11 14/15 14/15 14/19 15/5
 15/21 16/9 16/14 18/18 24/17
 25/11 25/12 26/25 27/12 28/16
 30/16 31/6 32/7 32/24 33/1
 35/15 35/17 36/13 37/10 37/22
 38/17 39/5 40/7 42/18 43/23
 44/17 44/20 44/25 45/14 45/17
 48/8 56/23 57/12 58/25 64/5
 64/14 65/25 67/9 68/14 75/10
 75/13 75/18 75/21 76/12 91/8
 91/13 91/15 91/19 91/22
 103/22 105/8 105/24 142/9
 169/12 174/7 176/1 188/18
 222/1 222/9 225/13 225/15
 225/16 226/12 226/13 226/18
 227/6 228/8 231/15 232/10
 232/10 233/8 234/6 234/9
Court's [14]   5/18 5/20 6/6
 6/12 7/25 9/1 10/7 10/8 10/10
 10/17 26/14 43/22 50/10 97/4
courtesy [1]   60/16
courtroom [5]   4/24 16/11 27/8
 31/14 160/5
courts [3]   18/6 42/19 224/11
cover [6]   7/19 7/20 10/4 10/6
 10/14 224/19
coverage [1]   87/12
covering [2]   192/2 230/18
covers [1]   173/25
create [2]   182/3 231/17
creates [1]   189/17
credible [1]   231/14
credit [2]   181/16 181/19
creditor [7]   108/15 108/25
 109/1 109/2 109/3 110/11
 110/18
criminal [3]   9/20 191/23
 232/6
critical [3]   95/18 95/20
 112/21
cross [22]   2/9 2/13 5/9 5/14
 5/15 6/23 11/19 12/3 15/1
 17/17 17/18 25/25 34/4 38/23
 58/13 59/19 69/8 69/11 119/23
 169/25 176/8 199/8
cross-examination [18]   2/9
 2/13 5/9 5/14 5/15 6/23 11/19
 15/1 17/17 34/4 38/23 59/19
 69/8 69/11 119/23 169/25
 176/8 199/8
cross-examine [3]   12/3 25/25
 58/13
crucial [1]   117/7
Cs [1]   14/17
CSEC [2]   71/24 117/8
CSR [1]   234/17

## C

cured [1] 11/1
current [4] 117/25 118/3
 118/6 164/2
currently [11] 13/25 33/16
 33/22 39/7 72/15 83/9 88/14
 113/4 117/7 164/3 215/21
customer [9] 185/22 185/24
 186/17 186/20 189/18 190/16
 200/25 202/3 202/13
customers [7] 28/5 185/10
 185/12 185/15 202/15 216/4
 230/21
cut [2] 57/19 87/1
cv [1] 1/2

## D

D-W-O-R-N-I-K [1] 60/9
daily [1] 73/5
damage [2] 104/17 221/16
damages [44] 12/8 26/18 43/11
 74/8 74/12 74/15 74/18 74/25
 75/2 77/11 91/9 92/2 92/4
 93/7 93/22 93/24 93/25 94/5
 94/15 94/18 94/25 95/4 95/14
 95/16 95/23 96/6 96/15 96/20
 97/3 97/8 97/13 97/16 113/5
 194/10 194/12 211/5 221/20
 221/22 224/12 224/24 224/25
 225/7 225/12 229/7
damaging [1] 28/4
danger [1] 12/18
dash [1] 117/8
data [4] 90/10 90/10 90/11
 90/14
date [48] 44/11 62/20 64/18
 66/6 74/4 82/12 82/19 84/4
 88/11 90/5 97/17 112/21 118/7
 118/9 127/19 133/21 134/18
 135/3 135/13 136/11 137/19
 137/21 140/17 147/22 147/23
 147/25 150/3 153/9 158/25
 165/13 165/15 165/21 176/22
 176/25 177/5 177/6 177/8
 177/8 184/12 184/18 189/2
 189/4 189/25 190/15 190/23
 191/6 191/10 223/3
dated [12] 2/17 31/4 31/7
 31/11 31/13 64/7 66/22 121/13
 122/8 146/11 148/8 172/8
dates [4] 134/23 185/16
 186/13 189/17
DAVIS [45] 1/15 2/9 2/10 2/13
 4/10 4/17 6/25 10/2 15/17
 16/16 17/8 17/20 18/7 23/2
 32/6 33/13 33/19 34/3 45/22
 48/11 48/24 57/20 58/7 58/15
 60/10 61/2 67/21 119/20
 142/18 156/2 169/9 169/18
 169/22 169/25 173/16 175/12
 184/3 191/20 192/11 213/12
 219/12 220/6 220/9 226/20
 232/24
Davis' [1] 38/4
day [30] 12/12 24/16 33/9
 36/7 37/11 37/14 37/19 38/7
 40/17 41/16 44/19 45/6 58/18
 74/7 74/8 74/15 74/18 87/17
 87/18 130/21 177/4 177/9
 190/1 191/12 223/19 224/8
 224/12 226/12 234/9 234/15
days [10] 9/25 38/7 44/9 74/8

## D

dead [3] 133/20 134/18 137/21
deadline [10] 117/8 117/13
 117/21 117/25 118/4 118/6
 118/14 118/16 118/24 133/11
deadlines [7] 28/10 82/1 83/5
 114/4 114/12 115/13 124/14
deal [25] 36/10 37/24 59/14
 70/1 76/21 76/23 76/25 77/4
 79/20 80/16 131/13 154/19
 159/16 159/21 197/4 197/5
 197/14 198/7 198/7 198/20
 199/2 199/4 199/15 200/8
 200/8
dealing [10] 38/17 42/19
 42/20 43/4 80/14 80/23 81/2
 156/21 166/3 199/3
dealings [1] 214/8
dealt [8] 79/10 79/22 79/25
 80/6 80/9 155/2 160/3 193/24
Dear [3] 172/9 184/10 189/1
debt [16] 38/14 38/20 111/12
 130/12 140/8 140/8 178/4
 178/8 178/14 179/15 179/24
 180/1 180/5 180/5 180/7
 180/19
debts [7] 23/10 23/19 111/3
 111/8 210/3 210/6 212/15
December [20] 3/7 44/22 66/7
 66/22 123/18 123/23 124/19
 124/25 126/4 129/18 132/4
 134/5 134/7 134/10 134/23
 156/11 158/3 208/4 217/7
 222/22
December 21st [1] 44/22
December 7 [1] 129/18
decide [2] 37/10 37/12
decided [6] 134/13 176/19
 209/9 209/17 214/2 230/25
deciding [1] 158/16
decision [4] 133/17 179/20
 179/23 179/25
deck [1] 19/1
default [1] 135/7
defeats [2] 224/12 225/8
defendant [25] 1/18 2/3 2/4
 2/5 2/11 2/20 4/13 4/23 7/22
 13/20 55/5 170/4 172/24
 174/20 175/14 192/1 227/11
 227/22 229/5 229/17 229/20
 230/19 230/25 231/1 232/9
DEFENDANT'S [37] 3/5 5/8 104/3
 104/7 122/14 122/21 122/22
 123/1 128/14 128/16 128/20
 128/22 128/25 129/14 129/15
 144/6 144/13 144/14 144/16
 144/20 146/15 146/19 146/21
 147/2 147/20 151/20 170/14
 170/19 171/4 172/23 173/2
 173/3 173/12 173/19 174/1
 192/18 201/18
Defendant's 16 [1] 192/18
Defendants [1] 1/9
defense [6] 103/16 121/12
 192/1 220/4 220/5 230/16
deficit [1] 205/1
defined [1] 5/3
definitely [2] 189/20 207/2
definition [2] 92/20 211/1
definitively [4] 91/13 91/15
 91/20 91/22
degree [1] 58/5

## D

Delaware [1] 27/13
delay [4] 43/7 43/8 43/10
 43/12 225/19 225/20 228/7
 228/8
delays [1] 127/20
deliver [13] 25/13 33/4 35/20
 36/19 38/20 39/6 89/21 126/6
 191/17 220/15 222/11 226/8
 228/24
delivered [18] 19/8 25/13
 26/11 38/14 65/10 67/11 67/24
 90/2 90/3 124/20 136/8 153/4
 168/25 189/13 216/10 216/18
 228/10 230/13
deliveries [1] 66/5
delivering [5] 150/8 150/11
 150/23 169/3 220/14
delivery [22] 13/14 13/25
 62/17 70/1 70/3 81/11 81/24
 83/16 91/25 92/3 97/7 137/19
 149/16 149/21 149/25 150/3
 150/9 157/21 158/25 162/1
 165/18 223/3
demand [6] 2/17 38/5 46/19
 62/19 152/22 172/1
demands [3] 106/24 106/25
 152/24
demonstrated [3] 227/8 227/11
 227/12
denied [1] 226/14
Dennis [1] 31/14
deny [1] 226/19
denying [1] 39/8
department [17] 63/16 70/5
 70/8 70/12 79/8 79/12 86/21
 86/22 87/8 89/9 176/16 186/2
 186/17 186/21 186/24 186/25
 193/17
depending [2] 186/6 189/17
depends [1] 204/21
deposit [15] 3/9 19/16 20/2
 20/3 133/2 138/2 138/6 138/14
 144/8 144/19 145/4 145/9
 145/25 158/4 179/17
deposited [2] 140/21 145/22
deposits [9] 19/16 157/4
 158/7 158/11 159/11 181/17
 181/19 181/25 182/5
deputy [1] 16/11
describe [7] 61/22 63/15 64/4
 65/5 65/25 66/20 68/13
described [4] 23/24 55/13
 56/21 72/3
describing [1] 55/4
Description [1] 138/5
design [2] 41/2 203/9
designed [1] 30/19
desire [1] 5/15
desk [1] 90/23
desks [1] 19/5
despite [3] 110/13 112/22
 133/7
detail [7] 3/9 18/13 144/9
 144/19 145/4 145/9 232/19
detailed [4] 14/24 15/14 94/1
 94/24
details [2] 2/24 66/2
determination [1] 193/21
determine [6] 30/10 35/17
 95/12 97/23 98/12 232/14
determined [2] 110/24 111/11
determining [4] 33/2 110/14
 187/14 232/10

**D**

**devastating [1]**  228/1
**developer [1]**  27/10
**development [3]**  39/4 164/2
164/6
**Dft [2]**  2/22 3/4
**did [183]**  7/13 7/15 10/1 10/9
19/20 20/25 21/9 21/22 23/5
24/2 26/1 26/5 26/6 28/3
29/11 36/3 37/2 46/7 46/18
47/6 55/17 55/18 55/24 75/7
75/11 75/11 77/14 77/25 81/6
81/9 82/11 86/10 86/14 86/16
86/18 86/21 90/18 90/20 98/6
111/19 113/1 114/16 115/5
117/16 121/9 123/17 123/19
124/3 126/7 127/20 131/24
132/1 132/2 132/6 132/9
132/12 132/25 133/5 133/9
133/19 133/23 134/15 134/16
134/17 135/4 138/15 139/17
139/21 139/25 140/3 140/4
140/5 140/16 148/16 148/20
148/22 151/8 151/11 153/7
153/11 153/15 153/17 153/18
153/19 154/19 156/16 156/24
157/1 157/2 158/19 158/19
159/4 159/5 159/14 160/7
160/10 160/10 160/12 163/25
165/17 165/22 165/24 165/25
166/21 166/23 167/8 167/10
168/24 177/11 177/17 177/23
178/3 179/12 180/18 180/23
181/5 181/19 181/24 182/17
182/23 188/13 189/24 190/5
190/7 190/17 190/18 190/19
191/18 193/1 193/1 193/2
193/25 194/3 194/3 194/9
194/13 195/15 195/25 196/7
196/12 196/15 196/17 197/15
198/6 198/15 200/10 200/20
200/24 201/2 201/5 201/7
201/21 202/4 202/9 202/18
203/7 203/8 203/14 203/24
207/7 207/13 207/14 207/20
207/20 208/15 208/19 209/18
210/11 210/17 211/5 211/7
211/13 213/6 213/7 217/15
217/18 219/23 220/3 220/16
221/5 222/18 228/11 230/2
**didn't [90]**  8/23 9/19 10/25
11/21 22/8 23/24 26/1 29/5
29/10 30/7 32/4 32/7 32/9
34/14 34/15 37/24 46/8 46/23
47/6 51/15 56/9 56/23 58/5
73/25 75/6 96/2 100/20 103/24
111/15 117/16 118/2 132/7
132/23 133/7 133/23 133/23
134/1 134/3 134/4 134/6
134/14 135/10 138/14 140/6
141/20 153/6 169/4 174/11
174/12 174/24 177/19 178/5
178/5 179/6 182/12 182/20
195/10 195/12 195/13 195/13
197/9 197/12 198/9 199/25
202/10 203/1 205/15 207/18
209/19 210/5 210/6 210/21
210/24 211/4 211/8 211/10
211/14 211/16 220/15 220/17
222/21 223/4 223/20 224/6
225/4 225/4 225/10 225/18
227/3 230/4

**difference [2]**  83/22 223/11
**different [36]**  25/23 25/24
**different [19]**  25/17 39/12
39/17 79/5 102/9 102/11 124/7
124/8 158/13 162/19 163/1
163/18 170/17 178/14 202/21
202/23 216/4 218/10 223/22
**differently [2]**  73/8 198/17
**difficult [7]**  10/25 30/22
34/25 50/21 209/22 227/7
231/6
**dig [1]**  188/17
**direct [16]**  2/9 16/17 17/4
17/9 17/12 29/25 32/5 32/20
37/23 57/15 57/21 57/22 58/1
61/12 64/3 148/7
**directed [6]**  5/21 5/23 5/25
104/24 108/18 110/1
**directing [3]**  32/24 33/4
35/20
**direction [1]**  233/9
**directly [4]**  40/2 70/20 70/22
191/4
**disagreement [2]**  35/10 36/22
**discount [1]**  182/4
**discovery [1]**  229/14
**discrete [1]**  61/11
**discriminated [1]**  110/12
**discuss [14]**  73/25 81/7 81/10
86/10 86/14 86/16 86/18 86/21
91/3 98/6 132/11 134/2 134/3
134/4
**discussed [13]**  52/21 52/23
53/2 53/3 53/4 73/20 89/5
89/8 92/6 98/9 134/5 138/2
222/23
**discusses [3]**  92/2 112/11
112/15
**discussing [3]**  60/24 200/3
208/18
**discussion [2]**  81/12 127/5
**discussions [2]**  81/19 133/16
**disposed [1]**  195/3
**dispute [3]**  226/23 228/9
229/22
**dissipating [1]**  230/4
**distracting [3]**  22/23 23/3
23/5
**DISTRICT [6]**  1/1 1/1 1/21
234/3 234/6 234/7
**division [2]**  1/2 79/5
**do [308]**
**Docket [3]**  50/24 50/25 53/18
**document [28]**  20/8 62/2 62/13
62/15 62/23 63/3 63/20 65/18
66/1 75/8 75/10 76/9 76/12
101/5 112/1 112/4 112/4 112/8
112/11 112/15 122/3 122/12
123/5 123/6 123/9 129/20
156/11 226/24
**documentation [14]**  6/1 6/4 6/9
13/5 21/20 22/13 30/2 30/3
91/4 132/23 195/18 197/2
200/5 212/21
**documented [1]**  11/17
**documents [19]**  19/15 19/23
20/5 24/19 53/24 55/2 57/8
57/18 63/1 63/15 77/7 77/9
132/19 132/21 137/9 143/20
143/21 156/16 166/14
**does [59]**  11/4 17/17 17/18
26/6 32/16 32/20 32/24 34/2
34/16 35/21 35/22 35/25 38/12

42/17 44/4 60/18 62/4 69/21
101/9 101/11 101/12 101/15
108/24 118/25 126/17 126/21
127/14 127/15 137/20 137/23
150/8 150/11 150/23 152/11
152/13 152/14 152/20 152/22
154/23 162/21 184/22 191/12
193/19 197/4 199/3 199/20
201/24 202/22 205/8 213/4
214/6 218/12 220/18 227/24
**doesn't [38]**  12/7 25/23 25/23
26/8 28/24 29/5 29/9 30/2
30/7 32/19 34/23 35/24 36/23
42/24 43/3 43/4 43/20 46/6
60/19 92/17 101/8 101/11
126/20 126/20 127/12 150/11
152/13 152/20 176/3 184/20
185/16 201/25 207/16 223/2
224/6 225/11 225/22 229/20
**doing [12]**  23/5 29/23 153/10
153/12 153/13 162/10 163/14
164/1 170/6 177/15 199/18
209/3
**dollar [5]**  12/16 12/16 228/25
229/17 229/18
**dollars [17]**  12/13 12/19
26/17 34/21 34/22 43/15
126/15 140/23 142/11 146/1
156/18 163/5 164/6 181/21
181/22 185/21 227/20
**don't [253]**
**don't get [1]**  134/18
**done [16]**  7/23 7/23 15/6
15/18 22/1 27/24 76/23 79/1
101/24 102/3 142/10 145/12
163/22 199/25 215/3 227/8
**double [1]**  174/16
**down [18]**  12/11 40/10 45/5
46/4 108/11 121/21 123/25
134/23 138/5 148/23 154/15
171/24 188/4 193/8 219/14
220/2 225/2 228/12
**drafted [1]**  77/16
**drawing [2]**  69/23 69/23
**Drive [1]**  1/19
**drop [4]**  133/20 134/18 134/23
137/21
**drop-dead [3]**  133/20 134/18
137/21
**drop-down [1]**  134/23
**due [35]**  132/24 176/17 176/19
178/19 178/22 178/23 178/24
179/5 179/7 179/8 179/16
179/17 179/21 180/10 180/21
181/10 181/13 198/13 200/9
204/12 204/13 204/22 205/12
205/13 205/16 208/6 208/8
211/4 211/9 213/2 213/6
213/25 214/4 214/6 214/12
**duplicate [2]**  51/15 59/13
**duplicates [3]**  49/14 52/5
52/12
**during [8]**  5/1 43/23 76/22
131/6 142/15 149/6 159/1
215/6
**duty [1]**  9/20
**DWORNIK [46]**  2/8 2/17 2/23
4/19 7/22 19/13 21/16 26/4
30/6 38/9 38/12 38/22 49/9
49/11 50/19 58/8 58/21 59/5
59/25 60/1 60/4 60/8 60/9
69/7 69/13 97/6 99/23 100/10

**D**

**DWORNIK... [18]** 119/23 120/3
120/7 122/25 145/8 148/7
172/14 184/8 187/8 187/12
192/18 217/7 217/24 222/24
223/18 224/16 225/10 226/9
**Dwornik's [5]** 13/3 45/8 52/25
53/1 216/7
**dworniknatalia [2]** 188/2
188/22

**E**

**e-file [1]** 142/12
**each [12]** 45/18 47/22 54/4
86/1 102/11 127/5 163/6 193/6
193/6 193/7 193/7 195/21
**earlier [4]** 112/24 114/3
120/8 162/16
**earliest [1]** 9/21
**early [5]** 44/13 83/16 89/19
186/25 226/7
**ease [1]** 73/7
**easier [2]** 129/9 203/21
**easy [3]** 14/14 143/6 232/14
**economy [1]** 227/10
**effect [4]** 149/2 193/1 196/13
196/17
**effectively [2]** 6/18 85/24
**eight [1]** 25/17
**eighth [1]** 125/11
**either [7]** 6/21 13/22 16/17
17/13 38/21 179/5 192/23
**elaborate [1]** 202/20
**elected [1]** 7/3 213/8 229/11
**electronically [2]** 61/7 233/12
**elects [1]** 169/25
**element [2]** 44/1 162/23
**Eleventh [4]** 38/15 61/6 224/8
233/9
**else [19]** 15/4 19/5 25/8 47/5
48/13 61/1 155/5 156/1 158/15
169/9 175/9 209/13 219/7
219/11 225/5 228/15 230/3
232/24 233/2
**else's [3]** 178/8 179/25 180/1
**elsewhere [3]** 39/17 70/24
133/22
**email [128]** 2/24 3/1 3/6 3/11
3/13 3/14 15/5 15/13 15/14
19/12 20/6 21/17 26/4 30/11
30/25 31/10 31/12 31/18 32/5
38/2 46/5 64/6 64/16 65/7
66/2 66/7 100/22 121/13 122/7
123/3 123/19 123/24 124/12
126/19 129/17 129/17 132/12
132/14 133/10 133/19 135/6
135/11 142/4 142/6 142/12
142/21 143/7 148/7 148/10
148/18 148/22 149/2 149/6
149/24 150/13 150/20 151/8
160/24 165/10 169/1 171/15
171/20 172/3 172/7 172/11
172/14 177/6 177/6 177/8
177/9 179/15 179/18 180/9
184/1 184/6 184/14 184/16
184/20 184/24 184/24 185/2
185/12 187/13 187/24 187/25
188/20 189/8 189/12 189/14
189/15 189/16 189/19 190/1
190/6 190/7 190/8 190/9
190/11 190/18 190/21 191/1
191/6 191/10 196/2 196/4

196/9 200/7 201/17 202/2
202/13 202/17 204/11 204/12
204/21 205/10 205/15 207/8
208/8 209/14 211/3 211/9
212/19 222/20 223/6
**emailed [1]** 159/2
**emails [25]** 3/7 3/8 3/10
19/12 34/11 51/20 123/21
132/14 132/16 133/9 134/7
147/6 147/24 171/15 178/17
178/20 190/10 196/12 196/15
196/17 209/12 209/12 220/1
230/19 232/18
**emerged [1]** 23/6
**eminent [1]** 39/1
**emphasize [2]** 28/15 28/15
**employ [1]** 27/14
**enacted [1]** 233/8
**encourage [1]** 44/25
**end [20]** 36/7 37/11 37/13
37/19 40/17 41/16 44/19 45/6
117/8 127/21 127/23 132/4
160/25 175/10 184/22 217/12
223/19 224/8 224/12 226/12
**end-of-product [1]** 160/25
**ended [1]** 222/8
**ending [1]** 172/3
**endorsement [2]** 230/22 231/4
**ends [3]** 13/13 13/13 44/21
**enforce [1]** 95/2
**engaged [1]** 139/2
**enormously [1]** 154/13
**enough [3]** 21/7 41/22 134/20
**entail [1]** 69/21
**entailed [1]** 76/25
**enter [3]** 29/10 35/17 232/21
**entered [4]** 18/19 19/9 37/6
215/3
**entering [1]** 33/3
**entire [2]** 20/4 95/17
**entirely [2]** 12/6 96/7
**entities [3]** 86/22 108/18
110/1
**entitle [2]** 220/18 220/20
**entitled [7]** 36/19 210/23
210/25 211/1 215/16 216/8
220/18
**entity [5]** 18/20 21/8 71/10
89/10 139/10
**Entry [3]** 50/24 50/25 53/18
**equally [1]** 27/20
**equipment [5]** 18/21 19/15
19/18 46/21 70/11
**equities [1]** 28/22
**error [3]** 141/23 142/1 142/2
**ESQ [2]** 1/15 1/18
**essence [1]** 157/6
**essentially [1]** 182/4
**establish [1]** 224/9
**established [1]** 67/18
**establishes [1]** 232/3
**estimate [4]** 17/23 89/22
193/12 193/13
**estimated [3]** 64/18 189/2
189/4
**estimates [1]** 69/22
**et [3]** 31/17 154/16 154/16
**evaluating [1]** 59/24
**even [31]** 5/24 8/20 9/16 9/25
11/6 12/18 13/10 20/9 33/10
37/24 38/9 39/10 41/14 42/25
44/19 45/6 89/22 95/14 98/15

100/17 124/12 159/1 166/12
210/23 223/23 225/10 226/3
**evenly [1]** 85/18
**event [2]** 14/11 22/12
**ever [44]** 36/3 58/3 72/19
73/20 78/12 78/20 79/22 79/25
80/6 80/9 80/12 80/23 86/2
86/5 86/7 90/14 98/9 101/24
102/18 131/24 132/9 133/19
135/5 138/21 139/25 156/9
164/25 165/3 165/6 166/21
166/23 176/12 179/21 182/17
182/23 201/2 207/7 207/13
207/19 207/20 207/24 211/13
217/15 230/17
**every [18]** 35/19 44/1 57/5
87/17 87/18 87/20 88/12 93/5
93/12 93/16 93/20 94/1 94/22
95/4 140/24 141/1 189/3 196/9
**everybody [10]** 13/12 13/13
22/14 35/7 47/20 48/9 57/4
139/14 203/21 226/15
**everybody's [1]** 45/4
**everything [17]** 12/2 12/2
15/19 33/9 34/9 37/16 47/15
61/1 77/1 102/23 133/12
154/12 181/13 203/15 207/23
209/8 225/9
**evidence [55]** 6/1 8/5 22/16
22/16 22/17 25/24 37/24 47/17
47/19 47/20 59/23 62/7 62/10
63/3 63/6 63/11 63/24 64/1
64/8 64/11 65/2 65/16 65/22
66/16 67/6 68/9 68/11 69/6
104/7 106/23 122/22 128/20
128/25 144/3 144/20 146/18
146/21 169/19 170/12 170/19
174/2 174/6 174/25 175/1
175/5 175/6 175/7 222/21
224/2 226/17 229/15 230/4
230/9 231/19 231/20
**evidentiary [5]** 1/11 6/10 6/17
6/19 47/13
**EX [6]** 2/15 2/23 3/1 3/2 3/3
3/5
**exact [6]** 43/2 106/9 165/19
202/24 203/1 203/9
**exactly [12]** 33/18 80/15
85/16 118/8 125/3 150/16
181/4 181/20 191/4 206/14
209/23 210/20
**examination [37]** 2/9 2/9 2/10
2/10 2/13 2/13 5/9 5/14 5/15
6/23 11/19 15/1 16/18 17/4
17/12 17/17 32/20 34/4 38/23
57/15 57/21 57/23 58/2 59/19
61/12 69/8 69/11 73/7 119/23
156/6 167/20 169/22 169/23
169/25 176/8 199/8 213/16
**examine [3]** 12/3 25/25 58/13
**example [5]** 8/23 16/22 38/11
79/4 97/19 150/17 186/9
**except [2]** 83/10 225/9
**exception [1]** 91/12
**exceptions [1]** 91/13
**exchange [7]** 11/20 11/23 15/4
15/10 23/7 47/8 149/6
**exchanged [3]** 11/20 121/14
122/5
**excuse [9]** 99/2 121/19 126/23
135/18 162/14 182/14 187/3
196/4 201/8

# E

**excused [3]**   167/12 169/11
169/17
**executives [3]**   110/13 110/21
110/23
**exhibit [260]**
**Exhibit 15 [1]**   128/22
**Exhibit 16 [5]**   146/16 146/19
147/3 147/20 173/3
**Exhibit 17 [1]**   173/12
**Exhibit 20 [2]**   122/21 123/1
**Exhibit 21 [1]**   144/13
**exhibits [66]**   5/3 5/6 11/2
11/3 11/13 11/15 11/16 11/18
11/18 11/19 11/22 16/24 49/2
49/12 49/21 49/24 50/6 50/19
51/15 53/9 53/10 54/3 54/6
54/7 54/8 54/10 55/20 56/1
56/7 56/10 56/14 56/17 56/20
57/21 58/9 58/15 58/23 59/1
59/2 59/7 59/12 59/16 59/17
60/12 60/14 60/23 61/7 61/8
61/11 73/9 98/18 99/10 128/8
170/17 170/20 171/8 173/18
173/25 174/1 174/11 174/16
174/20 232/18 233/6 233/10
233/13
**exist [4]**   25/14 171/22 232/4
232/13
**existed [1]**   231/14
**existence [1]**   231/19
**existing [1]**   202/14
**expand [1]**   164/10
**expansion [2]**   164/13 224/2
**expect [2]**   6/7 172/12
**expectation [1]**   167/5
**expedited [4]**   5/24 11/24
154/3 222/3
**experience [9]**   87/19 160/22
161/21 161/23 162/6 197/6
197/8 197/10 198/8
**expert [1]**   38/18
**explain [12]**   14/21 17/13
76/19 141/8 141/10 180/3
198/17 203/21 204/3 204/4
204/5 218/8
**explained [7]**   43/19 48/11
154/9 199/1 199/2 199/21
226/11
**explaining [1]**   59/19
**explanation [2]**   141/6 178/12
**explicitly [3]**   92/8 94/7 94/13
**Export [8]**   108/16 109/11
109/14 109/18 110/5 112/3
112/6 112/12
**Export-Import [7]**   108/16
109/11 109/14 109/18 110/5
112/6 112/12
**expressed [2]**   26/25 218/3
**extend [1]**   60/16
**extension [2]**   10/9 10/13
**extensive [2]**   10/17 10/17
**extent [3]**   52/2 73/9 191/25
**external [1]**   68/5
**extra [3]**   11/11 60/12 98/18
**extraordinary [1]**   26/14
**extremely [1]**   124/16

# F

**fabric [2]**   160/13 160/19
**face [5]**   32/25 201/6 201/6
202/9 202/9

**facilitate [1]**   88/11
**facilities [1]**   89/4
**facility [4]**   203/18 215/11
215/13 215/17
**fact [29]**   26/18 34/12 34/13
34/14 36/9 41/5 57/7 57/9
87/22 89/13 96/23 104/11
116/2 116/12 150/22 151/1
152/15 158/9 161/18 165/6
184/15 194/16 208/19 217/21
221/5 226/10 230/2 231/8
231/9
**factor [3]**   158/16 161/8 221/1
**factors [1]**   220/11
**factory [5]**   184/19 184/23
185/14 185/15 186/6
**facts [4]**   7/17 13/18 14/22
35/8
**factual [2]**   7/16 37/13
**failed [3]**   24/10 162/5 220/21
**failure [7]**   24/3 24/6 32/23
32/25 33/6 38/20 228/23
**faint [3]**   51/7 54/16 54/18
**fair [13]**   11/5 34/6 34/8
57/10 67/18 67/23 72/12 72/16
79/10 116/18 116/19 116/20
116/22
**fairly [1]**   11/9
**faith [2]**   126/7 159/5
**false [5]**   185/5 189/14 189/19
**familiar [7]**   101/21 106/20
107/3 123/5 137/10 147/3
160/16
**family [2]**   102/16 217/4
**fanciers [1]**   28/13
**far [7]**   77/22 83/11 83/13
84/6 91/17 118/7 118/13
**fashion [3]**   193/10 193/14
221/18
**fault [1]**   12/11
**favor [2]**   110/12 221/2
**favorable [2]**   197/9 198/9
**February [23]**   3/8 19/22 20/6
47/6 115/7 115/7 115/8 130/19
131/6 132/12 133/16 134/8
184/6 187/1 187/25 188/20
190/2 190/3 191/2 191/6
191/10 191/12 191/13
**February 1st [2]**   130/19 132/12
**February 2016 [2]**   115/7 115/8
**February 2017 [1]**   188/20
**February 28th [8]**   184/6 187/25
190/2 190/3 191/6 191/10
191/12 191/13
**February and [1]**   187/1
**February asking [1]**   134/8
**feel [5]**   8/11 17/11 29/11
176/2 202/10
**fees [14]**   166/21 181/22
181/23 200/17 200/20 200/21
200/25 201/1 201/3 201/8
201/12 202/8 208/6 217/10
**feet [1]**   203/19
**FELDMAN [25]**   1/18 1/18 2/9
2/10 2/13 4/12 4/20 5/16 15/2
16/20 22/20 29/15 46/18 49/7
60/17 69/9 119/4 119/20 120/4
126/23 167/14 169/23 219/6
222/6 233/2
**felt [1]**   24/1
**few [6]**   6/5 6/5 120/20 131/14
213/11 216/4
**FF [25]**   18/20 21/13 70/4 70/8

70/10 70/12 87/8 91/25 92/3
92/20 93/2 93/3 93/11 94/7
94/10 95/9 95/17 95/20 98/10
139/3
**figure [1]**   226/15
**figured [2]**   157/7 179/16
**figures [1]**   90/13
**file [12]**   5/21 5/25 6/3 6/14
6/15 7/2 7/14 140/8 142/9
142/12 219/23 233/6
**filed [21]**   6/4 16/19 30/6
30/6 32/5 39/9 50/23 61/7
61/11 103/21 103/22 105/10
108/4 120/9 120/22 142/5
169/6 193/22 224/22 230/11
233/12
**filing [2]**   7/24 153/6
**fill [1]**   17/13
**final [9]**   117/8 117/13 117/21
117/25 118/4 118/6 118/13
118/16 118/24
**finances [1]**   229/12
**financial [14]**   7/7 4/7 4/13
12/15 26/22 43/5 72/10 80/1
119/15 139/19 139/23 149/16
192/6 227/21
**financially [3]**   74/15 112/13
112/16
**find [22]**   22/23 23/2 23/4
25/25 42/12 46/4 53/5 53/13
53/13 54/6 124/12 132/14
136/7 136/15 148/18 186/5
223/22 228/13 228/14 228/20
231/23 232/15
**finding [2]**   27/12 232/1
**fine [9]**   16/10 24/7 24/12
48/5 56/6 60/19 73/11 135/14
175/8
**finish [9]**   9/10 18/3 18/9
44/5 92/19 203/16 208/22
208/25 218/18
**finished [2]**   119/3 213/12
**firm [2]**   38/5 38/5
**first [42]**   14/21 17/20 20/5
23/7 29/17 36/11 40/23 42/16
50/3 60/6 67/12 67/25 74/8
74/12 108/20 108/21 123/18
123/18 125/19 129/16 132/10
132/17 144/4 156/21 166/11
166/14 169/24 170/8 176/5
176/10 177/2 191/5 198/25
199/1 200/1 200/24 203/2
208/9 209/8 217/22 220/9
228/7
**firsthand [4]**   45/8 155/21
225/22 226/10
**fit [1]**   37/25
**Fitch [2]**   38/19 38/21
**fittings [1]**   70/11
**five [10]**   5/18 48/7 48/20
110/14 126/1 132/5 152/1
167/15 167/19 206/18
**five-person [1]**   110/14
**fixtures [1]**   18/21
**flagpole [3]**   225/1 225/3
225/5
**flagship [1]**   27/22
**flew [1]**   208/5
**flip [1]**   105/14
**floor [4]**   1/16 84/18 185/18
185/19
**floors [2]**   88/20 88/20

## F

**FLORIDA [18]** 1/1 1/8 1/16
1/19 1/22 40/20 42/18 42/19
42/20 45/5 131/23 131/25
132/2 159/1 234/3 234/7
234/15 234/19

**flsd.uscourts.gov [4]** 1/23
142/22 143/2 234/20

**focused [1]** 131/14

**follow [15]** 22/1 28/1 28/2
28/17 80/19 97/4 101/2 104/10
124/3 147/15 147/19 153/23
153/24 203/5 221/22

**follow-up [3]** 80/19 97/4
203/5

**followed [2]** 154/14 221/23

**following [5]** 27/4 85/4 85/9
87/16 168/22

**follows [2]** 28/18 141/6

**Ford [1]** 185/25

**foregoing [1]** 234/10

**foreign [2]** 1/4 111/8

**foreigners [1]** 110/12

**formed [2]** 162/17 162/19

**forms [1]** 233/14

**forth [10]** 5/7 34/12 36/14
37/25 47/14 177/12 178/18
178/20 196/10 223/3

**forthcoming [2]** 108/14 108/22

**forward [17]** 11/7 14/12 35/6
58/1 60/1 81/21 120/1 136/9
142/12 151/1 151/2 158/16
158/19 205/11 209/16 214/3
226/18

**forwarder [1]** 222/12

**forwarding [4]** 171/17 171/19
187/13 201/22

**found [2]** 11/2 126/19

**foundation [6]** 56/16 56/17
58/12 58/17 67/16 67/17

**foundational [1]** 57/7

**four [17]** 11/12 16/8 39/12
39/13 51/13 56/12 56/13 72/5
84/15 85/18 126/1 132/5
177/20 206/19 206/20 226/6
226/6

**four-part [1]** 39/13

**Fourteen [2]** 54/12 172/21

**frame [2]** 160/13 160/19

**framed [1]** 24/17

**frames [4]** 125/22 125/23
125/24 203/16

**Frank [3]** 195/9 195/11 195/16

**frankly [9]** 25/12 32/17 37/11
39/12 41/12 94/6 104/24
223/12 225/4

**free [2]** 47/5 169/15

**freight [2]** 136/9 222/12

**frequently [2]** 11/3 212/6

**Friday [2]** 5/23 6/5

**front [14]** 31/23 82/21 135/12
137/13 151/17 176/22 176/25
184/2 184/22 187/5 191/4
194/13 200/12 206/15

**front-end [1]** 184/22

**fulfill [6]** 180/13 180/14
181/8 195/19 221/8 222/2

**fulfilled [4]** 207/14 207/15
216/2 221/7

**fulfilling [2]** 18/19 221/13

**full [22]** 19/10 20/15 21/20
23/13 23/14 23/18 23/21 24/1

24/16 124/10 158/8 158/10
206/22 207/6 207/24 212/23
213/2 221/9

**fuller [1]** 232/19

**fully [1]** 221/11

**fumble [1]** 54/6

**functioning [2]** 22/3 22/5

**fundamental [2]** 34/23 133/1

**funding [1]** 31/19

**funds [1]** 192/23

**funnel [1]** 186/16

**furnish [1]** 212/23

**furnished [1]** 196/8

**Furnishings [1]** 138/6

**furniture [14]** 18/21 40/19
41/9 46/21 68/20 70/11 157/5
157/5 157/6 157/8 177/14
198/12 201/3 210/4

**further [16]** 3/1 10/8 10/14
20/7 31/21 31/22 46/10 66/23
106/23 149/3 149/17 168/23
169/11 220/6 225/3 234/12

**Furthermore [1]** 25/4

**future [2]** 148/13 148/16

## G

**G-A-O [1]** 70/17

**G-E-R-A-L-D [1]** 170/9

**gain [1]** 221/16

**Gao [11]** 70/13 70/15 70/17
70/22 70/24 71/4 71/6 81/12
87/7 154/22 154/23

**gave [11]** 6/2 32/17 32/21
32/22 129/20 178/22 211/22
211/23 211/24 212/7 212/9

**GDP [1]** 27/15

**general [7]** 78/10 78/13
113/21 113/23 164/13 185/14
197/7

**generally [4]** 41/17 185/9
186/13 230/20

**generate [1]** 27/14

**generated [2]** 12/22 140/18

**generates [2]** 189/16 190/9

**GERALD [9]** 2/12 3/11 4/22
40/5 40/15 170/1 170/4 170/9
217/19

**get [83]** 6/7 6/8 6/8 16/1
19/14 24/13 24/14 24/24 27/11
28/8 29/3 29/5 29/8 29/11
29/12 29/13 32/2 32/4 32/4
32/7 34/14 34/24 36/15 36/21
37/18 38/23 39/10 41/2 42/6
42/6 42/24 43/1 43/4 46/5
46/12 46/16 46/25 47/12 47/21
59/11 59/22 59/23 70/5 89/12
90/22 94/5 101/4 111/21 113/5
114/8 126/8 132/23 134/10
134/11 134/18 135/15 138/14
143/20 154/2 157/11 158/23
159/13 160/24 164/12 165/17
167/5 176/10 177/13 184/12
185/22 186/15 198/9 206/5
208/7 213/19 217/3 220/9
223/4 223/5 225/3 226/5
228/16 229/14

**gets [2]** 44/10 186/18

**getting [15]** 28/19 30/13
45/19 46/11 81/3 115/6 124/11
126/9 141/4 147/15 151/1
159/20 209/11 209/13 224/17

**girl [1]** 186/22

**girl's [1]** 187/4

**give [32]** 7/13 9/7 9/11 11/8
14/20 15/16 15/20 16/9 19/18
19/19 21/6 33/8 46/15 62/20
82/12 116/5 121/18 129/8
144/4 169/23 178/11 178/12
181/19 182/4 185/5 186/13
186/13 187/12 198/22 201/14
212/10 230/14

**given [10]** 12/19 26/18 28/18
39/7 112/23 125/1 136/6 146/5
178/3 186/15

**gives [1]** 189/7

**giving [3]** 58/1 181/16 186/8

**global [1]** 37/6

**go [40]** 6/10 9/19 11/7 16/11
17/20 35/4 35/6 42/8 46/7
54/25 58/1 58/15 70/6 73/10
74/21 85/7 101/5 114/8 129/8
131/24 132/17 143/7 143/25
148/23 154/25 157/11 158/16
158/19 167/12 169/15 171/9
174/18 176/15 178/15 185/25
190/7 193/17 197/10 209/17
220/9

**goes [11]** 110/10 112/1 112/19
117/6 148/10 149/14 152/22
162/24 186/10 196/9 225/19

**going [165]** 8/7 9/11 9/11
10/21 11/7 11/7 12/24 14/12
14/20 16/21 18/5 18/13 22/15
28/10 29/8 34/4 34/11 35/6
35/14 36/13 37/18 38/13 41/14
43/20 45/2 45/3 45/4 45/7
46/23 46/24 47/12 47/12 47/13
47/14 48/1 48/13 51/4 52/1
54/13 57/3 57/5 57/17 57/19
58/7 58/8 58/22 58/22 58/24
61/14 80/18 80/20 81/20 83/24
84/1 87/17 90/22 91/2 91/3
92/24 99/23 100/15 104/12
105/9 105/10 105/23 108/11
113/5 115/24 116/1 116/2
119/6 121/12 122/25 128/6
129/8 129/17 133/21 133/24
145/8 145/10 145/11 145/16
146/15 151/6 152/11 155/12
158/7 159/21 163/8 163/10
167/15 167/22 171/9 176/3
176/15 176/18 177/2 177/12
177/21 178/17 178/20 178/22
178/23 179/5 179/6 179/7
179/10 179/14 179/16 179/19
179/21 180/9 180/12 181/13
181/25 182/2 182/2 182/3
184/8 187/24 188/7 188/17
191/17 191/24 191/25 204/13
205/11 205/12 205/25 206/21
208/8 208/9 209/4 209/5 209/5
209/10 209/16 209/16 209/16
210/3 211/3 211/9 212/14
212/24 214/4 216/13 217/13
217/16 217/20 218/3 218/21
220/10 220/22 221/23 222/8
222/20 223/23 224/7 227/20
227/25 228/10 229/14 229/22
232/17 232/18

**golf [2]** 84/16 84/17

**gone [1]** 159/11

**good [68]** 4/2 4/3 4/4 23/10
23/19 23/21 23/23 24/2 28/11
29/3 46/11 46/24 87/14 87/21

## G

**good...** **[54]** 89/2 89/4 121/6
126/7 129/10 130/13 150/18
151/3 151/6 152/11 152/20
156/20 157/2 159/5 166/6
178/18 178/22 178/23 178/24
179/5 179/6 179/7 179/11
179/16 181/18 191/20 197/3
198/13 200/6 204/11 205/12
205/13 205/17 205/25 206/4
206/8 208/9 208/19 208/19
209/19 210/11 210/22 211/3
211/10 213/25 214/4 214/11
214/25 217/13 217/16 217/20
218/4 220/16 222/20
**goods** **[11]** 46/12 46/16 48/12
157/10 167/6 167/8 180/15
180/18 189/2 200/9 205/14
**goodwill** **[2]** 28/5 124/25
**got** **[51]** 14/16 32/6 32/11
34/15 35/7 37/7 37/16 38/2
45/24 46/7 46/20 49/16 50/23
54/12 56/5 87/14 92/19 102/11
106/12 110/24 111/11 124/14
126/10 132/11 138/16 138/20
139/25 142/4 142/6 143/16
156/16 167/8 171/6 172/1
179/17 185/14 185/17 205/13
205/18 206/1 219/24 223/3
223/4 223/8 225/1 225/7 225/8
225/20 225/20 225/20 231/16
**gotten** **[1]** 48/12
**government** **[11]** 28/20 76/14
108/19 110/2 110/8 111/3
111/8 162/9 162/13 192/1
227/9
**grand** **[1]** 138/12
**granted** **[2]** 6/4 232/11
**grave** **[1]** 221/16
**group** **[2]** 51/17 51/20
**guess** **[19]** 13/13 14/1 31/15
32/1 35/12 38/22 41/14 41/20
48/18 55/22 76/18 87/21 97/4
105/20 125/17 149/1 163/5
174/23 226/21
**guest** **[1]** 88/23
**guests** **[4]** 84/14 85/2 88/15
88/16
**guilty** **[7]** 18/1 18/3 175/13
175/23 175/23 175/25 232/6
**guy's** **[1]** 176/3
**guys** **[2]** 118/18 127/20

## H

**habit** **[1]** 212/4
**had** **[137]** 5/16 7/2 10/12
10/13 13/4 18/4 18/19 18/25
19/7 19/8 19/16 20/2 20/3
20/10 20/14 20/14 20/24 21/2
21/2 21/14 21/15 21/17 21/19
21/20 21/21 22/9 23/11 23/11
23/23 23/25 24/1 31/18 33/5
33/11 36/25 45/24 46/8 46/8
48/9 48/18 50/10 55/20 58/2
59/16 72/19 76/5 76/8 76/23
78/12 80/14 81/2 81/12 81/19
81/23 87/25 102/18 116/12
120/21 122/4 123/16 124/9
124/16 126/12 130/24 132/4
133/16 133/25 135/2 139/15
140/8 140/11 140/12 140/13
140/25 140/25 142/24 142/25
149/6 153/23 156/8 156/17
158/4 158/5 158/11 161/14
165/1 165/1 165/22 166/6
166/11 170/17 174/25 177/23
178/5 178/5 181/17 193/8
194/4 196/8 196/18 196/20
196/25 199/7 200/15 202/19
203/2 208/24 210/4 210/8
210/13 210/20 211/2 211/2
211/4 214/8 215/8 216/25
217/24 219/1 220/1 220/2
224/17 225/1 230/2 230/2
230/11 230/14 231/1 231/9
231/21 232/6 232/20 234/8
**hadn't** **[2]** 44/12 159/7
**Hailey** **[1]** 68/5
**half** **[11]** 17/23 29/25 40/22
40/23 40/23 85/25 124/13
124/19 124/20 124/21 196/21
**hand** **[5]** 54/4 146/15 203/14
229/2 234/14
**handed** **[8]** 20/8 20/11 83/15
122/4 129/12 130/15 147/2
183/24
**handheld** **[3]** 60/13 99/18
188/6
**handing** **[2]** 152/6 168/2
**handle** **[3]** 58/22 58/23 191/22
**handling** **[3]** 18/20 167/25
168/17
**hands** **[1]** 206/1
**handwriting** **[1]** 173/5
**Hank** **[1]** 41/8
**happen** **[9]** 18/4 58/6 143/3
154/12 185/17 209/4 209/16
210/5 211/10
**happened** **[12]** 20/17 20/19
111/16 123/22 131/5 208/11
210/16 210/18 210/20 216/11
222/22 232/16
**happening** **[3]** 96/23 143/4
209/10
**happens** **[3]** 59/15 209/2
218/19
**happy** **[6]** 34/13 35/13 180/22
183/9 205/20 207/12
**hardly** **[2]** 230/16 230/21
**harm** **[25]** 12/5 26/23 27/2
28/14 28/21 28/25 29/12 38/8
38/11 38/16 38/25 43/3 44/11
104/17 221/4 221/11 223/18
224/10 225/19 227/7 227/7
227/16 227/23 228/2 228/16
**harmed** **[1]** 29/9
**harmless** **[1]** 46/14
**harms** **[1]** 221/3
**has** **[85]** 10/16 11/13 13/20
19/25 24/17 30/14 33/8 33/10
38/10 38/15 39/15 41/10 42/20
43/19 46/6 48/11 51/6 52/11
55/1 56/11 62/12 64/7 67/10
68/2 72/15 73/9 73/20 75/4
79/7 82/1 83/5 87/22 88/22
91/4 93/3 93/5 93/6 93/10
93/13 93/17 93/23 100/1 101/4
101/24 102/2 102/4 102/11
102/18 104/16 106/8 106/23
107/18 107/19 107/25 109/5
109/15 109/17 109/23 112/12
112/16 114/3 114/11 116/1
116/7 120/11 135/4 137/9
154/14 154/25 164/5 164/22
173/4 174/6 174/7 193/16
224/9 226/9 226/10 227/1
230/8 230/10
**hasn't** **[3]** 19/25 25/11 48/9
**have** **[460]**
**haven't** **[12]** 13/23 27/6 34/10
37/18 49/17 56/25 67/18
131/14 136/23 228/17 230/15
231/16
**having** **[11]** 13/10 19/23 51/14
54/6 56/6 59/1 88/14 142/13
184/14 184/24 224/3
**he** **[56]** 17/17 17/18 26/9
32/19 32/19 32/23 33/21 35/4
35/20 35/21 35/21 35/22 35/24
35/24 36/3 36/4 41/11 45/24
46/6 60/18 60/19 60/21 61/3
70/25 71/7 106/24 107/1
107/12 107/13 107/14 120/22
135/10 141/11 148/12 150/8
150/11 150/12 150/15 151/1
151/5 154/25 155/2 169/25
174/8 174/24 175/11 178/13
178/13 180/3 183/19 183/19
195/12 197/17 204/4 204/4
232/12
**he'd** **[1]** 174/7
**he'll** **[1]** 40/5
**he's** **[9]** 4/23 33/25 34/4
35/22 46/5 105/19 150/15
175/15 175/15
**head** **[3]** 79/14 79/16 79/18
**heading** **[1]** 45/5
**headsets** **[1]** 30/17
**hear** **[15]** 10/2 29/19 30/13
30/20 30/22 47/12 56/20 56/23
124/7 195/10 219/18 220/8
222/18 225/4 225/4
**heard** **[10]** 20/25 29/24 30/1
32/19 222/18 222/19 222/21
222/22 222/24 228/17
**hearing** **[22]** 1/11 6/10 6/18
6/19 6/21 8/2 9/2 9/4 10/15
11/21 17/24 17/24 34/9 39/5
47/13 51/22 53/10 61/10 61/11
227/18 229/16 232/20
**hearsay** **[3]** 104/10 104/23
105/1
**heart** **[3]** 36/15 36/21 94/5
**heavily** **[1]** 227/21
**held** **[5]** 78/20 118/18 118/24
127/23 154/10
**hello** **[1]** 160/7
**help** **[4]** 105/24 130/9 194/1
227/11
**helpful** **[1]** 27/2
**hemisphere** **[1]** 28/12
**her** **[66]** 18/22 30/20 49/12
49/18 49/22 49/23 50/3 50/12
50/24 51/1 53/5 53/8 53/13
53/13 53/15 53/16 53/22 55/14
55/18 56/7 56/8 57/20 58/10
58/13 58/13 60/12 60/14 63/7
63/10 68/16 87/1 96/11 96/12
100/5 114/5 117/17 118/3
121/18 121/18 126/25 127/1
127/3 129/4 129/6 129/8
131/12 136/2 141/8 154/7
160/6 166/7 186/23 186/23
187/5 201/7 208/2 208/5 217/9
218/1 219/20 219/22 220/2
223/19 224/17 225/21 225/22

**H**

**here [113]**   4/22 6/10 6/17
6/18 8/20 8/22 8/25 9/17
10/18 11/25 13/1 18/13 19/2
24/3 24/14 24/17 26/13 28/21
30/14 31/1 31/13 32/7 32/11
34/9 35/10 35/16 35/16 35/16
36/13 38/17 39/3 39/4 40/5
40/7 40/7 40/12 40/18 40/19
42/20 43/4 43/22 45/5 45/11
48/9 48/17 48/19 54/3 57/5
58/18 58/19 61/16 61/19 73/7
74/3 74/14 74/17 74/20 77/12
80/2 81/6 83/2 85/12 91/5
91/8 95/3 97/3 97/12 98/7
99/13 102/2 105/22 108/1
113/14 116/11 117/1 121/22
123/3 123/24 125/5 129/14
129/15 135/5 136/15 136/18
137/1 137/13 142/5 142/10
142/24 143/23 144/1 155/13
159/1 160/5 175/14 175/15
175/15 176/3 188/9 214/11
214/21 215/15 219/24 220/2
221/4 222/1 222/10 222/10
223/20 224/14 225/5 225/15
225/19
**here's [3]**   57/17 58/7 208/9
**hereby [1]**   234/7
**hereunto [1]**   234/14
**hernandez [6]**   1/21 1/23 234/5
234/17 234/17 234/20
**Hi [2]**   131/12 184/10
**high [5]**   33/3 35/18 43/25
223/10 226/6
**high-standard [1]**   33/3
**higher [1]**   218/15
**highlight [2]**   5/11 18/14
**highly [1]**   162/4
**him [15]**   9/10 9/12 43/19 48/4
58/1 81/20 149/2 149/6 149/19
155/6 174/25 178/12 183/19
187/24 187/25
**his [23]**   17/17 24/20 24/22
26/9 32/23 33/13 33/16 35/25
38/5 40/9 106/25 106/25 171/8
173/18 175/11 178/12 180/3
183/17 197/20 197/23 197/24
197/25 198/22
**historically [1]**   82/6
**history [4]**   3/12 14/9 39/3
173/13
**hit [1]**   227/19
**hold [5]**   46/14 78/20 89/21
109/6 127/23
**hold-ups [1]**   127/23
**holding [6]**   37/3 163/3 163/10
175/15 175/15 201/3
**holds [1]**   109/4
**hole [1]**   21/22
**holiday [1]**   127/18
**holidays [1]**   45/3
**honest [3]**   54/17 96/12 137/12
**honestly [2]**   80/18 116/16
**honor [104]**   4/3 4/4 4/18 4/21
5/17 5/21 5/23 6/2 7/1 8/9
9/8 9/9 10/3 15/3 15/21 15/23
16/2 17/10 17/14 18/8 22/18
23/1 35/3 43/19 44/18 48/25
49/3 51/3 51/19 51/23 52/3
52/7 53/12 54/15 55/6 55/17
57/24 59/6 59/10 60/11 61/20

62/8 62/21 63/4 63/9 63/12
66/14 67/4 67/15 68/9 68/17
69/4 96/7 99/16 99/21 103/13
104/4 105/11 119/21 120/5
121/16 122/4 129/1 142/23
144/22 146/23 148/2 152/1
154/5 155/13 155/25 156/4
158/4 158/7 158/11 167/11
169/10 169/16 169/20 170/2
170/15 172/13 173/17 174/3
183/12 183/15 187/22 191/21
192/12 213/13 219/13 219/24
220/7 222/4 224/9 226/13
228/5 232/25 233/4
**HONORABLE [1]**   1/12
**honored [1]**   133/3
**hook [2]**   43/15 43/18
**hopefully [3]**   37/22 143/3
171/11
**hoping [1]**   159/16
**hotel [13]**   19/1 85/11 85/11
85/12 86/1 88/8 88/14 90/10
90/11 90/12 133/25 197/7
198/8
**hotels [6]**   84/16 85/2 85/22
85/24 87/24 206/18
**hour [1]**   17/23
**hours [3]**   6/18 38/6 152/23
**hover [3]**   129/4 129/6 145/10
**how [70]**   12/20 14/18 14/19
32/24 38/8 38/9 38/12 39/15
42/25 43/25 44/4 49/8 52/19
53/25 59/6 69/13 69/15 72/2
72/14 72/21 72/23 73/20 74/20
81/19 81/20 82/14 86/1 87/16
87/20 90/8 105/10 105/22
110/15 112/11 112/15 113/23
114/21 116/7 116/15 119/8
126/18 131/4 131/16 138/19
153/4 154/17 154/19 156/21
162/20 165/9 184/8 186/9
190/18 190/19 193/3 193/6
193/9 193/12 195/4 195/18
196/1 198/7 200/20 202/5
204/21 206/13 207/17 214/16
218/24 229/24
**however [3]**   11/16 59/14 133/1
**huge [2]**   162/11 228/25
**huh [15]**   74/13 78/6 79/19
80/22 83/4 93/1 99/25 100/16
114/20 123/2 151/10 153/16
159/25 200/4 202/16
**hundred [11]**   14/7 22/10 71/18
124/24 156/18 158/10 181/21
203/19 203/25 216/4 229/18
**hundred-and-something-thousand [1]**
181/21
**hundred-thousand-dollar [1]**
229/18
**hundreds [6]**   12/19 34/21 58/2
156/23 156/24 185/21
**hunt [2]**   46/3 123/25
**hypothetical [3]**   95/25 210/15
216/13

**I**

**I'd [20]**   5/17 63/3 64/8 85/16
114/8 120/20 128/11 134/24
142/6 144/2 146/17 148/18
149/10 170/11 171/24 174/5
176/25 183/6 183/9 199/5
**I'll [38]**   5/9 5/11 8/1 16/10

16/16 18/1 22/16 27/20 32/2
58/17 60/16 62/12 63/10 65/20
73/8 73/10 74/3 80/1 94/23
108/11 120/3 120/11 167/17
167/17 169/21 169/22 169/23
175/12 183/19 184/12 191/23
220/8 232/21
**I'm [235]**
**I've [32]**   11/2 23/5 23/24
32/10 38/2 47/21 47/25 54/12
56/5 56/17 56/20 57/1 58/2
58/18 59/16 78/16 78/16 87/14
87/15 87/15 87/16 129/12
132/18 134/20 136/22 142/4
142/5 147/2 160/6 160/18
162/9 176/1
**I-Z-M-I-R-L-I-A-N [1]**   105/21
**idea [13]**   38/14 72/21 72/23
74/20 89/3 89/4 110/7 116/18
116/21 145/24 154/18 184/8
229/19
**ideally [1]**   59/14
**identical [1]**   25/3
**identified [3]**   25/4 56/15
129/13
**identifies [3]**   53/23 137/19
137/21
**identify [10]**   4/15 49/1 58/16
65/11 65/18 66/19 125/7 128/2
129/23 183/13
**Images [1]**   3/13
**imagine [1]**   45/1
**immediately [5]**   135/2 137/20
158/24 159/3 222/11
**immensely [2]**   27/21 28/4
**impact [12]**   38/19 38/19 45/7
81/10 81/23 86/10 87/9 102/25
103/3 161/23 162/7 223/21
**imperative [1]**   158/23
**imply [2]**   13/19 13/20
**Import [7]**   108/16 109/11
109/14 109/18 110/5 112/6
112/12
**importance [2]**   28/19 227/8
**important [5]**   27/22 33/1
35/15 111/21 222/9
**impossible [1]**   185/17
**impression [3]**   178/23 209/4
217/12
**in their [1]**   32/17
**inability [2]**   228/16 229/16
**inappropriate [1]**   6/11
**Inc [1]**   31/6
**inclined [1]**   9/1
**include [2]**   126/20 218/12
**included [7]**   7/19 43/9 43/10
94/7 94/13 126/14 218/6
**includes [4]**   31/2 77/11 92/20
142/11
**including [8]**   9/24 18/23 19/1
31/10 44/1 50/24 92/10 163/6
**inconsistent [1]**   10/10
**incorporate [2]**   13/16 14/22
**incorrect [1]**   44/8
**incredibly [1]**   10/25
**incur [2]**   93/22 113/5
**incurred [1]**   181/20
**incurrence [3]**   95/22 96/6
97/13
**incurring [1]**   217/10
**incurs [1]**   12/11
**indebtedness [3]**   23/22 23/24

**I**

**indebtedness... [1]** 24/2
**indemnify [1]** 26/21
**independent [5]** 13/6 53/10
 54/5 54/7 56/14
**indicate [4]** 36/4 152/11
 165/22 228/17
**indicated [8]** 27/1 97/2
 126/15 127/13 156/17 204/12
 224/9 224/11
**indicating [4]** 184/25 190/7
 190/19 196/7
**indication [2]** 87/14 150/17
**individuals [1]** 8/21
**indulge [1]** 9/14
**inform [1]** 177/17
**information [53]** 3/2 6/9 6/15
 8/19 12/14 16/18 23/25 30/9
 32/8 35/8 35/9 36/25 41/23
 46/11 46/15 57/7 66/23 66/24
 72/10 72/19 120/25 121/6
 121/10 124/10 124/15 125/1
 126/8 126/9 126/10 126/10
 132/15 138/23 155/16 155/22
 159/20 185/5 185/13 185/17
 186/14 186/16 186/18 187/13
 191/4 193/11 193/15 194/12
 195/23 196/8 219/25 220/17
 223/21 230/10 232/1
**infringement [1]** 41/3
**initial [3]** 6/4 136/2 139/9
**initially [3]** 32/4 165/10
 170/12
**injunction [31]** 9/25 13/14
 28/6 29/13 32/24 33/4 33/6
 33/10 35/18 39/5 42/22 50/23
 53/20 73/15 81/9 86/10 90/19
 135/20 136/24 151/21 153/7
 153/14 153/20 153/22 154/3
 155/20 155/21 222/11 223/11
 223/16 226/14
**injunctions [1]** 58/3
**injunctive [2]** 26/13 221/10
**injury [6]** 25/5 224/10 224/12
 224/13 225/6 225/8
**inquire [2]** 22/8 104/12
**inquiries [1]** 186/16
**inquiry [3]** 184/8 184/17
 185/22
**inside [2]** 41/14 231/16
**insolvency [1]** 12/18
**installed [2]** 70/5 70/7
**instance [3]** 96/1 96/5 200/15
**instances [1]** 231/22
**instead [3]** 34/11 58/25 127/6
**insult [1]** 25/5
**insurer [1]** 29/2
**intend [1]** 213/7
**intended [1]** 54/5
**intense [1]** 227/12
**intention [3]** 149/11 157/16
 208/22
**interest [7]** 39/11 77/23
 109/15 109/17 220/24 221/1
 226/3
**interested [2]** 209/3 231/25
**interesting [2]** 44/16 185/8
**intermediary [1]** 154/11
**internal [1]** 184/11
**internally [3]** 133/17 153/11
 207/17
**International [1]** 31/5

**Internet [1]** 189/9
**Interpret [1]** 30/4
**interpretation [2]** 222/19
 223/12
**interpreted [1]** 202/20
**interrupt [2]** 117/19 148/20
**interrupting [1]** 126/25 162/14
**intimately [2]** 195/21 196/10
**introduce [1]** 73/8
**introduced [2]** 11/18 61/8
**inventory [1]** 160/25
**investigators [1]** 231/23
**invoice [1]** 159/2
**invoke [1]** 94/3
**invoking [1]** 94/4
**involved [18]** 19/5 77/6 77/10
 80/12 87/15 106/18 113/11
 114/11 115/6 115/16 161/2
 161/5 167/23 168/7 195/21
 196/9 196/10 224/5
**involvement [3]** 76/2 76/7
 113/10
**irony [1]** 25/8
**irrelevant [1]** 79/6
**irreparable [31]** 12/5 26/23
 27/2 28/7 28/14 28/21 38/8
 38/11 38/16 38/25 43/1 43/2
 43/3 44/11 104/17 221/11
 223/18 224/10 224/12 224/13
 225/6 225/8 225/18 225/19
 227/7 227/7 227/15 227/23
 228/2 228/16 229/11
**is [626]**
**is getting [1]** 141/4
**isn't [8]** 28/17 87/13 98/13
 119/24 122/7 186/4 205/14
 210/12
**issuance [1]** 80/12
**issue [29]** 2/22 5/19 14/4
 16/22 18/18 19/1 19/25 20/9
 22/11 23/15 24/16 24/24 26/11
 28/6 32/1 37/13 37/22 37/24
 41/2 46/9 61/15 90/13 98/6
 98/9 133/1 133/7 149/11
 224/11 225/7
**issued [14]** 2/16 20/21 20/24
 20/24 20/25 21/4 21/10 21/14
 22/9 31/20 31/24 61/25 62/16
 158/9
**issues [17]** 6/22 8/20 8/22
 8/24 11/8 17/6 23/6 38/1
 59/20 59/21 70/1 70/3 95/22
 131/13 175/11 220/3 228/7
**issuing [1]** 45/16
**it [598]**
**it'll [1]** 35/4
**it's [151]** 6/12 6/13 10/1
 12/16 16/23 23/13 25/8 27/20
 31/7 33/1 33/13 33/23 34/25
 35/15 40/3 42/5 42/11 43/2
 43/2 45/3 45/4 47/19 50/21
 51/11 54/17 56/11 56/12 59/9
 62/21 62/25 64/9 66/25 67/18
 71/3 71/18 71/19 74/24 75/8
 75/10 75/13 82/12 87/21 90/12
 92/4 93/16 96/7 101/1 103/8
 104/23 104/24 105/2 105/9
 105/21 105/22 107/10 108/1
 111/1 111/21 113/4 113/5
 114/18 114/19 116/2 116/20
 117/19 118/8 119/6 121/22
 121/24 124/11 124/11 124/12
 125/10 125/11 125/12 127/19

 133/9 136/1 142/10 143/4
 146/7 146/7 14678 151/17
 151/20 151/20 152/17 160/25
 162/3 163/2 163/3 163/3 163/6
 163/13 163/16 168/6 168/15
 171/20 172/3 172/4 172/7
 174/16 175/6 175/7 175/19
 175/19 175/20 176/19 179/5
 183/18 184/1 184/6 184/7
 184/9 185/17 186/2 186/5
 186/7 186/22 187/20 188/25
 190/8 191/6 191/17 194/13
 194/23 194/25 197/7 199/4
 199/21 203/18 209/15 210/9
 210/18 216/24 216/25 217/5
 220/9 220/24 222/9 223/13
 223/14 224/13 225/13 228/16
 229/6 229/8
**item [9]** 93/5 94/1 94/22
 94/24 95/4 95/18 95/20 103/15
 125/7
**items [18]** 14/15 51/15 93/3
 94/2 96/15 96/18 96/18 126/1
 130/25 133/18 133/22 158/17
 159/18 159/19 180/22 182/3
 189/4 194/14
**its [29]** 10/9 11/15 21/14
 28/3 28/4 28/9 28/10 42/12
 56/8 56/9 72/16 108/14 108/22
 112/20 113/2 117/2 117/9
 152/16 152/17 163/7 182/17
 182/25 189/12 190/19 191/15
 221/13 221/16 221/19 222/2
**itself [4]** 55/19 55/21 105/11
 225/8
**Izmirlian [9]** 105/18 106/3
 106/11 106/15 106/21 106/23
 107/11 109/12 112/24

**J**

**jail [1]** 176/4
**Jaime [3]** 187/2 187/7 187/13
**Jamaica [7]** 161/18 161/19
 162/12 162/20 163/8 163/10
 167/22
**Jamaican [1]** 162/9
**Jamie [1]** 187/4
**January [19]** 19/22 24/15 26/3
 64/7 112/20 113/11 113/12
 114/14 114/22 117/2 117/4
 131/6 134/8 180/25 200/1
 200/23 202/3 202/9 216/1
**January 20 [3]** 112/20 117/2
 117/4
**January 2015 [2]** 113/11 114/14
**January 2017 [2]** 64/7 202/3
**January/February [1]** 131/6
**Jersey [2]** 79/17 79/18
**job [1]** 72/9
**joint [2]** 59/16 172/9
**Jordan [1]** 41/7
**judge [155]** 1/12 4/6 4/13
 7/10 8/13 8/16 9/6 9/13 9/16
 14/2 14/4 15/13 15/18 15/24
 16/12 16/23 17/7 22/21 22/24
 29/16 30/18 30/23 31/12 32/1
 32/10 32/16 33/12 36/2 36/24
 40/4 40/13 40/25 41/25 42/16
 43/17 44/7 44/16 45/16 45/20
 47/19 48/4 48/21 56/22 57/3
 58/25 60/15 60/18 67/19 69/10
 73/7 73/10 85/5 85/9 87/3

**J**

**judge... [101]**   88/24 90/23
96/1 96/9 96/21 98/18 99/5
99/8 99/15 100/3 100/7 103/10
103/19 104/1 104/6 104/11
104/18 104/22 105/4 105/7
105/22 114/7 117/18 118/1
119/5 119/9 119/15 119/19
120/15 122/3 122/9 122/13
122/15 122/23 127/7 128/1
128/6 128/15 129/3 129/7
135/20 135/24 136/3 137/7
137/15 137/25 141/4 142/3
142/16 142/21 143/4 143/9
144/3 145/6 145/9 146/18
147/11 147/24 151/23 155/12
169/8 169/13 170/11 170/23
171/13 171/18 171/23 172/6
172/17 173/1 173/9 173/14
173/20 173/23 174/17 174/24
175/10 183/23 192/6 197/17
198/1 198/24 213/15 213/21
213/23 219/8 219/11 219/17
220/5 222/7 222/8 222/17
223/9 224/4 225/5 225/19
226/2 226/13 226/17 230/7
232/22
**judges [1]**   233/9
**judgment [1]**   135/17
**judicial [2]**   44/17 44/20
**July [3]**   1/5 122/8 234/9
**July 18th [1]**   122/8
**jump [5]**   48/8 48/9 57/4 108/9
130/15
**junction [1]**   49/10
**juncture [1]**   39/14
**June [4]**   31/13 153/9 153/22
224/21
**June 15 [1]**   31/13
**June 29 [1]**   153/9
**June 29th [1]**   153/22
**jury [7]**   37/11 37/12 47/18
47/19 223/12 223/14 223/16
**just [168]**   4/25 6/5 6/10 10/5
13/21 14/9 16/1 16/23 17/1
17/3 17/22 18/13 20/8 20/11
21/6 22/14 22/15 23/24 29/24
29/25 31/1 32/19 33/5 34/19
35/7 35/11 36/15 36/21 37/3
39/25 40/4 43/4 43/13 44/9
44/14 45/24 45/24 46/13 46/23
47/17 47/19 49/4 49/8 50/10
50/20 51/4 52/1 53/10 53/25
54/9 54/10 54/13 56/11 56/18
56/21 57/1 58/4 58/5 58/15
58/17 58/19 59/22 59/23 60/18
61/4 68/21 69/14 71/1 71/20
72/13 73/8 76/3 76/21 77/7
77/9 77/15 77/22 80/19 80/20
85/9 88/5 88/19 89/2 89/3
89/4 89/12 90/22 91/4 92/4
93/23 96/22 97/15 98/13 98/17
99/6 102/10 105/9 105/24
108/13 112/24 116/17 117/24
121/18 122/9 122/11 124/11
127/1 128/2 129/4 129/16
132/4 132/16 133/9 137/2
138/2 139/13 141/21 142/7
145/9 147/25 155/12 155/13
156/8 158/14 159/19 159/20
162/15 162/23 163/3 163/16
170/11 171/3 171/17 174/20

175/12 175/16 178/8 180/20
181/9 181/11 182/1 182/3
183/19 183/23 183/24 184/4
185/25 186/14 187/19 187/25
188/17 188/20 195/12 197/7
198/4 212/8 213/18 213/23
216/11 219/8 224/21 228/10
228/13 228/19 229/24 231/18
232/5 233/14
**justified [1]**   29/11

**K**

**keen [1]**   88/10
**keep [19]**   24/8 24/8 24/13
29/6 33/1 36/19 44/25 45/17
47/13 61/7 62/4 97/18 168/23
210/23 220/19 220/22 220/25
229/5 233/13
**keeping [4]**   6/12 6/13 21/9
220/13
**Kendall [1]**   1/19
**kept [4]**   63/22 66/9 124/11
126/9
**kick [1]**   91/18
**kind [15]**   34/19 36/15 44/18
56/16 78/24 89/8 109/10 142/4
160/24 161/7 199/4 210/10
210/16 221/12 228/11
**kinds [1]**   221/19
**KMM [1]**   1/2
**knew [1]**   169/3
**know [300]**
**know where [1]**   48/13
**knowledge [15]**   45/8 76/17
76/20 83/20 83/25 84/2 87/9
87/11 103/5 107/8 135/4 168/9
183/7 225/23 226/10
**known [2]**   76/13 200/17
**knows [3]**   4/25 155/13 223/23
**Kong [2]**   98/3 98/5

**L**

**L-U-M-I-N-G [1]**   70/17
**labeled [1]**   231/1
**lack [6]**   10/4 10/6 35/8 58/12
176/17 225/20
**lady [1]**   160/2
**laid [3]**   11/9 16/24 18/12
**language [2]**   156/20 199/4
**largely [1]**   54/16
**largest [3]**   27/13 28/12 41/11
**Las [3]**   206/18 206/20 206/21
**last [18]**   5/22 8/17 29/2 60/6
82/13 90/16 113/7 131/14
140/19 141/24 170/8 170/9
186/23 186/24 187/5 194/14
195/10 199/2
**lasting [1]**   26/1
**late [9]**   6/5 81/11 81/23 82/5
83/20 84/1 87/13 142/5 219/25
**later [6]**   18/2 18/5 26/4
124/14 132/5 191/2
**latter [1]**   108/17
**law [15]**   1/18 23/17 24/12
35/25 36/12 40/20 42/20 50/8
52/15 142/13 143/12 209/23
209/25 220/20 229/4
**lawsuit [8]**   12/10 108/13
108/13 108/22 153/6 153/20
169/6 224/22
**lawsuits [1]**   108/4
**lawyer [2]**   92/18 95/6
**lawyers [1]**   152/8

**lay [1]**   58/16
**layers [1]**   41/9
**lead [3]**   96/19 133/13 135/1
**lead-in [1]**   133/13
**leading [1]**   168/7
**leads [2]**   48/14 217/3
**League [1]**   41/8
**learn [1]**   221/25
**learned [2]**   166/11 166/15
**least [4]**   26/25 38/2 116/13
227/19
**leave [1]**   189/3
**leaving [1]**   45/4
**led [4]**   134/25 187/25 231/11
231/13
**left [7]**   21/22 41/5 138/19
195/19 195/20 222/25 231/19
**leftover [1]**   160/25
**legal [10]**   13/18 14/21 62/16
76/7 77/22 81/3 86/25 87/5
93/8 107/17
**legitimate [1]**   231/14
**less [7]**   36/25 108/14 108/22
172/12 197/8 198/9 217/3
**let [39]**   10/2 16/1 17/20
18/24 31/21 37/23 50/20 52/11
53/5 53/13 71/12 76/2 76/11
80/19 81/7 84/10 90/21 92/25
93/12 94/6 94/10 103/23 104/8
105/14 108/24 110/17 120/2
122/1 122/6 128/12 148/7
152/12 154/7 171/3 178/12
181/11 203/4 217/19 218/18
**let's [21]**   7/5 24/1 32/22
32/22 33/12 42/15 42/16 42/25
44/13 58/15 74/11 74/11 82/23
83/2 107/13 107/22 107/24
108/20 116/11 156/20 223/18
**letter [21]**   2/17 38/5 46/19
62/16 62/19 142/25 151/15
151/18 152/8 152/8 152/11
152/12 152/15 172/1 172/5
172/8 172/8 172/9 177/4 177/5
190/23
**letters [1]**   49/3
**letting [2]**   57/22 228/19
**level [2]**   42/17 43/3
**liability [1]**   172/10
**liar [2]**   185/11 231/1
**liars [2]**   185/9 230/20
**library [1]**   88/21
**license [1]**   163/18
**lied [1]**   230/15
**light [2]**   14/8 16/18
**like [60]**   5/17 8/17 14/24
17/11 21/6 35/12 41/6 42/5
44/14 46/24 47/18 53/9 54/9
56/7 56/10 57/23 59/15 82/21
84/13 85/23 87/7 88/19 90/13
106/15 110/21 114/8 120/20
122/18 127/6 128/11 129/18
141/22 141/25 142/2 142/6
144/2 145/22 146/17 147/21
158/14 160/6 160/25 162/20
164/22 170/11 171/24 172/15
174/8 176/2 177/14 183/5
183/6 185/25 186/7 186/14
191/7 199/5 217/1 219/5
224/23
**likelihood [5]**   36/16 44/2
220/23 223/9 223/15
**likely [2]**   112/22 209/15
**limit [1]**   37/22

**L**

limitation [1]  121/9
limitations [2]  75/4 91/23
limited [4]  1/4 125/14 162/17
163/4
limiting [1]  6/21
line [8]  117/15 125/11 125/16
126/1 141/13 172/11 176/5
232/17
lines [1]  88/19
liquidated [37]  26/17 43/11
74/8 74/12 74/15 74/18 74/25
75/2 77/11 91/9 92/2 93/7
93/22 93/24 93/25 94/5 94/15
94/18 94/25 95/4 95/14 95/16
95/23 96/6 96/15 96/20 97/3
97/8 97/13 97/16 106/9 106/12
113/5 194/24 195/1 195/3
225/11
liquidation [1]  106/8
list [26]  14/13 14/14 15/5
54/4 55/20 58/25 103/16
103/17 120/2 128/8 130/2
130/3 136/1 137/1 151/20
151/22 151/23 151/24 155/12
170/22 171/22 171/22 174/18
193/8 233/7 233/12
listed [15]  15/5 55/20 59/7
59/7 59/8 93/3 93/13 93/17
93/21 94/22 95/5 96/18 170/21
170/22 197/24
lists [1]  193/20
litigating [1]  34/22
litigation [1]  226/7
little [13]  8/17 18/5 18/15
47/21 48/10 76/11 79/6 88/12
105/25 138/25 162/15 163/7
165/14
LLP [1]  1/15
loan [1]  109/10
loaned [1]  109/12
local [2]  28/19 227/12
localities [1]  163/18
located [3]  70/24 122/2
203/19
locations [1]  143/8
logical [2]  26/20 28/18
logo [1]  68/2
long [22]  9/5 16/21 23/5 26/1
34/14 44/4 69/13 69/15 71/3
74/20 113/23 116/7 131/16
134/20 135/1 154/13 165/22
184/9 184/11 187/19 196/18
200/9
longer [5]  26/6 26/8 119/8
179/19 187/5
look [36]  8/1 9/8 10/21 12/5
20/11 27/8 30/5 33/12 36/14
45/25 46/2 52/11 64/13 65/4
67/8 68/13 85/16 85/23 85/25
90/18 123/4 125/3 143/16
145/11 147/3 151/1 162/10
176/25 181/1 183/6 183/23
184/4 201/14 201/24 226/2
226/4
looked [7]  13/10 13/11 90/16
100/20 136/22 160/8 189/6
looking [21]  9/17 11/4 12/5
23/16 34/19 35/11 53/8 53/14
60/14 65/24 122/11 122/13
124/13 151/19 158/25 162/3
164/7 189/15 190/1 216/22

232/15
**lose [3]**  42/24 43/24 43/25
loses [1]  12/10
losing [1]  13/13
loss [3]  28/4 28/5 192/20
losses [7]  46/13 182/1 182/8
182/12 182/13 192/20 192/22
lost [3]  26/19 43/15 137/13
lot [22]  13/9 38/16 40/18
45/11 45/12 45/13 78/17 80/20
81/19 84/18 84/20 84/25 87/18
102/22 105/7 130/8 153/11
157/5 157/7 170/6 223/19
225/21
lots [1]  54/17
lounge [18]  33/17 39/16 41/13
41/17 118/18 124/17 125/5
138/17 150/3 158/22 159/12
215/16 215/21 215/25 216/9
216/25 222/12 228/24
lounges [8]  48/18 118/25
217/22 217/23 228/15 228/16
228/18 228/19
LTD [6]  1/4 4/6 4/11 152/17
197/8 198/9
Luck [8]  108/17 109/20 109/21
109/25 110/4 112/3 112/9
112/16
Luming [2]  70/13 70/15
lunch [1]  142/15

**M**

machine [1]  234/8
made [48]  7/21 13/2 16/7
23/23 24/14 38/15 39/19 54/2
84/15 104/17 107/3 121/6
124/20 124/21 135/5 135/8
139/11 140/13 148/14 148/17
149/3 157/7 157/16 181/17
181/20 185/21 197/10 198/10
200/21 200/25 206/4 206/8
207/22 208/9 209/1 209/5
210/1 210/2 210/13 211/25
212/19 212/20 212/22 213/25
214/11 219/2 221/14 231/23
MAGISTRATE [1]  1/12
maintained [2]  62/25 64/21
major [2]  28/8 41/8
make [91]  13/4 14/14 16/5
16/11 17/21 19/13 23/19 23/21
24/2 25/23 29/3 29/6 30/15
40/7 40/24 41/5 43/6 43/14
46/11 46/20 46/23 46/25 47/3
57/3 58/11 58/12 70/5 81/4
83/18 99/6 121/24 122/11
129/9 141/2 143/19 145/12
148/3 151/6 152/11 152/20
156/20 156/24 157/2 158/25
160/10 161/22 174/21 178/18
178/22 178/23 179/5 179/6
179/7 179/11 179/16 179/23
181/11 189/3 195/13 198/12
200/25 201/2 203/1 203/15
204/11 205/12 205/13 205/17
205/25 208/15 208/19 209/19
210/11 211/3 211/9 212/8
213/24 214/4 214/25 217/4
217/5 217/8 217/13 217/16
217/20 218/3 218/17 220/16
222/20 233/13 233/14
makes [15]  23/15 27/9 30/21

39/17 46/2 47/9 58/25 72/21
176/2 201/11
making [14]  22/19 23/10 57/12
130/13 143/22 150/18 151/3
167/4 178/24 187/19 193/20
197/3 199/14 200/6
management [6]  1/7 4/7 4/13
69/25 119/16 192/7
manager [6]  21/11 68/5 69/19
78/21 115/19 172/10
mandatory [7]  13/14 33/3
35/17 42/21 222/10 223/11
223/16
manner [2]  19/21 159/6
manufacture [13]  37/17 40/18
44/4 149/16 149/21 149/25
165/11 165/20 177/3 177/21
229/23 230/6 230/7
manufactured [26]  13/24 24/21
25/10 25/12 25/21 26/9 26/10
36/5 36/9 39/22 40/7 44/12
136/8 157/19 158/22 165/4
165/7 165/25 166/12 176/12
177/18 187/15 215/19 215/24
222/1 230/3
manufactures [2]  40/11 40/18
manufacturing [6]  165/22
176/16 177/10 184/21 185/18
185/19
many [18]  41/18 42/9 72/2
86/1 133/9 133/16 138/23
154/17 154/19 156/21 157/4
161/3 163/5 193/9 193/12
202/21 202/23 206/13
Mar [42]  79/23 82/2 101/16
102/1 105/19 106/5 106/6
106/8 115/16 116/4 125/14
130/8 139/2 139/7 140/7
152/17 161/13 161/22 162/11
162/18 164/3 164/6 164/10
178/2 194/14 197/6 197/7
197/8 198/8 198/8 200/23
204/10 204/15 204/17 204/18
205/2 205/6 205/9 206/8
208/23 214/9 216/10
Mar's [3]  139/17 206/24
216/23
March [11]  20/9 21/21 112/21
121/14 123/9 138/15 156/16
191/3 191/5 196/6 223/6
March 27 [1]  112/21
March 8th [3]  121/14 123/9
138/15
mark [10]  55/17 55/18 59/2
59/13 141/16 141/18 141/22
141/24 171/10 171/24
marked [18]  50/22 54/4 56/5
56/10 61/14 62/12 100/1
120/11 121/12 122/7 122/25
128/7 146/15 147/2 152/6
171/21 183/16 183/18
market [1]  25/1
marketing [1]  160/24
marking [1]  56/1
marshals [1]  175/14
MARTIN [1]  1/18
match [5]  40/23 41/5 41/21
42/10 42/12
material [4]  8/20 8/21 142/10
232/9
materialize [1]  224/7
materials [5]  5/22 7/9 149/17

**M**

materials... [2]   149/22 149/25
matter [8]   24/12 27/4 28/24
 36/15 97/12 191/23 227/12
 232/9
matters [2]   42/2 149/16
maximum [1]   5/18
may [74]   5/19 6/1 7/10 8/11
 8/12 8/19 8/21 9/7 9/9 9/13
 15/24 16/7 35/10 37/11 42/9
 43/1 46/10 56/16 60/11 62/21
 64/18 76/4 76/8 80/14 81/23
 88/24 89/10 95/13 97/8 99/16
 103/10 105/4 109/6 121/16
 122/16 124/6 128/1 129/9
 133/21 137/15 142/21 145/11
 146/23 147/13 151/15 152/3
 153/2 153/9 153/21 154/5
 154/8 162/15 165/12 171/23
 172/4 178/15 183/12 184/18
 185/13 186/13 187/22 190/3
 191/3 191/5 192/14 194/11
 203/8 206/23 206/24 213/11
 214/8 217/19 224/22 230/13
May 26th [1]   230/13
May 3 [3]   151/15 153/2 153/9
May 3rd [1]   154/8
May the [1]   153/21
maybe [16]   8/20 14/1 33/8
 33/8 35/25 41/4 48/7 88/22
 127/2 132/2 159/16 196/21
 198/17 206/14 229/25 229/25
McCarthy [10]   4/25 31/13
 159/24 160/1 171/16 172/15
 184/6 184/16 187/18 202/11
me [132]   4/18 4/22 4/25 5/5
 9/7 9/14 10/2 11/4 11/9 12/23
 14/2 15/8 15/10 15/10 15/20
 15/20 16/1 17/1 17/20 18/24
 21/6 21/7 21/8 31/16 31/21
 31/24 34/25 37/4 40/4 40/5
 42/3 44/8 47/15 48/2 50/20
 50/22 52/11 53/5 53/13 54/4
 62/20 71/12 72/12 76/2 76/11
 76/19 80/19 81/7 82/14 82/18
 82/21 83/23 83/25 84/10 87/23
 90/21 92/25 93/12 94/6 94/10
 97/9 99/2 100/19 102/21
 103/23 104/8 105/14 106/6
 107/11 108/24 110/17 117/19
 120/2 121/19 122/1 122/6
 122/10 126/23 128/12 129/20
 130/24 131/10 133/8 133/15
 135/12 135/18 137/14 137/19
 137/21 139/14 139/14 141/1
 147/3 147/15 148/7 148/24
 151/17 152/12 158/3 158/9
 159/2 162/14 171/3 171/9
 176/2 176/22 176/25 178/11
 178/22 179/7 181/2 181/11
 183/3 183/5 183/9 187/3 187/5
 188/3 191/5 194/13 196/4
 200/2 201/8 201/14 202/23
 203/4 206/15 210/19 217/19
 218/8 218/18 228/10
mean [73]   7/19 8/16 9/3 9/16
 13/5 14/6 16/23 17/3 22/2
 22/3 26/7 29/5 33/23 34/16
 35/24 35/25 36/1 36/22 40/2
 40/21 41/3 42/13 44/5 47/21
 50/8 50/9 51/14 56/7 56/15
 57/12 58/2 59/14 59/21 60/19

71/3 81/19 84/13 86/25 88/6
 91/2 92/17 95/2 106/2 114/19
 127/17 141/4 141/19 143/6
 153/13 157/2 159/8 162/9
 168/1 173/3 176/3 197/4
 197/15 198/6 199/3 199/20
 199/21 202/22 219/17 225/16
 228/6 228/6 228/7 228/10
 228/13 228/15 229/6 229/25
 231/18
mean certain [1]   88/6
Meaning [3]   180/11 180/12
 200/8
means [7]   24/3 26/7 29/7 88/7
 192/22 202/23 231/21
meant [6]   90/4 145/2 198/4
 199/2 222/19 223/13
meant from [1]   145/2
meantime [1]   233/13
media [14]   86/2 86/5 86/7
 86/11 86/14 86/16 86/18 86/21
 87/12 87/16 87/20 87/22 89/6
 223/21
meet [17]   28/3 28/9 28/10
 36/16 39/13 39/14 43/21 44/1
 45/13 117/8 131/24 132/3
 135/2 152/16 152/23 223/15
 226/5
meeting [17]   26/13 67/1 74/4
 134/9 158/3 158/20 159/1
 159/10 159/15 215/6 215/8
 217/7 217/9 217/12 217/18
 217/24 226/6
member [9]   86/2 86/5 86/7
 86/11 86/14 86/16 86/18 89/5
 89/8
memo [20]   2/18 2/19 2/20 2/21
 24/20 49/25 50/7 50/15 50/16
 53/7 55/1 55/2 55/11 63/13
 64/13 112/20 117/2 117/4
 145/20 146/5
memorandum [11]   5/25 6/14 7/2
 7/4 7/6 7/6 10/12 52/10 52/18
 64/4 65/5
memory [1]   91/11
mention [4]   30/3 39/15 57/24
 110/10
mentioned [13]   18/3 44/19
 77/12 87/7 111/18 142/4
 144/24 145/10 146/12 215/10
 217/7 217/8 234/9
mentions [8]   91/25 92/8 92/9
 92/12 93/2 106/14 106/14
 117/1
merely [2]   7/24 45/14
merits [6]   36/17 220/11
 220/23 223/10 223/15 227/5
message [1]   64/15
met [8]   34/10 123/18 123/18
 132/4 134/10 160/6 201/6
 226/18
Metalworks [1]   195/16
methods [1]   232/1
MIAMI [13]   1/2 1/16 1/19 1/22
 1/22 40/8 40/9 136/9 203/19
 222/12 234/15 234/18 234/19
mic [2]   188/6 219/19
Michael [1]   41/7
microphone [16]   30/16 30/20
 60/6 60/13 75/20 99/18 99/18
 100/25 103/12 121/20 121/23
 170/7 184/3 188/7 213/20
 222/16

middle [2]   114/21 176/10
might [7]   12/7 14/8 18/4
 30/16 95/2 162/7 168/10
Mike [3]   31/14 201/22 202/5
million [8]   26/17 27/15
 110/11 110/18 224/24 224/24
 225/2 227/19
millions [3]   12/13 26/21
 43/15
mind [10]   5/17 6/17 9/5 26/24
 33/1 45/1 45/17 91/3 200/2
 214/7
mine [1]   122/7
minister [1]   112/23
minute [5]   45/23 123/19
 126/23 196/25 201/14
minutes [10]   5/18 6/5 6/5
 35/3 48/7 48/20 119/9 167/16
 167/19 175/13
misheard [1]   147/14
misrepresent [1]   40/6
miss [3]   97/8 97/9 97/12
missed [7]   82/1 83/5 112/22
 114/3 114/12 115/13 116/19
misses [6]   94/24 96/5 106/14
 106/15 106/19 106/20
missing [7]   26/19 123/11
 123/13 123/14 124/8 161/18
 225/25
misspeak [1]   182/14
mistake [4]   20/10 20/25 20/25
 30/23
Mister [1]   70/21
misunderstand [2]   111/19
 114/16
misunderstood [2]   162/15
 217/19
mitigate [3]   194/10 194/12
 211/4
Mitigating [1]   192/22
mitigation [5]   166/23 192/20
 192/20 192/25 194/4
mix [1]   47/21
modified [1]   227/1
moment [1]   161/18
Monday [1]   6/2
monetary [4]   12/8 224/11
 225/7 227/17
monetized [5]   43/8 43/9 43/12
 224/13 224/15
money [105]   18/24 23/11 24/8
 24/8 24/13 26/19 29/6 29/7
 29/12 30/13 31/8 32/3 32/8
 32/16 32/20 33/8 34/17 36/19
 36/23 37/7 46/16 72/14 72/21
 72/23 73/20 109/12 110/24
 127/13 130/8 131/2 138/21
 139/7 139/7 140/1 140/10
 142/24 142/25 144/5 148/11
 148/12 152/17 166/17 166/18
 167/5 167/8 177/23 178/3
 178/7 178/13 179/25 180/14
 180/18 180/21 180/23 181/5
 181/9 181/10 182/17 186/10
 192/25 193/3 193/6 193/7
 193/8 193/20 194/4 194/10
 195/19 204/10 205/8 205/17
 206/7 206/16 206/20 206/23
 210/23 211/11 211/13 211/21
 211/22 211/23 211/24 212/7
 212/9 212/10 212/15 213/2
 213/6 213/8 214/7 214/14

## M

**money... [14]** 215/1 218/1
218/9 220/14 220/19 220/22
221/1 221/20 222/23 227/2
229/4 229/5 229/8 229/11
**monies [58]** 121/7 130/13
133/2 140/10 150/18 151/3
151/6 152/12 156/20 157/3
158/4 176/17 176/19 178/1
178/1 178/6 178/19 178/22
178/23 178/24 178/25 179/5
179/7 179/8 179/9 179/11
179/16 179/17 179/21 179/23
180/10 180/21 197/3 198/13
200/6 200/9 204/11 204/13
204/22 204/22 205/11 205/12
205/13 205/16 205/21 207/8
207/9 207/12 208/8 211/4
211/5 211/9 213/25 214/4
214/6 214/11 218/4 222/21
**month [5]** 26/4 26/5 88/1
133/13 176/23
**monthly [1]** 73/1
**months [8]** 124/10 124/13
134/5 177/20 191/2 196/22
196/23 196/23
**months from [1]** 134/5
**Moody's [6]** 38/12 38/13 38/18
38/21 91/4 174/22
**Moore [9]** 4/6 14/2 14/4 45/16
119/15 192/6 226/13 230/7
232/22
**more [24]** 10/22 19/24 26/24
27/1 27/5 34/21 35/12 47/22
54/2 57/13 57/15 78/18 88/13
138/15 149/12 149/23 164/6
194/5 194/7 202/25 210/10
216/3 218/14 232/19
**morning [4]** 4/2 4/3 4/4 58/21
**mortgage [3]** 109/4 109/6
109/9
**most [9]** 41/20 79/13 79/13
79/13 79/16 157/24 162/22
208/25 230/16
**mostly [2]** 166/3 177/16
**motion [25]** 9/24 11/10 39/8
49/10 50/23 53/19 55/15 73/15
81/9 86/9 90/19 135/16 135/18
135/19 136/24 151/21 155/20
155/21 226/14 226/19 229/21
230/1 230/8 230/11 230/14
**motions [2]** 22/19 54/7
**mouth [2]** 22/20 179/4
**move [18]** 60/22 62/7 63/3
63/24 64/8 64/24 68/9 81/20
91/5 133/18 133/21 134/13
151/2 188/18 208/25 209/7
214/2 223/18
**moved [4]** 22/9 47/2 48/12
146/17
**moving [11]** 29/17 29/20 32/12
32/17 32/19 37/25 38/6 41/6
43/6 63/12 134/20
**MR [11]** 2/9 2/9 2/10 2/10
2/13 2/13 22/20 23/2 33/20
109/12 174/5
**Mr. [115]** 4/17 4/20 5/16 6/25
10/2 15/12 15/17 16/16 16/20
17/8 17/20 18/7 24/21 25/25
26/8 29/15 32/6 33/12 33/13
33/15 33/15 33/19 34/1 34/1
34/3 34/4 38/4 45/22 46/18
48/11 48/24 49/7 57/20 58/7
69/9 70/20 70/22 70/24 71/4
71/6 81/12 87/7 105/18 106/3
106/11 106/15 106/21 106/23
107/11 112/24 119/4 119/20
119/20 120/4 120/22 126/23
128/9 128/12 129/12 135/10
142/18 146/16 147/6 148/7
148/10 149/2 149/14 149/24
150/5 151/8 154/22 154/23
155/3 155/6 155/6 156/2
167/14 168/25 169/9 169/18
169/22 169/23 169/25 170/12
172/3 173/10 173/16 174/8
175/10 175/12 184/3 191/20
192/9 192/11 192/17 213/12
215/10 219/6 219/12 219/15
220/2 220/6 220/9 220/12
222/6 222/24 226/11 226/20
232/24 233/2
**Mr. Davis [39]** 4/17 6/25 10/2
15/17 16/16 17/8 17/20 18/7
32/6 33/13 33/19 34/3 45/22
48/11 48/24 57/20 58/7 58/15
60/10 61/2 67/21 119/20
142/18 156/2 169/9 169/18
169/22 169/25 173/16 175/12
184/3 191/20 192/11 213/12
219/12 220/6 220/9 226/20
232/24
**Mr. Davis' [1]** 38/4
**Mr. Feldman [18]** 4/20 5/16
15/2 16/20 29/15 46/18 49/7
60/17 69/9 119/4 119/20 120/4
126/23 167/14 169/23 219/6
222/6 233/2
**Mr. Gao [8]** 70/22 70/24 71/4
71/6 81/12 87/7 154/22 154/23
**Mr. Izmirlian [8]** 105/18 106/3
106/11 106/15 106/21 106/23
107/11 112/24
**Mr. or [1]** 70/20
**Mr. Shvartsman [25]** 24/21
25/25 26/8 33/12 33/15 33/15
34/1 34/4 135/10 147/6 148/10
149/2 149/14 149/24 150/5
172/3 174/8 175/10 192/9
192/17 215/10 219/15 220/2
222/24 226/11
**Mr. Shvartsman's [12]** 34/1
120/22 128/9 128/12 129/12
146/16 148/7 151/8 168/25
170/12 173/10 220/12
**Mr. Wu [3]** 155/3 155/6 155/6
**Mrs [1]** 70/20
**Ms [2]** 38/9 119/23
**Ms. [43]** 13/3 19/13 21/16
26/4 38/12 38/22 45/8 49/9
49/11 50/19 52/25 53/1 58/8
58/21 59/5 59/25 60/1 69/7
69/13 97/6 99/23 100/10 120/3
120/7 122/25 145/8 148/7
172/14 172/15 184/6 184/8
187/8 187/12 187/18 192/18
216/7 217/7 217/24 222/24
223/18 224/16 225/10 226/9
**Ms. Dwornik [35]** 19/13 21/16
26/4 38/12 38/22 49/9 49/11
50/19 58/8 58/21 59/5 59/25
60/1 69/7 69/13 97/6 99/23
100/10 120/3 120/7 122/25
145/8 148/7 172/14 184/8

**money... [14]** 215/1 218/1

48/11 48/24 49/7 57/20 58/7

187/8 187/12 192/18 217/7
217/24 223/18 225/10 226/9
225/10 226/9
**Ms. Dwornik's [5]** 13/3 45/8
52/25 53/1 216/7
**Ms. McCarthy [3]** 172/15 184/6
187/18
**much [25]** 27/7 36/13 39/19
72/14 72/21 72/23 73/20 80/18
83/15 88/12 100/3 110/15
119/8 120/5 129/1 138/19
147/17 162/3 188/3 193/6
195/4 195/18 203/11 214/16
218/24
**multibillion [1]** 229/17
**multimillion [1]** 12/16
**multimillion-dollar [1]** 12/16
**multiple [7]** 49/3 160/17
160/19 160/23 200/15 206/16
208/6
**my [92]** 4/22 5/24 8/12 8/16
8/18 9/7 9/18 13/3 16/8 16/10
18/17 27/6 30/14 30/23 31/1
31/12 32/11 32/24 33/4 33/10
34/8 35/20 37/5 37/15 38/3
39/5 40/4 40/8 41/14 41/20
43/18 44/7 44/9 48/18 54/2
60/20 65/19 66/22 70/4 70/4
73/7 77/20 77/22 78/23 87/7
87/19 90/23 92/11 92/18 95/6
97/6 99/5 99/8 113/1 118/1
120/2 122/9 127/7 133/16
135/2 137/1 138/10 142/12
142/12 143/12 155/12 168/22
173/7 175/10 176/3 176/5
176/10 176/16 177/1 178/11
179/9 179/10 181/1 182/14
193/17 196/12 197/14 200/2
205/22 206/3 210/22 212/1
212/3 219/8 222/8 234/11
234/14
**myself [2]** 64/6 177/16
**mystery [1]** 26/1

## N

**N-A-T-A-L-I-A [1]** 60/8
**name [16]** 60/6 60/7 80/4
102/9 102/11 102/11 163/1
168/1 170/8 170/8 170/10
186/22 186/23 186/24 187/4
187/5
**names [1]** 105/25
**Nassau [1]** 102/6
**NATALIA [28]** 2/8 4/18 7/22
30/6 60/4 60/8 178/18 178/21
181/24 184/7 184/10 184/10
184/17 190/23 196/11 198/11
200/7 201/6 204/10 204/21
205/10 205/10 207/8 208/2
208/5 209/15 211/3 215/6
**Natalia's [1]** 179/18
**nature [5]** 26/16 39/1 39/1
161/25 226/4
**neaten [1]** 191/25
**necessarily [5]** 6/6 95/13
126/20 225/12 225/24
**necessary [5]** 16/18 30/9
120/25 121/6 174/16
**need [54]** 13/21 14/13 17/1
17/11 19/15 29/24 30/15 31/22
32/18 32/19 42/20 44/1 46/3
48/6 50/11 55/20 56/16 57/14
59/11 60/17 60/19 61/7 61/8

**N**

**need... [31]**   61/10 66/24
75/20 99/18 100/25 103/12
121/17 123/25 133/17 133/23
144/4 147/19 149/15 169/22
175/16 183/13 188/6 191/24
191/25 192/9 194/8 202/10
208/7 213/19 219/20 221/10
225/18 233/6 233/11 233/11
233/14
**needed [5]**   7/17 18/25 132/10
165/15 208/24
**needing [1]**   18/6
**needs [7]**   16/14 17/4 58/9
59/23 141/10 143/19 226/12
**negotiate [3]**   136/7 136/18
162/12
**negotiating [1]**   163/9
**negotiation [3]**   77/5 77/10
115/10
**negotiations [9]**   12/23 76/14
77/4 77/18 115/12 167/23
167/24 168/10 168/17
**neighborhood [1]**   20/13
**never [35]**   24/21 25/10 26/9
29/1 30/8 34/24 46/7 46/13
46/21 46/22 47/12 79/10 91/3
95/14 102/2 120/24 124/2
132/11 134/12 138/24 141/3
156/14 156/15 160/6 165/1
165/1 191/17 201/13 201/21
202/4 202/7 211/7 211/15
225/14 225/15
**new [36]**   6/15 6/15 79/17
79/18 80/16 88/9 127/16
127/20 130/24 130/25 130/25
131/8 131/18 134/11 136/7
136/18 158/12 162/24 162/25
163/22 164/1 164/4 164/4
164/9 164/12 164/14 164/15
164/17 164/18 164/21 168/12
182/3 182/6 210/4 233/7 233/8
**newspaper [7]**   27/4 76/16
107/20 107/22 107/24 107/25
117/15
**next [12]**   9/16 68/13 88/1
108/9 121/22 121/22 127/3
151/12 152/7 186/11 186/12
219/16
**Nica [1]**   186/22
**nice [3]**   142/14 216/12 216/24
**night [2]**   6/16 8/17
**no [240]**
**no-reply [1]**   64/16
**nobody [1]**   209/13
**nobody's [2]**   209/11 209/11
**non [2]**   62/17 95/16
**non-completion [1]**   95/16
**non-delivery [1]**   62/17
**none [5]**   30/3 32/11 32/17
32/18 133/2
**normally [4]**   62/4 62/25 66/9
66/11
**north [4]**   1/19 1/22 45/4
234/18
**not [419]**
**not going [1]**   47/12
**note [5]**   4/8 20/8 25/16 55/17
142/23
**notebook [1]**   59/16
**noted [3]**   25/2 119/17 192/8
**notes [3]**   100/17 219/8 234/11

**nothing [12]**   25/8 40/19 47/9
172/12 208/11 232/2 232/2
**nothing's [1]**   209/15
**notice [8]**   2/21 30/16 44/17
44/20 44/20 47/20 168/22
191/7
**noticed [1]**   220/2
**notified [3]**   190/16 191/2
191/14
**notify [2]**   190/18 190/19
**notion [3]**   29/8 47/7 221/17
**November [10]**   44/15 44/15
89/19 90/8 171/19 172/4 172/5
172/7 172/8 234/15
**November 17th [1]**   172/5
**November 28 [1]**   171/19
**November 28th [1]**   172/7
**now [97]**   7/23 8/8 11/20 15/10
22/13 23/23 24/9 25/1 25/12
26/3 28/17 32/3 32/4 33/12
33/21 34/16 35/9 37/1 37/9
37/18 38/3 43/18 43/20 51/1
51/9 54/14 57/14 57/22 57/24
64/3 64/13 64/13 65/24 72/13
72/15 74/14 74/17 74/20 82/9
83/3 84/5 84/6 84/11 84/13
85/20 87/24 88/2 88/17 91/8
92/21 97/1 101/14 102/6 106/8
106/10 106/23 114/8 116/4
117/18 117/21 122/1 129/12
143/4 143/13 144/3 148/24
156/1 159/22 160/16 161/10
162/12 164/19 168/15 170/1
170/11 174/6 174/10 184/12
188/23 189/1 189/22 190/13
190/15 190/20 192/18 195/17
204/3 214/11 214/21 215/15
216/13 221/25 230/15 230/15
232/2 232/5 232/19
**number [57]**   4/5 15/12 15/14
20/14 53/18 54/1 57/1 61/4
61/20 61/21 61/22 72/13 85/1
85/16 98/24 103/15 103/24
113/24 114/1 114/9 114/11
119/14 120/12 120/19 121/13
125/8 125/18 125/19 128/7
128/7 135/22 138/6 145/21
151/22 151/25 152/7 161/2
162/2 170/14 171/4 171/10
172/20 172/21 173/10 174/11
188/15 189/5 189/5 189/8
192/5 218/8 218/10 218/19
218/21 225/9 225/10 228/24
**numbered [5]**   11/12 11/16 61/9
99/11 171/9
**numbers [6]**   49/21 73/10 85/23
86/1 144/5 225/24
**numerous [2]**   112/2 176/1

**O**

**oath [3]**   35/21 35/22 120/3
**object [3]**   57/13 59/18 61/3
**objection [20]**   10/1 56/18
57/25 67/16 96/7 104/3 104/4
104/9 105/2 122/19 122/20
128/16 128/18 128/22 128/23
142/19 144/14 144/15 173/15
173/18
**objections [5]**   56/20 58/11
58/17 104/9 232/23
**obligated [11]**   24/4 24/11 95/4
181/8 208/16 208/20 209/20

209/24 210/7 210/12 228/2
**obligation [2]**   118/20 119/1
**obligations [3]**   28/3 97/7
152/16
**obtain [1]**   161/24
**obtained [2]**   35/1 47/2
**obtaining [1]**   162/20
**obvious [3]**   221/22 227/23
228/9
**obviously [24]**   5/23 6/14 12/3
14/3 15/9 28/1 36/13 36/25
42/19 43/18 48/15 55/25 80/19
105/6 109/7 144/25 174/5
174/6 174/9 175/10 226/14
232/5 232/6 232/13
**occasion [1]**   183/1
**occasions [3]**   182/25 191/14
230/12
**occurred [1]**   221/4
**October [13]**   44/11 45/2 82/22
88/11 89/22 90/6 92/5 93/14
93/18 118/7 118/21 119/2
140/19
**October 15th [2]**   93/14 93/18
**October 2016 [1]**   82/22
**October 30th [1]**   89/22
**October date [1]**   44/11
**October in [1]**   90/6
**odd [2]**   14/6 228/14
**off [6]**   66/25 87/1 127/1
155/9 174/18 231/12
**offer [27]**   6/21 49/8 49/12
54/10 58/10 65/13 65/20 66/14
67/4 67/14 69/4 75/6 100/18
100/19 103/10 122/18 128/11
144/2 160/12 160/23 167/3
167/4 167/8 170/12 174/5
174/24 177/23
**offered [16]**   2/15 3/4 3/5
45/24 50/22 52/8 53/10 56/18
61/4 61/5 69/2 73/9 98/24
105/2 160/11 175/1
**offering [9]**   52/5 55/19 63/7
104/11 104/13 104/14 104/19
104/22 122/17
**offerings [1]**   160/16
**offers [2]**   61/3 189/6
**office [7]**   79/14 79/17 79/18
131/7 131/24 159/1 160/2
**offs [1]**   154/16
**Oh [13]**   55/23 113/21 121/22
125/24 143/23 143/25 144/23
159/11 162/9 175/20 175/22
180/14 189/22
**okay [254]**
**old [9]**   66/24 116/4 158/12
179/24 196/21 196/22 210/4
211/5 211/12
**on-site [2]**   70/1 70/3
**once [12]**   26/8 29/10 161/14
164/21 180/4 186/12 205/21
207/12 209/8 212/20 212/22
228/8
**one [91]**   5/19 6/7 8/12 9/4
9/7 9/13 11/12 13/8 15/4 16/1
16/5 16/6 16/8 21/22 25/24
39/13 39/15 42/6 42/10 42/12
45/23 46/10 48/4 49/5 51/14
52/2 57/6 58/10 58/15 60/20
60/20 67/10 78/15 78/18 80/14
80/14 81/2 82/22 83/20 84/3
84/4 85/19 93/3 98/12 104/12

one... **[46]** 104/16 108/2
110/13 110/21 110/23 115/21
121/14 122/7 122/13 125/5
126/1 126/2 130/15 132/16
140/9 144/24 145/11 147/23
148/1 148/2 148/23 149/23
150/20 151/9 154/20 160/8
162/2 164/7 168/3 168/5
171/23 172/12 183/1 186/5
193/7 199/23 203/18 203/25
206/13 206/18 215/10 216/7
220/1 222/24 223/20 224/17
**ones [2]** 139/5 139/6
**ongoing [1]** 96/14
**only [43]** 7/6 14/3 15/3 16/5
17/9 25/18 28/17 30/15 47/17
76/13 77/5 86/23 100/20
124/19 124/20 124/24 126/4
126/5 126/5 130/3 130/5 134/1
142/23 145/10 147/14 149/6
150/20 160/12 160/20 162/18
172/4 175/23 184/11 189/13
203/18 204/3 215/13 224/15
226/8 226/22 231/6 231/11
232/11
**onward [2]** 136/9 222/13
**open [31]** 24/25 44/3 45/12
46/9 83/17 84/11 84/13 84/17
84/18 84/19 85/1 85/10 85/22
85/24 87/24 88/12 88/12 130/2
130/5 199/19 199/22 199/23
201/9 205/20 206/19 208/6
208/15 208/16 208/20 208/23
210/12
**opening [18]** 2/2 2/3 5/11
5/13 14/20 14/24 17/21 22/17
22/20 29/25 30/13 31/2 32/24
33/23 47/15 47/18 112/21
222/8
**openings [1]** 22/15
**operating [6]** 84/14 102/8
102/10 113/4 197/2 200/5
**operational [1]** 88/10
**operator [1]** 88/9
**opinion [3]** 92/19 178/9
178/11
**opinions [1]** 104/15
**opportunity [3]** 6/3 58/1
169/24
**opposed [3]** 38/25 39/16 195/4
**opposing [10]** 14/23 15/9
29/24 35/2 35/13 77/17 122/5
128/3 142/7 174/7
**optimistic [1]** 44/13
**order [110]** 2/16 2/21 4/1
5/20 6/6 6/12 7/13 10/7 10/8
10/10 10/10 12/13 12/22 14/5
19/7 19/9 20/1 20/2 20/4 22/9
25/4 25/13 25/18 25/21 25/22
26/1 26/5 29/3 38/7 40/2 42/5
42/5 42/21 42/21 51/12 52/6
53/24 54/2 55/25 61/15 61/15
61/24 62/18 63/17 64/17 67/12
67/25 69/24 93/6 97/20 124/18
125/5 125/12 126/2 133/25
134/1 134/24 135/2 136/8
136/19 137/17 139/9 150/15
150/20 150/21 152/24 153/7
158/13 158/23 159/3 159/12
159/13 166/20 168/24 180/22
181/9 181/25 182/25 183/5

186/4 189/1 189/6 189/12
193/6 193/7 195/18 195/21
198/13 199/20 199/23 200/1
200/24 203/10 203/15 206/13
206/21 207/1 207/10 207/13
208/9 209/8 210/5 223/2 224/9
229/23 230/6
**ordered [9]** 18/25 24/18 24/19
25/12 34/24 100/18 160/14
165/1 176/11
**ordering [1]** 228/8
**orders [74]** 19/24 30/10 66/5
66/25 129/24 130/2 130/3
130/5 131/11 139/6 150/19
150/19 168/23 180/13 180/15
181/6 181/8 182/1 182/3 182/6
182/9 182/11 182/14 192/22
193/4 193/8 193/9 193/14
195/19 197/11 199/19 199/22
199/23 201/9 204/14 204/24
204/25 205/1 205/5 205/8
205/21 206/1 206/8 206/12
206/13 206/13 206/14 206/17
206/19 206/22 206/24 206/24
207/2 207/9 207/14 208/6
208/10 208/15 208/16 208/20
208/23 209/6 209/7 209/17
209/20 210/12 210/14 211/6
211/10 211/12 213/2 213/7
213/8 216/2
**organization [1]** 58/5
**organized [1]** 12/2
**original [6]** 11/3 53/8 56/8
61/8 61/24 124/18
**originally [4]** 21/21 53/3 82/8
176/17
**other [80]** 8/10 8/20 9/5 9/21
12/21 12/23 13/1 16/8 18/6
19/9 23/15 23/19 23/22 23/23
26/11 26/23 27/23 27/24 28/11
39/16 47/2 47/24 77/21 78/21
85/20 86/23 87/2 87/6 87/7
88/20 95/22 96/5 96/17 96/18
97/7 100/19 101/24 102/3
102/5 102/7 108/2 124/9
124/21 127/5 130/15 131/13
132/14 134/2 134/22 135/6
137/20 155/19 155/21 157/23
161/10 161/12 161/12 161/13
161/24 162/7 162/7 164/22
167/4 169/8 169/18 174/10
174/11 180/8 180/19 200/10
207/14 215/25 217/4 220/25
224/18 226/11 228/8 228/18
229/2 232/1
**other's [1]** 47/22
**others [3]** 51/25 108/2 155/7
**otherwise [4]** 12/18 159/13
196/24 222/23
**our [83]** 4/19 5/1 10/16 11/1
18/12 18/12 20/23 22/9 22/11
23/21 24/8 24/13 24/25 25/2
25/6 25/7 25/7 26/13 26/23
26/24 28/21 29/1 29/6 29/12
30/11 31/18 31/20 31/24 31/25
36/12 36/20 41/6 41/6 43/6
47/18 49/10 50/7 53/17 53/19
56/11 62/16 63/16 65/8 68/5
81/3 82/20 88/11 90/6 123/25
128/7 129/13 129/14 134/9
134/23 142/15 143/7 151/2
168/24 178/25 186/9 186/9

186/17 189/3 190/16 194/12
200/25 202/3 202/13 203/18
206/15 207/16 208/22 209/2
211/4 216/3 217/1 221/2
226/24 233/9
**out [65]** 9/20 10/11 11/9
13/12 16/11 16/24 17/13 18/12
25/25 28/10 34/10 36/8 43/14
46/10 46/19 53/9 66/25 76/11
85/17 101/1 105/25 110/24
116/16 120/2 121/17 126/3
132/3 132/7 132/7 139/4
142/13 158/23 162/12 168/11
179/4 179/16 182/1 186/5
188/17 189/21 189/22 190/5
190/6 190/7 190/12 190/20
191/1 191/1 191/3 191/8 193/8
195/20 202/14 208/5 208/23
209/1 216/22 223/22 226/15
226/22 228/12 231/23 232/1
232/7 232/15
**outdoor [29]** 1/8 2/16 31/3
31/5 32/15 64/15 68/2 80/2
80/7 100/10 118/25 123/6
129/19 133/3 140/22 141/15
144/11 144/12 145/14 145/17
146/4 146/10 149/12 152/15
152/22 188/23 189/1 214/14
214/22
**Outdoors [2]** 12/7 65/7
**outside [3]** 27/7 41/12 77/21
**outstanding [13]** 140/7 140/8
179/15 180/13 180/21 193/6
197/12 206/11 207/5 207/12
210/3 210/6 211/6
**over [26]** 10/1 18/18 21/12
50/22 83/15 90/21 90/22
105/14 121/22 126/3 126/25
127/5 129/4 129/6 140/25
141/5 141/16 145/10 161/3
168/11 181/21 188/13 194/14
196/21 206/12 216/16
**overall [1]** 74/10
**overlooked [1]** 171/23
**overpaid [1]** 156/17
**overpayment [1]** 21/16
**overruled [1]** 105/2
**overtaken [1]** 49/18
**owe [2]** 205/8 206/19
**owed [52]** 18/24 19/4 19/14
19/20 20/12 29/1 29/7 37/7
37/16 46/15 46/17 47/7 121/7
130/8 130/9 130/13 131/2
150/18 151/2 151/3 151/6
152/12 152/17 156/21 157/3
157/11 157/20 178/1 178/4
178/14 179/1 179/3 179/9
179/11 197/3 200/6 204/8
204/10 204/15 204/15 204/17
205/5 205/18 206/25 212/11
214/7 214/14 214/22 218/1
218/4 218/9 222/21
**owes [2]** 204/8 206/16
**owing [1]** 124/24
**own [5]** 20/14 27/6 77/20
163/7 206/18
**owned [4]** 108/18 110/1 110/7
178/4
**owner [21]** 94/3 95/1 95/2
105/19 106/5 106/5 106/6
106/11 108/16 139/2 163/22
164/4 164/5 164/9 164/14

**O**

owner... [6]  164/15 164/17
164/18 164/22 168/10 168/12
owners [1]  162/2
ownership [3]  77/23 109/15
109/17

**P**

p.m [5]  119/13 119/13 192/3
192/3 233/17
page [17]  2/7 46/2 50/24
101/10 105/14 108/9 125/7
125/10 129/17 141/2 144/8
144/10 144/11 145/4 145/16
160/8 188/13
pages [3]  1/9 51/17 234/12
paid [80]  12/22 19/8 19/10
19/22 19/25 19/25 20/10 20/15
21/20 22/9 23/9 23/13 24/1
24/16 25/7 26/3 28/23 28/24
29/13 30/1 30/10 32/8 34/14
37/7 46/9 110/24 111/4 111/9
111/11 125/1 126/5 126/12
133/2 138/16 139/7 139/7
139/8 140/11 150/3 151/1
157/4 157/12 158/5 165/1
166/17 176/11 176/23 176/24
177/20 177/23 178/13 179/23
180/21 180/25 182/18 192/19
195/19 200/9 205/11 205/16
205/21 206/7 206/20 206/22
207/6 207/9 207/9 207/11
207/12 207/23 209/6 211/20
211/21 212/23 220/14 221/5
221/8 221/9 222/23 227/2
pair [1]  42/5
Pam [1]  143/21
Panama [2]  114/23 163/2
paper [1]  10/5
papers [16]  18/12 25/3 27/3
28/21 28/25 31/2 32/12 32/12
32/19 37/25 41/6 43/6 76/13
87/17 116/23 116/24
paragraph [20]  30/8 33/15 74/3
100/15 106/14 106/23 108/11
120/24 132/17 135/15 136/6
168/21 197/1 197/20 198/21
199/1 199/11 200/12 204/7
205/16
paragraphs [1]  117/6
Pardon [1]  21/25
parent [10]  71/12 71/23 71/24
71/25 71/25 72/3 112/20 117/3
117/4 117/9
part [43]  8/5 13/7 37/6 39/13
41/25 43/16 47/13 53/5 72/9
76/14 77/4 77/15 77/18 79/12
85/10 93/11 95/17 102/16
111/16 111/24 123/14 129/16
130/4 140/6 140/11 144/25
145/8 157/24 163/16 171/20
182/5 182/5 195/10 195/20
198/25 199/1 204/9 204/10
208/25 217/13 217/15 220/21
230/8
partial [3]  125/22 126/10
206/9
partially [3]  206/9 209/6
209/6
particular [4]  41/10 132/14
228/18 232/3
parties [15]  5/3 11/20 11/22

parties' [1]  232/20
parts [4]  77/5 77/6 88/18
208/1
party [2]  33/6 194/17
past [3]  132/24 179/11 226/5
patent [1]  41/2
path [2]  95/18 95/20
PATTON [1]  1/15
Pause [hs]  8/15 9/15 10/23
16/3 16/15 90/24 98/19 128/5
137/24 143/14 144/21 155/11
155/14 155/24 168/19 183/11
199/13 201/16 219/10
pay [40]  19/4 19/14 19/17
23/21 26/17 29/9 32/4 33/9
34/13 34/15 34/16 46/13 46/16
47/8 48/13 74/15 74/18 126/4
126/6 130/9 157/11 157/20
158/8 166/19 166/21 166/23
167/5 167/8 179/14 180/14
181/12 182/23 210/3 210/6
212/10 212/14 213/2 213/6
226/25 229/16
paying [9]  23/18 27/6 27/7
28/20 46/25 85/2 126/11
176/18 211/21
payment [27]  2/18 2/20 14/7
24/15 24/15 31/17 38/1 38/1
53/23 53/24 55/1 55/5 63/17
63/18 64/7 124/20 124/21
124/23 139/11 141/22 142/1
166/18 167/3 181/9 213/25
214/2 219/2
payments [10]  13/2 13/4 66/4
74/21 140/12 148/13 148/17
149/3 149/12 212/22
payout [2]  110/11 110/18
peak [9]  44/18 45/1 45/2 45/7
45/9 89/14 89/17 89/23 90/9
peculiar [5]  39/16 40/19
40/25 41/5 42/18
peek [1]  45/2
penalties [1]  227/20
penalty [1]  12/12
pending [1]  117/22
people [24]  27/14 46/24 77/19
77/20 77/21 79/20 79/22 79/25
86/23 87/2 87/6 87/7 87/18
102/7 102/8 109/12 142/14
154/17 154/19 163/11 190/11
212/5 220/24 231/24
people's [2]  180/19 220/25
per [5]  5/20 163/1 163/4
166/19 179/18
percent [9]  14/7 22/10 27/15
27/17 71/19 126/5 126/6
158/10 182/4
Perfect [8]  108/17 109/20
109/21 109/25 110/4 112/3
112/9 112/15
perform [5]  13/25 220/21
221/18 229/5 229/24
perhaps [3]  59/15 127/2
172/19
period [8]  35/1 76/23 82/20
91/17 115/10 153/21 165/23
187/19
perjury [3]  232/7 232/9
232/12
permanently [2]  71/1 71/2

permission [1]  211/16
permit [3]  5/9 5/11 10/9
permits [1]  229/5
permitted [1]  11/6
Perry [1]  112/23
person [11]  34/11 110/14
187/7 187/14 201/6 202/9
208/22 215/8 223/20 224/18
231/1
person's [1]  9/5
personal [10]  42/22 45/8
76/17 76/19 87/9 87/11 135/4
168/9 172/10 225/23
personally [3]  101/21 140/6
162/1
persons [1]  4/15
perspective [4]  60/20 187/11
199/22 209/2
pertain [1]  206/13
phone [2]  31/1 32/11
phones [1]  142/13
photo [2]  3/3 3/4
photograph [7]  57/9 60/21
60/22 60/25 67/10 68/21 99/1
phrase [1]  199/2
pick [1]  216/17
picked [2]  87/20 87/21
picture [19]  34/20 65/8 65/9
65/11 67/20 68/1 68/2 68/4
68/20 68/25 69/1 100/13
101/12 101/15 101/16 216/7
216/9 216/12 216/25
pictures [1]  25/5
piece [2]  74/11 74/11
pieces [1]  216/4
place [7]  20/5 42/12 42/13
125/9 135/2 191/20 199/20
placed [7]  134/1 134/24
139/10 139/10 204/24 205/5
205/8
places [2]  41/21 45/5
Plaintiff [22]  1/5 1/15 2/2
2/3 2/4 2/5 2/7 4/10 5/21 6/2
8/6 13/4 14/12 35/19 40/2
44/15 45/18 60/4 73/9 102/2
120/12 223/10
PLAINTIFF'S [48]  2/15 5/8
14/11 51/5 51/13 51/16 51/17
54/12 54/13 54/14 54/19 54/20
54/20 54/24 55/3 55/4 55/7
55/8 55/9 57/10 61/21 61/22
62/10 63/6 63/11 64/1 64/11
65/2 65/16 65/22 66/16 67/6
68/11 69/6 98/24 100/5 100/7
136/1 136/25 137/6 137/9
143/16 144/6 151/23 151/24
152/6 174/15 174/23
plane [3]  161/19 167/12
167/18
planning [1]  224/2
play [1]  77/14
played [3]  110/17 110/19
110/19
plea [6]  18/1 18/3 175/13
175/19 175/20 232/6
plead [1]  33/11
pleadings [2]  21/12 23/7
pleas [4]  112/19 117/1 175/23
175/24
please [39]  4/2 4/8 31/21
44/8 48/23 60/2 60/5 62/20
63/15 64/5 65/6 65/18 66/18

**P**

**please... [26]**   66/21 70/6
70/10 70/16 78/22 79/15 99/20
121/20 130/16 147/19 150/3
154/6 170/5 171/24 178/8
183/3 189/7 192/4 194/5
196/14 198/21 201/14 202/20
203/3 205/23 208/17
**plenty [1]**   42/7
**plumbing [2]**   78/8 78/9
**plus [10]**   27/12 38/7 124/10
126/14 138/15 140/22 142/11
146/1 158/5 224/23
**PO [2]**   217/21 217/23
**podium [4]**   84/19 84/21 84/23
127/2
**point [27]**   5/12 22/12 25/9
27/21 34/8 40/19 41/23 44/16
46/10 47/3 80/14 82/9 95/25
96/9 115/21 124/9 134/13
142/3 179/20 196/22 202/10
202/14 207/3 209/14 226/22
227/17 227/21
**pointing [1]**   43/13
**policies [1]**   233/8
**policy [6]**   39/11 206/16
207/16 207/18 226/4 233/7
**pool [1]**   41/18
**poolside [1]**   65/12
**popped [1]**   142/5
**popular [1]**   216/25
**population [1]**   227/9
**portion [1]**   37/8
**position [16]**   5/8 25/23 36/18
37/5 37/15 42/17 42/23 45/17
47/24 69/21 78/20 121/5
208/14 214/22 214/25 221/19
**positions [3]**   47/23 59/24
232/20
**possession [4]**   33/16 33/18
33/23 215/21
**possibility [1]**   42/3
**possible [6]**   88/10 155/7
155/8 187/20 194/13 220/13
**possibly [6]**   12/13 79/24
81/12 81/14 108/3 148/18
**post [1]**   164/4
**post-bankruptcy [1]**   164/4
**potential [1]**   161/13
**potentially [3]**   118/17 138/18
224/25
**powder [1]**   203/16
**practices [1]**   230/22
**Precisely [1]**   187/16
**predecessor [1]**   30/11
**predict [2]**   227/7 229/15
**prefer [1]**   147/17
**prejudice [1]**   8/1
**preliminary [9]**   9/25 26/16
33/4 33/10 35/18 39/4 39/14
49/10 58/2
**premarked [1]**   59/1
**premise [4]**   151/2 197/3 200/5
229/21
**premised [1]**   230/1
**premises [1]**   189/3
**prepared [4]**   10/18 10/19
38/18 223/2
**preparing [1]**   6/9
**present [7]**   5/3 7/17 47/10
49/1 57/23 114/5 234/7
**presented [4]**   7/18 32/5 47/17

48/2
**presentation [4]**
**presently [1]**   34/2
**president [3]**   71/7 71/8
143/18
**presidents [1]**   168/5
**press [7]**   28/20 80/12 81/1
81/4 87/12 100/22 230/18
**pressure [1]**   12/1
**Presumably [1]**   40/22
**presuming [1]**   109/3
**pretending [1]**   231/24
**pretension [1]**   42/22
**pretty [4]**   39/19 40/20 89/2
232/14
**prevail [2]**   220/11 227/4
**prevailing [1]**   220/23
**prevented [1]**   221/13
**previous [11]**   2/24 18/19 66/2
106/25 180/5 182/9 182/11
182/14 213/2 213/7 213/8
**previously [10]**   3/3 15/6 20/23
25/6 52/13 65/10 119/17
121/14 133/2 192/8
**price [6]**   19/10 23/14 23/15
158/8 217/1 217/1
**primarily [1]**   18/15
**primary [1]**   5/7
**prime [1]**   112/23
**principals [2]**   163/9 163/11
**print [1]**   142/13
**printed [3]**   105/10 133/10
193/18
**printing [3]**   54/18 143/12
143/21
**printout [1]**   101/2
**prior [27]**   6/18 21/5 21/8
21/13 27/10 73/25 77/25 78/12
81/6 81/8 86/9 89/19 89/22
90/18 92/21 98/7 113/10
113/14 115/12 115/15 116/18
116/21 120/21 149/16 153/6
177/18 212/24
**private [1]**   231/22
**probably [19]**   16/23 23/2 23/4
28/23 37/13 45/1 97/22 111/7
116/2 119/9 121/8 131/17
140/19 146/14 148/23 151/17
155/3 155/4 179/22
**problem [3]**   41/24 41/25 42/13
**problematic [1]**   149/15
**procedural [1]**   7/25
**procedurally [1]**   39/8
**procedure [2]**   10/11 11/24
**proceed [17]**   5/2 5/7 5/14
10/20 45/22 48/24 56/1 58/7
59/6 60/10 61/2 119/18 120/4
122/16 192/11 192/14 219/6
**proceeded [10]**   197/4 197/5
197/14 198/6 198/19 199/2
199/15 199/15 200/7 200/8
**proceeding [1]**   175/13
**proceedings [30]**   5/4 8/15 9/15
10/23 13/10 16/3 16/15 43/24
45/15 75/7 75/16 76/7 76/16
90/24 98/19 128/5 137/24
143/14 144/21 155/11 155/14
155/24 168/19 169/12 183/11
199/13 201/16 219/10 233/17
234/8
**process [16]**   19/24 20/7 26/5
110/11 110/18 135/8 140/7
153/23 153/24 154/7 154/14

161/5 161/7 168/22 186/9
**processed [3]**   150/15 150/19
150/22
**procured [3]**   12/21 70/4
228/19
**procurement [8]**   21/11 21/14
69/24 115/19 131/14 134/2
139/3 139/3
**produce [3]**   14/5 25/11 221/6
**produced [5]**   191/7 230/12
230/14 231/8 231/8
**product [27]**   102/23 102/23
102/24 103/2 131/8 133/24
157/12 157/21 158/8 158/9
158/13 160/25 184/22 194/8
194/9 194/11 194/16 194/21
194/21 194/23 205/18 205/20
206/1 206/5 208/24 208/24
210/21
**production [34]**   2/21 64/17
135/7 137/22 183/1 184/9
184/11 184/15 185/1 185/3
187/18 188/23 189/1 189/13
189/16 189/20 189/21 189/22
189/24 189/25 190/4 190/5
190/7 190/9 190/12 190/19
190/20 191/1 191/3 191/8
191/15 191/16 191/18 212/24
**products [4]**   160/23 161/2
194/3 200/15
**profited [2]**   112/12 112/16
**profiting [2]**   112/12 112/16
**prognosticate [1]**   28/16
**progress [1]**   168/24
**project [89]**   18/16 27/13
27/22 29/7 65/8 65/8 65/12
67/11 68/21 71/1 71/2 71/3
74/10 76/15 76/22 76/24 79/23
80/17 80/18 81/11 82/2 83/10
83/16 84/8 84/10 84/15 85/10
87/15 87/16 87/17 87/18 87/19
92/5 92/9 95/9 98/10 101/17
102/1 102/5 102/11 102/13
102/19 106/6 106/7 108/5
113/11 113/15 113/22 113/25
114/12 115/11 115/16 115/24
116/1 116/4 116/4 117/7
118/14 118/17 118/24 136/10
136/11 139/4 140/25 156/22
157/5 157/6 157/10 161/22
162/2 162/5 162/10 162/11
162/18 162/20 163/4 163/7
164/3 164/10 167/22 167/25
197/6 221/12 222/13 227/9
227/24 227/24 228/23 228/25
**project's [1]**   83/15
**projects [13]**   28/11 101/24
102/3 102/5 161/10 161/12
161/13 161/17 162/7 162/8
163/4 163/21 164/1
**promise [3]**   129/7 212/19
212/20
**promised [2]**   177/14 212/22
**promises [1]**   211/25
**promotion [1]**   217/2
**prong [3]**   26/23 26/24 28/14
**proof [5]**   21/2 21/16 26/16
27/1 104/19
**proper [1]**   13/5
**properties [1]**   85/18
**property [6]**   25/6 25/8 39/6
42/23 161/14 206/20

**P**

**proposal [4]** 156/24 157/2
157/14 157/17
**prospecting [1]** 167/25
**provide [19]** 8/18 13/21 15/16
23/8 23/17 24/4 24/6 24/7
24/11 34/3 99/18 141/1 195/17
222/2 225/10 227/3 227/13
228/3 228/3
**provided [16]** 15/5 15/20
16/19 16/23 21/21 46/8 165/13
193/20 195/23 196/2 196/4
196/24 218/11 221/8 222/3
230/10
**provides [3]** 74/24 221/19
226/25
**providing [2]** 24/5 221/19
**provision [7]** 10/7 77/11 92/2
93/23 94/16 94/18 97/15
**provisions [1]** 5/12
**PSI [25]** 21/11 21/13 21/13
21/14 22/3 30/2 31/3 31/6
31/10 31/15 34/14 34/15 34/17
66/3 124/18 138/18 139/7
139/8 139/10 139/10 140/9
141/1 157/9 157/20 201/1
**public [11]** 39/11 79/7 79/12
80/10 80/24 86/22 89/9 220/24
221/1 221/14 226/3
**publicity [9]** 28/1 28/2 38/12
86/11 102/18 102/22 103/5
104/15 227/25
**publicized [1]** 227/15
**pull [3]** 9/7 120/2 121/17
**purchase [51]** 2/16 12/22 19/9
19/9 20/1 20/2 20/4 22/9
22/11 22/13 25/4 25/18 51/11
52/6 53/23 61/14 61/15 61/24
62/18 63/17 66/25 129/23
130/2 130/3 130/5 130/25
131/7 133/18 133/22 136/8
136/19 137/17 139/6 150/19
150/20 150/21 157/19 158/12
158/23 159/3 166/19 168/24
177/13 189/5 189/5 189/6
198/12 200/24 203/10 212/11
223/2
**purchased [12]** 3/3 25/6 39/17
39/18 62/18 65/9 161/14
202/19 203/2 203/8 210/8
231/10
**purchaser [1]** 224/1
**purchasing [22]** 31/5 32/13
32/15 125/15 138/22 139/1
139/21 139/25 140/21 144/10
144/12 144/18 145/1 145/3
145/4 145/13 145/17 146/4
146/11 200/21 205/2 214/9
**pure [1]** 104/10
**purports [2]** 24/25 61/23
**purpose [9]** 14/13 46/10
104/15 162/17 162/20 166/17
182/18 212/10 216/1
**purposes [9]** 24/2 51/22 75/15
116/11 129/14 129/15 163/6
169/24 225/14
**pursuant [6]** 67/12 67/25
100/18 157/20 205/5 233/8
**Pursue [1]** 153/20
**pursued [2]** 153/22 225/17
**pursuing [1]** 153/14
**put [21]** 15/6 17/11 19/1

28/21 35/21 37/25 41/6 47/15
189/20 189/24 189/25 190/3
190/8 197/9 210/4 223/18
226/18
**puts [1]** 24/20
**puzzle [1]** 123/14

**Q**

**quality [2]** 102/22 102/24
**question [71]** 8/25 18/16
21/15 34/8 34/23 44/8 45/6
48/4 60/14 71/12 76/10 82/18
85/9 92/11 92/23 93/8 94/21
96/2 96/8 97/4 97/6 97/10
101/18 113/1 117/22 127/6
132/6 133/6 140/5 141/5 141/9
141/16 141/18 141/22 141/24
149/1 149/23 154/6 176/10
179/9 181/18 185/8 193/2
194/7 195/12 196/12 196/14
197/14 198/16 198/19 200/3
204/9 205/22 208/17 209/22
209/9 210/10 210/11 210/15
210/17 210/18 210/22 210/25
211/20 212/1 212/3 217/22
217/24 223/12 223/14 223/17
**questionable [2]** 44/3 45/12
**questions [24]** 13/9 31/21 33/5
37/20 37/21 38/1 38/3 38/4
38/9 38/24 39/3 39/10 45/7
47/25 104/23 120/20 156/3
169/8 174/7 176/6 186/19
189/7 213/11 229/12
**quick [5]** 123/4 124/16 159/13
183/23 219/8
**quickly [3]** 15/6 88/10 143/3
**quit [1]** 22/19
**quite [4]** 85/1 85/17 126/11
196/20
**quotation [1]** 159/2
**quotations [4]** 130/24 131/7
132/22 158/9
**quote [10]** 100/15 108/15
108/16 117/7 117/8 117/24
118/3 150/18 152/15 222/11
**quote/unquote [2]** 108/15
108/16

**R**

**radio [5]** 131/12 131/16
179/18 208/12 209/14
**raise [2]** 8/24 44/17
**raised [4]** 6/22 8/22 33/5
227/17
**ran [2]** 141/11 193/8
**rather [3]** 34/20 183/18
228/11
**rating [2]** 38/14 38/21
**rationale [1]** 220/13
**Raymond [1]** 172/9
**re [1]** 50/23
**re-filed [1]** 50/23
**read [17]** 5/20 10/25 51/7
54/16 54/17 74/3 75/2 87/17
108/11 160/7 160/10 173/5
188/13 188/18 198/21 199/5
205/15
**readily [1]** 25/2
**reading [1]** 13/3
**reads [1]** 188/20
**ready [6]** 11/22 45/22 48/24
81/4 119/18 192/11

**real [3]** 123/4 186/18 219/8
**reality [2]** 143/11 219/13
28/15 41/22 43/13 43/25 45/7
92/23 111/23 200/3 209/2
211/1 225/17
**reason [9]** 29/23 32/3 47/3
58/5 61/10 121/22 219/24
227/17 228/18
**reasonable [1]** 30/8
**reasons [4]** 23/24 25/25 51/14
163/6
**rebut [1]** 11/8
**rebuttal [2]** 2/5 226/21
**recall [16]** 74/5 77/22 80/15
81/16 81/18 81/22 81/25 91/17
101/18 112/19 117/2 120/9
121/1 149/1 214/17 229/9
**Recalling [2]** 119/14 192/5
**receipt [3]** 2/20 55/4 121/9
**receive [10]** 8/23 19/20 20/7
30/7 87/12 156/16 157/10
185/16 221/6 226/25
**received [54]** 19/23 23/11
30/8 37/18 62/10 63/6 63/11
64/1 64/7 64/11 64/15 65/2
65/7 65/16 65/22 66/16 67/6
68/11 69/6 88/5 88/22 104/7
110/14 120/25 121/5 122/22
123/9 124/2 124/23 126/3
128/20 128/25 134/12 134/24
138/24 141/3 144/20 146/21
156/14 156/15 159/23 165/13
170/19 174/1 174/6 182/5
190/18 200/6 200/24 209/8
209/14 211/5 217/21 217/23
**receiver [6]** 82/10 82/11
82/15 82/17 172/10 224/2
**receivers [7]** 76/15 109/21
109/23 115/10 133/1 133/7
164/20
**receivership [5]** 110/25 111/1
140/9 164/3 168/11
**receives [1]** 227/12
**receiving [2]** 131/6 133/11
**recently [3]** 162/10 180/20
193/25
**recess [12]** 48/6 48/20 48/22
119/7 119/12 119/13 191/22
191/23 191/24 192/2 192/3
233/5
**recessing [1]** 17/25
**recite [6]** 7/7 91/8 91/12
197/1 201/10 204/7
**recited [1]** 197/14
**recites [3]** 19/20 24/22 189/5
**reciting [1]** 23/20
**recognize [4]** 11/24 12/10
28/16 62/13
**recollection [3]** 80/23 181/3
183/17
**recommend [2]** 226/13 230/8
**recommendation [3]** 45/16
226/16 232/22
**recommendations [1]** 14/4
**reconciliation [28]** 8/23 46/1
123/7 124/22 125/11 127/24
129/24 130/4 132/9 132/13
133/5 133/11 133/20 134/19
138/15 159/15 193/19 193/22
193/23 196/6 212/21 218/10
218/12 218/14 218/20 218/23
219/1 223/7
**reconciliations [1]** 134/8

**record [26]**   4/9 5/4 6/11 19/10 26/15 59/22 60/7 61/1 61/4 61/9 61/22 62/5 62/25 63/22 64/21 66/11 66/12 68/15 91/4 91/5 98/25 122/2 141/2 170/8 171/3 201/19
**records [26]**   19/19 19/19 19/21 57/4 57/8 60/20 60/21 62/2 62/4 62/23 63/20 63/21 64/19 67/2 139/17 139/18 139/19 139/21 139/23 141/1 141/3 141/20 141/21 177/1 181/1 232/15
**recover [2]**   179/21 221/17
**recross [3]**   2/10 167/20 219/12
**RECROSS-EXAMINATION [1]**   167/20
**recycled [1]**   195/3
**redirect [10]**   2/10 2/13 17/16 17/19 156/2 156/6 167/16 174/9 213/14 213/16
**reduced [1]**   217/1
**reduction [1]**   127/13
**reduplicate [1]**   120/7
**refer [17]**   14/15 14/19 14/19 16/14 49/8 51/15 73/8 80/1 91/2 120/11 121/12 135/21 201/10 202/18 203/7 203/8 214/6
**reference [11]**   13/16 16/13 39/21 39/22 46/2 112/5 112/8 151/5 160/10 201/22 203/1
**referenced [2]**   21/12 51/25
**references [3]**   27/9 112/2 146/4
**referred [7]**   5/6 7/9 11/16 15/14 51/6 117/24 137/10
**referring [26]**   17/9 61/18 74/7 74/10 106/24 108/13 111/2 111/6 112/4 117/14 117/15 117/17 117/23 117/24 125/3 137/3 145/25 147/25 150/16 151/18 152/8 184/16 188/8 197/19 197/20 201/12
**refers [1]**   151/5
**reflection [1]**   141/14
**refresh [1]**   183/17
**refund [8]**   32/14 32/14 34/15 140/22 141/14 142/11 145/21 146/5
**refunded [4]**   34/17 38/2 142/24 142/25
**refusing [1]**   152/16
**refutes [1]**   30/11
**regard [7]**   27/2 47/25 66/9 70/3 77/14 84/8 223/7
**regarded [1]**   166/6
**regarding [23]**   5/13 12/15 13/1 13/9 33/12 58/12 58/13 59/20 62/17 66/4 66/22 79/23 79/25 80/6 80/9 81/23 102/22 104/16 127/24 196/15 224/18 229/16 231/19
**regardless [12]**   29/7
**region [5]**   101/23 101/24 162/24 163/1 163/1
**register [5]**   140/12 140/14 141/14 162/25 163/1
**registered [1]**   163/19
**regurgitate [1]**   36/13
**rejecting [1]**   39/8

**related [12]**   8/24 38/10 42/22 108/5 127/23 132/23 200/18
**relating [2]**   102/18 201/3
**relations [8]**   79/7 79/12 80/10 80/24 81/1 86/21 86/22 89/9
**relationship [16]**   108/14 108/23 108/24 109/5 109/7 109/23 112/2 112/5 112/9 112/13 112/17 139/1 166/6 208/22 209/1 215/4
**relationships [1]**   110/6
**relative [4]**   95/13 98/10 175/10 223/21
**relatively [1]**   233/7
**releases [1]**   80/13
**relevant [1]**   59/17
**reliance [2]**   150/17 231/20
**relied [1]**   49/17
**relief [8]**   8/10 14/22 26/14 26/14 221/10 226/8 229/3 232/11
**rely [5]**   5/10 36/14 54/5 225/24 227/20
**relying [5]**   46/5 47/16 47/17 48/1 49/24
**remain [1]**   60/2
**remainder [1]**   198/12
**remained [1]**   30/10
**remaining [3]**   49/21 156/17 158/19
**remains [3]**   85/10 194/23 204/8
**remedies [1]**   225/17
**remember [16]**   33/18 35/15 75/5 80/18 80/21 81/3 82/19 113/24 116/8 116/10 116/14 131/5 149/9 165/19 195/8 222/9
**remind [1]**   120/3
**renumbered [2]**   14/13 49/4
**repaid [1]**   141/21
**repay [2]**   229/13 229/13
**repeat [6]**   18/13 141/9 196/14 203/3 205/23 208/17
**rephrase [3]**   71/12 94/23 152/12
**replacement [1]**   224/18
**reply [13]**   6/3 6/7 6/13 6/13 7/18 7/20 7/21 8/4 10/12 10/14 11/5 64/16 226/20
**report [13]**   3/9 45/16 70/18 70/20 70/22 71/6 144/9 144/19 145/4 146/12 174/22 226/16 232/21
**reported [2]**   154/12 234/8
**reporter [6]**   1/21 16/14 30/17 105/25 234/5 234/18
**reports [2]**   71/4 71/7
**represent [1]**   105/8
**representation [4]**   57/10 67/19 67/23 68/6
**representative [1]**   230/18
**represented [2]**   33/14 105/22
**reputation [12]**   28/4 38/11 81/11 81/24 101/21 101/23 102/25 103/3 104/17 104/20 221/16 223/22
**req [2]**   2/24 3/1
**request [9]**   9/1 9/3 10/8 20/5 45/14 66/23 196/20 231/7
**requested [10]**   21/21 30/9 32/8

75/15 120/25 121/6 132/15
**requesting [2]**   68/2 156/11
**require [7]**   12/12 25/11 55/25 56/10 220/24 222/2 231/17
**required [9]**   5/24 14/8 19/23 23/25 27/1 111/8 136/7 221/6 228/3
**requirement [2]**   111/3 223/16
**requires [1]**   233/10
**reseal [1]**   225/16
**research [1]**   31/19
**researched [1]**   184/18
**reserve [1]**   11/7
**resold [1]**   195/4
**resolution [1]**   149/15
**resolve [4]**   13/12 34/25 81/20 159/5
**resort [2]**   29/2 224/1
**respect [6]**   47/16 58/15 60/23 61/11 104/20 173/5
**respectfully [1]**   42/24
**respective [1]**   35/14
**respond [11]**   5/24 7/16 9/11 10/8 130/12 131/12 149/19 149/24 151/8 185/23 196/23
**responding [2]**   184/17 209/11
**responds [1]**   184/10
**response [32]**   3/6 5/8 6/14 7/11 7/18 8/19 9/24 10/9 11/5 11/10 15/7 25/1 31/18 32/5 33/11 36/12 36/14 41/6 66/22 76/6 103/19 103/22 123/19 130/7 142/5 143/11 165/17 171/5 172/1 184/7 216/15 226/15
**responsibility [6]**   29/1 37/17 94/10 94/12 180/4 180/7
**responsible [1]**   187/14
**responsive [1]**   32/12
**rest [10]**   123/21 159/6 169/20 171/1 177/13 197/11 204/16 206/22 208/10 220/5
**restart [1]**   76/24
**restaurants [1]**   85/1
**restraining [2]**   152/24 153/7
**rests [3]**   2/3 2/4 220/4
**result [5]**   12/11 95/22 96/5 97/8 97/13
**resulted [2]**   76/9 205/1
**resume [1]**   119/7
**resumption [1]**   80/17
**retail [3]**   84/19 84/21 84/25
**retained [1]**   66/11
**return [7]**   24/8 32/9 42/22 123/15 177/23 229/4 229/11
**returned [16]**   20/14 21/15 21/17 21/18 21/19 22/2 22/2 22/7 30/2 31/8 123/16 127/13 134/9 138/18 196/8 196/16
**revealed [1]**   225/21
**revenue [1]**   27/15
**review [6]**   81/5 124/16 130/21 132/10 140/16 232/18
**reviewed [3]**   120/21 140/14 141/13
**reviewing [4]**   14/14 77/16 120/21 132/18
**right [73]**   4/22 6/16 7/2 8/8 10/13 15/10 17/11 17/16 32/2 33/21 38/3 41/5 41/24 43/20 46/18 50/17 52/19 53/11 53/19 57/14 59/3 59/25 72/12 72/15

**R**

**right...** [49]   74/14 74/17
74/20 83/3 85/20 88/2 88/17
91/8 97/1 99/14 101/4 102/5
106/9 108/1 109/8 116/4
117/17 117/21 122/12 122/13
127/3 130/23 133/8 143/4
144/3 145/2 148/3 148/24
156/1 164/19 168/15 170/1
170/11 170/25 172/23 175/21
178/3 178/5 178/6 179/5 190/1
190/6 190/13 214/11 214/19
214/21 215/15 223/1 232/2
**ringing** [1]   230/22
**rise** [3]   42/17 43/3 142/23
**risk** [2]   12/19 57/12
**rodrick** [2]   188/1 188/21
**role** [11]   70/3 70/4 77/14
110/11 110/18 110/19 110/20
113/14 113/20 113/21 115/18
**Room** [1]   1/22
**rooms** [1]   88/23
**root** [1]   32/2
**Rosewood** [9]   85/11 85/14
85/15 87/23 88/3 88/4 88/14
88/16 88/22
**roughly** [1]   85/25
**round** [1]   203/2
**routinely** [2]   63/22 64/21
**RPR** [1]   234/17
**rule** [2]   9/11 9/23
**rules** [1]   61/5
**run** [6]   70/6 70/8 102/12
163/6 163/7 225/1
**running** [1]   217/2
**runs** [2]   70/12 82/20

**S**

**S-H-V-A-R-T-S-M-A-N** [1]   170/10
**said** [87]   5/1 7/15 7/21 10/12
11/12 15/3 18/23 19/3 19/23
20/24 20/25 21/1 24/5 30/7
32/19 33/12 33/15 33/15 33/19
34/3 34/13 35/12 42/20 44/9
47/11 47/14 47/16 56/6 57/14
58/17 71/21 74/4 78/5 79/20
80/20 81/14 82/24 84/10 85/23
89/2 89/25 90/2 98/13 101/14
107/11 107/12 107/13 107/14
114/16 118/2 136/14 141/15
141/25 142/1 145/3 152/7
158/6 158/11 159/11 160/12
160/20 163/25 165/19 181/24
182/8 182/12 183/1 183/19
187/12 187/16 187/18 191/17
198/19 201/8 204/15 205/16
210/19 213/7 213/18 213/23
213/24 216/16 221/24 221/24
222/20 223/25 230/6
**sale** [11]   3/4 25/7 25/15
157/9 158/12 160/25 161/1
164/4 164/21 186/10 194/11
**sales** [6]   3/12 64/16 173/13
184/22 185/21 217/3
**sales-type** [1]   64/16
**salesforce.com** [2]   188/1
188/25
**salesman** [1]   186/1
**salespeople** [6]   185/9 185/14
185/20 186/12 186/17 230/20
**salesperson** [4]   184/17 186/4
186/4 186/10

**same** [36]   12/24 24/15 33/22
78/20 99/7 102/4 125/4 125/8
141/2 156/24 157/8 158/20
159/6 159/10 160/14 163/3
163/11 186/2 197/10 198/10
202/18 202/20 202/22 202/23
202/24 202/24 202/24 203/1
203/9 216/3 231/10
**sames** [1]   202/23
**sat** [8]   110/21 110/23 111/11
111/18 111/22 224/21 224/21
224/22
**satisfy** [3]   12/8 208/15
230/21
**saw** [6]   35/11 176/16 176/17
196/2 196/3 196/5
**say** [86]   5/16 6/11 7/10 9/3
9/23 10/24 12/4 22/6 22/7
22/17 23/14 24/9 24/10 27/5
27/5 29/10 29/24 30/1 30/7
32/3 40/5 40/6 42/7 44/8
44/13 46/5 46/6 46/13 46/23
51/4 55/12 59/17 61/3 72/12
79/15 82/23 83/2 84/9 85/19
85/25 86/25 88/18 92/21 94/2
94/3 101/8 101/11 106/5
110/10 112/1 112/19 116/18
117/6 119/23 120/24 123/19
126/7 127/12 132/9 132/12
132/17 132/18 133/7 135/15
140/3 141/18 143/6 145/12
149/14 150/8 150/11 150/23
152/13 152/20 163/8 163/25
175/13 179/20 197/7 217/18
220/21 226/17 229/2 230/15
230/15 230/21
**saying** [50]   20/6 25/19 26/4
31/16 31/18 31/18 31/24 33/25
34/1 35/7 35/11 36/22 38/6
44/11 44/14 46/1 47/24 53/4
55/3 83/19 83/19 87/1 88/19
96/14 96/17 97/14 97/15
100/25 101/4 102/13 118/23
119/1 126/2 138/14 141/22
149/9 164/10 165/10 168/11
178/18 178/21 180/7 180/9
181/12 185/20 189/22 210/19
211/3 219/18 231/21
**says** [50]   12/18 26/10 30/8
32/14 33/20 33/21 35/24 46/3
47/19 91/10 92/19 100/17
100/20 103/18 106/23 108/12
110/21 111/13 111/20 113/5
117/6 123/24 124/12 125/6
125/14 125/16 125/16 125/16
125/21 125/21 126/19 130/7
133/19 138/5 138/9 143/12
145/13 145/20 148/12 148/18
150/3 150/15 151/1 152/15
184/7 189/25 204/22 223/4
225/13 226/9
**scales** [1]   39/11
**scan** [2]   10/25 61/8
**scenario** [1]   44/14
**schedule** [3]   10/17 83/9 84/7
**schedules** [1]   116/19
**scheduling** [4]   5/20 6/12 95/22
96/5
**scope** [21]   93/10 93/11 93/13
93/17 93/21 94/1 94/8 94/13
94/19 94/23 94/24 95/5 95/8
95/13 95/14 95/17 95/17 96/17

**96/19 97/7 97/17
96/19 97/7 97/17
**scrutiny** [2]   28/19 162/11
**sealed** [6]   75/8 75/10 75/13
75/18 76/12 225/13
**sealing** [1]   76/9
**season** [11]   44/18 45/1 45/2
45/2 45/7 45/9 89/14 89/15
89/17 89/23 90/9
**seated** [6]   4/2 4/15 48/23
60/5 170/5 192/4
**second** [16]   8/12 9/7 9/13
16/1 24/16 40/22 42/6 42/8
46/2 68/2 90/21 129/20 144/11
145/3 145/5 145/16
**Secondly** [1]   132/18
**seconds** [1]   154/13
**sections** [4]   88/1 88/4 88/7
88/9
**secured** [5]   108/15 108/25
109/1 109/2 109/3
**see** [68]   10/12 20/12 22/16
23/3 23/5 28/2 34/17 37/25
46/19 47/22 50/20 87/19 95/14
100/21 105/16 106/16 107/1
110/2 110/15 112/24 117/9
121/23 123/21 123/21 123/21
124/17 125/13 125/14 126/11
129/17 129/17 129/19 132/19
133/3 136/12 138/3 138/6
142/19 145/14 145/18 146/8
148/8 148/14 149/17 149/19
152/18 152/25 157/8 162/24
171/21 171/21 171/21 183/5
183/6 183/8 183/24 185/2
187/21 193/6 193/25 196/7
196/12 196/15 196/17 203/4
205/15 208/15 230/4
**seeing** [3]   46/1 183/7 232/21
**seek** [4]   6/23 152/24 153/6
154/1
**seeking** [4]   21/16 33/6 135/5
222/10
**seeks** [1]   33/17
**seem** [3]   11/4 11/9 13/20
**seemed** [2]   14/6 228/10
**seems** [5]   12/25 13/19 34/13
34/24 133/12
**seen** [13]   56/17 74/23 87/16
87/16 90/14 95/8 103/6 156/9
160/18 184/14 184/24 191/14
231/22
**sees** [1]   183/19
**seldom** [3]   79/21 79/22 176/10
**selecting** [1]   161/8
**self** [1]   169/1
**self-serving** [1]   169/1
**sell** [14]   23/20 47/4 47/5
194/3 194/3 194/9 194/13
195/15 200/9 203/14 216/22
220/18 220/19 231/12
**selling** [6]   24/25 26/11
155/17 155/22 217/1 230/3
**send** [8]   21/1 31/16 133/8
133/19 133/20 134/6 202/2
202/10
**sending** [5]   122/10 123/6
132/19 132/21 149/2
**sends** [2]   189/17 189/18
**sense** [6]   5/13 23/15 25/24
28/7 44/10 47/9
**sensible** [2]   23/13 55/25
**sent** [37]   15/7 20/6 21/2 26/4

**S**

**sent... [33]** 31/17 38/5 46/1 46/6 46/18 62/19 126/16 129/18 130/24 134/7 138/21 142/25 151/12 177/4 177/6 177/8 180/9 190/23 202/4 202/5 202/7 202/11 204/11 205/10 207/8 208/8 209/11 209/12 211/8 212/19 216/22 224/22 230/19
**sentence [3]** 108/20 108/21 175/18
**sentencing [2]** 175/19 176/2
**sentencings [1]** 175/21
**separate [5]** 13/6 163/4 171/6 173/24 182/25
**separated [1]** 53/9
**separately [4]** 56/10 170/21 170/22 171/8
**September [8]** 82/13 82/23 83/1 83/2 113/7 113/8 114/5 140/19
**September 2016 [3]** 83/2 113/8 114/5
**series [1]** 129/23
**serious [2]** 26/24 59/21
**serve [2]** 164/13 164/15
**servers [1]** 143/7
**service [6]** 164/14 164/16 185/25 186/2 186/17 186/20
**services [1]** 221/19
**serving [1]** 169/1
**set [11]** 10/11 33/7 36/10 36/14 58/18 60/12 101/25 102/12 200/2 223/8 234/14
**setting [1]** 5/7
**several [9]** 19/12 19/18 132/15 133/9 156/18 172/9 178/17 178/20 216/4
**share [1]** 142/6
**she [57]** 4/19 10/16 10/18 18/22 19/3 20/6 38/10 53/23 58/8 58/9 58/16 87/1 97/7 117/16 117/16 118/2 118/2 130/23 130/24 130/24 131/1 141/9 141/10 141/10 143/19 160/6 165/19 165/20 165/22 165/24 165/25 166/9 167/12 179/15 184/9 184/22 185/13 185/17 187/19 204/12 208/7 217/15 217/18 220/1 220/3 223/20 223/25 224/5 224/5 224/5 224/6 224/16 224/17 225/11 225/13 225/22 226/10
**she's [17]** 10/18 10/18 96/16 141/8 143/12 143/21 143/21 143/23 144/1 160/2 160/5 160/7 179/22 185/18 186/24 186/24 187/5
**sheet [8]** 7/19 7/20 10/4 10/6 10/15 218/10 218/14 218/20
**shift [1]** 90/21
**ship [24]** 180/13 180/15 180/18 180/22 181/13 189/4 205/20 206/17 206/21 207/10 207/12 207/14 207/23 208/16 208/20 209/5 209/7 209/20 210/3 210/7 210/13 210/14 210/21 210/24
**shipment [1]** 125/22
**shipped [5]** 137/20 183/2 187/15 192/23 207/4

**shipping [4]** 136/9 184/12
**shocked [1]** 126/11
**shoddy [6]** 107/1 107/4 107/15 107/19 107/25 116/22
**shoe [5]** 42/6 42/7 42/8 42/10 42/11
**shoes [4]** 42/5 42/7 42/9 42/9
**shops [1]** 84/25
**short [4]** 9/2 9/4 9/4 97/20
**shortened [1]** 10/1
**shortfalls [1]** 23/10
**shorthand [3]** 234/5 234/8 234/18
**shortly [4]** 184/13 190/4 209/9 217/21
**should [23]** 6/21 7/19 7/20 7/23 10/20 18/9 35/17 54/2 101/10 126/22 187/8 187/12 199/7 204/3 222/2 226/13 226/19 228/3 230/6 230/7 230/8 232/11 232/14
**shouldn't [1]** 22/10
**show [21]** 19/15 46/7 60/12 61/14 62/12 99/23 100/19 101/12 101/15 122/25 128/3 141/20 142/7 142/13 145/8 145/16 172/20 183/3 183/9 187/24 201/24
**showed [4]** 68/22 138/16 141/21 187/25
**showing [5]** 32/6 100/5 104/15 140/12 171/11
**shown [3]** 156/8 159/22 188/20
**shows [7]** 20/12 22/16 34/15 124/22 125/11 138/2 170/6
**SHVARTSMAN [38]** 2/12 3/7 3/8 3/10 3/11 3/12 3/13 3/14 4/22 24/21 25/25 26/8 33/12 33/15 33/15 33/20 34/1 34/4 135/10 147/6 148/10 149/2 149/14 149/24 150/5 170/1 170/4 170/9 172/3 174/8 175/10 192/9 192/17 215/10 219/15 220/2 222/24 226/11
**Shvartsman's [13]** 34/1 120/22 128/9 128/12 129/12 146/16 148/7 151/8 168/25 170/12 173/10 174/5 220/12
**side [1]** 47/24
**sides [6]** 16/17 47/11 59/22 179/4 228/11 233/6
**sides' [1]** 14/23
**sight [3]** 43/24 43/25 43/25
**sign [3]** 82/11 113/2 154/16
**sign-offs [1]** 154/16
**signature [3]** 143/16 143/17 172/11
**signed [13]** 41/7 41/8 73/13 77/11 81/8 82/15 82/16 82/18 82/19 82/19 82/25 98/21 155/9
**significant [13]** 9/17 27/21 36/12 37/20 37/21 37/25 38/3 38/4 38/9 38/24 39/2 39/2 45/18
**signing [3]** 73/25 86/9 90/18
**silence [2]** 131/13 208/12
**silent [3]** 131/16 179/18 209/14
**similar [2]** 28/11 202/4
**SIMONTON [5]** 1/12 85/9 142/22 143/2 213/23
**simple [1]** 210/2

**simply [8]** 6/22 7/4 25/23 228/3
**since [19]** 6/23 15/19 47/7 105/2 114/8 116/1 116/2 116/24 118/2 139/14 156/11 175/17 190/16 199/8 216/1 221/25 224/16 228/2 229/20
**single [13]** 35/19 57/6 87/18 87/20 93/5 93/12 93/16 93/20 94/1 94/22 95/4 196/9 207/10
**sir [2]** 194/20 198/16
**sit [11]** 74/14 74/17 74/20 91/8 111/15 136/15 136/18 192/2 214/11 214/21 215/15
**site [12]** 65/8 67/1 67/20 67/24 68/7 70/1 70/3 70/5 132/4 134/11 136/10 222/13
**sits [1]** 224/24
**sitting [12]** 4/25 30/25 31/13 35/22 38/2 38/18 41/12 41/14 110/13 208/24 215/17 228/12
**situation [7]** 33/5 66/4 74/10 106/9 130/12 224/15 225/8
**six [6]** 6/18 50/12 52/12 52/17 63/25 88/2
**Sixteen [2]** 147/9 147/11
**size [1]** 189/17
**skepticism [1]** 26/25
**sleep [1]** 6/16
**slightly [1]** 79/5
**SLS [4]** 85/11 87/23 87/25 88/17
**snippet [1]** 132/16
**snowbirds [1]** 45/3
**so [399]**
**sold [11]** 23/12 23/16 25/3 179/14 194/16 194/17 194/22 194/25 195/3 195/6 216/10
**Solutions [20]** 31/5 32/13 32/15 125/15 138/22 139/1 139/25 140/21 144/11 144/12 144/18 145/1 145/3 145/5 145/13 145/17 146/4 146/11 200/21 205/2
**Solutions' [1]** 139/21
**some [35]** 8/21 11/6 12/25 13/17 19/16 26/25 37/8 38/10 45/25 47/25 49/14 56/16 59/15 65/9 82/25 87/25 88/1 105/6 109/10 110/19 139/18 147/6 170/23 171/11 181/19 191/25 194/11 194/11 194/13 194/16 204/15 206/24 207/2 214/19 216/2
**somebody [11]** 40/21 41/1 48/13 80/6 80/9 111/18 179/25 180/1 216/15 230/3 232/6
**somebody's [1]** 225/3
**someone [3]** 178/8 184/19 225/21
**someone's [1]** 178/7
**something [45]** 5/16 7/10 7/25 12/17 13/25 14/8 18/4 20/13 32/25 37/10 37/11 38/8 39/6 40/5 40/6 73/8 76/3 82/4 82/21 89/3 89/13 90/12 90/23 95/12 102/24 103/2 110/14 110/17 124/24 125/6 126/12 141/22 141/25 142/2 158/5 162/16 176/19 181/21 183/8 183/17 189/15 190/8 190/12 229/24 232/13

**sometime [5]** 44/15 113/7
181/4 196/6 216/10
**somewhere [1]** 228/15
**sooner [1]** 189/4
**sorry [56]** 29/19 31/9 65/14
70/6 71/15 75/9 75/21 76/10
77/8 79/15 81/7 85/5 87/3
87/3 90/1 92/1 95/24 96/10
98/4 99/5 99/8 100/24 101/1
101/7 101/14 103/13 105/20
107/6 108/7 113/16 117/14
117/20 120/17 125/24 129/5
133/6 133/14 135/19 137/4
137/25 138/10 145/24 147/10
148/20 149/23 151/23 163/25
168/4 176/7 176/12 180/24
182/10 187/4 195/10 205/10
222/17
**sort [9]** 27/22 35/7 62/4 63/1
64/16 132/3 132/7 132/7
183/19
**sorts [2]** 69/22 231/4
**sought [2]** 28/10 75/24
**source [142]** 1/8 2/16 2/19
12/7 12/10 12/12 12/15 18/23
19/6 20/24 21/20 23/8 24/4
24/20 27/2 31/3 31/5 32/9
32/15 32/16 32/20 33/8 33/16
33/17 34/2 34/23 40/11 40/17
61/25 62/17 63/18 63/19 64/6
64/15 65/7 66/3 66/23 67/24
68/2 68/20 68/25 80/1 80/1
80/7 100/10 121/3 121/7 123/6
123/24 126/15 127/13 127/24
129/19 132/21 133/3 133/19
134/14 134/22 135/4 135/6
138/14 138/18 138/21 139/5
140/22 141/3 141/15 143/10
143/11 144/11 144/12 144/17
144/25 145/2 145/3 145/5
145/13 145/17 146/3 146/5
146/10 148/16 149/9 149/12
151/12 152/7 152/12 152/15
152/22 155/17 155/22 157/14
157/25 158/3 158/6 158/17
158/21 160/16 164/25 165/10
166/17 166/21 166/23 166/25
168/22 168/23 168/23 169/3
176/11 182/25 184/14 188/22
189/1 194/3 195/16 195/17
195/23 196/15 197/2 197/3
197/4 197/14 197/16 199/15
200/7 200/15 204/7 204/8
205/18 208/16 208/20 214/8
214/12 214/14 214/22 217/10
221/4 222/2 222/11 226/8
226/9 227/18
**Source's [10]** 23/10 39/20
42/17 42/23 43/5 131/24 159/1
160/2 206/1 208/14
**sourceoutdoor.net [4]** 188/1
188/21 189/8 189/9
**south [6]** 1/16 45/5 45/5 79/4
162/23 163/2
**southern [4]** 1/1 28/12 234/3
234/6
**sovereign [2]** 38/13 38/20
**speak [14]** 30/16 30/21 60/5
75/20 99/17 100/25 103/12
140/6 170/7 179/4 184/2
185/15 186/18 187/8

**speaking [6]** 8/16 41/17 95/24
**special [1]** 68/22
**specific [18]** 14/15 18/18
80/23 81/22 102/11 102/12
150/24 155/21 155/22 165/13
194/5 194/8 194/8 202/25
203/7 211/25 212/10 216/8
**specific name [1]** 102/11
**specifically [10]** 32/14 81/6
81/9 91/19 92/12 92/14 93/2
101/25 161/1 211/25
**speculative [7]** 38/16 38/17
38/25 96/8 224/7 224/10 225/9
**spell [5]** 60/6 70/16 78/2
105/20 170/8
**spending [1]** 34/20
**spends [1]** 72/23
**spins [1]** 13/12
**spoke [3]** 120/8 167/22 208/2
**spoken [3]** 30/20 35/2 224/17
**spread [1]** 206/12
**spreadsheet [6]** 3/12 126/21
126/22 127/12 173/13 206/15
**square [1]** 203/19
**SQUIRE [1]** 1/15
**stage [6]** 168/15 184/11
184/19 186/11 186/12 224/6
**stages [1]** 226/7
**stamp [3]** 31/8 145/22 145/24
**stand [7]** 17/12 35/23 60/2
120/2 127/2 170/2 192/10
**standard [3]** 33/3 35/18 57/4
**standing [2]** 60/2 127/3
**stands [2]** 70/10 232/2
**start [10]** 44/5 48/6 58/20
58/20 107/13 107/22 107/24
176/15 184/9 222/8
**started [15]** 44/12 113/25
115/6 115/10 116/8 116/9
116/13 116/14 126/15 153/23
153/24 154/8 157/9 186/12
209/1
**starting [1]** 49/5
**starts [3]** 44/21 44/22 105/15
**state [8]** 9/20 58/25 60/6
66/23 136/6 168/9 168/21
170/7
**stated [3]** 19/13 207/6 214/16
**statement [12]** 5/11 5/13 14/24
17/21 33/19 33/23 72/17
108/21 145/9 151/5 210/10
213/24
**statements [5]** 14/21 22/17
26/22 47/15 223/4
**STATES [4]** 1/1 1/12 234/1
234/6
**stating [10]** 93/23 200/7
204/11 205/10 207/8 208/8
209/15 211/9 212/19 230/19
**status [5]** 5/2 36/20 36/25
131/10 185/22
**stay [1]** 167/17
**stenographic [1]** 234/11
**step [4]** 35/19 45/18 219/14
222/16
**sterling [1]** 230/16
**stick [3]** 37/22 54/13 105/10
**still [27]** 12/20 18/9 21/18
21/22 22/3 22/5 26/19 28/23
28/25 43/10 47/7 54/23 54/25
97/9 119/22 120/3 124/13

124/14 159/14 159/15 159/16
159/16 159/17 160/19 207/1
207/5 210/9
**stip [1]** 207/5
**stock [1]** 203/15
**stop [2]** 18/1 191/20
**stopped [5]** 178/24 179/17
208/11 209/9 211/10
**storage [26]** 166/21 181/21
181/22 182/23 200/17 200/20
200/21 200/25 201/1 201/2
201/8 201/12 202/8 203/17
203/18 203/25 208/5 215/13
217/10 218/6 218/13 218/20
218/24 218/24 219/2 222/23
**store [1]** 200/15
**storing [1]** 166/25
**story [2]** 77/9 231/3
**straight [1]** 21/9
**street [1]** 40/10
**stress [1]** 76/2
**strict [1]** 6/6
**strike [5]** 6/24 8/7 81/7
87/10 136/14
**strikes [1]** 42/3
**striking [1]** 219/21
**strong [1]** 229/3
**structure [2]** 71/18 72/6
**style [3]** 202/24 203/9 216/1
**subject [3]** 96/15 188/22
203/10
**submission [1]** 140/11
**submit [2]** 140/12 220/3
**submitted [10]** 4/23 7/4 7/7
24/19 24/25 28/6 52/13 175/11
197/2 200/5
**submitting [1]** 7/22
**subsidiary [1]** 71/10
**substance [1]** 105/11
**substantial [9]** 36/16 44/1
92/15 98/6 98/10 136/11 223/9
223/15 228/22
**substantially [7]** 90/4 93/6
93/13 93/17 96/19 97/18 97/21
**substantiating [1]** 57/16
**subtract [1]** 218/20
**subtracted [1]** 219/2
**success [4]** 36/16 44/2 223/10
223/15
**such [5]** 9/19 46/21 46/22
203/17 227/24
**suffice [1]** 226/17
**sufficient [2]** 35/8 220/17
**suggest [1]** 26/7
**suggesting [2]** 8/3 40/1
**suggestion [2]** 48/8 48/10
**Suite [1]** 1/19
**sum [4]** 105/11 193/7 204/8
213/4
**summary [1]** 135/16
**Supp [9]** 2/18 2/19 2/20 2/21
2/23 2/23 3/1 3/2 3/3
**supplement [2]** 65/25 174/23
**supplemental [48]** 5/22 7/2
7/14 10/19 10/22 30/5 49/11
49/25 50/7 50/13 50/15 50/16
50/18 52/10 52/18 53/3 53/6
53/7 53/14 53/15 53/16 54/25
55/1 55/2 55/10 55/11 55/18
55/21 56/3 56/4 56/6 56/8
56/13 58/11 63/13 64/4 65/5
65/19 66/20 68/16 98/21 99/2
99/11 99/12 99/24 120/9

**S**

**supplemental... [2]** 155/20
168/21
**supplements [1]** 54/7
**supplied [2]** 135/16 193/24
**supplier [3]** 136/7 136/16
136/22
**supply [1]** 39/20
**support [15]** 6/2 28/6 39/8
42/21 42/21 52/10 57/7 57/8
79/13 79/16 86/9 90/19 106/24
135/16 232/15
**supports [2]** 22/17 38/8
**suppose [1]** 229/6
**supposed [2]** 15/19 230/7
**Supreme [1]** 42/18
**sure [66]** 8/14 11/1 12/8
13/11 13/24 14/18 14/18 15/13
30/15 30/24 34/9 35/9 41/4
42/2 42/10 43/14 49/23 50/9
50/21 52/11 56/15 70/5 71/19
72/5 76/10 81/16 83/18 84/2
84/4 94/22 99/6 109/22 112/3
116/9 121/24 122/11 127/10
128/4 139/13 141/2 145/12
148/3 148/23 159/8 161/12
166/13 171/5 171/13 172/19
174/21 175/14 181/11 184/18
186/23 196/15 198/24 199/21
200/2 200/14 212/8 213/21
217/8 228/22 229/23 233/13
233/15
**surprise [2]** 140/20 140/20
**surprised [2]** 41/12 41/13
**surprises [1]** 7/8
**surround [2]** 37/21 37/21
**suspect [2]** 45/11 72/5
**suspension [2]** 76/23 115/9
**sustaining [2]** 57/12 74/21
**switched [1]** 196/18
**sworn [4]** 60/3 60/4 73/18
170/4
**system [6]** 11/1 182/1 190/9
190/16 202/13 216/3

**T**

**table [1]** 4/16
**tables [3]** 19/5 191/25 192/2
**tack [1]** 225/25
**take [38]** 5/18 9/8 18/3 19/4
25/20 25/22 36/14 44/4 44/17
44/20 48/6 48/20 58/17 58/19
60/2 74/11 116/5 119/7 120/1
123/4 147/3 153/23 154/14
157/20 158/10 178/7 179/25
180/9 180/12 183/23 184/4
190/5 191/7 218/19 222/24
222/25 229/22 232/17
**taken [6]** 49/18 65/11 162/9
190/12 204/22 227/21
**takes [1]** 174/19
**taking [3]** 168/10 184/9
204/13
**talk [21]** 32/2 43/5 46/18
48/9 74/11 96/25 105/9 108/20
141/5 142/8 142/18 142/20
146/1 149/21 149/25 156/20
188/7 214/6 223/3 226/3
228/12
**talked [3]** 86/24 87/5 89/4
**talking [34]** 34/19 41/7 41/9
41/10 46/3 77/19 77/19 77/21

85/12 87/5 89/14 90/11 94/4
124/17 125/8 126/25 127/4
130/23 130/24 131/1 132/22
135/22 137/12 143/7 161/11
163/9 163/21 179/18 228/24
**talks [2]** 41/11 113/10
**target [2]** 83/25 84/2
**team [6]** 77/15 77/22 81/3
89/9 133/16 133/17
**technically [2]** 7/19 78/25
**telephone [1]** 38/3
**telephonic [3]** 5/1 36/20 36/24
**tell [29]** 8/7 17/1 21/7 31/6
40/5 47/18 64/4 64/14 67/8
82/14 83/23 83/25 87/23 90/17
91/12 91/15 91/19 91/22
102/21 132/2 137/19 137/21
146/10 147/3 165/25 177/11
177/20 201/7 217/15
**telling [2]** 149/2 189/12
**tells [2]** 32/7 190/11
**temporary [21]** 50/23 53/19
73/15 81/9 86/10 90/19 135/19
136/24 151/21 152/24 153/6
153/14 153/20 153/22 154/3
155/20 155/20 222/11 223/11
223/16 226/14
**tend [1]** 78/24
**tender [1]** 69/7
**tens [1]** 34/20
**term [3]** 97/8 165/20 192/21
**terms [30]** 11/13 12/2 12/4
21/9 23/16 26/13 27/1 28/22
34/12 42/1 44/2 44/13 47/24
53/25 54/18 86/11 96/24 96/25
97/5 218/9 221/3 221/10
222/14 225/11 227/6 228/15
228/23 229/3 229/12 232/10
**terribly [1]** 53/25
**test [4]** 39/13 43/7 43/7
43/21
**testified [10]** 38/10 94/7
94/12 94/15 94/18 114/3
223/20 224/5 224/16 226/9
**testifies [1]** 38/9
**testify [9]** 10/18 10/19 35/22
38/18 38/24 45/9 58/8 175/10
201/22
**testifying [4]** 81/6 98/7 212/5
215/15
**testimony [24]** 18/22 29/25
36/8 37/23 48/2 83/2 92/21
93/16 93/20 95/3 97/12 114/6
131/1 162/16 212/8 220/12
222/22 223/14 225/21 227/18
227/22 230/23 230/24 231/5
**than [25]** 27/5 34/20 35/13
36/25 39/18 78/18 108/2
108/14 108/22 134/22 135/6
137/20 155/19 161/13 183/19
189/4 197/9 198/9 210/10
216/3 217/4 218/10 218/15
226/11 228/11
**thank [57]** 4/14 4/21 9/13
15/22 16/12 18/8 22/25 23/1
29/14 29/16 36/6 45/20 45/21
48/21 59/10 60/15 69/10 99/15
99/21 100/3 100/8 103/14
104/6 114/7 119/11 120/5
121/25 122/23 129/1 129/3
136/4 137/7 145/6 146/22
167/11 169/10 169/14 169/16

169/16 170/5 174/3 181/22
213/15 219/13 219/14 222/4
222/7 228/5 232/25 233/1
233/3 233/5 233/16
**Thanksgiving [2]** 89/19 89/20
**that [1342]**
**that's [140]** 6/11 6/20 12/8
13/5 13/21 13/22 16/10 16/10
19/1 21/8 21/8 21/17 22/12
22/17 22/18 24/12 25/24 33/9
33/9 33/19 33/20 34/6 34/8
36/1 36/8 37/13 39/9 39/12
39/25 41/9 41/24 41/25 42/14
42/15 42/16 43/7 44/16 47/17
48/2 48/16 48/17 49/7 50/19
51/4 51/9 51/16 52/7 53/16
55/15 58/22 58/22 70/17 72/18
73/11 73/17 75/14 80/4 81/22
90/5 92/11 93/8 93/21 95/1
95/6 96/9 99/4 101/5 101/16
104/16 105/10 105/22 105/23
109/12 111/7 111/20 112/4
119/25 122/9 125/23 126/5
132/22 134/23 135/14 137/2
137/17 138/7 138/20 143/18
144/18 145/5 147/12 147/23
160/24 162/12 162/19 167/17
168/14 168/15 170/13 171/15
171/17 172/16 173/12 174/14
174/19 175/8 179/11 181/18
183/16 185/8 188/3 194/19
203/19 204/9 204/9 207/16
207/17 208/7 209/4 209/17
209/22 210/15 210/15 210/15
210/19 210/25 212/1 216/9
218/10 223/12 224/7 224/7
224/10 224/13 225/2 227/25
230/22 231/3 231/4 232/13
**the spreadsheet [1]** 126/22
**theft [2]** 229/7 229/10
**their [60]** 6/4 6/16 7/18 12/4
20/13 23/17 23/17 23/19 23/23
24/20 25/16 25/23 26/22 27/3
28/25 29/2 29/3 29/9 30/2
30/3 31/2 32/12 32/17 32/19
37/23 37/25 41/21 43/11 46/19
47/24 73/10 79/14 79/16 81/1
97/16 104/12 113/20 113/21
140/11 141/1 174/18 179/17
180/5 185/10 202/24 206/17
209/1 210/21 211/11 211/13
214/9 220/25 226/18 229/16
229/19 230/20 230/21 230/24
231/16 233/6
**them [149]** 7/13 10/8 11/2
11/20 13/21 14/2 14/2 14/4
19/3 19/19 22/8 23/8 23/18
25/11 25/12 25/13 25/13 26/11
26/19 29/6 33/4 34/3 35/25
36/3 37/23 39/17 40/7 41/5
42/10 43/10 46/20 47/3 47/8
49/5 49/8 52/2 54/10 56/5
57/1 57/22 58/3 58/10 59/1
59/11 59/18 59/19 60/19 61/9
73/9 80/1 88/11 96/15 97/3
104/11 104/13 104/14 104/22
104/24 109/8 114/17 114/22
128/11 131/24 132/2 133/24
133/25 134/1 134/2 134/3
134/4 134/5 134/7 134/20
134/21 134/22 134/25 135/9
135/12 137/13 140/5 140/6

them... [68]   142/9 142/9
143/1 143/9 143/20 144/4
156/16 157/20 158/11 159/12
159/13 159/13 165/15 170/23
171/1 171/9 171/17 174/12
177/4 177/9 177/11 177/13
177/13 177/17 177/20 179/6
179/24 180/13 180/13 181/16
185/16 190/19 191/2 191/16
197/11 197/13 198/14 200/8
200/9 200/10 200/25 206/17
206/20 207/11 207/24 208/7
208/7 210/14 211/16 212/23
212/24 216/17 216/18 216/20
219/25 220/18 220/19 220/21
221/21 226/10 229/23 230/3
230/4 230/6 230/14 231/12
231/17 231/25
**themselves [1]**   102/5
**then [115]**   5/9 5/13 5/23 6/2
6/7 8/1 9/20 11/14 11/15 14/5
14/17 14/17 14/25 16/23 18/1
18/2 19/4 19/16 20/3 21/19
24/14 24/24 25/11 25/21 29/11
30/13 31/17 34/22 38/7 41/2
42/6 42/12 49/23 50/6 50/18
51/5 51/16 51/17 51/21 52/4
52/10 54/12 54/13 55/1 55/11
56/3 59/12 59/18 61/5 72/2
78/25 79/10 93/20 99/10
110/10 112/1 112/23 113/15
113/17 114/7 124/16 125/15
125/20 125/21 125/21 126/10
132/24 136/22 138/12 139/8
141/6 141/9 141/11 141/22
142/7 142/9 142/18 144/5
145/3 152/22 154/15 157/8
171/11 172/18 172/24 173/2
173/24 174/8 174/8 179/11
180/15 182/3 186/14 189/6
190/14 190/15 190/17 194/17
197/12 203/4 203/20 208/11
209/8 210/12 210/23 212/13
219/2 221/6 225/1 225/16
226/14 231/16 232/8 232/22
233/12
**theoretically [1]**   133/12
**theory [1]**   220/20
**there [132]**   5/14 7/8 11/18
11/22 12/5 12/6 12/23 12/25
14/6 15/4 17/4 18/5 19/7
19/12 19/12 19/16 19/16 20/2
20/3 20/9 22/10 23/6 24/3
25/9 25/10 27/1 29/12 29/18
29/21 32/8 33/3 35/8 35/10
36/22 36/23 37/23 38/2 38/18
42/4 42/7 42/9 42/13 42/24
43/4 45/11 45/12 45/13 45/19
46/21 46/22 49/13 49/15 56/7
56/15 57/15 59/21 71/12 71/14
71/16 72/2 76/21 80/20 84/14
85/2 91/20 93/10 96/14 107/13
107/15 109/10 110/10 111/24
119/1 121/21 122/19 129/13
129/14 130/2 132/7 133/5
135/18 137/19 137/21 141/14
141/21 141/21 143/10 143/25
144/24 147/24 149/21 150/19
154/9 155/7 158/24 159/21
162/19 165/20 174/10 178/17
185/13 190/1 194/11 194/21

196/5 201/8 203/17 206/11
221/3 221/20 221/21 223/5
224/2 224/4 225/16 226/22
228/9 229/10 229/15 230/17
231/22 231/23 232/1 232/7
232/8 232/16 232/24 233/2
**there's [75]**   10/7 10/10 10/15
12/6 12/17 12/18 16/13 27/23
27/24 31/17 32/23 34/22 37/12
39/21 40/19 42/3 52/10 53/22
56/18 59/15 59/15 59/16 60/21
80/18 84/14 84/25 88/16 91/12
91/13 91/15 91/17 91/22 94/15
95/12 97/15 102/5 102/22
105/7 108/4 109/9 117/22
123/3 125/16 127/12 138/6
141/6 143/9 147/24 154/10
154/11 154/13 155/5 167/24
172/5 174/22 175/9 180/20
181/10 202/23 207/5 208/1
208/5 211/20 220/19 227/1
227/3 228/17 229/2 229/8
229/9 229/22 231/25 232/2
232/2 233/10
**thereafter [4]**   74/9 212/13
213/24 217/21
**therefore [6]**   24/4 34/2
124/21 135/1 198/15 200/7
**therein [1]**   129/23
**thereto [1]**   200/18
**these [60]**   5/4 12/21 13/9
13/20 19/1 23/9 25/2 25/16
25/17 26/21 36/23 37/17 38/14
39/15 41/12 43/24 44/4 45/14
46/12 50/21 53/9 54/1 55/9
57/6 57/18 59/17 63/15 68/22
75/6 75/15 83/10 105/25
106/24 110/6 133/18 133/22
138/17 139/1 152/23 158/17
158/22 159/12 162/7 162/22
163/4 164/7 171/7 171/8 182/3
184/7 184/10 184/15 221/25
222/1 225/24 225/25 227/22
228/18 229/22 231/6
**they [406]**
**they're [28]**   21/12 22/5 23/20
25/6 33/21 39/21 39/22 41/14
44/10 46/1 52/9 52/20 52/23
53/2 53/4 53/5 54/10 54/11
55/14 83/24 84/2 100/20
108/13 150/23 154/10 179/7
179/16 221/6
**they've [11]**   6/23 25/10 28/22
28/24 48/12 59/7 59/8 97/2
116/24 224/21 226/18
**thing [15]**   7/6 33/22 39/19
43/2 46/10 54/24 87/20 93/13
93/16 93/21 125/4 129/10
162/2 185/16 186/2
**things [25]**   11/12 16/25 18/14
18/25 38/10 38/24 39/12 45/11
45/12 45/13 54/1 57/6 69/22
89/3 98/17 104/12 155/13
162/3 223/19 224/21 225/22
226/1 226/4 228/12 231/13
**think [88]**   6/20 9/18 10/20
16/7 16/23 17/3 18/3 33/1
35/15 36/11 36/24 37/5 37/15
39/21 41/24 42/16 42/23 43/6
43/21 44/17 44/18 44/19 50/24
56/5 56/5 57/3 57/14 58/3
59/21 60/25 81/4 82/25 85/16

85/17 87/14 87/20 88/1 89/2
111/21 115/6 115/6 115/9
116/2 116/9 118/8 125/12
125/23 127/2 127/8 129/10
131/23 141/11 141/12 142/1
142/10 149/5 149/5 155/6
155/25 162/1 165/19 166/13
173/25 174/19 175/9 176/5
178/7 178/9 213/10 219/7
220/12 220/22 221/1 222/1
222/9 225/2 226/2 226/4
227/23 229/2 229/8 229/9
229/22 232/16
**thinking [4]**   7/5 126/7 159/5
200/2
**third [3]**   108/11 125/10
194/17
**this [325]**
**those [62]**   11/19 12/24 13/4
16/24 19/11 25/1 25/15 28/6
28/12 31/23 33/7 38/24 39/7
39/12 50/10 50/11 52/1 55/10
56/24 59/24 74/21 74/24 78/24
85/1 85/13 91/18 96/18 106/18
106/19 115/12 126/1 130/5
131/10 137/11 141/3 143/20
144/2 147/6 148/22 156/24
160/14 162/7 163/22 167/5
168/17 174/8 174/12 186/18
193/8 204/13 206/12 206/24
207/4 215/24 216/17 224/5
224/18 224/20 226/2 226/5
231/13 232/3
**though [8]**   11/6 11/11 37/18
111/14 112/1 141/12 207/13
210/23
**thought [11]**   18/4 22/9 27/17
28/8 111/18 114/16 139/15
162/16 178/13 202/19 210/7
**thousand [12]**   124/24 125/6
126/15 140/22 142/11 146/1
156/18 158/5 181/21 203/19
203/25 229/18
**thousand dollars [1]**   126/15
**thousands [4]**   12/19 34/20
34/21 185/21
**three [25]**   11/12 14/16 14/16
14/16 16/7 17/23 17/23 39/12
50/19 69/16 69/17 72/5 106/14
106/15 108/18 110/1 114/16
114/17 114/18 114/19 117/6
126/1 133/13 147/24 176/23
**three-and-a-half-hour [1]**
17/23
**three-month [1]**   133/13
**threshold [1]**   43/21
**thresholds [1]**   45/13
**through [31]**   1/9 9/16 34/11
45/15 49/4 49/5 49/22 52/2
52/12 52/17 54/6 54/24 54/25
55/10 56/23 57/4 70/4 79/14
99/11 99/12 134/7 143/8
148/10 155/12 171/9 183/19
193/4 195/21 196/9 208/10
220/11
**throughout [4]**   27/24 45/14
45/15 206/19
**thrown [2]**   195/3 195/4
**Tiger [1]**   143/18
**tight [4]**   224/21 224/21
224/22 224/24
**till [6]**   58/18 58/19 83/2

**T**

**till... [3]**   88/11 177/11
 213/19
**time [72]**   5/18 8/3 8/18 9/17
 9/24 10/5 10/14 11/8 12/24
 18/17 20/7 24/23 25/14 30/8
 32/18 35/1 45/25 46/8 49/8
 52/2 57/13 58/10 58/16 66/24
 69/8 80/16 82/4 82/25 83/10
 83/19 83/23 90/16 91/17 119/7
 120/8 121/9 130/21 131/20
 133/13 134/13 135/1 136/6
 142/3 149/4 149/23 150/24
 157/6 157/16 158/21 161/11
 164/25 165/23 166/11 175/18
 176/15 176/20 177/2 179/1
 184/11 187/19 190/17 196/18
 199/23 200/2 200/23 211/22
 211/24 217/2 230/11 231/13
 233/3 233/10
**timeline [1]**   82/15
**timeliness [1]**   161/8
**timely [3]**   19/21 162/5 221/18
**times [5]**   19/18 132/15 133/9
 138/24 176/1
**timing [1]**   159/8
**tipping [1]**   39/10
**title [2]**   79/3 79/5
**titles [2]**   78/24 79/6
**today [20]**   10/20 11/7 21/24
 34/9 37/3 45/15 48/2 48/18
 81/6 98/7 136/15 136/18
 142/10 186/14 186/22 190/15
 220/1 227/18 230/11 231/5
**together [2]**   15/6 68/1
**told [24]**   9/18 20/20 37/2
 49/7 134/11 134/20 140/21
 142/24 159/7 176/18 177/2
 177/9 179/7 179/10 179/15
 179/19 179/22 187/8 191/16
 208/2 208/5 217/9 224/16
 230/11
**tomorrow [3]**   58/20 58/20
 216/17
**too [3]**   51/7 54/16 188/3
**took [17]**   17/22 18/18 21/12
 67/20 68/4 124/25 180/4 180/7
 189/20 189/22 191/1 191/1
 193/3 196/18 196/22 211/11
 230/21
**top [8]**   49/5 105/15 122/8
 144/8 144/10 147/23 148/1
 148/2
**total [3]**   37/16 126/1 138/12
**totaled [1]**   158/5
**tourism [1]**   89/20
**tourist [6]**   45/9 89/14 89/14
 89/17 89/23 90/9
**towards [2]**   182/6 192/19
**toxic [1]**   221/18
**track [1]**   148/23
**trail [3]**   131/5 196/2 196/4
**transaction [1]**   61/15
**transactions [2]**   2/24 66/3
**transcript [4]**   1/11 234/10
 234/11 234/12
**transfer [1]**   115/5
**transferred [1]**   192/24
**transmission [1]**   186/1
**treble [1]**   229/7
**trial [3]**   37/12 54/9 233/10
**Tribune [2]**   103/25 221/23

**tried [8]**   28/15 34/10 47/21
 209/12
**troubling [2]**   228/13 228/20
**true [10]**   42/9 73/18 103/6
 104/21 104/24 107/10 107/10
 108/21 205/14 234/10
**truth [6]**   104/12 104/14
 104/14 104/23 105/3 185/8
**truthful [2]**   166/9 230/20
**try [8]**   35/16 42/12 94/6
 132/11 143/20 145/10 198/6
 228/12
**trying [28]**   10/5 13/11 27/11
 33/2 36/21 42/6 48/8 48/9
 53/13 54/23 54/25 57/1 59/22
 59/23 88/11 94/4 94/5 96/25
 120/7 127/5 162/12 164/12
 177/12 177/13 198/4 217/3
 223/25 231/12
**turn [5]**   30/21 105/15 122/1
 128/12 159/3
**turned [2]**   121/24 194/17
**turns [1]**   232/7
**TV [1]**   170/6
**Twelve [1]**   27/18
**two [34]**   11/12 14/17 23/6
 39/14 44/12 49/12 56/7 85/2
 85/24 85/24 97/19 112/24
 124/10 124/13 126/1 127/4
 131/17 143/9 144/7 162/3
 176/23 179/4 182/25 191/2
 191/14 194/14 196/22 203/25
 204/9 206/13 208/1 226/2
 226/5 230/12
**two-part [1]**   204/9
**twofold [1]**   208/23
**type [8]**   64/16 66/11 74/21
 79/1 87/11 185/16 198/10
 203/24
**types [1]**   186/19
**typical [2]**   9/23 106/1
**typically [4]**   133/12 160/24
 162/24 163/5

**U**

**U.S [1]**   1/21
**Uh [14]**   74/13 78/6 79/19
 80/22 83/4 93/1 99/25 100/16
 114/20 123/2 151/10 159/25
 200/4 202/16
**Uh-huh [14]**   74/13 78/6 79/19
 80/22 83/4 93/1 99/25 100/16
 114/20 123/2 151/10 159/25
 200/4 202/16
**ultimate [2]**   71/25 72/3
**ultimately [6]**   13/13 37/10
 76/9 108/18 110/1 155/9
**umbrella [1]**   163/16
**unable [2]**   30/9 161/21
**uncommon [1]**   212/5
**under [39]**   9/23 10/11 12/1
 28/6 33/7 35/21 35/22 36/17
 39/1 61/5 62/18 79/11 80/4
 91/18 93/4 93/6 93/11 97/3
 97/15 102/8 102/10 106/14
 106/15 106/20 113/4 120/3
 161/17 162/11 162/23 163/1
 164/3 209/3 214/3 217/12
 221/25 223/13 227/22 231/6
 232/17
**undercut [1]**   230/8
**underlying [1]**   43/11

**understand [45]**   20/17 20/19
 56/22 66/4 69/18 71/21 76/10
 83/18 83/22 88/7 96/2 96/10
 96/11 97/10 100/24 111/2
 118/13 149/10 164/5 168/14
 181/12 186/8 193/2 195/18
 198/4 198/18 199/5 203/6
 203/22 209/23 209/25 210/9
 210/17 210/18 210/25 211/1
 212/8 213/10 230/17 231/20
**understandably [1]**   230/25
**understanding [20]**   12/20 79/11
 92/23 95/6 97/2 110/25 111/12
 117/17 118/3 118/16 118/19
 118/23 205/25 206/3 206/4
 208/19 209/19 213/1 214/3
 232/19
**understood [13]**   8/9 9/6 22/18
 34/5 34/7 34/7 57/2 111/5
 157/4 168/11 180/14 205/17
 217/9
**undertake [1]**   161/14
**underway [1]**   102/6
**unfamiliar [2]**   193/21 193/23
**unfortunately [4]**   16/8 31/1
 130/8 137/1
**unfounded [1]**   231/21
**unfulfilled [1]**   18/23
**unique [10]**   12/20 39/16 40/20
 40/25 41/6 41/9 42/9 42/18
 45/17 228/17
**uniqueness [2]**   41/10 42/4
**Unit [1]**   138/5
**UNITED [4]**   1/1 1/12 234/1
 234/6
**unless [8]**   9/25 12/17 56/18
 73/8 171/25 184/2 197/11
 209/2
**unlikely [3]**   148/13 148/16
 149/3
**unpaid [1]**   29/3
**unquote [3]**   108/15 108/16
 150/18
**unsealed [6]**   75/11 75/12
 75/15 75/25 225/14 225/16
**unsolvable [1]**   43/1
**until [17]**   84/4 119/7 168/25
 181/12 191/15 193/8 193/25
 200/1 200/23 202/3 206/17
 206/21 207/5 207/10 207/14
 207/23 224/21
**unusual [1]**   160/22
**up [59]**   9/7 12/13 13/13 13/13
 20/8 20/12 22/1 32/7 43/23
 45/15 47/21 54/4 54/10 69/1
 69/23 80/19 84/15 85/4 85/9
 87/20 87/21 95/1 95/2 97/4
 101/25 102/12 114/18 114/19
 117/6 118/18 118/25 122/4
 124/3 127/23 139/15 142/5
 154/14 154/17 154/19 154/25
 164/5 165/21 177/1 187/19
 191/25 195/13 196/18 201/14
 203/5 208/7 212/15 213/4
 216/15 216/17 217/18 218/17
 218/21 225/1 225/3
**updated [1]**   190/16
**upon [3]**   5/9 23/9 210/14
**ups [1]**   127/23
**upset [1]**   186/15
**us [49]**   1/15 8/24 19/18 19/19
 23/21 26/21 30/22 31/17 46/1

**U**

**us... [40]**   46/8 46/15 59/3
76/22 86/5 86/14 133/20
142/25 148/13 158/22 168/23
176/18 176/18 178/1
179/10 179/14 179/15 179/18
179/19 179/19 179/22 189/7
189/8 198/13 201/10 204/11
206/16 206/19 209/11 209/13
211/11 211/24 212/19 217/3
220/18 220/19 230/11 230/14
231/11
**use [6]**   16/8 50/11 59/12
106/24 188/6 192/20
**used [4]**   97/7 212/5 216/12
216/24
**useful [4]**   21/8 22/23 117/19
127/9
**uses [1]**   148/22
**using [5]**   11/25 97/14 105/25
183/17 211/2
**usual [1]**   217/1
**utilizes [1]**   189/10

**V**

**vacuum [1]**   7/24
**vague [3]**   36/1 39/21 39/21
**value [4]**   124/18 125/12
158/10 162/3
**various [6]**   5/12 46/12 137/9
143/8 170/17 233/14
**Vegas [3]**   206/18 206/20
206/21
**vehicle [3]**   108/17 109/25
110/4
**vendor [5]**   140/24 141/1 161/8
161/8 172/9
**vendors [13]**   18/22 47/3 139/5
139/8 140/13 140/25 156/21
156/25 157/5 157/7 157/8
157/23 160/22
**verbal [1]**   76/6
**verification [1]**   123/16
**verified [2]**   49/16 49/17
**verify [1]**   26/9
**very [40]**   5/23 10/16 11/1
27/2 28/18 35/18 43/6 55/25
71/3 71/18 83/16 87/14 87/21
88/10 89/20 100/3 120/5
124/16 129/1 134/23 135/1
142/5 158/21 158/21 161/18
162/3 179/14 184/11 187/16
187/20 194/13 199/4 203/11
209/15 209/22 216/25 219/25
223/10 229/3 231/5
**via [2]**   140/9 165/10
**view [3]**   46/20 95/25 220/13
**viewing [2]**   100/22 127/3
**voiced [1]**   198/11
**voted [1]**   233/9

**W**

**w/Check [1]**   3/9
**wait [11]**   88/11 123/19 126/23
134/21 147/9 154/15 175/16
177/11 178/12 213/19 225/18
**waited [4]**   38/7 134/20 177/20
224/25
**waiting [4]**   124/10 124/14
143/15 144/22
**waiver [1]**   37/12
**waiving [1]**   22/22
**walk [1]**   90/22

**walking [1]**   30/21
**want [88]**   1/10 6/2 6/7 7/22
8/2 8/2 9/10 11/11 11/11
11/12 11/17 13/14 15/20 16/9
19/13 19/14 24/10 25/25 27/5
28/15 40/6 40/22 41/5 41/21
42/10 47/4 47/19 48/5 49/1
51/21 57/13 57/20 58/12 59/3
59/6 59/12 59/12 59/14 60/13
61/4 76/3 76/4 83/18 89/3
89/12 98/17 99/6 105/24
111/21 117/23 119/23 120/1
121/19 122/11 124/7 129/16
141/5 143/20 143/24 145/12
147/14 148/20 148/24 158/8
159/12 161/1 168/1 168/12
169/24 174/21 178/11 184/4
185/8 185/9 197/10 197/12
198/9 198/22 200/10 204/5
212/8 216/16 216/16 216/17
217/8 219/16 226/22 230/5
**wanted [16]**   5/22 15/4 15/8
15/10 15/10 54/2 54/3 56/11
140/8 158/13 161/14 167/1
176/19 208/25 212/21 228/11
**wants [6]**   35/3 61/6 164/10
168/12 174/20 204/4
**warehouse [11]**   40/8 40/9
125/23 125/24 194/23 203/18
215/11 215/13 231/16 232/7
232/8
**warned [3]**   112/21 117/8 173/7
**warnings [2]**   112/19 117/1
**was [411]**
**wasn't [23]**   7/23 29/11 30/1
31/1 37/4 111/16 111/24
113/15 113/17 124/11 126/9
131/1 139/14 159/20 159/21
169/6 185/13 191/15 191/16
199/23 220/2 224/5 224/17
**waste [1]**   57/12
**Watching [1]**   170/6
**waving [1]**   160/7
**way [27]**   5/2 6/21 7/25 16/14
35/20 37/8 45/15 45/19 55/25
58/7 58/22 58/22 58/24 93/12
94/7 94/23 95/12 105/9 134/7
160/22 178/8 197/9 200/11
207/24 209/10 221/20 221/21
**ways [1]**   202/21
**we [386]**
**we'll [20]**   17/16 19/4 19/4
23/20 28/17 34/13 46/14 59/25
91/5 99/18 119/7 119/12 130/9
142/18 180/22 191/22 192/2
207/12 227/4 233/5
**we're [63]**   5/23 6/9 9/17
11/25 16/21 24/9 33/2 33/2
35/6 35/10 35/14 35/16 38/6
41/7 41/9 41/9 42/19 42/20
43/3 43/20 46/1 46/23 46/24
46/25 47/7 48/17 49/24 55/19
57/5 58/7 58/18 60/18 81/19
83/15 85/12 88/9 88/11 92/25
99/6 114/21 119/6 125/8 130/8
133/21 136/14 143/15 158/7
161/11 162/10 162/12 181/24
182/2 182/2 182/3 206/21
207/6 208/9 209/2 209/9
209/16 217/19 220/22 227/20
**we've [21]**   18/12 24/24 28/15
28/21 35/6 45/24 47/2 47/2
59/7 124/14 172/18 176/5

182/1 189/6 190/16 191/14
227/8
**wearing [1]**   30/17
**website [5]**   25/16 68/25
100/17 101/2 160/18
**week [10]**   9/16 9/19 9/22
26/17 88/5 88/12 132/5 191/12
200/1 227/20
**weekend [1]**   89/20
**weekly [1]**   72/24
**weeks [6]**   44/12 88/2 112/24
132/5 176/23 176/23
**weighs [1]**   221/1
**well [102]**   5/5 9/10 11/1 11/4
15/20 17/1 29/1 32/7 34/16
35/24 36/11 39/25 42/7 49/24
49/25 51/1 52/21 53/16 59/7
69/22 70/4 71/2 71/24 76/13
76/13 76/18 76/21 77/15 78/16
78/23 79/1 83/22 84/4 84/6
85/16 87/7 88/8 95/2 101/25
102/4 102/22 104/8 105/24
106/8 108/1 108/24 109/10
110/21 114/7 116/2 119/6
121/17 125/16 130/2 130/7
133/12 136/22 143/6 144/4
144/19 145/1 147/14 149/10
150/15 155/5 156/23 157/4
158/7 162/1 166/14 168/3
171/15 176/5 178/10 179/4
181/8 181/21 182/12 182/20
184/24 186/3 187/16 191/23
195/9 196/12 197/6 198/6
199/23 201/24 202/2 202/4
202/10 204/9 204/15 205/20
206/12 210/4 220/10 222/18
223/25 225/1 231/4
**well-said [1]**   187/16
**went [17]**   6/16 18/22 19/3
49/4 139/4 153/9 176/16
179/18 184/24 190/6 193/4
193/8 201/13 201/21 201/24
202/14 209/14
**were [190]**   7/5 7/9 12/23
12/24 13/2 16/19 18/5 20/12
20/20 24/18 24/18 24/19 24/21
25/6 25/14 26/8 26/9 26/10
26/19 30/9 37/16 41/1 47/5
48/12 49/13 49/15 55/10 61/6
65/9 65/10 67/24 72/12 74/7
77/4 77/6 77/10 77/16 77/18
77/21 81/3 82/4 82/8 85/17
86/1 89/21 91/20 97/19 99/11
111/24 112/23 113/13 113/23
114/17 114/21 115/3 115/15
115/22 116/23 118/23 124/17
124/20 126/5 131/16 131/20
131/22 131/25 132/2 132/22
134/25 135/1 135/7 135/8
137/2 139/4 140/9 141/2 141/3
150/19 156/8 156/11 156/21
157/23 157/25 158/6 158/21
158/22 158/25 159/22 159/22
164/25 165/3 165/3 165/6
165/6 165/9 165/11 165/20
166/3 166/3 167/4 176/11
176/11 176/15 176/18 176/23
176/24 177/12 177/12 177/15
178/17 178/22 178/23 178/25
179/10 179/14 179/14 179/17
179/23 180/9 180/12 180/21
181/13 181/16 181/19 184/15

**W**

**were...** [65]   184/25 185/3
186/15 191/17 192/22 193/9
193/12 193/14 195/17 196/20
198/11 199/3 200/9 200/17
200/20 201/2 201/3 201/12
202/7 203/17 204/13 205/5
205/8 205/11 205/25 206/8
206/8 207/11 207/15 208/8
209/3 209/4 209/5 209/6
209/20 210/3 210/12 211/3
211/9 211/21 211/25 211/25
212/14 214/3 216/22 216/23
217/2 217/12 218/3 220/3
222/3 223/25 224/6 230/3
230/4 230/7 230/17 230/20
231/12 231/12 231/22 231/23
231/24 232/8 233/8
**weren't** [13]   55/12 113/18
114/14 115/1 115/20 127/23
165/15 177/2 177/17 177/21
202/3 228/10 230/19
**what** [294]
**what's** [31]   7/7 18/21 22/1
36/14 44/18 61/4 61/5 61/14
66/6 67/17 70/3 76/13 87/17
96/23 99/23 117/13 122/25
123/13 124/7 127/16 130/9
133/6 138/25 146/15 147/2
152/6 184/8 195/2 197/18
218/15 231/23
**whatever** [16]   7/18 19/5 46/6
46/15 58/5 58/9 76/8 123/15
133/21 142/19 157/19 177/8
179/15 180/22 209/5 230/21
**whatsoever** [1]   94/24
**when** [123]   9/3 14/16 18/16
20/6 28/18 30/5 30/20 30/21
30/21 35/22 36/10 37/19 37/20
39/18 41/21 44/20 45/3 45/4
47/18 50/21 61/3 80/16 82/8
82/11 82/16 82/18 82/19 86/25
87/1 87/23 88/18 89/17 90/16
105/25 106/5 113/1 113/24
115/5 115/9 115/10 115/15
115/22 116/8 116/14 123/17
123/18 123/18 124/17 126/10
131/24 133/11 134/10 139/9
140/5 140/16 140/18 141/13
141/18 142/25 143/15 145/25
156/22 159/10 159/20 160/25
162/24 163/8 165/13 166/11
166/14 166/17 171/11 175/14
176/1 176/15 176/21 178/24
180/23 183/1 185/12 185/25
186/9 187/14 187/18 189/13
189/15 189/24 190/3 190/5
190/8 190/11 190/22 191/7
192/25 197/7 199/14 199/25
200/24 201/5 201/6 202/2
204/10 204/21 208/2 208/3
208/4 208/7 208/11 209/1
211/10 211/20 212/7 212/9
213/6 214/2 214/6 216/22
224/16 224/21 224/22 226/2
226/4 228/24
**When's** [1]   177/2
**whenever** [1]   174/18
**where** [58]   8/22 14/21 18/24
22/2 24/17 24/19 33/1 35/14
37/19 39/5 39/7 42/1 43/20
43/24 44/2 45/25 48/13 65/11

77/25 79/5 84/23 91/2 92/6
122/1 125/3 127/4 131/22
132/12 132/15 133/24 137/19
137/21 138/5 150/2 150/16
161/1 168/15 178/25 178/25
194/21 195/11 197/18 197/18
198/11 199/10 205/16 212/18
222/8 223/13 224/6 231/22
231/23 231/25
**WHEREOF** [1]   234/14
**wherewithal** [1]   43/5
**whether** [47]   11/8 12/5 13/6
13/7 21/18 22/2 28/23 33/2
35/17 37/9 43/8 45/6 46/20
72/14 75/24 85/19 91/13 91/15
91/20 91/22 94/3 95/2 95/12
96/11 96/22 96/23 104/20
104/24 107/12 107/12 107/13
107/14 111/24 116/19 116/21
127/12 135/4 163/2 167/8
195/23 205/18 206/1 220/24
229/12 229/17 232/11 232/13
**which** [142]   5/6 6/16 7/3 10/1
11/5 12/22 13/17 18/15 18/20
19/10 19/13 20/4 21/11 23/9
24/17 24/24 25/7 25/18 26/14
26/17 27/4 28/1 28/20 30/10
31/6 31/20 32/14 33/5 33/22
36/20 41/3 41/18 42/19 44/13
46/12 46/16 49/9 49/11 49/25
50/13 50/23 50/25 51/6 51/7
51/13 51/16 51/20 52/11 52/16
53/1 53/18 53/23 54/1 54/1
54/16 55/2 55/4 55/19 57/13
60/23 61/10 63/12 64/3 64/13
65/4 65/8 65/24 67/8 68/15
71/24 75/18 78/15 79/17 83/20
84/3 85/12 91/17 98/25 99/11
100/1 110/11 112/21 113/3
121/13 124/10 124/18 128/8
133/2 133/15 134/9 135/22
136/24 137/4 142/7 142/14
144/8 145/4 145/9 145/16
146/16 151/2 151/21 158/5
166/25 170/21 171/7 171/7
172/6 172/24 173/4 174/6
174/22 174/23 181/6 181/23
186/17 187/25 189/5 192/17
194/4 194/8 194/9 201/11
201/19 204/25 212/4 212/10
212/20 216/9 220/20 221/9
221/14 223/10 225/7 225/23
226/11 227/15 229/21 230/15
231/5 233/10 233/14
**while** [7]   60/2 60/14 139/15
143/15 191/22 191/24 194/14
**whispered** [1]   40/4
**white** [15]   25/18 25/19 100/17
100/20 101/5 125/15 125/22
160/13 160/13 160/20 215/25
217/3 217/3 217/5 217/5
**white-on-white** [2]   217/3 217/5
**who** [62]   4/15 4/22 21/4 21/9
27/9 27/10 28/13 29/7 31/13
31/24 39/20 67/20 68/4 68/5
70/12 70/14 70/17 71/4 71/6
73/22 97/23 98/2 98/12 102/8
105/18 108/16 109/1 109/2
109/11 109/20 110/14 110/24
111/11 136/20 140/8 154/21
155/2 155/9 160/1 163/11
168/1 168/10 184/17 185/20

186/20 186/25 187/13 188/24
201/1 204/8 204/715 204/24
223/23 224/2 224/24 225/21
231/1 231/24
**who's** [3]   27/10 167/25 223/20
**whoever** [2]   74/24 169/24
**whole** [28]   19/14 24/9 29/6
29/6 34/19 41/2 46/20 46/23
46/25 47/3 54/24 77/9 95/9
95/10 96/9 96/24 97/1 97/5
143/5 149/6 160/7 167/4 197/6
197/8 198/8 209/5 225/25
230/1
**whom** [1]   5/10
**whose** [2]   31/25 143/17
**why** [41]   12/21 32/18 34/4
34/10 35/9 35/10 35/15 38/4
47/10 48/8 54/1 54/1 58/21
61/10 90/5 126/5 127/22
134/23 135/21 140/24 141/9
158/2 176/2 176/14 177/11
177/25 178/13 185/5 185/6
190/7 196/17 197/9 202/2
202/5 202/11 203/20 205/8
209/17 218/8 222/9 228/18
**will** [84]   5/6 8/7 8/10 9/23
10/24 11/1 12/4 14/13 14/25
17/6 17/24 18/13 22/14 25/25
27/14 27/14 27/15 28/11 28/17
31/6 35/22 36/4 36/8 37/22
38/20 46/15 52/1 58/10 58/18
58/19 62/9 63/5 65/1 65/15
65/21 66/15 68/10 69/5 87/12
87/12 87/21 93/22 94/3 97/14
97/15 104/5 104/24 122/21
126/6 128/19 128/24 142/9
142/13 143/3 144/16 144/17
146/10 146/19 149/15 152/23
152/24 172/2 173/21 175/14
182/5 187/14 189/2 189/3
190/16 203/21 204/4 204/22
204/22 207/5 220/11 221/14
221/15 221/24 223/21 226/25
227/13 227/15 229/2 232/22
**Williams** [1]   201/22
**willing** [4]   13/4 34/16 130/9
130/9
**Winder** [1]   172/9
**winter** [2]   44/21 44/22
**wire** [2]   31/17 31/19
**wire/check** [1]   31/17
**wise** [1]   139/15
**wit** [1]   59/14
**withdrawn** [2]   52/9 52/16
**within** [7]   35/1 96/18 133/17
152/23 154/13 154/13 200/22
**without** [8]   99/17 147/15
153/10 153/12 153/13 153/14
172/10 183/7
**witness** [23]   17/12 48/6 57/20
60/2 60/4 60/11 108/10 119/3
119/8 120/2 128/7 130/17
139/15 142/8 142/8 154/5
169/11 169/17 170/4 183/24
192/10 219/16 234/14
**witnesses** [5]   12/3 169/19
169/23 232/21 232/21
**witnesses'** [1]   97/1
**won't** [2]   37/24 159/13
**wondering** [1]   39/25
**word** [4]   17/22 97/14 141/24
211/1

**W**

**words [3]** 148/22 165/19 215/25

**work [27]** 27/20 27/23 27/24 34/10 46/19 66/24 77/25 79/1 79/3 79/4 79/4 92/19 92/20 93/10 107/25 109/8 116/16 116/22 162/11 162/21 164/6 164/18 164/22 207/17 208/9 224/3 228/12

**worked [8]** 69/13 69/15 78/1 78/12 78/18 86/2 86/5 86/7

**working [11]** 77/25 78/12 78/16 78/16 78/23 113/17 114/14 114/24 115/1 115/2 115/3

**workmanship [5]** 107/1 107/4 107/16 107/19 162/2

**works [4]** 68/5 164/19 186/9 229/25

**world [3]** 86/19 101/22 206/19

**worried [1]** 165/15

**worse [1]** 28/12

**would [221]** 4/8 6/7 6/17 7/3 7/6 7/6 8/17 9/14 10/6 10/13 10/17 11/15 12/12 14/1 14/7 14/24 15/13 16/8 18/22 19/17 19/17 20/2 20/4 22/19 22/22 23/12 26/7 26/18 26/21 27/1 27/5 28/1 28/2 28/3 28/21 29/3 37/5 37/9 37/15 37/17 40/24 41/11 41/13 41/14 41/20 42/1 42/16 42/23 43/9 43/22 44/15 44/25 45/14 46/12 46/22 49/8 51/7 54/6 54/9 55/20 55/21 55/23 57/13 57/23 61/1 64/18 71/17 71/22 72/2 72/5 72/14 72/16 74/4 76/20 78/25 79/11 79/18 81/10 81/12 82/4 82/4 82/10 82/14 83/20 84/9 85/12 85/23 86/10 87/14 88/23 89/13 89/22 90/3 93/20 95/20 96/19 97/6 97/13 97/21 97/23 98/12 102/24 102/25 103/2 103/3 103/10 103/15 105/15 106/11 116/16 118/1 118/3 118/8 118/13 121/5 121/6 122/18 123/21 124/4 126/6 126/8 127/8 127/9 127/22 128/15 129/10 130/15 132/6 134/10 134/11 136/10 136/25 138/19 140/20 140/20 142/14 144/10 144/11 146/5 147/17 151/21 154/21 157/8 157/11 158/4 158/14 158/24 161/15 161/23 163/13 163/22 164/1 164/9 164/22 165/11 165/13 165/20 167/5 167/5 168/25 170/15 170/18 171/1 172/12 173/9 173/10 175/5 177/9 178/18 180/14 180/15 183/1 183/5 185/5 187/7 187/11 189/13 193/17 194/1 196/24 198/12 202/2 204/11 205/11 205/13 205/16 205/17 205/20 206/5 207/1 207/1 207/9 207/9 207/10 207/23 210/7 212/23 213/1 214/7 215/3 216/15 220/5 220/17 220/20 221/7 221/8 221/8 221/20 221/21 225/2 225/3 226/21 227/18 228/1 228/1 228/1 228/22

229/6 229/13 230/13 230/20 can't me't Hitbred on FLSD 25/13 25/20 32/3 48/19 72/14 72/18 142/24 158/10 158/11 159/8 181/8 215/3

**wrapping [1]** 43/23

**write [2]** 87/18 188/3

**writes [3]** 130/7 130/19 150/5

**writing [2]** 152/23 173/7

**written [7]** 50/22 66/25 143/10 143/11 146/9 220/1 226/23

**wrong [6]** 27/19 40/5 40/6 67/17 186/14 186/15

**wrote [4]** 31/14 139/5 165/14 165/16

**Wu [4]** 143/18 155/3 155/6 155/6

**Y**

**yawns [1]** 176/10

**yeah [31]** 15/3 16/7 77/2 81/15 88/21 90/3 90/5 101/1 102/10 102/14 102/17 110/3 110/19 114/2 114/18 115/25 116/20 122/9 123/5 126/20 130/20 138/7 144/1 152/10 157/13 159/10 161/16 171/17 174/17 188/14 195/9

**year [15]** 82/13 82/22 113/7 116/4 118/11 118/12 118/14 118/17 118/24 127/16 127/21 131/18 134/11 196/21 200/24

**years [18]** 69/16 69/17 78/16 87/15 87/19 113/24 114/1 114/9 114/11 114/16 114/17 114/18 114/19 161/3 176/4 194/14 196/22 227/25

**yes [219]** 4/18 7/1 7/12 8/17 9/1 10/3 15/2 15/12 15/16 15/23 15/25 17/1 17/18 17/19 21/1 22/21 30/18 36/6 40/13 40/16 41/19 45/23 49/15 49/20 50/14 51/3 51/19 51/23 52/3 54/15 55/6 55/14 60/13 62/6 62/14 62/24 63/9 63/19 66/10 67/13 68/8 69/3 69/20 70/2 71/5 71/14 71/16 74/6 75/1 75/3 76/3 76/5 77/13 78/11 78/14 78/19 79/1 81/13 82/10 83/11 83/13 84/9 88/25 90/15 92/13 93/15 93/19 95/19 95/21 97/22 99/17 100/3 100/7 102/20 103/1 103/4 103/13 105/5 105/17 108/3 110/16 111/13 111/23 113/13 115/4 115/17 116/23 117/20 119/19 119/21 120/16 120/23 121/4 121/8 121/17 121/24 122/17 122/18 123/8 123/12 123/24 126/24 128/2 129/21 129/22 130/18 132/20 133/9 134/7 134/15 134/17 136/3 136/13 137/7 137/16 137/17 139/12 139/22 139/24 140/2 140/15 140/24 141/6 145/15 146/2 146/7 146/9 146/24 147/5 147/8 147/23 148/2 150/1 150/14 151/18 152/4 153/1 153/3 153/17 153/19 155/1 157/15 157/18 157/22 157/24 158/18 160/4 160/9 160/12 160/18 161/4 161/6 161/9

161/20 163/17 163/24 164/11 166/10 166/16 167/7 167/13 168/7 169/5 169/5 169/7 169/13 172/17 173/9 173/14 173/20 173/23 175/19 176/7 178/16 180/17 183/13 183/15 185/7 187/20 187/23 188/5 191/11 191/21 192/15 193/5 194/20 195/9 200/16 200/19 201/4 203/12 203/20 206/9 208/2 208/18 212/3 212/4 212/12 213/5 213/9 213/12 214/1 214/5 214/10 214/15 214/24 215/2 215/7 215/12 215/14 216/14 217/11 217/14 218/2 231/2

**yesterday [6]** 6/3 6/7 15/8 32/6 87/25 219/25

**yet [10]** 5/25 26/15 29/25 44/12 56/25 124/24 126/4 167/24 186/5 223/5

**you [1143]**

**you run [1]** 70/6

**you'd [2]** 100/22 218/18

**you'll [11]** 20/8 20/12 59/2 60/1 121/23 129/17 129/17 132/14 142/19 158/8 233/14

**you're [81]** 17/9 30/21 40/1 42/6 43/7 46/24 52/5 53/4 55/3 55/4 58/8 60/3 60/14 69/18 83/12 83/19 83/19 87/12 88/19 89/14 92/24 96/11 96/12 96/22 96/23 98/15 100/5 100/25 101/4 102/13 104/13 104/14 104/19 105/25 120/3 126/25 127/1 127/3 127/3 127/4 128/2 130/9 135/22 137/12 145/12 145/25 147/3 151/18 152/8 155/4 163/9 163/21 164/9 169/14 171/9 171/11 179/5 179/6 181/12 183/13 183/17 184/2 184/16 188/6 189/15 189/22 190/1 191/24 197/19 198/16 199/8 210/19 211/2 213/12 218/21 219/19 219/21 219/21 225/25 228/24 229/14

**you've [23]** 14/16 34/15 49/16 50/21 50/22 77/12 79/10 89/4 94/7 94/12 94/15 94/18 95/14 103/6 132/19 155/16 191/14 210/22 225/8 225/20 225/20 225/20 230/6

**your [259]**

**yours [1]** 196/3

**yourself [3]** 90/14 103/6 151/8

**yvette [6]** 1/21 1/23 234/5 234/17 234/17 234/20

**Z**

**zero [1]** 206/17